## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | : Chapter 11 |
| KAISER ALUMINUM CORPORATION, et al., | : Case No. 02-10429 (JKF) |
| Debtors. | : Jointly Administered |
| | : |
| | : |
| | : |
| | : Related to D.I. 8008 and 8009 |
| | : |

### NOTICE OF APPEAL

Pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8001, creditor Law Debenture Trust Company of New York (**"LDTC"**), the Indenture Trustee[1] under an Indenture dated as of February 1, 1993 (the **"1993 Indenture"**), by and through its undersigned counsel, hereby gives notice of appeal to the United States District Court for the District of Delaware from the Order of the United States Bankruptcy Court for the District of Delaware (Fitzgerald, J.) entitled "Order Overruling Objections to Plan Confirmation by Law Debenture Trust Company of New York and by Liverpool Limited Partnership" [D.I. 8009] and the accompanying Memorandum of Decision [D.I. 8008] referenced therein, both dated and docketed December 22, 2005 (together, the **"Guaranty Decision"**).

LDTC has moved in the Bankruptcy Court for reconsideration of a portion of the Guaranty Decision overruling LDTC's objection to subordination of LDTC's fees and expenses (the **"Fee Objection"**)[2] and is awaiting the Bankruptcy Court's ruling on that motion.

The parties to the Guaranty Decision appealed from and the names and addresses of their respective attorneys are as follows:

---

[1]  LDTC is the successor indenture trustee to State Street Bank and Trust Company which was, in turn, the successor to First National Bank of Boston.

[2]  The Fee Objection is captioned: "Objection of Law Debenture Trust Company of New York to (I) Subordination of Indenture Trustee Fees and Expenses under (A) the Third Amended Joint Plan of Liquidation for Alpart Jamaica, Inc. and Kaiser Jamaica Corporation dated February 25, 2005, and (B) the Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation, and to (II) Proposed Settlement of 7 ¾% SWD Revenue Bond Dispute." [D.I. 6505].

Edward F. Houff, Esq.
c/o Lynn Stewart & Tammy Nero
Kaiser Aluminum Corporation
5847 San Felipe - Suite 2400
Houston, TX 77057
E-mail: lynn.stewart@kaiseral.com
E-mail: tammy.nero@kaiseral.com
**(Debtors)**

Gregory M. Gordon, Esq.
Daniel P. Winikka, Esq.
Nick Bowen, Esq.
Jones Day
2727 North Harwood St.
Dallas, TX 75201
E-mail: gmgordon@jonesday.com
E-mail: dpwinikka@jonesday.com
E-mail: nbowen@jonesday.com
**(Outside Counsel to Debtors)**

Daniel J. DeFranceschi, Esq.
Kimberly D. Newmarch, Esq.
Richards, Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
E-mail: defranceschi@rlf.com
E-mail: newmarch@rlf.com
**(Delaware Counsel to Debtors)**

Elizabeth J. Futrell, Esq.
Aimee M. Quirk, Esq.
Jones, Walker, Waechter, Poitevent, Carrère &
Denègre, L.L.P.
201 St. Charles Ave.
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 582-8011
E-mail: efutrell@joneswalker.com
**(Counsel for J.P. Morgan Trust Company,
National Association, Successor to Bank One
Trust Company, N.A., as Indenture Trustee)**

Lisa Beckerman, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP
590 Madison Avenue
New York, NY 10022
E-mail: lbeckerman@akingump.com
**(Outside Counsel to Official Committee of
Unsecured Creditors)**

Brian A. Kilmer, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP
1111 Louisiana - 44th Fl.
Houston, TX 77002
E-mail: bkilmer@akingump.com
**(Outside Counsel to Official Committee of
Unsecured Creditors)**

William P. Bowden, Esq.
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
E-mail: wbowden@ashby-geddes.com
**(Delaware Counsel to Official Committee
of Unsecured Creditors)**

Anthony Callaghan, Esq.
Gibbons, Del Deo, Dolan, Griffinger &
Vecchione
One River Front Plaza
Newark, NJ 07102
Telephone: (973) 596-4500
E-mail: acallaghan@gibbonslaw.com
**(Co-Counsel for Bear, Stearns & Co., Inc.,
Citadel Equity Fund Ltd. and Citadel
Credit Trading Ltd.)**

Michael B. Joseph, Esq.
Theodore J. Tacconelli, Esq.
Ferry, Joseph & Pearce, P.A.
824 Market St. - Suite 904
Wilmington, DE 19899
Telephone: (302) 575-1555
Facsimile: (302) 575-1714
E-mail: ttacconelli@ferryjoseph.com
       mjoseph@ferryjoseph.com
**(Counsel for U.S. Bank National Association, as Indenture Trustee)**

Clark T. Whitmore, Esq.
Alain M. Baudry, Esq.
Christina A. Smith, Esq.
Maslon, Edelman, Borman & Brand, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
Telephone: (612) 672-8335
Facsimile: (612) 642-8335
E-mail: alain.baudry@maslon.com
       clark.whitmore@maslon.com
**(Counsel for U.S. Bank National Association, as Indenture Trustee)**

Karen C. Bifferato, Esq.
Marc J. Phillips, Esq.
Connolly Bove Lodge & Hutz, LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Telephone: (302) 658-9141
Facsimile: (302) 658-5614
E-mail: kbifferato@cblh.com
       mphillips@cblh.com
**(Counsel for Ad Hoc Group of Senior Note Holders)**

George A. Davis, Esq.
Diane Harvey, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
E-mail: diane.harvey@weil.com
       george.davis@weil.com
**(Counsel for Ad Hoc Group of Senior Note Holders)**

Christine P. Hsu, Esq.
Weil, Gotshal & Manges LLP
1501 K Street NW - Suite 100
Washington, DC 20005
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
E-mail: Chsu@weil.com
**(Counsel for Ad Hoc Group of Senior Note Holders)**

Carl N. Kunz, III, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Ave. - 10th Fl.
Wilmington, DE 19801
Telephone: (302) 888-6811
Facsimile: (302) 571-1750
E-mail: ckunz@morrisjames.com
**(Counsel to Deutsche Bank Trust Company, National Association, as Successor Trustee for 9-7/8% Notes)**

Harold L. Kaplan, Esq.
Mark F. Hebbeln, Esq.
Gardner Carton & Douglas LLP
191 North Wacker Drive - Suite 3700
Chicago, IL 60606-1698
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
E-mail: hkaplan@gcd.com
E-mail: mhebbeln@gcd.com
**(Counsel to Deutsche Bank Trust Company, National Association, as Successor Trustee for 9-7/8% Notes)**

Kristin K. Going, Esq.
Gardner Carton & Douglas LLP
1301 K Street, N.W.
Suite 900, East Tower
Washington, DC 20005
Telephone: (202) 230-5177
Facsimile: (202) 230-5377
E-mail: kgoing@gcd.com
**(Counsel to Deutsche Bank Trust Company, National Association, as Successor Trustee for 9-7/8% Notes)**

Duane D. Werb, Esq.
Jennifer H. Unhoch, Esq.
Werb & Sullivan
300 Delaware Ave. - 13th Fl.
P.O. Box 25046
Wilmington, DE 19899
Telephone: (302) 652-1100
Facsimile: (302) 652-1111
E-mail: dwerb@werbsullivan.com
**(Co-Counsel for Bear, Stearns & Co., Inc.,
Citadel Equity Fund Ltd. and Citadel Credit
Trading Ltd.)**

Isaac M. Pachulski, Esq.
K. John Shaffer, Esq.
Stutman, Treister & Glatt, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788
**(Counsel to Liverpool)**

David J. Baldwin, Esq.
Laurie Selber Silverstein, Esq.
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE 19899-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
**(Counsel to Liverpool)**

Brad A. Berish, Esquire
Adelman & Gettleman, Ltd.
53 W. Jackson Boulevard
Suite 1050
Chicago, Illinois 60604
312-435-1050 telephone
312-435-1059 facsimile
**(Counsel to Allstate Insurance Company)**

Peter B. Ackerman, Esq.
Coudert Brothers LLP
333 South Hope Street
Los Angeles, CA 90071
**(Counsel to London Market Insurers)**

Jason J. DeJonker
McDermott, Will & Emery
227 W. Monroe St.
Suite 5400
Chicago, IL 60606
**(Counsel for CAN Mart Companies)**

Leonard P. Goldberger
WHITE AND WILLIAMS LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
Telephone: (215) 864-7000
Telecopier: (215) 864-7123
**(Counsel to Century Indemnity Company)**

James L. Eggeman, Esq.
Pension Benefit Guaranty Corporation
Office of General Counsel
1200 K Street, N.W., Suite 340
Washington, D.C. 20005-4026
Phone: 202-326-4020 (ext. 6833)
Fax: 202-326-4112
**(Counsel to Pension Benefit Guaranty
Corporation)**

Mark T Hurford
Campbell & Levine, LLC
800 King Street
Suite 300
Wilmington, DE 19801
302-426-1900
Fax : 302-426-9947
Email: cl@camlev.com
**(Counsel to Asbestos Creditors Committee)**

Sharon M Zieg
Donald Brown
Young, Conaway, Stargatt & Taylor
The Brandywine Bldg., 17th Floor
1000 West Street
PO Box 391
Wilmington, DE 19899
302-571-6600
Fax : 302-576-3350
Email: bankruptcy@ycst.com
**(Counsel to Asbestos Futures
Representative)**

David M. Klauder
Trial Attorney
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 fax machine
**(Office of the United States Trustee)**

Peter C. D'Apice
Stutzman, Bromberg, Esserman & Plifka
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689
Telephone: (214) 969-4900
Facsimile: (214) 969-4999
**(Counsel to Silica Future Claimants'
Representative)**

Marc S. Casarino
White and Williams LLP
824 N. Market St., Suite 902
PO Box 709
Wilmington, DE 19899-0709
Telephone: (302) 467-4520
**(Counsel to ACE Insurance Company)**

Richard Chesley
Jones Day
77 West Wacker Drive
Chicago, IL 60601
**(Outside Counsel to Debtors)**

Ronald E. Reinsel
CAPLIN & DRYSDALE
One Thomas Circle. N.W.
Washington, D.C. 20005
(202) 862-5000
(202) 429-3301 (fax)
**(Counsel to Personal Injury
Committee)**

Evans Wohlforth
David N. Crapo
Gibbons, Del Deo, Dolan, Griffinger &
Vecchione
One Riverfront Plaza
Newark, New Jersey 07102
**((Co-Counsel for Bear, Stearns & Co., Inc.,
Citadel Equity Fund Ltd. and Citadel
Credit Trading Ltd.)**

Dated:  January 3, 2006

LAW DEBENTURE TRUST COMPANY OF
NEW YORK

Francis A. Monaco, Jr. (#2078)
Joseph J. Bodnar (#2512)
MONZACK AND MONACO, P.A.
P.O. Box 2031
1201 North Orange Street, Suite 400
Wilmington, DE 19899-2031
Tel.     (302) 656-8162

and

Evan D. Flaschen (ct10660)
Gregory W. Nye (ct06028)
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT  06103-3178
Tel.     (860) 240-2700

*Special Counsel to*
*Law Debenture Trust Company of New York*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR DISTRICT OF DELAWARE**

IN RE:

Kaiser Aluminum Corporation, *et al.*          Bankruptcy No. 02-10429-JKF

          Debtor(s)                            Chapter 11

                                               **Related to Dkt. Nos. 6261, 6265, 6504, 6505,
                                               6508, 6520, 6546.**

**ORDER OVERRULING OBJECTIONS TO PLAN CONFIRMATION
BY LAW DEBENTURE TRUST COMPANY OF NEW YORK
AND BY LIVERPOOL LIMITED PARTNERSHIP**

    **AND NOW**, this **22nd** day of **December, 2005**, for the reasons set forth in the

foregoing Memorandum Opinion the objections to the joint plans of reorganization of Alpart

Jamaica, Inc., and Kaiser Jamaica Corporation, (plan at Dkt. No. 6261), and the joint plan of

Kaiser Alumina Australia Corporation, and Kaiser Finance Corporation, (plan at Dkt. No.

6265) filed on behalf of Law Debenture Trust Company of New York and the objections filed

on behalf of Liverpool Limited Partnership are **OVERRULED**.

    It is **FURTHER ORDERED** that if a motion for reconsideration is filed by Law

Debenture Trust Company of New York within ten days hereof with respect to the issue of its

fees and expenses, responses shall be filed by January 9 at 10 A.M. and argument on the

motion will be heard on January 10, 2006, at 10:00 a.m., Courtroom A, 54th Floor, U.S. Steel

Building, 600 Grant Street, Pittsburgh, Pennsylvania.

                      *Judith K. Fitzgerald*
                      Judith K. Fitzgerald
                      United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR DISTRICT OF DELAWARE

IN RE:

Kaiser Aluminum Corporation, *et al.*      Bankruptcy No. 02-10429-JKF

      Debtor(s)      Chapter 11

          **Related to Dkt. Nos. 6261, 6265, 6504, 6505, 6508, 6520, 6546.** *See Appendix A.*

Appearances of Counsel – *See Appendix B*

### MEMORANDUM OPINION[1]

    Before the court are objections filed by Law Debenture Trust Company of New York ("LDTC") and Liverpool Limited Partnership[2] to the confirmation of the Third Amended Joint Plans of Liquidation of four subsidiaries of Kaiser Aluminum Corporation ("KAC"): (1) the joint plan of Alpart Jamaica, Inc. ("AJI") and Kaiser Jamaica Corporation ("KJC"), (plan at Dkt. No. 6261), and (2) the joint plan of Kaiser Alumina Australia Corporation ("KAAC") and Kaiser Finance Corporation ("KFC"), (plan at Dkt. No. 6265). LDTC is the Indenture Trustee under an Indenture dated February 1, 1993 (the "1993 Indenture"). Kaiser Aluminum & Chemical Corporation ("KACC" or "the Company"), a subsidiary of KAC, is the issuer of the "1993 Notes" (also known as the $12^{3/4}\%$ Notes) and various debtor subsidiaries of KACC are guarantors of these Notes (the "Subsidiary Guarantors"). LDTC

---

[1] The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

[2] By agreement of the parties, an order confirming the liquidating plans was entered, reserving jurisdiction over these objections, which address entitlement to certain distributions under the plans.

1

objected to both joint plans with respect to subordination of the 1993 Note Guarantees to the 1994 Note Guarantees of the $9^{7/8}$% Senior Notes and the 1996 Note Guarantees of the $10^{7/8}$% Senior Notes.[3]

LDTC also filed an objection with respect to certain subordination issues raised by The Liverpool Limited Partnership (*see* Dkt. No. 6520) and an objection with respect to the joint plans' treatment of LDTC's fees and expenses and its claim for indemnification (*see* Dkt. No. 6506).[4]  The plan confirmation order was entered on December 20, 2005, so as to save the estate $4 million in certain taxes that would otherwise be due, but preserving these objections.[5]

---

[3]LDTC asserts that the plan proponents must commence an adversary proceeding in order to assert subordination.  Inasmuch as this is simply a dispute over the meaning of contract terms, no adversary proceeding is necessary.  To the extent an adversary is required, one was commenced at Adv. No. 04-55115 by the 1994/96 Indenture Trustee and the 1994/96 Ad Hoc Group of Senior Noteholders (U.S. National Bank Association and Ad Hoc Group of Senior Noteholders v. KACC, *et al.*).  The adversary complaint seeks a declaratory judgment that the 1994/96 Senior Notes and related guarantees are senior to the 1993 Senior Subordinated Notes.  The issue with respect to subordination is identical.  This Memorandum Opinion will resolve both LDTC's objection to the plans and the adversary.  The adversary was stayed until completion of the plan confirmation process by order dated April 18, 2005.  *See* Adv. 04-55115 at Dkt. No. 40.  Prosecution of the adversary will be mooted by this outcome.  An Order will be entered at the Adversary.

[4]LDTC also objected to Debtors' proposed settlement with the Parish of St. James, State of Louisiana, Solid Waste Disposal Revenue Bonds (the "$7^{3/4}$ % SWD Revenue Bonds") ("Gramercy Bonds").  *See* Motion . . . for an Order (A) Approving Settlement . . .", Dkt. No. 6290.  An order approving that settlement was entered on June 2, 2005, at Dkt. No. 6865.  *See also* Adv. 04-51165, Dkt. No. 70.  No appeal was taken from this order.

[5]LDTC filed an appeal from this court's order of January 24, 2005, Bankr. Dkt. No. 6006, which denied with prejudice LDTC's motion for reconsideration of a stay of its objection to certain proofs of claim filed by PBGC.  This appeal is pending in the District Court for the District of Delaware at case number 1:05-cv-00135-JJF and was consolidated with 1:05-cv-00136-JJF by order of the District Court dated May 3, 2005.  *See* 1:05-cv-
(continued...)

2

**Subordination of 1993 Note Guarantees**

The crux of the dispute is the interpretation of certain language in the 1993 Indenture

which Debtors contend subordinates the 1993 Notes and Guarantees in right of payment to

later incurred obligations of KACC that qualify as "Senior Indebtedness of the Company" in

accordance with the terms of the 1993 Indenture. *See* Trial Exh. D-4, 1993 Indenture, Section

3.01, at 36. There is also a dispute as to whether extrinsic evidence is admissible to explain

---

[5](...continued)

00136-JJF at Dkt. No. 8. Case #1:05-cv-00136 is an appeal of this court's order of January
24, 2005, at Bankr. Dkt. No. 6005, which approved a settlement between the Debtors and the
PBGC and dismissed LDTC's objection to the PBGC's proofs of claim. The PBGC filed an
appeal from the February 5, 2004, order entered by this court in the District Court for the
District of Delaware. *See* 1:04-cv-145. The District Court affirmed this court's order
approving distress termination of the Debtors' plans and authorizing a replacement plan. The
PBGC appealed to the Court of Appeals and that appeal is pending. *See* CA 05-2695.

LDTC also filed an Emergency motion to Stay Pending Appeal with respect to the
PBGC settlement. Dkt. No. 6464. We heard argument on that motion at the plan
confirmation hearing and indicated that if there had not been a ruling on the appeal by the
time a plan confirmation order issued we would address the stay issue. We did so at a hearing
on December 19, 2005. By way of background, at the April 27, 2005, hearing counsel for the
PBGC stated that a number of the settlement provisions had been implemented. *See* Tr.
4/27/05 at 100, Bankr. Dkt. No. 6857. During the December 19, 2005, hearing, Debtors'
counsel articulated the significant steps already taken to implement settlement. Other than
distribution on the PBGC's settled and reduced claim through the plans, all other steps
required by the settlement have been concluded, including, *inter alia,* Debtors' retention of
several pension plans and a $5 million contribution to same which cannot be recovered by the
estates, PBGC's assumption of the largest of Debtors' pension plans, etc. In addition, we
previously found that LDTC's objection on the ground that the settlement would affect the
source of its recovery on its claims was not an appropriate basis for staying the PBGC
settlement which we found was in the best interests of creditors and the estate. We reiterated
these finding at the December 19, 2005, hearing. A transcript of that hearing is not yet
available. Previously, we also held that LDTC did not have a substantive right on the merits
with respect to another creditor's (PBGC) claim, although it had a right to appear and be
heard, Tr. 1/.18/05 at 34-35, Bankr. Dkt. No. 6099, particularly because, if LDTC was
successful on appeal, PBGC would be subject to disgorgement, if applicable. In addition, at
the time the PBGC settlement was under consideration negotiation with respect to an
Intercreditor Settlement Agreement was also taking place. The two settlements were
interdependent and both have been approved.

3

the 1993 Indenture and a dispute as to what constitutes "extrinsic evidence" under applicable New York law.[6]

LDTC objects to confirmation of the joint plans asserting, *inter alia*, that the plans impermissibly subordinate payment of the 1993 Note Guarantees. In LDTC's view, the 1993 Note Guarantees rank equally with all other obligations of the Subsidiary Guarantors except those that are "Senior Indebtedness." Debtors and KACC dispute LDTC's contentions. Hearings on the confirmation of the plans were held on April 13, April 27, and May 2, 2005. The plan confirmation order was entered on December 20, 2005. Dkt. No. 7983.

### The 1993 Indenture

Article Three of the 1993 Indenture is entitled "Subordination of Notes" and constitutes an agreement to subordinate the 1993 Notes to those obligations of the Company that qualify as "Senior Indebtedness of the Company" to the extent and in the manner set forth in other provisions of Article Three. Trial Exh. D-4, 1993 Indenture, Section 3.01, at 36. Sections 3.02[7] and 3.03[8] describe events that trigger Section 3.01 subordination and the

---

[6]In addition, Liverpool Limited Partnership filed a motion to strike declarations of John T. La Due and Theodore Sands, among others. Dkt. No. 6497. To the extent that that motion is based on an argument that extrinsic evidence cannot be considered the motion is denied. For the reasons expressed hereafter, we find that extrinsic evidence that explains circumstances surrounding creation of the document is admissible. The deposition and declaration of Kenneth D. Gartrell was not admitted. At the hearing on April 27, 2005, the court ultimately concluded that they were irrelevant inasmuch as the testimony concerned how the bonds traded in 2004 based on pricing in 1993. Tr. 4/27/05, Dkt. No. 6857, at 193.

[7]Section 3.02 contains the "x clause," which provides that, under certain circumstances, subordinated noteholders will receive reorganization securities. The x clause is qualified, however, so that any such payments or distributions may not cause the Subordinated Notes or any Guarantees associated therewith to be treated in, *inter alia*, a "case or proceeding" "as part of the same class of claims as the Senior Indebtedness of (KACC) or

(continued...)

4

mechanics of effectuating the subordination once a triggering event occurs. *Id.* at 36-40.

Section 3.03 describes the mechanics of subordination if there is a nonbankruptcy default.

Unless one of the triggering events described in Sections 3.02 occurs, including the filing of

a bankruptcy petition, the Indenture prescribes that the 1993 Notes will not be subordinated.

Article Sixteen, entitled "Guarantee of Notes," concerns the 1993 Note Guarantees

rather than the Notes themselves. *Id.* at 103-14. The Subsidiary Guarantors, which include

the Subsidiary Debtors, issued these Guarantees. Section 16.01 sets forth operative terms and

---

[7](...continued)
any Subsidiary Guarantor that is a debtor in any such case, proceeding . . . ." The rest of this
section, in further pertinent part, provides:

> (a) the holders of all Senior Indebtedness . . . shall be entitled to
> receive payment in full . . . before the holders of the Notes or
> the Trustee on behalf of the noteholders shall be entitled to
> receive any direct or indirect payment or distribution on or with
> respect to the Notes . . . . provided, however, that payments or
> distributions pursuant to this parenthetical clause or any other
> reference in this Indenture to Reorganization Distributions shall
> be permitted only so long as such payments or distributions do
> not cause the Notes or any Guarantee to be treated in any case
> or proceeding or similar event . . . as part of the same class of
> claims as the Senior Indebtedness of the Company or any
> Subsidiary Guarantor that is a debtor in any such case,
> proceeding or similar event, or any class of claims on a parity
> with or senior to such Senior Indebtedness . . . .

Trial Exh. D-4 at Section 3.02(a) at 37.

[8]Section. 3.03, titled "Default on Senior Indebtedness," provides, in part:
> No direct or indirect payments or distributions by or on behalf
> of the Company on or with respect to the Notes, whether
> pursuant to the terms of the Notes, or upon acceleration or
> otherwise . . . other than Reorganization Distributions, shall be
> made if, at the time of such payment or distribution, there exists
> a default in the payment of all or any portion of any Senior
> Indebtedness of the Company . . . .

Trial Exh. D-4, 1993 Indenture at Section 3.03, at 39.

Section 16.02 constitutes the agreement by the Subsidiary Guarantors, the Trustee and the noteholders to subordinate the 1993 Note Guarantees "for the benefit of all present and future holders of Senior Indebtedness of each Subsidiary Guarantor" and is an agreement that all payments pursuant to the guarantees by the Subordinated Guarantors are "hereby expressly subordinated . . in right of payment to the prior payment in full . . . of all Senior Indebtedness of such Subsidiary Guarantor."[9]  Trial Exh. D-4 at 104.

The 1993 Note Guarantees are subordinated only to the "Senior Indebtedness" of each Subsidiary Guarantor and then only to the extent and manner set forth in the rest of Article Sixteen.  *Id.*  Section 16.03 provides that when there is direct or indirect payment or distribution of assets or securities of any Subsidiary Guarantor upon dissolution, liquidation or reorganization of a Subsidiary Guarantor, holders of Senior Indebtedness of the Subsidiary Guarantor shall be paid in full.  Section 16.04 provides that there will be no direct or indirect payments by or on behalf of any Subsidiary Guarantor or with respect to the Guarantee (other than Guarantor Reorganization Distributions) if there is default in payment of Senior Indebtedness of "such Subsidiary Guarantor."  *Id.* at 107.  Section 16.04 is inapplicable to any payment to which Section 16.03 applies.  *Id.* at 108.

_____

[9] "Subsidiary Guarantor" is defined as follows:

> The term . . . shall mean the Persons from time to time named as Subsidiary Guarantors in this Indenture or that become Subsidiary Guarantors hereunder, and each of their respective successors, provided, however, that in the event that a Subsidiary Guarantor is released form its Guarantee in accordance with the terms of this Indenture, such Subsidiary Guarantor shall without any further action no longer be a Subsidiary Guarantor for any purpose of this Indenture or the Notes.

Trial Exh. D-4 at 30.

6

The term "Senior Indebtedness" is defined in Article One at Section 1.01. *See* Appendix C. "Senior Indebtedness" refers to "the obligations" of "[any] Person under the Credit Agreement." *Id.* at 27-28. (The Credit Agreement referred to is that of 1989. *Id.* at 15.) Clause (ii) of the definition provides that other debt will also qualify as Senior Indebtedness if incurred from a bank or if a written notice to that effect is delivered by the Company to the 1993 Indenture Trustee when such debt is issued. The parties agree that the required Notices were delivered with respect to the 1994 and the 1996 Notes.[10]

Clause (ii)(A)(1) designates indebtedness "for money borrowed" as Senior Indebtedness. Clause (ii)(A)(5) is broader and provides that Senior Indebtedness includes all guarantees of "any indebtedness referred to in this clause (ii)(A) of any Subsidiary of such Person." *Id.* at 28. "[S]uch Person," under the definition of "Senior Indebtedness" means "any Person." *Id.* at 27. Further, Senior Indebtedness constitutes "(i)(A) the Obligations of such Person under the Credit Agreement . . . and (ii) to the extent . . . designated in writing by the Company as Senior Indebtedness in a notice to the Trustee . . . ." *Id.* at 28. The reference in (ii)(A)(5) is not limited to money borrowed as LDTC contends; rather, it renders all downstream guarantees of any indebtedness covered by clause (ii)(A) as Senior Indebtedness.

Section 3.01 of the 1993 Indenture provides:

> Agreement to subordinate. The Company, for itself, its
> successors and assigns, covenants and agrees, and the Trustee

_____

[10]At the hearing there was argument over the significance, if any, of capital "I" Indebtedness versus lower case "i" indebtedness. In light of the many instances in which "Indebtedness" is used and other places in the document in which "indebtedness" is used, we find that lower case "i" indebtedness is not a defined term. This view is illustrated not just by the contexts in which the two terms are used but by the fact that certain types of debt are excluded by the very terms of the definition of "Senior Indebtedness."

7

> and each holder of Notes, by his acceptance hereof, likewise
> covenants and agrees, for the benefit of all present, and future
> holders of Senior Indebtedness of the Company, that all direct
> and indirect payments or distributions on or with respect to the
> Notes, whether pursuant to the terms of the Notes or upon
> acceleration or otherwise . . ., is hereby expressly subordinated,
> to the extent and in the manner hereinafter set forth, in right of
> payment to the prior payment in full . . . of all Senior
> Indebtedness of the Company.

*Id.* at 18.

Section 3.01 of the 1993 Indenture is clear that the parties (KACC, the 1993 Indenture

Trustee and Subordinated Noteholders) agreed that all direct or indirect payments with

respect to the 1993 Notes could be subordinated to holders of indebtedness that did not exist

in 1993.  Section 3.01 provides that subordination will be "to the extent and in the manner

hereinafter set forth."  Falling under that proviso is an agreement by the holders of the

Subordinated Notes that, in the event that KACC filed bankruptcy, the noteholders would not

receive direct or indirect payments or distributions until holders of Senior Indebtedness of

KACC are paid in full.[11]

Section 16.02 contains provisions similar to Section 3.01 but with respect to

Subsidiary Guarantors.  That is, Subsidiary Guarantors, the Trustee and Subordinated

Noteholders agree "for the benefit of all present and future holders of Senior Indebtedness of

such Subsidiary Guarantors . . . that all payments pursuant to the Guarantee by such

Subsidiary Guarantor are hereby expressly subordinated to the extent and in the  manner

---

[11]Section 3.02 contains an "x clause," *see* note 7, *supra*, which permits limited
distributions in a reorganization proceeding as long as they do not cause the Subordinated
Notes or any Guarantee to be treated as part of the class of claims of the Senior Indebtedness
or any debtor Subsidiary Guarantor.  Such distribution may not occur inasmuch as there are
probably insufficient funds to accomplish it. Section 16.03 also contains an x-clause.

hereinafter set forth, in right of payment to the prior payment in full . . . of all Senior

Indebtedness of such Subsidiary Guarantor." *Id.*, Section 16.02 at 104.[12] As will be

illustrated below, it is clear from the documents, and the court finds, that the purpose of the

Indenture was to subordinate all payments with respect to the Subordinated Notes regardless

of source, including payments on the Subordinated Guarantees, to any "Senior Indebtedness"

of KACC or the Subsidiary Guarantors outstanding then or in the future.

The Guarantees of the Senior Notes under the 1993 Indenture were designated as

"Senior Indebtedness" of the Subsidiary Guarantors, pursuant to the terms of the 1993

Indenture, when the notices with respect to the 1994 and 1996 Indentures were sent. The

1994 Notice provided, in part, that:

> Reference is made to the Indenture, dated as of February 1,
> 1993, . . .
> This letter constitutes notice to the Trustee, as contemplated
> by the definition of the term "Senior Indebtedness" under the
> Indenture, that (i) the Company hereby designates the payment
> of the principal of, premium, if any, and interest on
> $225,000,000 aggregate principal amount of its $9^{7/8}$% Senior
> Notes . . . as "Senior Indebtedness" under the terms, and for all
> purposes, of the Indenture and (ii) each Subsidiary Guarantor
> hereby expressly designates the Guarantee (as defined in the
> Senior Note Indenture (as defined)) in respect of the payment of
> the principal of, premium, if any, and interest on the Senior
> Notes as "Senior Indebtedness" of such Subsidiary Guarantor
> under the terms, and for all purposes, of the Indenture. The
> Senior Notes have been issued, in an aggregate principal
> amount of $225,000,000, under an Indenture dated as of

---

[12]Section 5.05 provides that the Company is not required to continue the corporate
existence of any Subsidiary other than a Subsidiary Guarantor, as long as the subsidiary is a
Subsidiary Guarantor. However, Subsidiary Guarantors are permitted to merge or consolidate
with or into the Company, any other Subsidiary Guarantor, or "any other Person." Subsidiary
Guarantors are also permitted to transfer all or substantially all of their property to the
Company, any other Subsidiary Guarantor, or "any other Person." *Id.* at 51.

February 17, 1994 (the "Senior Note Indenture") . . ..

Trial Exh. D-14, Notice Dated February 17, 1994. Two notices were issued with respect to

the 1996 Indenture and are substantially similar in their content. The notice dated October

23, 1996, states:

> Notice is hereby given . . . that Senior Indebtedness, as
> defined in the Indenture, dated as of February 1, 1993,
> governing the Company's $12^{3/4}$ % Senior Subordinated Notes
> due 2003 . . . includes the principal of, premium, if any, and
> interest on the Company's $10^{7/8}$ % Senior Notes . . . and the
> related guarantees thereof . . . of each of the Subsidiary
> Guarantors under the 1996 Indenture . . . .
> . . . . The principal of, premium, if any, and interest on the
> $9^{7/8}$ % Senior Notes . . . and the related guarantees thereof of
> each of the Subsidiary Guarantors under the 1994 Indenture
> also constitute Senior Indebtedness, as defined in the 1993
> Indenture. The Subsidiary Guarantors under the 1994 Indenture
> are the same as the Subsidiary Guarantors under the 1996
> Indenture.

Trial Exh. D-12, Letter of October 13, 1996. *See also* Trial Exh. D-13, Letter of December

23, 1996.

It is LDTC's position that Senior Indebtedness includes only "money borrowed" and,

therefore, because the subsidiaries did not themselves borrow, the Subsidiary Guarantees

cannot be Senior Indebtedness. However, clause (ii) of the definition provides that

"Obligations"[13] shall constitute Senior Indebtedness when, *inter alia*, so designated in writing

---

[13]"Obligations" is also a defined term and refers to "all obligations for principal" and
other financial commitments that arise under the 1989 Credit Agreement. Trial Exh. D-4 at
21. The term is broad enough to include guarantees. Further, because guarantors promise to
pay the obligor's debt, guarantors are liable for payment of the principal and interest, etc., on
the obligor's debt. LDTC and Liverpool argue that a guarantee cannot fall within the
definition of "Senior Indebtedness" because it is not an "assumption of debt." Assumption of
debt is the function of a guarantee. A guarantee <u>is</u> a debt. *See, e.g., In re Gibralter*

(continued...)

10

by the Company. Trial Exh. D-4 at 28. This is what occurred when the 1994 and 1996

Notices were issued, as will be discussed below.

"Senior Indebtedness" is defined "with respect to any Person (whether heretofore

incurred or provided for or incurred after the date hereof)" and, *inter alia*, "to the extent . . .

designated in writing by the Company [KACC] as Senior Indebtedness in a notice to the

Trustee pursuant to the terms of this Indenture"[14] Trial Exh. D-4 at 27-28. The term includes

> (ii)(A)(1) the principal of, premium, if any, and interest on all
> indebtedness of such Person for money borrowed (including all
> such indebtedness evidenced by notes, debentures or other
> securities issued for money, whether issued or assumed by such
> Person)

*id.* at 28, as well as

> (D) all penalties, fees, premiums, expenses, reimbursements,
> indemnity obligations and all other monetary obligations of
> such Person in respect of any Indebtedness, obligation or
> guarantee described in [ii] . . .

*Id.* The definition of "Person" includes a corporation, *id.* at 25, and "Indebtedness" includes,

with respect to any "Person," "all Indebtedness of others guaranteed by such Person." *Id.* at

17, ¶ (f). The definition of "Senior Indebtedness" contains certain exclusions, none of which

are guarantees of KACC obligations by KACC subsidiaries. *Id.* at 29.

---

[13](...continued)
*Amusements, Ltd.*, 187 F.Supp. 931, 935 (E.D.N.Y. 1960), *affirmed* 291 F.2d 22 (2d Cir.),
*cert. denied* 368 U.S. 925 (1961)(liability on a guarantee is a non-contingent liquidated debt
provable in bankruptcy). The argument is devoid of merit.

[14]LDTC argues that the notices referred to cannot be admitted into evidence inasmuch
as they constitute extrinsic evidence violative of the parol evidence rule. We held at the
hearing that the notices are part and parcel of the Indentures and so overruled LDTC's
objection on this basis.

Reading the Indenture as a whole, it is abundantly clear that the hybrid financial structure of subordinated treatment of the Subordinated Notes at the parent level and *pari passu* treatment of the Subordinated Guarantees at the Subsidiary Guarantor level as suggested by LDTC was not created by the Indenture. The Indenture refers to the Subordinated Notes as subordinated. The Subordinated Notes themselves do so as well and further provide that their payment "is guaranteed on a senior subordinated basis by" these subsidiaries. *Id.* at 3. There is no reference therein that indicates that the Subordinated Guarantees are to be treated on a par with the Subsidiary Guarantors' guarantee of Senior Indebtedness of the Company.

Article Three is captioned "Subordination of Notes." Section 3.01 of the Indenture captioned "Agreement to subordinate" states that the Subordinated Note Indenture Trustee and each holder of the Subordinated Notes

> . . . covenants and agrees, for the benefit of all present and future holders of Senior Indebtedness of the Company, that all direct or indirect payments or distributions on or with respect to the Notes . . . is hereby expressly subordinated . . . in right of payment to the prior payment in full . . . of all Senior Indebtedness of the Company.".

*Id.* at 36.[15] Payments, whether pursuant to the terms of the Subordinated Notes or, *inter alia*, on account of a "Claim"[16] are "expressly subordinated, to the extent and in the manner

---

[15]With respect to Senior Indebtedness as defined in clause (i) of the same definition, the "prior payment in full" must be "in cash or Cash Equivalents." *See* Section 3.01 at 36. *See also* definition of "Senior Indebtedness" at 28.

[16]"Claim" is defined as "any claim against the Company *or any of its Subsidiaries* for rescission of the purchase of the Notes or for monetary damages from, or in connection with, the purchase of the notes, or for reimbursement or contribution on account of such a claim."

(continued...)

hereinafter set forth, in right of payment to the prior payment in full . . . of all Senior

Indebtedness of the Company." *Id.* at Section 3.01, at 36. Upon reorganization or

receivership, holders of Senior Indebtedness are entitled to be paid in full before holders of

the Subordinated Notes or the Subordinated Note Trustee on behalf of the noteholders can be

paid directly or indirectly. *Id.* at Section 3.02 at 36-37.[17]

Article Sixteen, captioned "Guarantee of Notes," provides in Section 16.02 that each

of the Subsidiary Guarantors, the Subordinated Note Indenture Trustee, and each holder of

Subordinated Notes

> . . . covenants and agrees, for the benefit of all present and
> future holders of Senior Indebtedness of such Subsidiary
> Guarantor, that all payments pursuant to the Guarantee by such
> Subsidiary Guarantor are hereby expressly subordinated to the
> extent and in the manner hereinafter set forth, in right of
> payment to the prior payment in full . . . of all Senior
> Indebtedness of such Subsidiary Guarantor.

*Id.* at Section 16.02 at 104.[18] Under Section 16.03, holders of Senior Indebtedness are entitled

---

[16](...continued)
*Id.* at 12. (Emphasis added.)

[17]LDTC also argues that Section 3.01 (the specific section that provides that holders of Senior Indebtedness of the Company are entitled to payment in full before noteholders of the trustee receive any payment or distribution) applies only to direct or indirect payment or distribution of the Company's assets or securities. This is a misreading of Section 3.02 which provides simply that when the Company's assets or securities are distributed through, *inter alia*, bankruptcy, Senior Indebtedness is paid in full first. The Company, KACC, filed bankruptcy. That the Subordinated Noteholders are not to receive payment on their claims until Senior Indebtedness is paid in full is further clarified by Section 3.02 which contains an x-clause, applicable in a bankruptcy case, providing that the Subordinated Notes and Subordinated Guarantees cannot be in the same class of claims as Senior Indebtedness of the Company or the Subsidiary Guarantors that are debtors. *Id.* at Section 3.02(a), at 37.

[18]With respect to Senior Indebtedness as defined in clause (i) of the definition of same (at 28), the "prior payment in full" must be "in cash or Cash Equivalents." *See* Section 16.02
(continued...)

to payment in full first in the event of "dissolution, liquidation and reorganization" of a Subsidiary Guarantor. *Id.* That section also contains an x-clause permitting certain limited distributions in a reorganization proceeding on the same basis as provided in Section 3.02(a). *Id.* at 37, 104. Section 5.05 permits Subsidiary Guarantors to merge or consolidate with or into KACC or any other Subsidiary Guarantor or to transfer assets to any of them.[19] Article Sixteen tracks the language of Article Three for the most part, except that references in Article Three to "the Company" are replaced in Article Sixteen with references to "Subsidiary Guarantors." In other words, the Indenture contains two separate Articles – one with respect to subordination in connection with KACC's obligations on the Notes and the other in connection with its subsidiaries' guarantee of KACC's obligations on the Notes. Section 3.01 of Article Three and Section 16.02 of Article Sixteen refer to different groups: Section 3.01 to holders of Senior Indebtedness of KACC and Section 16.02 to holders of Senior Indebtedness of the Subsidiary Guarantors. Section 16.02 also provides that "all payments pursuant to the Guarantee by such Subsidiary Guarantor are expressly subordinated . . . in right of payment to the prior payment in full of . . . Senior Indebtedness."

Moreover, as will be discussed below, the 1994 Notice specifically provided that each

___

[18](...continued)
at 104.

[19]  Section 16.03(c) also provides that consolidation of any Subsidiary Guarantor with, or the merger of any Subsidiary Guarantor into, another corporation or the liquidation or dissolution of any Subsidiary Guarantor following a sale or conveyance of all or substantially all of its assets "shall not be deemed a . . . reorganization" of the Subsidiary Guarantor for purposes of Article Sixteen if that other corporation complies with Section 16.12 as part of the merger or conveyance. Section 16.12 provides for, *inter alia*, assumption of certain obligations under the Indenture and contains net worth requirements, depending on the circumstances.

14

Subsidiary Guarantor expressly designated the Guarantee as Senior Indebtedness of the Subsidiary Guarantor. Trial Exh. D-14. There is, therefore, no merit to LDTC's attack on the provisions of the Indenture.

## Extrinsic Evidence

LDTC also argues that extrinsic evidence should not be admitted inasmuch as the 1993 Indenture is clear and unambiguous on its face. As part of this argument LDTC asserts that the prospectuses with respect to the 1993, 1994 and 1996 Indentures are irrelevant. However, this court ruled at trial that the prospectuses and the Notices issued regarding the various Indentures were admissible, at least insofar as they provide historical context for the dispute. The 1989 Credit Agreement was admitted for the same limited purpose. The Notices with respect to the 1994 and 1996 Indentures were admitted on the same basis.

With respect to admission into evidence of the declarations and depositions of John La Duc, Theodore Sands, and Martin Balsam, we overrule the objections, inasmuch as the testimony describes the circumstances and purpose to be served by the documents.[20] Their testimony does not contradict the documents themselves. Under New York law, a court construing language of a contract "should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000), quoting

---

[20]At trial the depositions and declarations were conditionally admitted on this basis and insofar as they served to explain the surrounding circumstances concerning the 1993 Indenture. *See also* note 21, *infra*. We also admitted, on the same basis, prospectuses for the 1993 (Trial Exh. D-5), 1994 (Trial Exh. D-7), and 1996 Notes (Trial Exhs. D-9, D-11) and the 1994 (Trial Exh. D-6) and 1996 Indentures (Trial Exhs. D-8, D-10), and the 1989 Credit Agreement (Trial Exh. D-15). Other exhibits also were conditionally admitted on the same bases. We now admit these documents for the stated purpose.

15

*William C. Atwater & Co. v. Panama R. Co.*, 159 N.E. 418, 419 (N.Y. 1927). That is, the contract must be interpreted to give effect to the parties' intent as expressed in the contract itself. *Id.* Under New York law "[t]he parol evidence rule does not apply when the evidence sought to be introduced does not contradict the express terms of the written agreement in question." *See, e.g., In re Thomson McKinnon Securities, Inc.*, 139 B.R. 267, 273 (S.D.N.Y. 1992), citing *Marine Midland Bank-Southern v. Thurlow*, 425 N.E.2d 805, 808 (N.Y. 1981). The evidence that was offered at trial in this matter did not contradict the plain language of the 1993 Indenture but rather served to explain it and the context in which it was formulated.

New York law further provides that "[c]ontracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions, without regard to the surrounding circumstances, or the apparent purpose which the parties sought to accomplish." *Robertson v. Ongley Electric Co.*, 40 N. E. 390, 391 (N.Y. 1895), cited in *William C. Atwater & Co. v. Panama R. Co.*, 159 N.E. 418 (N.Y. 1927). That principle is still applied as New York law. *See In re Estate of Stravinsky*, 770 N.Y.S.2d 40, 45 (N.Y. App. Dist. 1st Dept.), *affirmed* 2003 WL 23028345 (N.Y. App. Dist. 1st Dept. 2003); *South Road Associates, LLC v. International Business Machines Corp.*, 770 N.Y.S.2d 126, 130 (N.Y. App. Dist. 2d Dept., 2003), *affirmed* 826 N.E.2d 806 (N.Y. 2005).

New York law, which the parties agree controls, permits extrinsic evidence to the extent it is of circumstances surrounding formation of a contract when that evidence explains the contract and does not contradict the plain meaning of the document. The ambiguity of a document is determined by looking only within its four corners. *See, e.g., Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998). All agree that the 1993 Indenture is unambiguous. The

16

evidence admitted here merely is explanatory and so is admissible. *See William C. Atwater &*

*Co., Inc. v. Panama R. Co.*, 159 N.E. 418 (N.Y. 1927). *See also Eternity Global Master Fund*

*Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004).

In *Atwater* the court said:

> Contracts are not to be interpreted by giving a strict and rigid
> meaning to general words or expressions without regard to the
> surrounding circumstances or the apparent purpose which the
> parties sought to accomplish. . . .   The court should examine
> the entire contract and consider the relation of the parties and
> the circumstances under which it was executed. Particular
> words should be considered, not as if isolated from the context,
> but in the light of the obligation as a whole and the intention of
> the parties as manifested thereby.

*Atwater, supra,* 246 N.Y. at 524.  New York law remains consistent with the pronouncement

in *Atwater. See, e.g., Sargent v. Halsey,* 348 N.Y.S.2d 661, 664 (N.Y.S. 1973), *affirmed* 348

N.Y.S.2d 160 (N.Y. App. Dist. 2d Dept. 1973); citing *Wack v. Wack,* 74 N.Y.S.2d 435, 437

(N.Y.S. 1947)("[t]o interpret the meaning of the agreement, at the time and place it was made,

all the surrounding circumstances at that time necessarily throw light upon it, and this rule

applies to an unambiguous writing as to an ambiguous one"). "[T]he parol evidence rule does

not prevent the introduction of extrinsic evidence to aid in interpretation of the contract. The

rule excludes 'only evidence of prior understandings and negotiations which contradicts the

unambiguous meaning of a writing which *completely* and *accurately* integrates the agreement

of the parties.'" *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir. 1988)

(emphasis in original) (citation omitted).

To the extent that deposition testimony and declarations of John La Duc, Theodore

Sands and Martin Balsam are consistent with the language of the Indentures and serve to

17

explain the circumstances surrounding the 1993 Indenture, they are admissible.[21] This
testimony is likewise consistent with Debtors' interpretation of the subordinated debt
structure. Furthermore, the parties do not dispute that for the past ten years trading has been
conducted in a manner consistent with the Debtors' interpretation which is supported by the
structure under which the obligations were created.

The video deposition of Theodore Sands of March 17, 2005, Trial Exh. 2, is credible
and particularly illustrative. At the time of the 1993, 1994, and 1996 Indentures Mr. Sands
was employed by Merrill Lynch Capital Markets,[22] the lead underwriter on several issues of
both stocks and bonds for the Kaiser Group and as to the public debt offerings represented by
the 1993, 1994 and 1996 Notes. He was the senior investment banker with respect to these
offerings and Merrill Lynch, as the lead underwriter, had the primary responsibility for due
diligence and negotiation of the indenture as well as for the marketing of the issues.

Mr. Sands testified that Kaiser's structure was somewhat complicated. Kaiser
Aluminum Corporation ("KAC") issued equity securities and KACC (the Company) was a

---

[21]The court had conditionally admitted deposition testimony at the hearing on April
27, 2005. We find that, because the testimony therein merely explains and does not alter the
clear language of the 1993 Indenture, the deposition testimony is properly admitted.
Furthermore, deposition testimony can be admitted if the witness is outside the court's
subpoena powers. Fed.R.Civ.P 32. No one disagreed with Debtors' counsel's statement that
the witnesses whose deposition testimony was admitted were, in fact, unavailable and outside
this court's subpoena powers. We had ordered parties to submit declarations with the
witnesses available for cross-examination at trial. However, some if not all of the witnesses
were unavailable and not subject to the court's jurisdiction, so they were deposed. At that
time counsel for the objecting parties had the opportunity to cross-examine the deponents and
to object to their testimony. Counsel's objections were limited to the form of certain
questions.

[22]This was the predecessor of Merrill Lynch & Co. Tr. of Sands Deposition of March
17, 2005, Deposition at 37.

18

subsidiary and the issuer of the debt. KACC functioned as an operating company but was also a holding company of sorts, as was KAC. The subsidiary guarantors were subsidiaries of KACC. Mr. Sands testified that the structure for the 1993, 1994 and 1996 offerings was used because of the structure of the initial transactions when KAC was purchased in a leveraged buyout.[23] He testified that "the banks were offered KACC and their debt was guaranteed by the subsidiaries, and so if we wanted to issue debt securities, we had to do it there and we couldn't do it up at KAC." Tr. of Sands Deposition, March 17, 2005, Deposition at 15. Some of the securities that were issued in the leveraged buyout were maturing in the time period leading up to the 1993 Indenture. Because Kaiser has "long-term assets" and lenders' terms generally are five to seven years, it was necessary that the debt be "stretched out." The interest rate on the subordinated debt before the 1993 transaction was at $14^{1/4}$ percent. That interest rate was replaced with the $12^{3/4}$% Notes which extended the maturity and brought

---

[23]MAXXAM, Inc. acquired KAC's predecessor, KaiserTech Limited, in 1988 and the transaction was financed by the issuance of increasing rate notes by KaiserTech which were in two tranches. The notes carried high initial interest rates which were scheduled to increase quarterly. Their maturity was three years, a very short time for a company that had very long-term assets. Therefore, after the acquisition, a refinancing was achieved resulting in the 1989 Credit Agreement and issuance of $350 million in $14^{1/4}$% Subordinated Notes. Because KACC held most of the Debtors' assets, the lenders required that KACC be the primary obligor, obtained mortgages against KACC's domestic fixed assets and certain of its subsidiaries. In addition, certain subsidiaries, including AJI, KJC, and KAAC, guaranteed KACC's obligations under that Credit Agreement. The guarantees of the $14^{1/4}$% Notes were on a subordinated basis inasmuch as significant assets and operations of KACC were owned by AJI, KJC, and KAAC. These Notes were issued as subordinated and not senior because KACC was not able to issue additional senior debt under the terms of the 1989 Credit Agreement. The $14^{1/4}$% Notes had a six year term and expired in 1995; the 1989 Credit Agreement expired in five years, in 1994. *See* Deposition of John La Duc. The 1993 debt was subordinated due to restrictions in the 1989 Credit Agreement. As Mr. Sands testified, it was anticipated that in the future KACC would issue senior debt in the form of public notes and it had to preserve its ability to do so.

19

down the interest rate. Mr. Sands repeated that KACC's position as issuer was set before the 1993 transaction. The debt bearing $14^{1/4}$ % was due in 1995. Kaiser was not an investment grade issuer and its business was cyclical due to aluminum price fluctuations so when the opportunity to refinance arose, it was taken. The $14^{1/4}$ % Notes were part of the borrowing base and certain ratios had to be maintained among the borrowing base, the equity, subdebt and senior debt. Therefore, the only choice was to "do subdebt". *Id.* at 21. In order to provide financial flexibility so that Kaiser could continue to extend maturities, a subordinated debt issue was the only option.[24]

Mr. Sands testified that when the 1993 Subordinated Notes were issued it was anticipated that senior Notes would be issued some time in the future. Furthermore, if subordinated debt was to be issued, it would have to be subordinated not only at the issuer but also at the guarantor level. Otherwise the result would be what he described as a "hybrid security" (such as what LDTC suggested was the case) which, to his knowledge, does not exist and which the bond markets would not accept. Subordinated debt holders get a higher interest rate to compensate for the subordinated status. The pricing indicates that the Notes are fully subordinated, i.e., at the parent and guarantor levels. *Id.* at 25. He testified that he had never heard of subordinating notes at the issuer level but not at the guarantor level and, in light of his experience with Kaiser in these matters, the 1993 Subordinated Notes and Guarantees were "absolutely" subordinated to the 1994 and 1996 Senior Notes and Guarantees. *Id.* at 26. Furthermore, a hybrid structure in which subsidiary guarantees would

---

[24]Mr. Sands testified that issuance of senior debt would have been preferred but to provide flexibility and in light of the existing structure, subordinated debt had to be issued.

rank equally to subsidiary guarantees of future senior notes would be considered novel and buyers would be confused, although such a structure could, in theory, be possible. *Id.* at 27-28.

Mr. Sands further testified that the statement in the 1994 and 1996 prospectuses that the subsidiary guarantees of the senior notes would rank senior to the subsidiary guarantees of the subordinated notes is consistent with his understanding of the structure. *Id.* at 28-30. He reiterated that the 1993 notes were subordinated and subsequent notes were senior. *Id.* at 33. He testified that the theory of notes subordinated with respect to payments at the KACC level but not with respect to payments from the guarantors was not supported in practice — a security would not be designed that way. *Id.* at 46. Mr. Sands repeated that the $12^{3/4}$ % issue had to be subordinated because of the way the pre-existing covenants and capital structure worked. *Id.* at 47. The court accepts Mr. Sands' testimony and finds that there was no evidence at all that the guarantees of the Subordinated Notes were *pari passu* with the guarantees of future senior notes. All the evidence, including that of the 1993 Indenture itself, is, in fact, clearly to the contrary.

In other words, in 1993, senior debt in the form of the Credit Agreement existed and there was no public debt offering at that time. The 1994 and subsequent issues were used to pay down the Credit Agreement.[25] At the time of the leveraged buyout there was significant bank debt plus the subdebt and a relatively small amount of equity, as was standard at the time in a leveraged buyout. However, in light of the nature of the assets, carrying that amount of debt in a short-term bank facility was inappropriate. The goal, therefore, was to extend

---

[25] At some point the Credit Agreement was renegotiated and re-extended. *Id.* at 57.

21

maturities of senior debt because the average loan duration was three or four years but Kaiser had 25-year assets.[26] *Id.* at 56-57. Subordinated debt must have a longer duration than senior debt when capitalization is restructured – subordinated debt has to be paid after senior debt.[27] Because interest rates were decreasing, the subordinated debt issues were accomplished in tranches to take care of the term of the senior debt. *Id.* at 58-59. This, Mr. Sands testified, is standard financing. *Id.* at 60. His knowledge was attained through training and experience during his career.[28]

Although, he testified, a single issuer is preferred, because of the structure of Kaiser's bank agreement and because that structure had been used with the $14^{1/4}$ % issue (i.e., issued at the KACC level and not at the parent), the 1993 and subsequent issues had to be done the same way. *Id.* at 72. The bottom line was that the 1993 issue was "a subordinated deal" at all levels. *Id.* at 93, 91. The structure was such that if the market existed for it a subsequent senior debt issue would be made. Circumstances were such that this hoped for goal was accomplished. *Id.* at 98.

The primary objective was to extend the maturity of KAC's subordinated debt. To meet that goal, it was necessary to have the parent as the issuer and the subsidiary as

---

[26]This meant utilizing senior notes which could have a ten year term as opposed to five to seven years, with an average loan life of three or four years.

[27]When the maturity of the subdebt was extended, the maturity of the senior debt could be extended, requiring that "we . . . start at the bottom of the capital and move up . . . ." *Id.* at 88.

[28]At the time of his deposition Mr. Sands was the president of HAAS Capital LLC, a financial advisory and investment company. He started his career with Merrill Lynch's predecessor, remained with Merrill Lynch when it acquired the predecessor, and worked for the firm until 1999.

guarantor because the original transaction was so structured. Extension of the term enabled the issuance of senior debt of longer duration. *Id.* at 96-97. That is, "[t]he commercial objective was to issue longer term subordinated debt which would permit you the option, if market conditions were appropriate, at some later date to issue senior debt." *Id.* at 112.

We further note that the testimony of others involved in the 1993, 1994 and 1996 transactions (Mr. La Duc and Mr. Balsam) was consistent with that expressed by Mr. Sands. *See, e.g.,* Deposition of John La Duc, March 24, 2005, at 13-40 (Trial Exh. 1); Deposition of Martin Balsam, April 4, 2005, at 14-53 (Trial Exh. 3).

This court initially determined that extrinsic evidence, whether in the form of deposition transcripts or other documents, would be inadmissible to explain the 1993 Indenture if it was unambiguous. *See* Tr. of 4/13/05 at 224, Dkt. No. 6722. However, our research has established that New York law, which the parties agree is the governing authority with respect to this matter, provides that only that parol evidence which contradicts an unambiguous contract is inadmissible. *See generally In re Thomson McKinnon Securities, Inc.,* 139 B.R. 267, 273 (S.D.N.Y. 1992). The parol evidence rule does not apply when the evidence proffered does not contradict the terms of the agreement. *Id. See also* discussion at 15-17, *supra.*

Although based on the documents alone the court finds that it is clear that the Debtors' view of the structure of the transactions and of what constitutes Senior Indebtedness is correct, the evidence adduced at trial of the surrounding circumstances supports Debtors' position as well. *See, e.g.,* Trial Exhs. D-12, D-13, D-14. The 1994 Notice provided, in part as follows:

23

> . . . each Subsidiary Guarantor hereby expressly designates the
> Guarantee (as defined in the Senior Note Indenture []as defined)
> in respect of the payment of the principal of, premium, if any,
> and interest on the Senior Notes as "Senior Indebtedness" of
> such Subsidiary Guarantor under terms, and for all purposes, of
> the Indenture to the extent that such Subsidiary Guarantor is a
> guarantor under the Indenture.

Notice of Incurrence of Senior Indebtedness dated February 17, 1994, Trial Exh. D-14.

LDTC conceded at the April 13, 2005, hearing that the Notices were timely sent. Tr. of

4/13/05 at 191-92. Despite acknowledging that the Notices were sent as required, LDTC

argues that the Notices were not public documents and that all indenture trustees do when

they receive such documents is file them once they make sure the Notice is signed.[29]  *Id.* at

---

[29]Section 3.06 and Section 16.07 captioned "Notice to Trustee" state that
neither the Trustee nor any paying agent (other than the
Company) shall be charged with knowledge of any event which
would prohibit the making of any payment . . . to or by the
Trustee or such paying agent, unless and until the Trustee or
such paying agent shall have received . . . written notice thereof
from the Company or from the holder of any Senior
Indebtedness of the Company or from the Bank Agent or the
trustee for any such Senior Indebtedness of the Company . . . .
Section 3.06, Trial Exh. D-4 at 41,

Section 16.07 provides:
. . . neither the Trustee nor any paying agent (other than a
Subsidiary Guarantor) shall be charged with knowledge of any
event which would prohibit the making of any payment . . . to
or by the Trustee or such paying agent, unless and until the
Trustee or such paying agent shall have received . . . written
notice thereof from such Subsidiary Guarantor or from the
holder of any Senior Indebtedness of such Subsidiary Guarantor
or from the Bank Agent or the trustee for any such Senior
Indebtedness of such Subsidiary Guarantor . . . .
*Id.* at 109.

24

192-94. The Notices,[30] however, clearly state, and we noted at the argument, that "this is senior sub debt and it's subordinated." *Id.* at 195.[31]

_____

[30]For example, the Notice dated February 17, 1994, Trial Exh. D-14, regarding the 1994 Senior Notes states:

> This letter constitutes notice to the Trustee, as contemplated by the definition of the term "Senior Indebtedness" under the [1993] Indenture, that (i) the Company hereby designates the payment of the principal of ,m premium, if any, and interest on [a certain amount of the principal] of its 9⅞ % Senior Notes . . . as "Senior Indebtedness" under the terms, and for all purposes, of the Indenture and (ii) each Subsidiary Guarantor hereby expressly designates the Guarantee . . . in respect of the payment of the principal of, premium, if any, and interest on the senior Notes as "Senior Indebtedness" of such Subsidiary Guarantor under the terms, and for all purposes, of the Indenture to the extent that such Subsidiary Guarantor is a guarantor under the Indenture.

*See also* Trial Exhs. D-12, D-13 with respect to the 1996 Senior Notes.

[31]Furthermore, in addition to Notices, which informed the Indenture Trustee of the issuance of Senior Indebtedness, the prospectus(es) that went to investors clearly state that the debt is senior and subordinated. In this regard, *see* Trial.Exh. D-5, 1993 Prospectus, which provides, in part, as follows:

> . . . . The Notes will be effectively subordinated to claims of creditors of the Company's subsidiaries, except to the extent that the holders of Notes may be creditors of such subsidiaries pursuant to a subsidiary guarantee. . .

*Id.* at 1. Further,

> The Notes are subordinate in right of payment to the Company's obligations under the Credit Agreement and all other present and future Senior Indebtedness . . . . See "Investment Considerations – Ranking of the Notes; Subordination; Debt Service."

*Id.* at 4. Under "Investment Considerations" the prospectus provides:
> **Ranking of the Notes; Subordination; Debt Service**
> The payment of the principal . . . and interest on the Notes is

(continued...)

---

[31](...continued)

> subordinated in right of payment, as set forth in the Indenture, to the payment when due of the Company's obligations under the Credit Agreement and all other present and future Senior Indebtedness (as defined) of the Company.

*Id.* at 6. Trial Exh. D-7, the 1994 Prospectus, provides in part as follows:

> The Notes will represent senior, unsecured obligations of the Company, ranking senior in right and priority of payment to all Indebtedness of the Company that by its terms is expressly subordinated to the Notes. The Notes will also be guaranteed on a senior, unsecured basis by certain subsidiaries of the Company. The Notes, however, will be effectively subordinated to secured Indebtedness of the Company and its subsidiaries that are guarantors of the Notes with respect to the assets securing such Indebtedness. The Notes will also be effectively subordinated to claims of creditors of the Company's subsidiaries, except to the extent that the holders of Notes may be creditors fo such subsidiaries pursuant to a subsidiary guarantee.

Trial Exh. D-7 at 1. Under the heading "Risk Factors" is the subheading "Ranking of the Notes; Subordination." That section states:

> *Ranking of the Notes.* The Notes will represent senior, unsecured obligations of the Company, ranking senior in right and priority of payment to all Indebtedness of the Company that by its terms is expressly subordinated to the Notes. . . . As of December 31, 1993, the Company's total consolidated indebtedness was $760.9 million (of which $431.5 million was expressly subordinated in right and priority of payment to the Notes).

Under the subheading "Subordination" is the following

> The obligations of the Company with respect to the Notes will be guaranteed, jointly and severally, on a senior, unsecured basis by certain Subsidiaries (as defined) of the Company. Any obligations of the Company's Subsidiaries will be effectively senior to the claims of the holders of te Notes with respect to the assets of such Subsidiaries, except to the extent that the holders of the Notes may be creditors of a Subsidiary pursuant to a subsidiary guarantee. . . . The rights of the Company and its creditors, including holders to eh Notes, to realize upon the

(continued...)

The issuance of the Notices was a prerequisite to creating Senior Indebtedness. LDTC agrees with this, *id.* at 191, but argues here that the Notices did not create Senior Indebtedness as that term is defined in the Indenture. LDTC asserts that only the Company, KACC, and not the Subsidiary Guarantors agreed to subordination subject to prior payment in full of Senior Indebtedness under the Indenture. This argument does not comport with the 1993 Notes or the 1993 Note Guarantees or the Notices themselves. Moreover, the noteholders themselves have agreed to the subordination of their payments, and that is what is at stake in this proceeding.

LDTC contends that because payments under the plans at bench are from the Subsidiary Guarantors' liquidation proceeding, the subordination agreement under the 1993 Indenture does not apply because Section 3.02 concerns distributions if the Company files a reorganization proceeding. LDTC's view that all payments must come from the Company is incorrect. LDTC argues that if Article Three and Article Sixteen of the 1993 Indenture are construed properly, the 1993 Noteholders are subordinated only through Article Three and only if the Company, not a Subsidiary, is distributing assets through a dissolution, liquidation or reorganization. *See* Trial Exh. D-4 at Section 3.02 at 36. LDTC argues that Article

---

[31](...continued)

> assets of any Subsidiary upon such Subsidiary's liquidation or reorganization (and the consequent rights of holders of the Notes to participate in those assets) will be subject to the prior claims of such Subsidiary's creditors, except to the extent that the Company may itself be a creditor with recognized claims against such Subsidiary or to the extent that the holders of the Not may be creditors with recognized claims against such Subsidiary pursuant to the terms of a subsidiary guarantee . . .

*Id.* at 9-10. Trial Exhibit D-9 which is the 1996 Prospectus is consistent. *See id.* at 17.

Sixteen operates to subordinate only debts of the Subsidiary Guarantors. However, even if LDTC is correct that distributions through the subsidiaries' reorganization is not an indirect payment as to the Company, the payment of Senior Indebtedness still is required to be made by the Subsidiary Guarantors under Article Sixteen. Section 16.03 provides that on direct or indirect distribution of the assets (or securities) of any Subsidiary Guarantor upon reorganization of the Subsidiary Guarantor the holders of Senior Indebtedness of the Subsidiary Guarantor are entitled to payment in full. The Notices designated the Guarantees to be Senior Indebtedness of the Subsidiary Guarantors. See text, *supra*, and Trial Exh. D-14. LDTC's argument is not well founded.

Section 16.02 is substantially the same as Section 3.01 and Section 16.03 is substantially the same as Section 3.02 but Article Three applies to the Company and Article Sixteen applies to the Subsidiary Guarantors. Both set forth obligations to pay Senior Indebtedness first upon dissolution, liquidation or reorganization. Therefore, even if Article Three does not apply, Article Sixteen does and LDTC's objections are overruled.

We find that the documents themselves, as well as the admissible evidence of the circumstances surrounding the transactions at issue clearly evidence an intent that the Subordinated Guarantees be subordinated to the Senior Guarantees.

**Liverpool Limited Partnership's objections to the joint plans**

The Liverpool Limited Partnership objected to confirmation stating:

> The Plans cannot be confirmed unless the distributions proposed therein account for the following:
> (i) The Subsidiary Guarantors' guarantees of the 1993 Notes generally are not subordinated to their guarantees of the 1994 Notes and of KACC's $10^{7/8}$ % notes (1996 Notes"). The plain language of the indenture that governs the 1993 Notes . . .

expressly provides that the Subsidiary Guarantors' guarantees of the 1993 Notes are subordinated to downstream guarantees of their own subsidiaries' obligations, but not to upstream guarantees of their parent's (KACC's) obligations. Thus, the Subsidiary Guarantors upstream guarantees of the 1993 Notes generally are *pari passu* with the upstream guarantees of the 1994 and 1996 Notes.

(ii)  Although the Subsidiary Guarantors' guarantees of the 1993, 1994, and 1996 Notes are generally *pari passu*, their guarantees of the 1994 Notes are senior to a limited extent – specifically, to the extent that the 1994 Notes were used to refinance the Debtors' then pre-existing obligations under a 1989 bank credit agreement . . . because the 1993 Indenture expressly provides that the guarantees of the 1993 Notes are subordinated to such refinancing indebtedness, and "all guarantees thereof." Thus, although the guarantees of the 1993 Notes generally are not subordinated to other upstream guarantees of KACC's obligations (including generally to the upstream guarantees of the 1994 and 1996 Notes), there is an express subordination in the 1993 Indenture to upstream guarantees of "refinancing' indebtedness.[32]

The Liverpool Limited Partnership's Objection to Confirmation of the Plans of

Reorganization Proposed by the Subsidiary Guarantors, Dkt. No. 6508, at 1. However, it is

clear from the documents that in 1993 it was contemplated that later issues of senior debt

would be made. Mr. Sands' testimony, consistent with that of La Duc and Balsam in this

regard, explains why this was so. *See* discussion of deposition of Theodore Sands, *supra*.[33]

---

[32]Liverpool's argument regarding the unambiguous nature of the 1993 Indenture and its assertion that New York law bars consideration of extrinsic evidence when a document is unambiguous are the same as those raised by LDTC and they are likewise overruled. As we noted *supra*, New York law does not bar consideration of evidence concerning circumstances surrounding creation of unambiguous contracts. Likewise, we reject the argument that the evidence of surrounding circumstances does not support the plan proponents' view.

[33]LDTC and Liverpool also argue that a guarantee cannot fall within the definition of "Senior Indebtedness" because it is not an "assumption of debt." Assumption of debt is the function of a guarantee. The argument is devoid of merit.

The arguments raised by Liverpool are essentially the same as those relied on by LDTC. Liverpool notes that the plan proponents agree that clause (ii)(A)(5) ("all guarantees by such Person of any indebtedness referred to in this clause (ii)(A) of any Subsidiary of such Person or any Non-Affiliate Joint Venture of such Person") of the definition of Senior Indebtedness refers only to downstream guarantees but disputes the meaning of clause (ii)(A)(1) ("the principal of, premium, if any, and interest on all indebtedness of such Person for money borrowed (including all such indebtedness evidenced by notes, debentures or other securities issued for money, whether issued or assumed by such Person)"). Liverpool's position is that the reference to "indebtedness . . . for money borrowed" refers to all guarantees, denies that a guarantee of an obligation is an "assumption" of that obligation and points to the fact that there is no reference to guarantee in (ii)(A)(1). Liverpool is wrong. A guarantee of a debt is an assumption of the payment due on that obligation. A classic definition of "guarantee" is "[t]o assume responsibility for the . . . execution of." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 552 (1984). "Assume" is defined as "[t]o take upon oneself" and the example given is "*assume* the payments." *Id.* at 132 (emphasis in original). A document must be read as a whole and the court cannot take separate clauses out of context and assign a meaning thereto. *See generally ABS Partnership v. AirTran Airways, Inc.*, 765 N.Y.S.2d 616, 619 (N.Y. App. Div. 1st Dept.), *affirmed* 2003 WL 22391014 (N.Y. App. Div. 1st Dept. 2003).

Liverpool, as does LDTC, asserts that (ii)(A)(5) extends "Senior Indebtedness" only to certain types of guarantees by affiliates, i.e., downstream guarantees of subsidiaries and certain joint ventures, but argue that (ii)(A)(1) has no restrictions with respect to affiliation

30

with Debtors. This broad interpretation of clause (ii)(A)(1) would negate the specific limitations of (ii)(A)(5), the objectors contend. The reference in Section 3.01 to "all direct or indirect payments or distributions on or with respect to the Notes" and the reference in Section 16.02 to "all payments pursuant to the guaranty by each Subsidiary Guarantor" are not mutually exclusive in that Section 3.01 applies to the Company and Section 16.02 applies to subsidiaries. The term "Senior Indebtedness" applies specifically to "any Person" whether the debt is "heretofore Incurred or provided for or Incurred after the date hereof". "Person" is defined broadly and could include not only the Company but its subsidiaries and others.

### LDTC's objections to subordination issues raised by Liverpool

LDTC's position is consistent with Liverpool's in that they both assert that the 1994 Note Guarantees are not Senior Indebtedness. However, LDTC disagrees with Liverpool's assertion that $100 million of the 1994 Note Guarantees is senior to the 1993 Note Guarantees under the definition of "Senior Indebtedness" to the extent that definition includes "renewals, extensions, refundings, replacements, restructurings, refinancings, amendments and modifications." See Trial Exh. D-4, definition of "Senior Indebtedness" at ¶ (ii)(E) at Section 1.01. at 27-29. Liverpool asserts that because a Credit Agreement in 1994[34] replaced the 1989 Credit Agreement and because the revolving credit facility under the 1994 Credit Agreement was $100 million less than the commitment under the 1989 Credit Agreement, the Subsidiary Guarantors' exposure was reduced by $100 million. Consequently, in Liverpool's view, the 1994 guarantees constituted a refinancing of $100 million. That is, Liverpool agrees with

---

[34]We admitted the 1994 Credit Agreement, Trial Exh. D-16, for the limited purpose of completing the history of the credit financing. Tr. 4/27/05, Dkt. No. 6857, at 173-74.

LDTC except with respect to this $100 million. *See* Objection of [LDTC] to Subordination Issues Raised by Liverpool . . ., Dkt. No. 6520, at 3. At the hearing on April 27, 2005, Liverpool acknowledged that this issue would not be addressed unless the court ruled in LDTC's favor. Tr. 4/27/05, Dkt. No. 6857, at 229. However, we address it briefly to make clear that the 1994 Credit Agreement by its terms replaced the 1989 Credit agreement. At the hearing we concluded that Liverpool's position was not supported – the 1994 Credit Agreement replaced the 1989 Credit Agreement. It did nothing to the notes or guarantees. *See* Tr. 4/27/05 at 256 (refinance issue is not part of subordination issue); *id.* at 264-65 ("the [1994] credit agreement replaced the [1989] credit agreement"); *id.* at 266-67.

### LDTC's Fees and Expenses

LDTC also objected to the joint plans at issue because of the treatment provided therein for its fees and expenses. However, the plans were amended to provide for payment of the fees prior to distributions to noteholders, and at a hearing on December 19, 2005, the parties submitted a consensual plan confirmation order which appears to resolve this issue. The plan confirmation order was entered on December 20, 2005. *See* Dkt. No. 7983. To the extent any remaining issues with respect to the fees and expenses of LDTC remain unresolved, within ten days from the date of the order accompanying this Memorandum Opinion, LDTC shall file a motion for reconsideration. If such a motion is filed it will be heard at the hearing scheduled for January 10, 2006, at 9:00 a.m. in Pittsburgh, Pennsylvania.

For the foregoing reasons, we will sustain the plan proponents' position and overrule

the objections with respect to the subordination issues.  An appropriate order will be issued.

DATE:  December 22, 2005            *Judith K. Fitzgerald*    rmab

Judith K. Fitzgerald
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

**Kaiser Aluminum Corporation**
**Bankruptcy Case No. 02-10429**                    **February 8, 2006**
**Appeal No.: 06-01**

**Name of Appellant:**       **Law Debenture Trust Company of New York**
**Counsel for Appellant:**   **Francis A Monaco**
                             1201 North Orange Street   Suite 400
                             Wilmington, Delaware 19899

**Name of Appellee:**        **Kaiser Aluminum Corporation et al**
**Counsel for Appellee:**    **Daniel J DeFranceschi**
                             **Kimberly D Newmarch**
                             One Rodney Square
                             PO Box 551
                             Wilmington DE 19899

**Enclosed Items:**
**Notice of Appeal docket #8052, Order docket  #8009.**

Memorandum Opinion docket #8008

Motion To Stay Pending Appeal, docket #8049,

Memorandum of Law *in Support of Motion,  docket #8050*

Motion to Reconsider Motion of Law Debenture Trust Company of New York  docket #8051

**Appellant: Designation: As of this date no Designations have been filed.**

**Appellee: Designation: doc   N/A**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

Clerk of Court

824 Market Street
Wilmington, DE  19801
(302) 252-2900

Date:  February 8, 2006

To:   Clerk of Court
      U.S. District Court
      District of Delaware
      Wilmington De 19801

Re    **Kaiser Aluminum Corporation**
      Bankruptcy Case #02-10429
      Ap #06-01

Enclosed you will find Notice of Appeal docket #8052, Orders docket #8009,

Memorandum Opinion docket #8009, Motion To Stay Pending Appeal, docket #8049,

Memorandum of Law *in Support of Motion,  docket #8050.*

Motion to Reconsider Motion of Law Debenture Trust Company of New York  docket #8051

Kindly acknowledge receipt of this  document.

Sincerely,

_____

Deputy Clerk

I hereby acknowledge receipt of the above transferred record this ____ day of _____ 2003.

By:_____

      Deputy Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | |
| KAISER ALUMINUM CORPORATION, et al., | : | Chapter 11 |
| Debtors. | : | Case No. 02-10429 (JKF) |
| | : | Jointly Administered |
| | : | |
| | : | |
| | : | |
| | : | Related to D.I. 8008, 8009 and 8051 |
| | : | Item #4 on 1/9/06 Agenda Notice |

### ORDER GRANTING LAW DEBENTURE TRUST COMPANY'S MOTION FOR RECONSIDERATION AND OVERRULING OBJECTION TO PLAN CONFIRMATION

Upon consideration of the Motion of Law Debenture Trust Company of New York for Reconsideration of Order Overruling Fee Objection (D.I. 8051, the "Motion for Reconsideration") and for good cause shown, it is hereby

**ORDERED** that the Motion for Reconsideration is **GRANTED**.

It is **FURTHER ORDERED** that, the Court's Memorandum Opinion, docketed December 22, 2005 (D.I. 8008) is hereby amended at Page 32, lines 10 - 18 (captioned "LDTC's Fees and Expenses") to read as follows:

> LDTC also objected to the joint plans at issue because of the treatment provided therein for its fees and expenses. For the reasons announced by the Court at hearings on May 2, 2005, (D.I. 7110) and January 10, 2006, (D.I. 8135), the Court finds that LDTC's "Fee Objection" (D.I. 6505) must be overruled.

In all other respects, the Order Overruling Objections to Plan Confirmation by Law Debenture Trust Company of New York and by Liverpool Limited Partnership (D.I. 8009) and the Memorandum Opinion (D.I. 8008) shall be unaffected by this Order.

Dated: 2/8/06

_____
Judith K. Fitzgerald
United States Bankruptcy Judge