## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| KAISER ALUMINUM CORPORATION, et al., | : | Case No. 02-10429 (JKF) |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | Hearing Date: January 10, 2006 |
| | : | Objections Due:  January 9, 2006 at 10:00 |
| | : | a.m. |
| | : | |
| | : | Related to D.I. 8008 and 8009 |

### MOTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK
### FOR RECONSIDERATION OF ORDER OVERRULING FEE OBJECTION

Law Debenture Trust Company of New York ("**LDTC**") the Indenture Trustee[1] under an Indenture

dated as of February 1, 1993 (the "**1993 Indenture**"), by and through its undersigned counsel, hereby moves

this Court, pursuant to Rules 9023(e) of the Federal Rules of Bankruptcy Procedure, for reconsideration of

that portion of this Court's Order Overruling Objections to Plan Confirmation (the "**Guaranty Decision**"[2])

that overrules LDTC's Objection to subordination of its fees and expenses (the "**Fee Objection**").[3]  A copy

of the Fee Objection is attached hereto as Exhibit C.

The Guaranty Decision determines the plan treatment of Class 3A and Class 3B under two separate

plans of liquidation for certain subsidiaries of Kaiser Aluminum & Chemical Corporation (the "**Company**"),

---

[1]  LDTC is the successor indenture trustee to State Street Bank and Trust Company which was, in turn, the successor to First National Bank of Boston.

[2]  The Guaranty Decision includes the "Order Overruling Objections to Plan Confirmation by Law Debenture Trust Company of New York and by Liverpool Limited Partnership" [D.I. 8009] and the Memorandum of Decision referenced therein, both dated December 22, 2005 [D.I. 8008].  A copy of the Order and Memorandum of Decision are attached hereto as Exhibits A and B respectively.

[3]  The Fee Objection is captioned: "Objection of Law Debenture Trust Company of New York to (I) Subordination of Indenture Trustee Fees and Expenses under (A) the Third Amended Joint Plan of Liquidation for Alpart Jamaica, Inc. and Kaiser Jamaica Corporation dated February 25, 2005, and (B) the Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation, and to (II) Proposed Settlement of 7 ¾% SWD Revenue Bond Dispute" [D.I. 6505].

both of which plans (the "**Subsidiary Plans**"[4]) were confirmed by this Court's Order dated December 20, 2005 (the "**Confirmation Order**").[5] LDTC is appealing (the "**Appeal**") the Guaranty Decision. This Motion for Reconsideration does not concern the ruling in the Guaranty Decision on LDTC's Objection to subordination of the 1993 Note Guarantee (the "**Subordination Objection**")[6] or any other ruling in the Guaranty Decision, other than the ruling on the Fee Objection.

In further support of this Motion, LDTC respectfully represents as follows:

## BACKGROUND

Pursuant to the 1993 Indenture, the Company issued certain notes (the "**1993 Notes**") and various subsidiaries of the Company (the "**Subsidiary Guarantors**" or the "**Debtors**") guaranteed the obligations of the 1993 Notes (the "**1993 Note Guarantees**"). The Company and the Subsidiary Guarantors filed chapter 11 cases in this Court on February 12, 2002 or January 14, 2003 (as the case may be). On February 25, 2005, the Debtors filed the Subsidiary Plans.

The Subsidiary Plans, among other things, provide for the distribution of liquidated assets to the Indenture Trustees for (a) holders of 9-7/8% Notes issued in 1994 by the Company (the "**1994 Notes**") and guaranteed by the Subsidiary Guarantors (the "**1994 Note Guarantees**"); and (b) holders of two series of 10-7/8% Notes issued in 1996 by the Company (the "**1996 Notes**") and guaranteed by the Subsidiary Guarantors in 1996 (the "**1996 Note Guarantees**"). The Subsidiary Plans provided that no distributions would be made to LDTC in its capacity as trustee for the holders of the 1993 Note Guarantees.

---

[4] The Subsidiary Plans are captioned: (a) "The Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation" [D.I. 6265]; and (b) "The Third Amended Joint Plan of Liquidation for Alpart Jamaica Inc. and Kaiser Jamaica Corporation." [D.I. 6261].

[5] The Confirmation Order is captioned: "Order Confirming (I) The Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation and (II) The Third Amended Joint Plan of Liquidation for Alpart Jamaica Inc. and Kaiser Jamaica Corporation. [D.I. 7983].

[6] The Subordination Objections is captioned: "Objection of Law Debenture Trust Company of New York to Subordination of 1993 Note Guarantees Pursuant to (A) the Third Amended Joint Plan of Liquidation for Alpart Jamaica, Inc. and Kaiser Jamaica Corporation dated February 25, 2005, and (B) the Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation, dated February 25, 2005" [D.I. 6504]

As permitted by this Court, on March 15, 2005, the Debtors, the 1994/96 Indenture Trustees, an ad hoc group of 1994/96 Noteholders, the Official Committee of Unsecured Creditors, as well as the trustee and holders of certain "Gramercy Bonds" issued by the Company,[7] (collectively, the "**1994/96 Parties**"), all filed Briefs in support of the Subsidiary Plans' treatment of LDTC's claims under the 1993 Note Guarantees as fully subordinated to the claims of the holders of the 1994/96 Note Guarantees.

On April 5, 2005, LDTC filed Objections to the Subsidiary Plans (including the Subordination Objection and the Fee Objection,). The Fee Objection asserted that, regardless of the outcome on the Subordination Objection, the Subsidiary Plans impermissibly provided for distributed of the "Public Note Distributable Consideration" (as defined under the Subsidiary Plans) to the Indenture Trustees for the 1994 Notes and 1996 Notes (the "**1994/96 Indenture Trustees**"), thereby circumventing LDTC's charging lien for its fees, charges and expenses, including professional fees (collectively, the "**Fees**"). LDTC asserted that the subordination provisions of the 1993 Indenture only encompassed distributions with respect to the 1993 Note Guarantees, not the Fees. LDTC further asserted that Bankruptcy Rule 3021 requires plan distributions in respect of public debt securities to be made in the first instance to the relevant indenture trustee, thus permitted the exercise of its charging lien.

Following plan confirmation hearings and various modifications to the Subsidiary Plans, on December 20, 2005, this Court issued its Confirmation Order. Pursuant to Section 3 of the Confirmation Order, all objections by LDTC (including the Fee Objection) were to be ruled upon in the separate Guaranty Decision.

Following the entry of the Confirmation Order, on December 22, 2005, the Guaranty Decision was entered on the Court's docket. The Guaranty Decision appears to overrule the Fee Objection, but also makes

---

[7]   The "Gramercy" Trustee and Bondholders apparently sought to protect a settlement with the Company whereby they would be paid monies from the recoveries obtained by the holders of the 1994/96 Note guarantees. This settlement put to rest litigation whereby the Gramercy bondholders claimed entitlement to assets of the Subsidiary Guarantors, notwithstanding the fact that they held no guarantees or other debt instruments issued by the Subsidiary Guarantors. Although LDTC objected, in part, to the foregoing settlement by the Fee Objection, such objection is not the subject of this Motion for Reconsideration or the Appeal.

provision for the filing of a Motion for Reconsideration, scheduling a hearing for January 10, 2006. Specifically, as set out in the Memorandum of Decision, the Court found that the Subsidiary Plans were modified to provide for payment of LDTC's Fees and that the Confirmation Order so provides (see Memorandum of Decision at 32). However, it appears that the Subsidiary Plans were not, in fact, modified to provide for payment of LDTC's Fees, as required by the 1993 Indenture and applicable law, as set out in the Fee Objection. While the Subsidiary Plans do provide for payment of the 1994/96 Parties fees and costs, no similar provision appears to have been made for LDTC, and 100% of the "Public Note Distributable Consideration" is still to be distributed to the 1995/96 Indenture Trustees, albeit through a "Distribution Trustee" as per modifications to the Subsidiary Plans.

### RELIEF REQUESTED

1.      LDTC respectfully requests that the Court reconsider the Guaranty Decision to (a) correct the factual error in the Guaranty Decision that the Subsidiary Plans, as modified, provide for the payment of LDTC's Fees; and (b) in light of such circumstance, sustain the Fee Objection and direct the Distribution Trustee to pay LDTC's Fees prior to any distributions to the 1994/96 Indenture Trustees.

### BASIS FOR RELIEF

2.      This Court has jurisdiction over LDTC's Motion for Reconsideration pursuant to Bankruptcy Rule 9023.

3.      The Fee Objection appears to have been overruled based, at least in part, upon a factual error by the Court: specifically, that modifications to the Subsidiary Plans now provide for the payment of LDTC's Fees. The Court should reconsider this portion of the Guaranty Decision and sustain the Fee Objection.

4.      As set forth more fully in the Fee Objection (attached as Exhibit C), LDTC is entitled to payment of its Fees prior to distributions to the 1994/96 Indenture Trustees.

WHEREFORE, LDTC respectfully requests that this Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: January 3, 2006

LAW DEBENTURE TRUST COMPANY OF
NEW YORK

Francis A. Monaco, Jr. (#2078)
Joseph J. Bodnar (#2512)
MONZACK AND MONACO, P.A.
P.O. Box 2031
1201 North Orange Street, Suite 400
Wilmington, DE 19899-2031
Tel.    (302) 656-8162

and

Evan D. Flaschen (ct10660)
Gregory W. Nye (ct06028)
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103-3178

# EXHIBIT "A"

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR DISTRICT OF DELAWARE

IN RE:

Kaiser Aluminum Corporation, *et al.*

        Debtor(s)

Bankruptcy No. 02-10429-JKF

Chapter 11

**Related to Dkt. Nos. 6261, 6265, 6504, 6505, 6508, 6520, 6546.**

### ORDER OVERRULING OBJECTIONS TO PLAN CONFIRMATION
### BY LAW DEBENTURE TRUST COMPANY OF NEW YORK
### AND BY LIVERPOOL LIMITED PARTNERSHIP

**AND NOW**, this **22nd** day of **December, 2005**, for the reasons set forth in the

foregoing Memorandum Opinion the objections to the joint plans of reorganization of Alpart

Jamaica, Inc., and Kaiser Jamaica Corporation, (plan at Dkt. No. 6261), and the joint plan of

Kaiser Alumina Australia Corporation, and Kaiser Finance Corporation, (plan at Dkt. No.

6265) filed on behalf of Law Debenture Trust Company of New York and the objections filed

on behalf of Liverpool Limited Partnership are **OVERRULED.**

It is **FURTHER ORDERED** that if a motion for reconsideration is filed by Law

Debenture Trust Company of New York within ten days hereof with respect to the issue of its

fees and expenses, responses shall be filed by January 9 at 10 A.M. and argument on the

motion will be heard on January 10, 2006, at 10:00 a.m., Courtroom A, 54th Floor, U.S. Steel

Building, 600 Grant Street, Pittsburgh, Pennsylvania.

*Judith K. Fitzgerald*
Judith K. Fitzgerald
United States Bankruptcy Judge

# APPENDIX A

**DOCKET NUMBER**                        **DOCKET TEXT**

| DOCKET NUMBER | DOCKET TEXT |
|---|---|
| 6261 | Third Amended Joint Plan of Liquidation for Alpart Jamaica, Inc., Bankr. No. 03-10144, and Kaiser Jamaica Corporation, Bankr. No. 03-10151, jointly administered at 02-10429 |
| 6265 | Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation, Bankr. No. 02-10432, and Kaiser Finance Corporation, Bankr. No. 02-10438, jointly administered at 02-10429 |
| 6504 | Objection of Law Debenture Trust Company of New York to Subordination of 1993 Note Guarantees Pursuant to (A) the Third Amended Joint Plan of Liquidation for Alpart Jamaica, Inc., and Kaiser Jamaica Corporation Dated February 25, 2005, and (B) The Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation, Dated February25, 2005 |
| 6505 | Objection of Law Debenture Trust Company of New York to (I) Subordination of Indenture Trustee Fees and Expenses Under (A) The Third Amended Joint Plan of Liquidation for Alpart Jamaica, Inc. and Kaiser Jamaica Corporation Dated February 25, 2005, and (B) The Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation, Dated February 25, 2005 and to (II) Proposed Settlement of $7^{3/4}$ % SWD Revenue Bond Dispute |
| 6508 | The Liverpool Limited Partnership's Objection to Confirmation of the Plans of Reorganization Proposed By The Subsidiary Guarantors |
| 6520 | Objection of Law Debenture Trust Company of New York to Subordination Issues Raised by Liverpool in Connection with (A) The Third Amended Joint Plan of Liquidation for Alpart Jamaica, Inc., and Kaiser Jamaica Corporation, Dated February 25, 2005 and (B) The Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation, Dated February 25, 2005. |

# APPENDIX B – APPEARANCES

1

Gregory M. Gordon, Esquire, Richard Chesley, Esquire, Daniel P. Winikka, Esquire, Michelle Miller, Esquire,  Daniel DeFranceschi, Esquire, Edward Huff, Esquire, George Davis, Esquire, for Debtors

Lisa G. Beckerman, Esquire, Brian Kilmer, Esquire, William P. Bowden, Esquire, for Creditors' Committee

Alain Baudry, Esquire, Clark T. Whitmore, Esquire, for U.S. Bank, N.A.

Diane Harvey, Esquire, George A. Davis, Esquire, for Ad Hoc Group of Senior Noteholders

E. Evans Wohlforth, Esquire, Anthony Callaghan, Esquire, James Gereghty, Esquire, David Crapo, Esquire, for Bear Stearns & Co., Citadel Equity Fund, Ltd., and Citadel Credit Trading, Ltd.

Evan D. Flaschen, Esquire, Gregory Nye, Esquire, Kate Simon, Esquire, Tina Moss, Esquire, Sally Siconolfi, Esquire, for Law Debenture Trust Company of New York

K. John Shaffer, Esquire, Margreta Sunderlin, Esquire, David J. Baldwin, Esquire, for The Liverpool Partnership

Brad A. Berish, Esquire, for Allstate Insurance Company

Peter B. Ackerman, Esquire, for London Market Insurers

William S. McMahon, Esquire, for St. Paul's Surplus Lines Insurance Company

Jason J. DeJonker, Esquire, for CNA Service Mart Companies

Leonard Goldberger, Esquire, for Century Indemnity Company, *et al.*

Mark F. Hebbeln, Esquire, Kristin Going, Esquire, Carl N. Kunz, III, Esquire, for Deutsche Bank Trust Company National Association

James Eggeman, Esquire, for the Pension Benefit Guaranty Corporation

Mark T. Hurford for the Asbestos Creditors Committee

Sharon M. Zieg, Esquire, and Donald Brown, Esquire, for the Asbestos Futures Representative

David Klauder, Esquire for the U.S. Trustee

2

Michael Aiken, Esquire, for Noise Induced Hearing Loss Claimants

Peter C. D'Apice, Esquire, Jacob Newton, Esquire, for Silica Future Representative

Ronald E. Reinsel, Esquire, for Personal Injury Committee

Marc S. Casarino, Esquire, for ACE Insurance Company

Elizabeth Jones Futrell, Esquire, for J.P. Morgan Trust

3

## APPENDIX C

### Definition of "Senior Indebtedness"

The definition of "Senior Indebtedness provides, in full:

Senior Indebtedness: The term "Senior Indebtedness" shall mean with respect to any Person[35] (whether heretofore Incurred or provided for or Incurred after the date hereof):

(i) (A) the Obligations of such Person under the Credit Agreement[36] and (B) penalties, fees, premiums, expense reimbursements, indemnity obligations and all other monetary obligations (other than monetary Obligations referred to in clause (i)(A) above) of such Person under the Credit Agreement, and

(ii) to the extent (x) incurred by such Person from a Person that is a Bank (or an affiliate of a Bank) at the time of such incurrence or (y) designated in writing by the Company as Senior Indebtedness in a notice to the Trustee pursuant to the terms of this Indenture, which notice shall indicate the amount of such Senior Indebtedness and the trustee or representative thereof.

(A)(1) the principal of, premium, if any, and interest on all indebtedness of such Person for money borrowed (including all such indebtedness evidenced by notes, debentures or other securities issued for money, whether issued or assumed by such Person); (2) all indebtedness incurred by such Person in the acquisition (whether by way of purchase, merger, consolidation or otherwise and whether by such Person or another Person) of any business Capital Stock, real property or other assets (except assets acquired in the ordinary course of business); (3) all lease obligations of such Person whether or not capitalized on the books of such Person in accordance with GAAP; (4) all reimbursement obligations of such Person with

---

[35] "Person" is defined as "any individual, corporation, partnership, joint venture association, joint-stock company, trust, unincorporated organization or government or other agency or political subdivision thereof." Trial Exh. D-4, 1993 Indenture at Section 1.01 at 25.

[36] The 1989 Credit Agreement which was in effect when the 1993 Indenture was created.

1

respect to letters of credit and letter of credit fees in connection therewith and bankers' acceptances and fees and commissions in connection therewith; (5) all guarantees by such Person of any indebtedness referred to in this clause (ii)(A) of any Subsidiary of such Person or any Non-Affiliate Joint Venture of such Person; (6) all obligations of such Person in connection with the sale of its receivable; and (7) all obligations of such Person in connection with the issuance of industrial revenue bonds.

(B) all Currency Hedging Obligations of such Person;

(C) all Interest Hedging Obligations of such Person;

(D) all penalties, fees, premiums, expenses, reimbursements, indemnity obligations and all other monetary obligations of such Person in respect of any Indebtedness, obligation or guarantee described in this clause (ii), and

(E) any renewals, extensions, refundings, replacements, restructurings, refinancings, amendments and modifications by such Person of any such indebtedness, obligation or guarantee described in clauses (i) and (ii) (in each case, in whole or in part).

Senior Indebtedness of a Person shall also include interest on Senior Indebtedness fo such Person, and any renewals, extensions, refundings, replacements, restructurings, refinancings, amendments and modifications thereof, that would accrue but for the filing of a bankruptcy or similar proceeding at the rate specified in the instrument governing such Senior Indebtedness, whether or not such interest is an allowable claim in such proceeding. The obligations of any Person described in clause (i) of this definition, the obligations of such Person under or in connection with any Refinancing Indebtedness that serves to Refinance any obligations of such Person described in clause (i) of this definition and all other monetary obligations of such Person under any agreements governing or securing such Refinancing Indebtedness and any renewals, extensions, refundings, replacements, restructurings, refinancings, amendments and modifications of any of the foregoing, shall constitute, and the obligations under the Credit Agreement are hereby expressly designated as Senior Indebtedness of such Person for all purposes of this Indenture (except as provided in

2

the next sentence below) and the subordination provisions of this Indenture shall continue to apply to such Senior Indebtedness notwithstanding that any such obligations (or any portion thereof) are subordinated to any other claims against such Person as a fraudulent transfer or fraudulent conveyance under any bankruptcy, insolvency, fraudulent conveyance or similar law.

Notwithstanding the foregoing, "Senior Indebtedness" shall not include:

(a) any Indebtedness (other than Indebtedness and obligations referred to in clause (i) of this definition and any Refinancings thereof to the extent that any such Refinancings do not violate Section 5.10(b)(vi) incurred by such Person in violation of the covenants of this Indenture (but notwithstanding the foregoing, such Indebtedness (including any additional Indebtedness that may be borrowed or received thereunder at a future time) shall constitute Senior Indebtedness fi the original holder thereof relied in good faith, after being provided with a copy of this Indenture, upon an Officer's Certificate of such Person to the effect that the Incurrence fo such Indebtedness (including any additional Indebtedness that may be borrowed or received thereunder at a future time) did not (or would not if then borrowed or received in the case of such additional Indebtedness) violate the covenants of this Indenture).

(b) any Indebtedness of such Person that by its terms or the terms of the instrument creating or evidencing it expressly provides that such Indebtedness is not Senior Indebtedness under this Indenture or provides that it is subordinated to or pari passu with the Notes or any Subsidiary Guarantor's obligation under its Guarantee, as the case may be.

(c) any Indebtedness of such Person to a Subsidiary of such Person or an Affiliate of such Person (provided that no holder of any Senior Indebtedness describe in clause (i) of this definition or incurred by such Person from a Person that is a Bank (or an affiliate of a Bank) at the time of such incurrence, or any renewals, extensions, refundings, replacements, restructurings, refinancings, amendments or modifications thereof, shall be deemed to be an Affiliate of such Person solely as a result of such holding).

3

(d) any trade payables, even if overdue, and

(e) any Redeemable Stock of such Person.

Trial Exh. D-4, definition of "Senior Indebtedness" at Section 1.01. at 27-29.

4

# EXHIBIT "B"

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR DISTRICT OF DELAWARE

IN RE:

Kaiser Aluminum Corporation, *et al.*

Debtor(s)

Bankruptcy No.  02-10429-JKF

Chapter 11

**Related to Dkt. Nos. 6261, 6265, 6504, 6505, 6508, 6520, 6546.** *See Appendix A.*

Appearances of Counsel – *See Appendix B*

### MEMORANDUM OPINION[1]

Before the court are objections filed by Law Debenture Trust Company of New York

("LDTC") and Liverpool Limited Partnership[2] to the confirmation of the Third Amended

Joint Plans of Liquidation of four subsidiaries of Kaiser Aluminum Corporation ("KAC"):

(1) the joint plan of Alpart Jamaica, Inc. ("AJI") and Kaiser Jamaica Corporation ("KJC"),

(plan at Dkt. No. 6261), and (2) the joint plan of Kaiser Alumina Australia Corporation

("KAAC") and Kaiser Finance Corporation ("KFC"), (plan at Dkt. No. 6265). LDTC is the

Indenture Trustee under an Indenture dated February 1, 1993 (the "1993 Indenture"). Kaiser

Aluminum & Chemical Corporation ("KACC" or "the Company"), a subsidiary of KAC, is

the issuer of the "1993 Notes" (also known as the $12^{3/4}$% Notes) and various debtor

subsidiaries of KACC are guarantors of these Notes (the "Subsidiary Guarantors"). LDTC

---

[1]The court's jurisdiction was not at issue.  This Memorandum Opinion constitutes our findings of fact and conclusions of law.

[2]By agreement of the parties, an order confirming the liquidating plans was entered, reserving jurisdiction over these objections, which address entitlement to certain distributions under the plans.

objected to both joint plans with respect to subordination of the 1993 Note Guarantees to the 1994 Note Guarantees of the $9^{7/8}$% Senior Notes and the 1996 Note Guarantees of the $10^{7/8}$% Senior Notes.[3]

LDTC also filed an objection with respect to certain subordination issues raised by The Liverpool Limited Partnership (*see* Dkt. No. 6520) and an objection with respect to the joint plans' treatment of LDTC's fees and expenses and its claim for indemnification (*see* Dkt. No. 6506).[4] The plan confirmation order was entered on December 20, 2005, so as to save the estate $4 million in certain taxes that would otherwise be due, but preserving these objections.[5]

---

[3]LDTC asserts that the plan proponents must commence an adversary proceeding in order to assert subordination. Inasmuch as this is simply a dispute over the meaning of contract terms, no adversary proceeding is necessary. To the extent an adversary is required, one was commenced at Adv. No. 04-55115 by the 1994/96 Indenture Trustee and the 1994/96 Ad Hoc Group of Senior Noteholders (U.S. National Bank Association and Ad Hoc Group of Senior Noteholders v. KACC, *et al.*). The adversary complaint seeks a declaratory judgment that the 1994/96 Senior Notes and related guarantees are senior to the 1993 Senior Subordinated Notes. The issue with respect to subordination is identical. This Memorandum Opinion will resolve both LDTC's objection to the plans and the adversary. The adversary was stayed until completion of the plan confirmation process by order dated April 18, 2005. *See* Adv. 04-55115 at Dkt. No. 40. Prosecution of the adversary will be mooted by this outcome. An Order will be entered at the Adversary.

[4]LDTC also objected to Debtors' proposed settlement with the Parish of St. James, State of Louisiana, Solid Waste Disposal Revenue Bonds (the "$7^{3/4}$ % SWD Revenue Bonds") ("Gramercy Bonds"). *See* Motion . . . for an Order (A) Approving Settlement . . .", Dkt. No. 6290. An order approving that settlement was entered on June 2, 2005, at Dkt. No. 6865. *See also* Adv. 04-51165, Dkt. No. 70. No appeal was taken from this order.

[5]LDTC filed an appeal from this court's order of January 24, 2005, Bankr. Dkt. No. 6006, which denied with prejudice LDTC's motion for reconsideration of a stay of its objection to certain proofs of claim filed by PBGC. This appeal is pending in the District Court for the District of Delaware at case number 1:05-cv-00135-JJF and was consolidated with 1:05-cv-00136-JJF by order of the District Court dated May 3, 2005. *See* 1:05-cv-

(continued...)

2

### Subordination of 1993 Note Guarantees

The crux of the dispute is the interpretation of certain language in the 1993 Indenture which Debtors contend subordinates the 1993 Notes and Guarantees in right of payment to later incurred obligations of KACC that qualify as "Senior Indebtedness of the Company" in accordance with the terms of the 1993 Indenture. *See* Trial Exh. D-4, 1993 Indenture, Section 3.01, at 36. There is also a dispute as to whether extrinsic evidence is admissible to explain

---

[5](...continued)

00136-JJF at Dkt. No. 8. Case #1:05-cv-00136 is an appeal of this court's order of January 24, 2005, at Bankr. Dkt. No. 6005, which approved a settlement between the Debtors and the PBGC and dismissed LDTC's objection to the PBGC's proofs of claim. The PBGC filed an appeal from the February 5, 2004, order entered by this court in the District Court for the District of Delaware. *See* 1:04-cv-145. The District Court affirmed this court's order approving distress termination of the Debtors' plans and authorizing a replacement plan. The PBGC appealed to the Court of Appeals and that appeal is pending. *See* CA 05-2695.

LDTC also filed an Emergency motion to Stay Pending Appeal with respect to the PBGC settlement. Dkt. No. 6464. We heard argument on that motion at the plan confirmation hearing and indicated that if there had not been a ruling on the appeal by the time a plan confirmation order issued we would address the stay issue. We did so at a hearing on December 19, 2005. By way of background, at the April 27, 2005, hearing counsel for the PBGC stated that a number of the settlement provisions had been implemented. *See* Tr. 4/27/05 at 100, Bankr. Dkt. No. 6857. During the December 19, 2005, hearing, Debtors' counsel articulated the significant steps already taken to implement settlement. Other than distribution on the PBGC's settled and reduced claim through the plans, all other steps required by the settlement have been concluded, including, *inter alia*, Debtors' retention of several pension plans and a $5 million contribution to same which cannot be recovered by the estates, PBGC's assumption of the largest of Debtors' pension plans, etc. In addition, we previously found that LDTC's objection on the ground that the settlement would affect the source of its recovery on its claims was not an appropriate basis for staying the PBGC settlement which we found was in the best interests of creditors and the estate. We reiterated these finding at the December 19, 2005, hearing. A transcript of that hearing is not yet available. Previously, we also held that LDTC did not have a substantive right on the merits with respect to another creditor's (PBGC) claim, although it had a right to appear and be heard, Tr. 1/.18/05 at 34-35, Bankr. Dkt. No. 6099, particularly because, if LDTC was successful on appeal, PBGC would be subject to disgorgement, if applicable. In addition, at the time the PBGC settlement was under consideration negotiation with respect to an Intercreditor Settlement Agreement was also taking place. The two settlements were interdependent and both have been approved.

the 1993 Indenture and a dispute as to what constitutes "extrinsic evidence" under applicable New York law.[6]

LDTC objects to confirmation of the joint plans asserting, *inter alia*, that the plans impermissibly subordinate payment of the 1993 Note Guarantees. In LDTC's view, the 1993 Note Guarantees rank equally with all other obligations of the Subsidiary Guarantors except those that are "Senior Indebtedness." Debtors and KACC dispute LDTC's contentions. Hearings on the confirmation of the plans were held on April 13, April 27, and May 2, 2005. The plan confirmation order was entered on December 20, 2005. Dkt. No. 7983.

### The 1993 Indenture

Article Three of the 1993 Indenture is entitled "Subordination of Notes" and constitutes an agreement to subordinate the 1993 Notes to those obligations of the Company that qualify as "Senior Indebtedness of the Company" to the extent and in the manner set forth in other provisions of Article Three. Trial Exh. D-4, 1993 Indenture, Section 3.01, at 36. Sections 3.02[7] and 3.03[8] describe events that trigger Section 3.01 subordination and the

---

[6]In addition, Liverpool Limited Partnership filed a motion to strike declarations of John T. La Duc and Theodore Sands, among others. Dkt. No. 6497. To the extent that that motion is based on an argument that extrinsic evidence cannot be considered the motion is denied. For the reasons expressed hereafter, we find that extrinsic evidence that explains circumstances surrounding creation of the document is admissible. The deposition and declaration of Kenneth D. Gartrell was not admitted. At the hearing on April 27, 2005, the court ultimately concluded that they were irrelevant inasmuch as the testimony concerned how the bonds traded in 2004 based on pricing in 1993. Tr. 4/27/05, Dkt. No. 6857, at 193.

[7]Section 3.02 contains the "x clause," which provides that, under certain circumstances, subordinated noteholders will receive reorganization securities. The x clause is qualified, however, so that any such payments or distributions may not cause the Subordinated Notes or any Guarantees associated therewith to be treated in, *inter alia*, a "case or proceeding" "as part of the same class of claims as the Senior Indebtedness of (KACC) or

(continued...)

4

mechanics of effectuating the subordination once a triggering event occurs. *Id.* at 36-40.

Section 3.03 describes the mechanics of subordination if there is a nonbankruptcy default.

Unless one of the triggering events described in Sections 3.02 occurs, including the filing of

a bankruptcy petition, the Indenture prescribes that the 1993 Notes will not be subordinated.

Article Sixteen, entitled "Guarantee of Notes," concerns the 1993 Note Guarantees

rather than the Notes themselves. *Id.* at 103-14. The Subsidiary Guarantors, which include

the Subsidiary Debtors, issued these Guarantees. Section 16.01 sets forth operative terms and

---

[7](...continued)
any Subsidiary Guarantor that is a debtor in any such case, proceeding . . . ." The rest of this
section, in further pertinent part, provides:

> (a) the holders of all Senior Indebtedness . . . shall be entitled to
> receive payment in full . . . before the holders of the Notes or
> the Trustee on behalf of the noteholders shall be entitled to
> receive any direct or indirect payment or distribution on or with
> respect to the Notes . . . . provided, however, that payments or
> distributions pursuant to this parenthetical clause or any other
> reference in this Indenture to Reorganization Distributions shall
> be permitted only so long as such payments or distributions do
> not cause the Notes or any Guarantee to be treated in any case
> or proceeding or similar event . . . as part of the same class of
> claims as the Senior Indebtedness of the Company or any
> Subsidiary Guarantor that is a debtor in any such case,
> proceeding or similar event, or any class of claims on a parity
> with or senior to such Senior Indebtedness . . . .

Trial Exh. D-4 at Section 3.02(a) at 37.

> [8]Section. 3.03, titled "Default on Senior Indebtedness," provides, in part:
> No direct or indirect payments or distributions by or on behalf
> of the Company on or with respect to the Notes, whether
> pursuant to the terms of the Notes, or upon acceleration or
> otherwise . . . other than Reorganization Distributions, shall be
> made if, at the time of such payment or distribution, there exists
> a default in the payment of all or any portion of any Senior
> Indebtedness of the Company . . . .

Trial Exh. D-4, 1993 Indenture at Section 3.03, at 39.

Section 16.02 constitutes the agreement by the Subsidiary Guarantors, the Trustee and the noteholders to subordinate the 1993 Note Guarantees "for the benefit of all present and future holders of Senior Indebtedness of each Subsidiary Guarantor" and is an agreement that all payments pursuant to the guarantees by the Subordinated Guarantors are "hereby expressly subordinated . . in right of payment to the prior payment in full . . . of all Senior Indebtedness of such Subsidiary Guarantor."[9] Trial Exh. D-4 at 104.

The 1993 Note Guarantees are subordinated only to the "Senior Indebtedness" of each Subsidiary Guarantor and then only to the extent and manner set forth in the rest of Article Sixteen. *Id.* Section 16.03 provides that when there is direct or indirect payment or distribution of assets or securities of any Subsidiary Guarantor upon dissolution, liquidation or reorganization of a Subsidiary Guarantor, holders of Senior Indebtedness of the Subsidiary Guarantor shall be paid in full. Section 16.04 provides that there will be no direct or indirect payments by or on behalf of any Subsidiary Guarantor or with respect to the Guarantee (other than Guarantor Reorganization Distributions) if there is default in payment of Senior Indebtedness of "such Subsidiary Guarantor." *Id.* at 107. Section 16.04 is inapplicable to any payment to which Section 16.03 applies. *Id.* at 108.

---

[9]"Subsidiary Guarantor" is defined as follows:
> The term . . . shall mean the Persons from time to time named as Subsidiary Guarantors in this Indenture or that become Subsidiary Guarantors hereunder, and each of their respective successors, provided, however, that in the event that a Subsidiary Guarantor is released form its Guarantee in accordance with the terms of this Indenture, such Subsidiary Guarantor shall without any further action no longer be a Subsidiary Guarantor for any purpose of this Indenture or the Notes.

Trial Exh. D-4 at 30.

6

The term "Senior Indebtedness" is defined in Article One at Section 1.01. *See* Appendix C. "Senior Indebtedness" refers to "the obligations" of "[any] Person under the Credit Agreement." *Id.* at 27-28. (The Credit Agreement referred to is that of 1989. *Id.* at 15.) Clause (ii) of the definition provides that other debt will also qualify as Senior Indebtedness if incurred from a bank or if a written notice to that effect is delivered by the Company to the 1993 Indenture Trustee when such debt is issued. The parties agree that the required Notices were delivered with respect to the 1994 and the 1996 Notes.[10]

Clause (ii)(A)(1) designates indebtedness "for money borrowed" as Senior Indebtedness. Clause (ii)(A)(5) is broader and provides that Senior Indebtedness includes all guarantees of "any indebtedness referred to in this clause (ii)(A) of any Subsidiary of such Person." *Id.* at 28. "[S]uch Person," under the definition of "Senior Indebtedness" means "any Person." *Id.* at 27. Further, Senior Indebtedness constitutes "(i)(A) the Obligations of such Person under the Credit Agreement . . . and (ii) to the extent . . . designated in writing by the Company as Senior Indebtedness in a notice to the Trustee . . . ." *Id.* at 28. The reference in (ii)(A)(5) is not limited to money borrowed as LDTC contends; rather, it renders all downstream guarantees of any indebtedness covered by clause (ii)(A) as Senior Indebtedness.

Section 3.01 of the 1993 Indenture provides:

> Agreement to subordinate. The Company, for itself, its
> successors and assigns, covenants and agrees, and the Trustee

---

[10]At the hearing there was argument over the significance, if any, of capital "I" Indebtedness versus lower case "i" indebtedness. In light of the many instances in which "Indebtedness" is used and other places in the document in which "indebtedness" is used, we find that lower case "i" indebtedness is not a defined term. This view is illustrated not just by the contexts in which the two terms are used but by the fact that certain types of debt are excluded by the very terms of the definition of "Senior Indebtedness."

7

> and each holder of Notes, by his acceptance hereof, likewise
> covenants and agrees, for the benefit of all present, and future
> holders of Senior Indebtedness of the Company, that all direct
> and indirect payments or distributions on or with respect to the
> Notes, whether pursuant to the terms of the Notes or upon
> acceleration or otherwise . . ., is hereby expressly subordinated,
> to the extent and in the manner hereinafter set forth, in right of
> payment to the prior payment in full . . . of all Senior
> Indebtedness of the Company.

*Id.* at 18.

Section 3.01 of the 1993 Indenture is clear that the parties (KACC, the 1993 Indenture

Trustee and Subordinated Noteholders) agreed that all direct or indirect payments with

respect to the 1993 Notes could be subordinated to holders of indebtedness that did not exist

in 1993. Section 3.01 provides that subordination will be "to the extent and in the manner

hereinafter set forth." Falling under that proviso is an agreement by the holders of the

Subordinated Notes that, in the event that KACC filed bankruptcy, the noteholders would not

receive direct or indirect payments or distributions until holders of Senior Indebtedness of

KACC are paid in full.[11]

Section 16.02 contains provisions similar to Section 3.01 but with respect to

Subsidiary Guarantors. That is, Subsidiary Guarantors, the Trustee and Subordinated

Noteholders agree "for the benefit of all present and future holders of Senior Indebtedness of

such Subsidiary Guarantors . . . that all payments pursuant to the Guarantee by such

Subsidiary Guarantor are hereby expressly subordinated to the extent and in the manner

---

[11]Section 3.02 contains an "x clause," *see* note 7, *supra*, which permits limited
distributions in a reorganization proceeding as long as they do not cause the Subordinated
Notes or any Guarantee to be treated as part of the class of claims of the Senior Indebtedness
or any debtor Subsidiary Guarantor. Such distribution may not occur inasmuch as there are
probably insufficient funds to accomplish it. Section 16.03 also contains an x-clause.

hereinafter set forth, in right of payment to the prior payment in full . . . of all Senior

Indebtedness of such Subsidiary Guarantor." *Id.*, Section 16.02 at 104.[12] As will be

illustrated below, it is clear from the documents, and the court finds, that the purpose of the

Indenture was to subordinate all payments with respect to the Subordinated Notes regardless

of source, including payments on the Subordinated Guarantees, to any "Senior Indebtedness"

of KACC or the Subsidiary Guarantors outstanding then or in the future.

The Guarantees of the Senior Notes under the 1993 Indenture were designated as

"Senior Indebtedness" of the Subsidiary Guarantors, pursuant to the terms of the 1993

Indenture, when the notices with respect to the 1994 and 1996 Indentures were sent. The

1994 Notice provided, in part, that:

> Reference is made to the Indenture, dated as of February 1,
> 1993, . . .
>     This letter constitutes notice to the Trustee, as contemplated
> by the definition of the term "Senior Indebtedness" under the
> Indenture, that (i) the Company hereby designates the payment
> of the principal of, premium, if any, and interest on
> $225,000,000 aggregate principal amount of its $9^{7/8}$% Senior
> Notes . . . as "Senior Indebtedness" under the terms, and for all
> purposes, of the Indenture and (ii) each Subsidiary Guarantor
> hereby expressly designates the Guarantee (as defined in the
> Senior Note Indenture (as defined)) in respect of the payment of
> the principal of, premium, if any, and interest on the Senior
> Notes as "Senior Indebtedness" of such Subsidiary Guarantor
> under the terms, and for all purposes, of the Indenture. The
> Senior Notes have been issued, in an aggregate principal
> amount of $225,000,000, under an Indenture dated as of

---

[12]Section 5.05 provides that the Company is not required to continue the corporate
existence of any Subsidiary other than a Subsidiary Guarantor, as long as the subsidiary is a
Subsidiary Guarantor. However, Subsidiary Guarantors are permitted to merge or consolidate
with or into the Company, any other Subsidiary Guarantor, or "any other Person." Subsidiary
Guarantors are also permitted to transfer all or substantially all of their property to the
Company, any other Subsidiary Guarantor, or "any other Person." *Id.* at 51.

February 17, 1994 (the "Senior Note Indenture") . . ..

Trial Exh. D-14, Notice Dated February 17, 1994.  Two notices were issued with respect to

the 1996 Indenture and are substantially similar in their content.  The notice dated October

23, 1996, states:

> Notice is hereby given . . . that Senior Indebtedness, as
> defined in the Indenture, dated as of February 1, 1993,
> governing the Company's $12^{3/4}$% Senior Subordinated Notes
> due 2003 . . . includes the principal of, premium, if any, and
> interest on the Company's $10^{7/8}$% Senior Notes . . . and the
> related guarantees thereof . . . of each of the Subsidiary
> Guarantors under the 1996 Indenture . . . .
>     . . . . The principal of, premium, if any, and interest on the
> $9^{7/8}$% Senior Notes . . . and the related guarantees thereof of
> each of the Subsidiary Guarantors under the 1994 Indenture
> also constitute Senior Indebtedness, as defined in the 1993
> Indenture.  The Subsidiary Guarantors under the 1994 Indenture
> are the same as the Subsidiary Guarantors under the 1996
> Indenture.

Trial Exh. D-12, Letter of October 13, 1996.  *See also* Trial Exh. D-13, Letter of December

23, 1996.

It is LDTC's position that Senior Indebtedness includes only "money borrowed" and,

therefore, because the subsidiaries did not themselves borrow, the Subsidiary Guarantees

cannot be Senior Indebtedness.  However, clause (ii) of the definition provides that

"Obligations"[13] shall constitute Senior Indebtedness when, *inter alia*, so designated in writing

---

[13]"Obligations" is also a defined term and refers to "all obligations for principal" and
other financial commitments that arise under the 1989 Credit Agreement.  Trial Exh. D-4 at
21.  The term is broad enough to include guarantees.  Further, because guarantors promise to
pay the obligor's debt, guarantors are liable for payment of the principal and interest, etc., on
the obligor's debt.  LDTC and Liverpool argue that a guarantee cannot fall within the
definition of "Senior Indebtedness" because it is not an "assumption of debt."  Assumption of
debt is the function of a guarantee.  A guarantee is a debt.  *See, e.g., In re Gibralter*
(continued...)

10

by the Company. Trial Exh. D-4 at 28. This is what occurred when the 1994 and 1996

Notices were issued, as will be discussed below.

"Senior Indebtedness" is defined "with respect to any Person (whether heretofore

incurred or provided for or incurred after the date hereof)" and, *inter alia*, "to the extent . . .

designated in writing by the Company [KACC] as Senior Indebtedness in a notice to the

Trustee pursuant to the terms of this Indenture"[14] Trial Exh. D-4 at 27-28. The term includes

> (ii)(A)(1) the principal of, premium, if any, and interest on all
> indebtedness of such Person for money borrowed (including all
> such indebtedness evidenced by notes, debentures or other
> securities issued for money, whether issued or assumed by such
> Person)

*id.* at 28, as well as

> (D) all penalties, fees, premiums, expenses, reimbursements,
> indemnity obligations and all other monetary obligations of
> such Person in respect of any Indebtedness, obligation or
> guarantee described in [ii] . . .

*Id.* The definition of "Person" includes a corporation, *id.* at 25; and "Indebtedness" includes,

with respect to any "Person," "all Indebtedness of others guaranteed by such Person." *Id.* at

17, ¶ (f). The definition of "Senior Indebtedness" contains certain exclusions, none of which

are guarantees of KACC obligations by KACC subsidiaries. *Id.* at 29.

---

[13](...continued)
*Amusements, Ltd.*, 187 F.Supp. 931, 935 (E.D.N.Y. 1960), *affirmed* 291 F.2d 22 (2d Cir.),
*cert. denied* 368 U.S. 925 (1961)(liability on a guarantee is a non-contingent liquidated debt
provable in bankruptcy). The argument is devoid of merit.

[14]LDTC argues that the notices referred to cannot be admitted into evidence inasmuch
as they constitute extrinsic evidence violative of the parol evidence rule. We held at the
hearing that the notices are part and parcel of the Indentures and so overruled LDTC's
objection on this basis.

Reading the Indenture as a whole, it is abundantly clear that the hybrid financial structure of subordinated treatment of the Subordinated Notes at the parent level and *pari passu* treatment of the Subordinated Guarantees at the Subsidiary Guarantor level as suggested by LDTC was not created by the Indenture. The Indenture refers to the Subordinated Notes as subordinated. The Subordinated Notes themselves do so as well and further provide that their payment "is guaranteed on a senior subordinated basis by" these subsidiaries. *Id.* at 3. There is no reference therein that indicates that the Subordinated Guarantees are to be treated on a par with the Subsidiary Guarantors' guarantee of Senior Indebtedness of the Company.

Article Three is captioned "Subordination of Notes." Section 3.01 of the Indenture captioned "Agreement to subordinate" states that the Subordinated Note Indenture Trustee and each holder of the Subordinated Notes

> . . . covenants and agrees, for the benefit of all present and
> future holders of Senior Indebtedness of the Company, that all
> direct or indirect payments or distributions on or with respect to
> the Notes . . . is hereby expressly subordinated . . . in right of
> payment to the prior payment in full . . . of all Senior
> Indebtedness of the Company.".

*Id.* at 36.[15] Payments, whether pursuant to the terms of the Subordinated Notes or, *inter alia*, on account of a "Claim"[16] are "expressly subordinated, to the extent and in the manner

---

[15]With respect to Senior Indebtedness as defined in clause (i) of the same definition, the "prior payment in full" must be "in cash or Cash Equivalents." *See* Section 3.01 at 36. *See also* definition of "Senior Indebtedness" at 28.

[16]"Claim" is defined as "any claim against the Company *or any of its Subsidiaries* for rescission of the purchase of the Notes or for monetary damages from, or in connection with, the purchase of the notes, or for reimbursement or contribution on account of such a claim."

(continued...)

12

hereinafter set forth, in right of payment to the prior payment in full . . . of all Senior

Indebtedness of the Company." *Id.* at Section 3.01, at 36. Upon reorganization or

receivership, holders of Senior Indebtedness are entitled to be paid in full before holders of

the Subordinated Notes or the Subordinated Note Trustee on behalf of the noteholders can be

paid directly or indirectly. *Id.* at Section 3.02 at 36-37.[17]

Article Sixteen, captioned "Guarantee of Notes," provides in Section 16.02 that each

of the  Subsidiary Guarantors, the Subordinated Note Indenture Trustee, and each holder of

Subordinated Notes

> . . . covenants and agrees, for the benefit of all present and
> future holders of Senior Indebtedness of such Subsidiary
> Guarantor, that all payments pursuant to the Guarantee by such
> Subsidiary Guarantor are hereby expressly subordinated to the
> extent and in the manner hereinafter set forth, in right of
> payment to the prior payment in full . . . of all Senior
> Indebtedness of such Subsidiary Guarantor.

*Id.* at Section 16.02 at 104.[18] Under Section 16.03, holders of Senior Indebtedness are entitled

---

[16](...continued)
*Id.* at 12. (Emphasis added.)

[17]LDTC also argues that Section 3.01 (the specific section that provides that holders of
Senior Indebtedness of the Company are entitled to payment in full before noteholders of the
trustee receive any payment or distribution) applies only to direct or indirect payment or
distribution of the Company's assets or securities. This is a misreading of Section 3.02 which
provides simply that when the Company's assets or securities are distributed through, *inter
alia*, bankruptcy, Senior Indebtedness is paid in full first. The Company, KACC, filed
bankruptcy. That the Subordinated Noteholders are not to receive payment on their claims
until Senior Indebtedness is paid in full is further clarified by Section 3.02 which contains an
x-clause, applicable in a bankruptcy case, providing that the Subordinated Notes and
Subordinated Guarantees cannot be in the same class of claims as Senior Indebtedness of the
Company or the Subsidiary Guarantors that are debtors. *Id.* at Section 3.02(a), at 37.

[18]With respect to Senior Indebtedness as defined in clause (i) of the definition of same
(at 28), the "prior payment in full" must be "in cash or Cash Equivalents." *See* Section 16.02
(continued...)

to payment in full first in the event of "dissolution, liquidation and reorganization" of a Subsidiary Guarantor. *Id.* That section also contains an x-clause permitting certain limited distributions in a reorganization proceeding on the same basis as provided in Section 3.02(a). *Id.* at 37, 104. Section 5.05 permits Subsidiary Guarantors to merge or consolidate with or into KACC or any other Subsidiary Guarantor or to transfer assets to any of them.[19] Article Sixteen tracks the language of Article Three for the most part, except that references in Article Three to "the Company" are replaced in Article Sixteen with references to "Subsidiary Guarantors." In other words, the Indenture contains two separate Articles — one with respect to subordination in connection with KACC's obligations on the Notes and the other in connection with its subsidiaries' guarantee of KACC's obligations on the Notes. Section 3.01 of Article Three and Section 16.02 of Article Sixteen refer to different groups: Section 3.01 to holders of Senior Indebtedness of KACC and Section 16.02 to holders of Senior Indebtedness of the Subsidiary Guarantors. Section 16.02 also provides that "all payments pursuant to the Guarantee by such Subsidiary Guarantor are expressly subordinated . . . in right of payment to the prior payment in full of . . . Senior Indebtedness."

Moreover, as will be discussed below, the 1994 Notice specifically provided that each

---

[18](...continued)
at 104.

[19]  Section 16.03(c) also provides that consolidation of any Subsidiary Guarantor with, or the merger of any Subsidiary Guarantor into, another corporation or the liquidation or dissolution of any Subsidiary Guarantor following a sale or conveyance of all or substantially all of its assets "shall not be deemed a . . . reorganization" of the Subsidiary Guarantor for purposes of Article Sixteen if that other corporation complies with Section 16.12 as part of the merger or conveyance. Section 16.12 provides for, *inter alia,* assumption of certain obligations under the Indenture and contains net worth requirements, depending on the circumstances.

14

Subsidiary Guarantor expressly designated the Guarantee as Senior Indebtedness of the
Subsidiary Guarantor. Trial Exh. D-14. There is, therefore, no merit to LDTC's attack on the
provisions of the Indenture.

### Extrinsic Evidence

LDTC also argues that extrinsic evidence should not be admitted inasmuch as the
1993 Indenture is clear and unambiguous on its face. As part of this argument LDTC asserts
that the prospectuses with respect to the 1993, 1994 and 1996 Indentures are irrelevant.
However, this court ruled at trial that the prospectuses and the Notices issued regarding the
various Indentures were admissible, at least insofar as they provide historical context for the
dispute. The 1989 Credit Agreement was admitted for the same limited purpose. The Notices
with respect to the 1994 and 1996 Indentures were admitted on the same basis.

With respect to admission into evidence of the declarations and depositions of John La
Duc, Theodore Sands, and Martin Balsam, we overrule the objections, inasmuch as the
testimony describes the circumstances and purpose to be served by the documents.[20] Their
testimony does not contradict the documents themselves. Under New York law, a court
construing language of a contract "should accord that language its plain meaning giving due
consideration to 'the surrounding circumstances [and] apparent purpose which the parties
sought to accomplish.'" *Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir. 2000), quoting

---

[20]At trial the depositions and declarations were conditionally admitted on this basis
and insofar as they served to explain the surrounding circumstances concerning the 1993
Indenture. *See also* note 21, *infra.* We also admitted, on the same basis, prospectuses for the
1993 (Trial Exh. D-5), 1994 (Trial Exh. D-7), and 1996 Notes (Trial Exhs. D-9, D-11) and the
1994 (Trial Exh. D-6) and 1996 Indentures (Trial Exhs. D-8, D-10), and the 1989 Credit
Agreement (Trial Exh. D-15). Other exhibits also were conditionally admitted on the same
bases. We now admit these documents for the stated purpose.

15

*William C. Atwater & Co. v. Panama R. Co.*, 159 N.E. 418, 419 (N.Y. 1927). That is, the contract must be interpreted to give effect to the parties' intent as expressed in the contract itself. *Id.* Under New York law "[t]he parol evidence rule does not apply when the evidence sought to be introduced does not contradict the express terms of the written agreement in question." *See. e.g., In re Thomson McKinnon Securities, Inc.*, 139 B.R. 267, 273 (S.D.N.Y. 1992), citing *Marine Midland Bank-Southern v. Thurlow*, 425 N.E.2d 805, 808 (N.Y. 1981). The evidence that was offered at trial in this matter did not contradict the plain language of the 1993 Indenture but rather served to explain it and the context in which it was formulated.

New York law further provides that "[c]ontracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions, without regard to the surrounding circumstances, or the apparent purpose which the parties sought to accomplish." *Robertson v. Ongley Electric Co.*, 40 N. E. 390, 391 (N.Y. 1895), cited in *William C. Atwater & Co. v. Panama R. Co.*, 159 N.E. 418 (N.Y. 1927). That principle is still applied as New York law: *See In re Estate of Stravinsky*, 770 N.Y.S.2d 40, 45 (N.Y. App. Dist. 1st Dept.), *affirmed* 2003 WL 23028345 (N.Y. App. Dist. 1st Dept. 2003); *South Road Associates, LLC v. International Business Machines Corp.*, 770 N.Y.S.2d 126, 130 (N.Y. App. Dist. 2d Dept., 2003), *affirmed* 826 N.E.2d 806 (N.Y. 2005).

New York law, which the parties agree controls, permits extrinsic evidence to the extent it is of circumstances surrounding formation of a contract when that evidence explains the contract and does not contradict the plain meaning of the document. The ambiguity of a document is determined by looking only within its four corners. *See, e.g., Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998). All agree that the 1993 Indenture is unambiguous. The

16

Case 1:06-cv-00088-JJF    Document 2-3    Filed 02/08/2006    Page 18 of 34

evidence admitted here merely is explanatory and so is admissible. *See William C. Atwater & Co., Inc. v. Panama R. Co.*, 159 N.E. 418 (N.Y. 1927). *See also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168 (2d Cir. 2004).

In *Atwater* the court said:

> Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish. . . . The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.

*Atwater, supra*, 246 N.Y. at 524. New York law remains consistent with the pronouncement in *Atwater*. *See, e.g., Sargent v. Halsey*, 348 N.Y.S.2d 661, 664 (N.Y.S. 1973), *affirmed* 348 N.Y.S.2d 160 (N.Y. App. Dist. 2d Dept. 1973); citing *Wack v. Wack*, 74 N.Y.S.2d 435, 437 (N.Y.S. 1947)("[t]o interpret the meaning of the agreement, at the time and place it was made, all the surrounding circumstances at that time necessarily throw light upon it, and this rule applies to an unambiguous writing as to an ambiguous one"). "[T]he parol evidence rule does not prevent the introduction of extrinsic evidence to aid in interpretation of the contract. The rule excludes 'only evidence of prior understandings and negotiations which contradicts the unambiguous meaning of a writing which *completely* and *accurately* integrates the agreement of the parties.'" *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988) (emphasis in original) (citation omitted).

To the extent that deposition testimony and declarations of John La Duc, Theodore Sands and Martin Balsam are consistent with the language of the Indentures and serve to

17

explain the circumstances surrounding the 1993 Indenture, they are admissible.[21] This testimony is likewise consistent with Debtors' interpretation of the subordinated debt structure. Furthermore, the parties do not dispute that for the past ten years trading has been conducted in a manner consistent with the Debtors' interpretation which is supported by the structure under which the obligations were created.

The video deposition of Theodore Sands of March 17, 2005, Trial Exh. 2, is credible and particularly illustrative. At the time of the 1993, 1994, and 1996 Indentures Mr. Sands was employed by Merrill Lynch Capital Markets,[22] the lead underwriter on several issues of both stocks and bonds for the Kaiser Group and as to the public debt offerings represented by the 1993, 1994 and 1996 Notes. He was the senior investment banker with respect to these offerings and Merrill Lynch, as the lead underwriter, had the primary responsibility for due diligence and negotiation of the indenture as well as for the marketing of the issues.

Mr. Sands testified that Kaiser's structure was somewhat complicated. Kaiser Aluminum Corporation ("KAC") issued equity securities and KACC (the Company) was a

---

[21]The court had conditionally admitted deposition testimony at the hearing on April 27, 2005. We find that, because the testimony therein merely explains and does not alter the clear language of the 1993 Indenture, the deposition testimony is properly admitted. Furthermore, deposition testimony can be admitted if the witness is outside the court's subpoena powers. Fed.R.Civ.P 32. No one disagreed with Debtors' counsel's statement that the witnesses whose deposition testimony was admitted were, in fact, unavailable and outside this court's subpoena powers. We had ordered parties to submit declarations with the witnesses available for cross-examination at trial. However, some if not all of the witnesses were unavailable and not subject to the court's jurisdiction, so they were deposed. At that time counsel for the objecting parties had the opportunity to cross-examine the deponents and to object to their testimony. Counsel's objections were limited to the form of certain questions.

[22]This was the predecessor of Merrill Lynch & Co. Tr. of Sands Deposition of March 17, 2005, Deposition at 37.

subsidiary and the issuer of the debt. KACC functioned as an operating company but was also a holding company of sorts, as was KAC. The subsidiary guarantors were subsidiaries of KACC. Mr. Sands testified that the structure for the 1993, 1994 and 1996 offerings was used because of the structure of the initial transactions when KAC was purchased in a leveraged buyout.[23] He testified that "the banks were offered KACC and their debt was guaranteed by the subsidiaries, and so if we wanted to issue debt securities, we had to do it there and we couldn't do it up at KAC." Tr. of Sands Deposition, March 17, 2005, Deposition at 15. Some of the securities that were issued in the leveraged buyout were maturing in the time period leading up to the 1993 Indenture. Because Kaiser has "long-term assets" and lenders' terms generally are five to seven years, it was necessary that the debt be "stretched out." The interest rate on the subordinated debt before the 1993 transaction was at $14^{1/4}$ percent. That interest rate was replaced with the $12^{3/4}$% Notes which extended the maturity and brought

---

[23]MAXXAM, Inc. acquired KAC's predecessor, KaiserTech Limited, in 1988 and the transaction was financed by the issuance of increasing rate notes by KaiserTech which were in two tranches. The notes carried high initial interest rates which were scheduled to increase quarterly. Their maturity was three years, a very short time for a company that had very long-term assets. Therefore, after the acquisition, a refinancing was achieved resulting in the 1989 Credit Agreement and issuance of $350 million in $14^{1/4}$% Subordinated Notes. Because KACC held most of the Debtors' assets, the lenders required that KACC be the primary obligor, obtained mortgages against KACC's domestic fixed assets and certain of its subsidiaries. In addition, certain subsidiaries, including AJI, KJC, and KAAC, guaranteed KACC's obligations under that Credit Agreement. The guarantees of the $14^{1/4}$% Notes were on a subordinated basis inasmuch as significant assets and operations of KACC were owned by AJI, KJC, and KAAC. These Notes were issued as subordinated and not senior because KACC was not able to issue additional senior debt under the terms of the 1989 Credit Agreement. The $14^{1/4}$% Notes had a six year term and expired in 1995; the 1989 Credit Agreement expired in five years, in 1994. *See* Deposition of John La Duc. The 1993 debt was subordinated due to restrictions in the 1989 Credit Agreement. As Mr. Sands testified, it was anticipated that in the future KACC would issue senior debt in the form of public notes and it had to preserve its ability to do so.

19

down the interest rate. Mr. Sands repeated that KACC's position as issuer was set before the 1993 transaction. The debt bearing 14¹/⁴ % was due in 1995. Kaiser was not an investment grade issuer and its business was cyclical due to aluminum price fluctuations so when the opportunity to refinance arose, it was taken. The 14¹/⁴ % Notes were part of the borrowing base and certain ratios had to be maintained among the borrowing base, the equity, subdebt and senior debt. Therefore, the only choice was to "do subdebt". *Id.* at 21. In order to provide financial flexibility so that Kaiser could continue to extend maturities, a subordinated debt issue was the only option.[24]

Mr. Sands testified that when the 1993 Subordinated Notes were issued it was anticipated that senior Notes would be issued some time in the future. Furthermore, if subordinated debt was to be issued, it would have to be subordinated not only at the issuer but also at the guarantor level. Otherwise the result would be what he described as a "hybrid security" (such as what LDTC suggested was the case) which, to his knowledge, does not exist and which the bond markets would not accept. Subordinated debt holders get a higher interest rate to compensate for the subordinated status. The pricing indicates that the Notes are fully subordinated, i.e., at the parent and guarantor levels. *Id.* at 25. He testified that he had never heard of subordinating notes at the issuer level but not at the guarantor level and, in light of his experience with Kaiser in these matters, the 1993 Subordinated Notes and Guarantees were "absolutely" subordinated to the 1994 and 1996 Senior Notes and Guarantees. *Id.* at 26. Furthermore, a hybrid structure in which subsidiary guarantees would

---

[24] Mr. Sands testified that issuance of senior debt would have been preferred but to provide flexibility and in light of the existing structure, subordinated debt had to be issued.

20

rank equally to subsidiary guarantees of future senior notes would be considered novel and buyers would be confused, although such a structure could, in theory, be possible. *Id.* at 27-28.

Mr. Sands further testified that the statement in the 1994 and 1996 prospectuses that the subsidiary guarantees of the senior notes would rank senior to the subsidiary guarantees of the subordinated notes is consistent with his understanding of the structure. *Id.* at 28-30. He reiterated that the 1993 notes were subordinated and subsequent notes were senior. *Id.* at 33. He testified that the theory of notes subordinated with respect to payments at the KACC level but not with respect to payments from the guarantors was not supported in practice -- a security would not be designed that way. *Id.* at 46. Mr. Sands repeated that the $12^{3/4}$ % issue had to be subordinated because of the way the pre-existing covenants and capital structure worked. *Id.* at 47. The court accepts Mr. Sands' testimony and finds that there was no evidence at all that the guarantees of the Subordinated Notes were *pari passu* with the guarantees of future senior notes. All the evidence, including that of the 1993 Indenture itself, is, in fact, clearly to the contrary.

In other words, in 1993, senior debt in the form of the Credit Agreement existed and there was no public debt offering at that time. The 1994 and subsequent issues were used to pay down the Credit Agreement.[25] At the time of the leveraged buyout there was significant bank debt plus the subdebt and a relatively small amount of equity, as was standard at the time in a leveraged buyout. However, in light of the nature of the assets, carrying that amount of debt in a short-term bank facility was inappropriate. The goal, therefore, was to extend

---

[25]At some point the Credit Agreement was renegotiated and re-extended. *Id.* at 57.

21

maturities of senior debt because the average loan duration was three or four years but Kaiser had 25-year assets.[26] *Id.* at 56-57. Subordinated debt must have a longer duration than senior debt when capitalization is restructured – subordinated debt has to be paid after senior debt.[27] Because interest rates were decreasing, the subordinated debt issues were accomplished in tranches to take care of the term of the senior debt. *Id.* at 58-59. This, Mr. Sands testified, is standard financing. *Id.* at 60. His knowledge was attained through training and experience during his career.[28]

Although, he testified, a single issuer is preferred, because of the structure of Kaiser's bank agreement and because that structure had been used with the 14¼ % issue (i.e., issued at the KACC level and not at the parent), the 1993 and subsequent issues had to be done the same way. *Id.* at 72. The bottom line was that the 1993 issue was "a subordinated deal" at all levels. *Id.* at 93, 91. The structure was such that if the market existed for it a subsequent senior debt issue would be made. Circumstances were such that this hoped for goal was accomplished. *Id.* at 98.

The primary objective was to extend the maturity of KAC's subordinated debt. To meet that goal, it was necessary to have the parent as the issuer and the subsidiary as

---

[26]This meant utilizing senior notes which could have a ten year term as opposed to five to seven years, with an average loan life of three or four years.

[27]When the maturity of the subdebt was extended, the maturity of the senior debt could be extended, requiring that "we . . . start at the bottom of the capital and move up . . . ." *Id.* at 88.

[28]At the time of his deposition Mr. Sands was the president of HAAS Capital LLC, a financial advisory and investment company. He started his career with Merrill Lynch's predecessor, remained with Merrill Lynch when it acquired the predecessor, and worked for the firm until 1999.

22

guarantor because the original transaction was so structured. Extension of the term enabled the issuance of senior debt of longer duration. *Id.* at 96-97. That is, "[t]he commercial objective was to issue longer term subordinated debt which would permit you the option, if market conditions were appropriate, at some later date to issue senior debt." *Id.* at 112.

We further note that the testimony of others involved in the 1993, 1994 and 1996 transactions (Mr. La Duc and Mr. Balsam) was consistent with that expressed by Mr. Sands. *See, e.g.*, Deposition of John La Duc, March 24, 2005, at 13-40 (Trial Exh. 1); Deposition of Martin Balsam, April 4, 2005, at 14-53 (Trial Exh. 3).

This court initially determined that extrinsic evidence, whether in the form of deposition transcripts or other documents, would be inadmissible to explain the 1993 Indenture if it was unambiguous. *See* Tr. of 4/13/05 at 224, Dkt. No. 6722. However, our research has established that New York law, which the parties agree is the governing authority with respect to this matter, provides that only that parol evidence which contradicts an unambiguous contract is inadmissible. *See generally In re Thomson McKinnon Securities, Inc.*, 139 B.R. 267, 273 (S.D.N.Y. 1992). The parol evidence rule does not apply when the evidence proffered does not contradict the terms of the agreement. *Id. See also* discussion at 15-17, *supra*.

Although based on the documents alone the court finds that it is clear that the Debtors' view of the structure of the transactions and of what constitutes Senior Indebtedness is correct, the evidence adduced at trial of the surrounding circumstances supports Debtors' position as well. *See, e.g.*, Trial Exhs. D-12, D-13, D-14. The 1994 Notice provided, in part as follows:

23

> . . . each Subsidiary Guarantor hereby expressly designates the
> Guarantee (as defined in the Senior Note Indenture []as defined)
> in respect of the payment of the principal of, premium, if any,
> and interest on the Senior Notes as "Senior Indebtedness" of
> such Subsidiary Guarantor under terms, and for all purposes, of
> the Indenture to the extent that such Subsidiary Guarantor is a
> guarantor under the Indenture.

Notice of Incurrence of Senior Indebtedness dated February 17, 1994, Trial Exh. D-14.

LDTC conceded at the April 13, 2005, hearing that the Notices were timely sent. Tr. of

4/13/05 at 191-92. Despite acknowledging that the Notices were sent as required, LDTC

argues that the Notices were not public documents and that all indenture trustees do when

they receive such documents is file them once they make sure the Notice is signed.[29] *Id.* at

---

[29]Section 3.06 and Section 16.07 captioned "Notice to Trustee" state that
neither the Trustee nor any paying agent (other than the
Company) shall be charged with knowledge of any event which
would prohibit the making of any payment . . . to or by the
Trustee or such paying agent, unless and until the Trustee or
such paying agent shall have received . . . written notice thereof
from the Company or from the holder of any Senior
Indebtedness of the Company or from the Bank Agent or the
trustee for any such Senior Indebtedness of the Company . . . .
Section 3.06, Trial Exh. D-4 at 41,

Section 16.07 provides:
. . . neither the Trustee nor any paying agent (other than a
Subsidiary Guarantor) shall be charged with knowledge of any
event which would prohibit the making of any payment . . . to
or by the Trustee or such paying agent, unless and until the
Trustee or such paying agent shall have received . . . written
notice thereof from such Subsidiary Guarantor or from the
holder of any Senior Indebtedness of such Subsidiary Guarantor
or from the Bank Agent or the trustee for any such Senior
Indebtedness of such Subsidiary Guarantor . . . .
*Id.* at 109.

24

192-94. The Notices,[30] however, clearly state, and we noted at the argument, that "this is

senior sub debt and it's subordinated." *Id.* at 195.[31]

_____

[30]For example, the Notice dated February 17, 1994, Trial Exh. D-14, regarding the
1994 Senior Notes states:

> This letter constitutes notice to the Trustee, as
> contemplated by the definition of the term "Senior
> Indebtedness" under the [1993] Indenture, that (i) the Company
> hereby designates the payment of the principal of ,m premium,
> if any, and interest on [a certain amount of the principal] of its
> $9^{7/8}$ % Senior Notes . . . as "Senior Indebtedness" under the
> terms, and for all purposes, of the Indenture and (ii) each
> Subsidiary Guarantor hereby expressly designates the
> Guarantee . . . in respect of the payment of the principal of,
> premium, if any, and interest on the senior Notes as "Senior
> Indebtedness" of such Subsidiary Guarantor under the terms,
> and for all purposes, of the Indenture to the extent that such
> Subsidiary Guarantor is a guarantor under the Indenture.

*See also* Trial Exhs. D-12, D-13 with respect to the 1996 Senior Notes.

[31]Furthermore, in addition to Notices, which informed the Indenture Trustee of the
issuance of Senior Indebtedness, the prospectus(es) that went to investors clearly state that the
debt is senior and subordinated. In this regard, *see* Trial Exh. D-5, 1993 Prospectus, which
provides, in part, as follows:

> . . . . The Notes will be effectively subordinated to claims of
> creditors of the Company's subsidiaries, except to the extent
> that the holders of Notes may be creditors of such subsidiaries
> pursuant to a subsidiary guarantee. . .

*Id.* at 1. Further,

> The Notes are subordinate in right of payment to the
> Company's obligations under the Credit Agreement and all
> other present and future Senior Indebtedness . . . . See
> "Investment Considerations – Ranking of the Notes;
> Subordination; Debt Service."

*Id.* at 4. Under "Investment Considerations" the prospectus provides:

> **Ranking of the Notes; Subordination; Debt Service**
> The payment of the principal . . . and interest on the Notes is

(continued...)

25

[11](...continued)

> subordinated in right of payment, as set forth in the Indenture, to the payment when due of the Company's obligations under the Credit Agreement and all other present and future Senior Indebtedness (as defined) of the Company.

*Id.* at 6. Trial Exh. D-7, the 1994 Prospectus, provides in part as follows:

> The Notes will represent senior, unsecured obligations of the Company, ranking senior in right and priority of payment to all Indebtedness of the Company that by its terms is expressly subordinated to the Notes. The Notes will also be guaranteed on a senior, unsecured basis by certain subsidiaries of the Company. The Notes, however, will be effectively subordinated to secured Indebtedness of the Company and its subsidiaries that are guarantors of the Notes with respect to the assets securing such Indebtedness. The Notes will also be effectively subordinated to claims of creditors of the Company's subsidiaries, except to the extent that the holders of Notes may be creditors fo such subsidiaries pursuant to a subsidiary guarantee.

Trial Exh. D-7 at 1. Under the heading "Risk Factors" is the subheading "Ranking of the Notes; Subordination." That section states:

> *Ranking of the Notes.* The Notes will represent senior, unsecured obligations of the Company, ranking senior in right and priority of payment to all Indebtedness of the Company that by its terms is expressly subordinated to the Notes. . . . As of December 31, 1993, the Company's total consolidated indebtedness was $760.9 million (of which $431.5 million was expressly subordinated in right and priority of payment to the Notes).

Under the subheading "Subordination" is the following

> The obligations of the Company with respect to the Notes will be guaranteed, jointly and severally, on a senior, unsecured basis by certain Subsidiaries (as defined) of the Company. Any obligations of the Company's Subsidiaries will be effectively senior to the claims of the holders of te Notes with respect to the assets of such Subsidiaries, except to the extent that the holders of the Notes may be creditors of a Subsidiary pursuant to a subsidiary guarantee. . . . The rights of the Company and its creditors, including holders to eh Notes, to realize upon the

(continued...)

26

The issuance of the Notices was a prerequisite to creating Senior Indebtedness. LDTC agrees with this, *id.* at 191, but argues here that the Notices did not create Senior Indebtedness as that term is defined in the Indenture. LDTC asserts that only the Company, KACC, and not the Subsidiary Guarantors agreed to subordination subject to prior payment in full of Senior Indebtedness under the Indenture. This argument does not comport with the 1993 Notes or the 1993 Note Guarantees or the Notices themselves. Moreover, the noteholders themselves have agreed to the subordination of their payments, and that is what is at stake in this proceeding.

LDTC contends that because payments under the plans at bench are from the Subsidiary Guarantors' liquidation proceeding, the subordination agreement under the 1993 Indenture does not apply because Section 3.02 concerns distributions if the Company files a reorganization proceeding. LDTC's view that all payments must come from the Company is incorrect. LDTC argues that if Article Three and Article Sixteen of the 1993 Indenture are construed properly, the 1993 Noteholders are subordinated only through Article Three and only if the Company, not a Subsidiary, is distributing assets through a dissolution, liquidation or reorganization. *See* Trial Exh. D-4 at Section 3.02 at 36. LDTC argues that Article

---

[31](...continued)
assets of any Subsidiary upon such Subsidiary's liquidation or reorganization (and the consequent rights of holders of the Notes to participate in those assets) will be subject to the prior claims of such Subsidiary's creditors, except to the extent that the Company may itself be a creditor with recognized claims against such Subsidiary or to the extent that the holders of the Not may be creditors with recognized claims against such Subsidiary pursuant to the terms of a subsidiary guarantee . . .

*Id.* at 9-10. Trial Exhibit D-9 which is the 1996 Prospectus is consistent. *See id.* at 17.

Sixteen operates to subordinate only debts of the Subsidiary Guarantors. However, even if
LDTC is correct that distributions through the subsidiaries' reorganization is not an indirect
payment as to the Company, the payment of Senior Indebtedness still is required to be made
by the Subsidiary Guarantors under Article Sixteen. Section 16.03 provides that on direct or
indirect distribution of the assets (or securities) of any Subsidiary Guarantor upon
reorganization of the Subsidiary Guarantor the holders of Senior Indebtedness of the
Subsidiary Guarantor are entitled to payment in full. The Notices designated the Guarantees
to be Senior Indebtedness of the Subsidiary Guarantors. See text, *supra*, and Trial Exh. D-14.
LDTC's argument is not well founded.

Section 16.02 is substantially the same as Section 3.01 and Section 16.03 is
substantially the same as Section 3.02 but Article Three applies to the Company and Article
Sixteen applies to the Subsidiary Guarantors. Both set forth obligations to pay Senior
Indebtedness first upon dissolution, liquidation or reorganization. Therefore, even if Article
Three does not apply, Article Sixteen does and LDTC's objections are overruled.

We find that the documents themselves, as well as the admissible evidence of the
circumstances surrounding the transactions at issue clearly evidence an intent that the
Subordinated Guarantees be subordinated to the Senior Guarantees.

**Liverpool Limited Partnership's objections to the joint plans**

The Liverpool Limited Partnership objected to confirmation stating:

> The Plans cannot be confirmed unless the distributions
> proposed therein account for the following:
> (i) The Subsidiary Guarantors' guarantees of the 1993
> Notes generally are not subordinated to their guarantees of the
> 1994 Notes and of KACC's $10^{7/8}$ % notes (1996 Notes"). The
> plain language of the indenture that governs the 1993 Notes . . .

28

expressly provides that the Subsidiary Guarantors' guarantees of the 1993 Notes are subordinated to downstream guarantees of their own subsidiaries' obligations, but not to upstream guarantees of their parent's (KACC's) obligations. Thus, the Subsidiary Guarantors upstream guarantees of the 1993 Notes generally are *pari passu* with the upstream guarantees of the 1994 and 1996 Notes.

(ii) Although the Subsidiary Guarantors' guarantees of the 1993, 1994, and 1996 Notes are generally *pari passu*, their guarantees of the 1994 Notes are senior to a limited extent – specifically, to the extent that the 1994 Notes were used to refinance the Debtors' then pre-existing obligations under a 1989 bank credit agreement . . . because the 1993 Indenture expressly provides that the guarantees of the 1993 Notes are subordinated to such refinancing indebtedness, and "all guarantees thereof." Thus, although the guarantees of the 1993 Notes generally are not subordinated to other upstream guarantees of KACC's obligations (including generally to the upstream guarantees of the 1994 and 1996 Notes), there is an express subordination in the 1993 Indenture to upstream guarantees of "refinancing' indebtedness.[32]

The Liverpool Limited Partnership's Objection to Confirmation of the Plans of Reorganization Proposed by the Subsidiary Guarantors, Dkt. No. 6508, at 1. However, it is clear from the documents that in 1993 it was contemplated that later issues of senior debt would be made. Mr. Sands' testimony, consistent with that of La Duc and Balsam in this regard, explains why this was so. *See* discussion of deposition of Theodore Sands, *supra*.[33]

---

[32]Liverpool's argument regarding the unambiguous nature of the 1993 Indenture and its assertion that New York law bars consideration of extrinsic evidence when a document is unambiguous are the same as those raised by LDTC and they are likewise overruled. As we noted *supra*, New York law does not bar consideration of evidence concerning circumstances surrounding creation of unambiguous contracts. Likewise, we reject the argument that the evidence of surrounding circumstances does not support the plan proponents' view.

[33]LDTC and Liverpool also argue that a guarantee cannot fall within the definition of "Senior Indebtedness" because it is not an "assumption of debt." Assumption of debt is the function of a guarantee. The argument is devoid of merit.

29

The arguments raised by Liverpool are essentially the same as those relied on by LDTC. Liverpool notes that the plan proponents agree that clause (ii)(A)(5) ("all guarantees by such Person of any indebtedness referred to in this clause (ii)(A) of any Subsidiary of such Person or any Non-Affiliate Joint Venture of such Person") of the definition of Senior Indebtedness refers only to downstream guarantees but disputes the meaning of clause (ii)(A)(1) ("the principal of, premium, if any, and interest on all indebtedness of such Person for money borrowed (including all such indebtedness evidenced by notes, debentures or other securities issued for money, whether issued or assumed by such Person)"). Liverpool's position is that the reference to "indebtedness . . . for money borrowed" refers to all guarantees, denies that a guarantee of an obligation is an "assumption" of that obligation and points to the fact that there is no reference to guarantee in (ii)(A)(1). Liverpool is wrong. A guarantee of a debt is an assumption of the payment due on that obligation. A classic definition of "guarantee" is "[t]o assume responsibility for the . . . execution of." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 552 (1984). "Assume" is defined as "[t]o take upon oneself" and the example given is "*assume* the payments." *Id.* at 132 (emphasis in original). A document must be read as a whole and the court cannot take separate clauses out of context and assign a meaning thereto. *See generally ABS Partnership v. AirTran Airways, Inc.*, 765 N.Y.S.2d 616, 619 (N.Y. App. Div. 1st Dept.), *affirmed* 2003 WL 22391014 (N.Y. App. Div. 1st Dept. 2003).

Liverpool, as does LDTC, asserts that (ii)(A)(5) extends "Senior Indebtedness" only to certain types of guarantees by affiliates, i.e., downstream guarantees of subsidiaries and certain joint ventures, but argue that (ii)(A)(1) has no restrictions with respect to affiliation

30

with Debtors. This broad interpretation of clause (ii)(A)(1) would negate the specific limitations of (ii)(A)(5), the objectors contend. The reference in Section 3.01 to "all direct or indirect payments or distributions on or with respect to the Notes" and the reference in Section 16.02 to "all payments pursuant to the guaranty by each Subsidiary Guarantor" are not mutually exclusive in that Section 3.01 applies to the Company and Section 16.02 applies to subsidiaries. The term "Senior Indebtedness" applies specifically to "any Person" whether the debt is "heretofore Incurred or provided for or Incurred after the date hereof". "Person" is defined broadly and could include not only the Company but its subsidiaries and others.

### LDTC's objections to subordination issues raised by Liverpool

LDTC's position is consistent with Liverpool's in that they both assert that the 1994 Note Guarantees are not Senior Indebtedness. However, LDTC disagrees with Liverpool's assertion that $100 million of the 1994 Note Guarantees is senior to the 1993 Note Guarantees under the definition of "Senior Indebtedness" to the extent that definition includes "renewals, extensions, refundings, replacements, restructurings, refinancings, amendments and modifications." *See* Trial Exh. D-4, definition of "Senior Indebtedness" at ¶ (ii)(E) at Section 1.01. at 27-29. Liverpool asserts that because a Credit Agreement in 1994[34] replaced the 1989 Credit Agreement and because the revolving credit facility under the 1994 Credit Agreement was $100 million less than the commitment under the 1989 Credit Agreement, the Subsidiary Guarantors' exposure was reduced by $100 million. Consequently, in Liverpool's view, the 1994 guarantees constituted a refinancing of $100 million. That is, Liverpool agrees with

---

[34]We admitted the 1994 Credit Agreement, Trial Exh. D-16, for the limited purpose of completing the history of the credit financing. Tr. 4/27/05, Dkt. No. 6857, at 173-74.

LDTC except with respect to this $100 million. *See* Objection of [LDTC] to Subordination Issues Raised by Liverpool . . ., Dkt. No. 6520, at 3. At the hearing on April 27, 2005, Liverpool acknowledged that this issue would not be addressed unless the court ruled in LDTC's favor. Tr. 4/27/05, Dkt. No. 6857, at 229. However, we address it briefly to make clear that the 1994 Credit Agreement by its terms replaced the 1989 Credit agreement. At the hearing we concluded that Liverpool's position was not supported – the 1994 Credit Agreement replaced the 1989 Credit Agreement. It did nothing to the notes or guarantees. *See* Tr. 4/27/05 at 256 (refinance issue is not part of subordination issue); *id.* at 264-65 ("the [1994] credit agreement replaced the [1989] credit agreement"); *id.* at 266-67.

## LDTC's Fees and Expenses

LDTC also objected to the joint plans at issue because of the treatment provided therein for its fees and expenses. However, the plans were amended to provide for payment of the fees prior to distributions to noteholders, and at a hearing on December 19, 2005, the parties submitted a consensual plan confirmation order which appears to resolve this issue. The plan confirmation order was entered on December 20, 2005. *See* Dkt. No. 7983. To the extent any remaining issues with respect to the fees and expenses of LDTC remain unresolved, within ten days from the date of the order accompanying this Memorandum Opinion, LDTC shall file a motion for reconsideration. If such a motion is filed it will be heard at the hearing scheduled for January 10, 2006, at 9:00 a.m. in Pittsburgh, Pennsylvania.

For the foregoing reasons, we will sustain the plan proponents' position and overrule

the objections with respect to the subordination issues.  An appropriate order will be issued.

DATE:   December 22, 2005

*Judith K. Fitzgerald*
                           mab
Judith K. Fitzgerald
United States Bankruptcy Judge

33

# EXHIBIT "C"

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | **Case No. 02-10429 (JKF)** |
| **KAISER ALUMINUM CORPORATION, et al.,** | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | **Hearing Date 4/13/05 @ 9:00 a.m.** |
| | : | **Objections Due 4/5/05 @ 4:00 p.m.** |
| | : | **Re: Docket Nos. 6261, 6265 & 6290** |

**OBJECTION OF LAW DEBENTURE TRUST COMPANY OF NEW YORK TO**
**(I) SUBORDINATION OF INDENTURE TRUSTEE FEES AND EXPENSES UNDER**
**(A) THE THIRD AMENDED JOINT PLAN OF LIQUIDATION FOR ALPART**
**JAMAICA, INC. AND KAISER JAMAICA CORPORATION DATED FEBRUARY 25,**
**2005, AND (B) THE THIRD AMENDED JOINT PLAN OF LIQUIDATION FOR**
**KAISER ALUMINA AUSTRALIA CORPORATION AND KAISER FINANCE**
**CORPORATION, DATED FEBRUARY 25, 2005 AND TO**
**(II) PROPOSED SETTLEMENT OF 7 3/4 % SWD REVENUE BOND DISPUTE**

Law Debenture Trust Company of New York ("**LDTC**") is the Indenture Trustee[1] under the

Indenture dated as of February 1, 1993 (the "**1993 Indenture**"), under which Kaiser Aluminum &

Chemical Corporation (the "**Company**") is the issuer of certain notes (the "**1993 Notes**") and various

Debtor subsidiaries of the Company are guarantors (the "**Subsidiary Guarantors**" and the "**1993 Note**

**Guarantees**"). LDTC hereby objects to (I) (a) the Third Amended Joint Plan of Liquidation for Alpart

Jamaica, Inc. and Kaiser Jamaica Corporation dated February 25, 2005 (D.I. 6261), and (b) the Third

Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance

Corporation, dated February 25, 2005 (D.I. 6265) (as the two Plans are substantially identical as relevant

to this Objection, they are together referred to as the "**Plan**") and (II) the Settlement Motion (as defined

below). Capitalized terms not otherwise defined herein are as defined in the Plan.

**This Objection focuses on the discrete issue of the proper treatment under the Plan and the**

**Settlement Motion of LDTC's fees and expenses.** Contemporaneously herewith, LDTC is filing a

second Objection that focuses on the Plan's treatment of the 1993 Notes as subordinated (the

---

[1] LDTC is the successor indenture trustee to State Street Bank and Trust Company which was, in
turn, the successor to First National Bank of Boston.

"**Classification Objection**") and a third Objection to address the discrete subordination issues raised by The Liverpool Limited Partnership.

### INTRODUCTION

This Objection concerns the Plan's failure to make distributions to LDTC in respect of its contractual entitlement to fees, charges and expenses, including professional fees (collectively, the "**Fees**"). The Court is well aware of the dispute between LDTC, on the one hand, and the so-called "1994/96 Parties" and Liverpool, on the other hand, regarding whether the 1993 Note Guarantees are subordinated to a portion or all of the so-called "1994/96 Note Guarantees" (as discussed in the Classification Objection and the Liverpool Objection, the "**Classification Dispute**"). Pursuant to the Plan, the Public Note Distributable Consideration (the "**Consideration**") is to be allocated between the 1993 Noteholders and the 1994/96 Noteholders, depending on the results of the Classification Dispute. Should LDTC prevail in the Classification Dispute, then the 1993 Noteholders' share of the Consideration will be distributed through LDTC and this Objection will be moot. On the other hand, should the 1994/96 Parties prevail in the Classification Dispute, the Plan provides that 100% of the Consideration will be distributed directly to the 1994/96 Noteholders through their indenture trustees. This Objection focuses on the latter possibility.[2]

A distribution of 100% of the Consideration through the 1994/96 Indenture Trustees would circumvent LDTC's charging lien for the Fees in violation of the 1993 Indenture and applicable law. Regardless of the results of the Classification Dispute, the subordination provisions in the 1993 Indenture encompass only distributions with respect to the 1993 Note Guarantees, not with respect to the Fees. Further, Bankruptcy Rule 3021 requires that all plan distributions in respect of public debt securities be made in the first instance to the relevant indenture trustee, thus permitting the trustee to exercise its charging lien even if the trustee is thereafter required to turn over the remainder of the distributions to a

---

[2] LDTC also intends to apply for payment of all or part of its Indenture Trustee Fees as a "substantial contribution" under section 503(b) of the Bankruptcy Code, but the Court may ultimately decide not to award all of the fees applied for.

more senior class of securities. In addition to this being a proper interpretation of the 1993 Indenture and

Bankruptcy Rule 3021, it is also sound policy to ensure that the interests of public debt securityholders

are appropriately represented in chapter 11 cases.

**DISCUSSION**

**I.     THE 1993 INDENTURE DOES NOT SUBORDINATE FEES**

**A.     The Fee Payment Provisions of the 1993 Indenture Are Not Subject to the Subordination Provisions**

The Fee payment provisions of the 1993 Indenture provide that LDTC's right to compensation

and reimbursement is not subordinated to the claims of the holders of the 1994/96 Notes. LDTC's Fees

are to be paid before amounts must be paid under the 1993 Indenture's debt subordination provisions.

First, Section 7.03 of the 1993 Indenture provides as follows (emphasis added):

> Any moneys collected by the Trustee pursuant to Section 7.02 shall be applied to the payment of all amounts due to the Trustee pursuant to Section 8.06 and thereafter, subject to Article Three and Article Sixteen, in the order following. . . .

Thus, the 1993 Indenture dictates that payments due under Section 8.06 must be paid first to LDTC, and

only thereafter are moneys received by LDTC subject to the subordination provisions (Articles Three and

Sixteen).

Second, Section 7.02 of the 1993 Indenture sets forth a typical payment default provision,

including LDTC's right to file and collect claims on behalf of itself and the 1993 Noteholders. In relevant

part, Section 7.02 provides (emphasis added) that:

> [The 1993 Indenture Trustee] shall be entitled to institute any actions or proceedings at law or in equity for the collection of the sums so due and unpaid . . . , to file and prove a claim or claims [in the Company's bankruptcy] for the whole amount of principal, premium . . . and interest owing and unpaid in respect of the [1993] Notes . . . , to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and of the noteholders allowed . . . , and to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same after the deduction of its reasonable charges and expenses . . . .

It is evident that Section 7.02 (i) distinguishes between claims of LDTC, on the one hand, and claims of the 1993 Noteholders, on the other hand, (ii) permits LDTC to pursue remedies in order to seek payment with respect to both types of claims, and (iii) contemplates that the 1993 Indenture Trustee will receive any moneys payable or deliverable on any such claims.

Third, Section 8.06 sets forth additional language confirming LDTC's right to payment of its Fees (emphasis added):

> The Company covenants and agrees to pay the Trustee . . . reasonable compensation . . . and the Company will pay or reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances . . . . The Company also covenants to indemnify the Trustee for . . . any loss, liability or expenses . . . . The obligation of the Company under this Section 8.06 . . . shall constitute additional indebtedness hereunder and shall survive the satisfaction and discharge of this Indenture. . . . Such additional indebtedness shall be secured by a Lien upon all property and funds held or collected by the Trustee as such, except funds held in trust for the benefit of the holders of particular Notes.

Adding together Sections 7.03, 7.02 and 8.06, the Debtors must pay LDTC's claim for Fees independently of and in addition to the claims of the 1993 Noteholders as set forth in other provisions of the 1993 Indenture. However, the Plan simply ignores LDTC's right to payment of its Fees and instead provides in Sections 2.4(c)(ii)(B) and 5.2.2 that any distributions from the Subsidiary Guarantors that are owed to the 1993 Noteholders will be made directly to the 1994/96 Indenture Trustees for the benefit of the 1994/96 Noteholders. For this reason, confirmation of the Plan should be denied.

**B.    The Subordination Provisions Do Not Apply to Fee Payments**

Assuming for the purposes of this Objection that the 1994/96 Parties prevail in the Classification Dispute and that therefore the 1993 Note Guarantees are subordinated to the 1994/96 Note Guarantees, the subordination provisions only extend to payments owing to the 1993 Noteholders and do not extend to the independent payments owing to LDTC. The Classification Objection quotes and discusses at length the subordination provisions in Articles Sixteen and Three; it is sufficient for this Objection to note the following:

- Section 16.02 provides that the 1993 Note Guarantees are subordinated to Senior Indebtedness of the Subsidiary Guarantors "to the extent and in the matter hereinafter set forth."

- Section 16.03(a) requires payment in full to holders of Senior Indebtedness of the Subsidiary Guarantors "before the holders of the Notes or the Trustee on behalf of the noteholders shall be entitled to receive, pursuant to the Guarantee, any direct or indirect payment or distribution on or with respect to the Notes." Fee payments owing to LDTC are neither payable to LDTC "on behalf of the noteholders" nor payments "on or with respect to the Notes." Fee payments are payable to LDTC on its own behalf and compromise payments to LDTC on or with respect to the Debtors' independent contractual obligations to pay the same as "additional indebtedness."

- Section 16.03(b) applies to any payments "to which the holders of the Notes or the Trustee would be entitled except for the provisions of this Article Sixteen." As quoted above, Section 7.03 is clear that the provisions of Article Sixteen do not apply until _after_ payment of LDTC's Fees.

- Section 16.03(c) requires turnover of any payments "received by the Trustee or any holder of the Notes, whether pursuant to the terms of the Notes, or upon acceleration or otherwise, including by way or on account of a Claim or the payment of the principal of, premium, if any, Change of Control Purchase Price, Asset Sale Purchase Price, or interest on any of the Notes." Fee payments are not received "pursuant to the terms of the Notes," meaning they are not part of the scheduled principal and interest payments. Fee payments are payable "upon acceleration," but as independent obligations, not as part of the 1993 Notes, which is made clear by the examples listed (Claim, principal, premium, interest, etc.), so Section 16.03(c) also does not apply. Section 16.04 is to the same effect, as can be seen from its penultimate paragraph.

- Section 3.01 is to the same effect as Section 16.02 as discussed above, and Sections 3.02(a), (b) and (c) are to the same effect as Sections 16.03(a), (b) and (c) as discussed above.

In sum, even if this Court determines that the obligations under the 1993 Note Guarantees are otherwise fully subordinated to the obligations under the 1994/96 Note Guarantees, the subordination provisions do not extend to the Debtors' obligations in respect of LDTC's Fees.

## II.   BANKRUPTCY RULE 3021 REQUIRES THAT ALL PLAN DISTRIBUTIONS WITH RESPECT TO THE 1993 INDENTURE MUST BE MADE FIRST TO LDTC

The Bankruptcy Rules require that distributions on account of the 1993 Note Guarantees be made first to LDTC as indenture trustee, even if thereafter LDTC is obligated to turn over all moneys received after application of its charging lien. Because the Plan provides otherwise, it cannot be confirmed.

Bankruptcy Rule 3003 provides that "[a]n indenture trustee may file a claim on behalf of all known or unknown holders of securities issued pursuant to the trust agreement under which it is a trustee." Fed. R. Bankr. P. 3003(c)(5). Here, LDTC filed two claims on behalf of itself and the 1993 Noteholders. See Claim Nos. 7562 and 7563.

The Bankruptcy Rules and the 1993 Indenture further provide that any distribution on account of the 1993 Notes must be made in the first instance to LDTC. Specifically, Bankruptcy Rule 3021, in relevant part, provides that when an indenture trustee files a proof of claim, distributions to holders must be made through the indenture trustee:

[A]fter a plan is confirmed, distribution shall be made . . . to indenture trustees who have filed claims under Rule 3003(c)(5) that have been allowed.

Fed. R. Bankr. P. 3021 (emphasis added). In particular, the use of the word "shall" in Rule 3021 is significant. When used in a Rule, "[t]he word 'shall' is ordinarily 'the language of command.' And when the same Rule uses both 'may' and 'shall,' the normal inference is that each is used in its usual sense – the one act being permissive, the other mandatory." *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947) (internal citation omitted). *See also Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily 'the language of command.'"). And the word "allowed" is not disqualifying. LDTC's and the 1993 Noteholders' claims are treated as "allowed" even if subordination is order. If the claims weren't "allowed," there would be no distributions to which the subordination provisions could apply.

The plain meaning of Bankruptcy Rule 3021 is clear: when an indenture trustee files a claim, plan distributions to holders must be made through the indenture trustee. When a statute or rule is plain on its face, it must be applied according to its plain meaning. *See Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000) ("As we have previously noted in construing [a section of the

Bankruptcy Code], when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.") (internal quotation marks omitted).

The logic behind Bankruptcy Rule 3021 is just as clear. The obvious purpose of Bankruptcy Rule 3021 is to preserve the participating indenture trustee's rights to fees and expenses, which rights typically are protected contractually by a charging lien. *See, e.g., In re NII Holdings*, 288 B.R. 356, 370 (Bankr. D. Del. 2002) (confirming plan which, although providing for the cancellation of all securities, expressly preserved the rights of the Indenture Trustee to assert a charging lien for unpaid fees and expenses against distributions to be made to holders of the securities); *In re Federated Dep't Stores*, No. 1-90-00130, 1991 Bankr. LEXIS 601 at *122 (Bankr. S.D. Ohio Apr. 29, 1991) ("notwithstanding the rejection of the Debt Securities Indentures . . . [nothing shall] impair the rights of the Indenture Trustees to enforce their Indenture Trustee Charging Liens against property that would otherwise be distributed to the holders of the Allowed Debt Security Claims"). Such contractual provisions are particularly important in the case of subordinated debt, where the indenture trustee's right to reimbursement of fees and expenses – as is the case here – is not subordinated to the payment of the senior claims. In fact, Bankruptcy Rule 3021 reflects what is obvious in any debt issuance – indenture trustees do not take the same risk as noteholders when it comes to getting paid.

Even before enactment of the Bankruptcy Code and the Bankruptcy Rules, Congress and the courts alike acknowledged the significant role that indenture trustees play in bankruptcy cases. Bankruptcy Rule 3021, as well as its predecessor Chapter X Rule 10-405(a), came into existence as a result of the indenture trustees' positive contributions to bankruptcy cases:

> The indenture trustee . . . did not risk its own funds and is not reaping the rewards of any investment in an issuer. It is in the service business and provides services for a fee. Accordingly, and in keeping with the policy articulated in Section 315(c) of the Trust Indenture Act of 1939, 15 U.S.C. § 77ooo(c), that indenture trustees take an aggressive role in Chapter X proceedings, Congress included in its revision to the Bankruptcy Act a new Section 242 [allowing for the reimbursement of proper costs, expenses and attorneys' fees incurred by indenture trustees] . . . Congress acknowledged that indenture

> trustees benefit the reorganization of an estate by their very participation under fiduciary
> standards.

*In re Multiponics, Inc.*, 436 F. Supp. 1072, 1076 (E.D. La. 1977), *aff'd on other grounds*, 622 F.2d 731

(5th Cir. 1980).

Bankruptcy Rule 3021 also highlights the fact that an issuer's bankruptcy triggers a host of

contractual and statutory duties for indenture trustees. As noted by one court, "Under the terms of the

Indenture (which are required under the Trust Indenture Act of 1939), when an Event of Default occurred,

the indenture trustee was required to exercise the rights and powers vested in it by the indenture and to

'use the same degree of care and skill in their exercise that a prudent man would exercise or use under the

same circumstances in the conduct of his own affairs.' [After the debtor filed for bankruptcy, the

indenture trustee] was required to take the steps it took to secure the Subordinated Debentureholders

recovery and is entitled to be compensated for its efforts." *United States Trust Co. of New York v. Pardo*

*(In re W.T. Grant Co.)*, 119 B.R. 898, 903 (S.D.N.Y. 1990), *aff'd*, 935 F.2d 1277 (2d Cir. 1991).

Similarly, LDTC is entitled to be compensated for its actions consistent with its contractual and statutory

duties on behalf of the 1993 Noteholders.

## III.   THE 1993 INDENTURE CANNOT OVERRIDE BANKRUPTCY LAW

As just discussed, Articles Three and Sixteen of the Indenture Trustee do not encompass LDTC's

Fees even if all other sums owing under the 1993 Indenture Trustee are required to be paid directly to the

holders of (or the indenture trustees for) Senior Indebtedness. However, even if Articles Three and

Sixteen provided otherwise, it is nevertheless black letter law that private parties cannot contract away

specific rights granted under the Bankruptcy Code. *See, e.g., Bank of America v. North LaSalle St. Ltd.*

*P'Ship (In re 203 N. LaSalle St. P'Ship)*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000) ("It is generally

understood that prebankruptcy agreements do not override contrary provisions in the Bankruptcy Code.");

*Hayhoe v. Cole (In re Cole)*, 226 B.R. 647, 652 nn.6-7 (B.A.P. 9th Cir. 1998) (listing cases that

prepetition waivers of bankruptcy rights are unenforceable); *see also Fallick v. Kehr*, 369 F.2d 899, 904

(2d Cir. 1966) (stating that advance agreements to waive the benefits of bankruptcy are void).

Public policy dictates that the Bankruptcy Rules must trump the specific terms of a private agreement. *See Klingman v. Levinson*, 831 F.2d 1292, 1296 n.3 (7th Cir. 1987) (it is contrary to public policy to allow a debtor to "contract away the right to a discharge"). Were it otherwise, bankruptcy law would simply be a matter of contract between private parties, rather than a comprehensive code of statutes and rules that all must follow. *See 203 N. LaSalle*, 246 B.R. at 331 ("since bankruptcy is designed to produce a system of reorganization and distribution different from what would obtain under nonbankruptcy law, it would defeat the purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply").

Moreover, implicit in the Plan's payment provisions is the preposterous presumption that an indenture trustee for subordinated debt would take the same investment risk with respect to its Fees as the noteholders take with respect to payments on their notes. In the well-established world of public debt, subordination applies only to the holders of debt as an intercreditor arrangement, and has no effect on the indenture trustee's contractual right to fees and expenses. *See* Revised Model Simplified Indenture, 55 Bus. Law. 1115, 1162 § 11.12 (May 2000) ("The Trustee's rights to compensation, reimbursement of expenses and indemnification under sections 6.08 [priority of payments] and 7.07 [compensation and indemnity] are not subordinated."). Obviously, if the Debtors' view of acceptable trustee risk were to prevail in the marketplace, the cost of trustee services would skyrocket above the modest fees charged under typical trust arrangements, and indenture trustees for subordinated debt issuances would resign their trusteeships rather than be forced to bear the risk of nonpayment of their Fees.[3] In essence, the Debtors would like LDTC to assume a degree of risk for which it was never compensated in the first place, and –

---

[3] An indenture trustee's right to apply for reimbursement of its Fees on the grounds of "substantial contribution" cannot be considered an acceptable protection against payment risk, given that substantial contribution applications are not ripe until the end of a case and the approval of such applications in full can never be presumed. Nor is it appropriate to suggest that the subordinated noteholders themselves should bear the risk of the indenture trustee's Fees on an out-of-pocket basis. Public indentures always require the note issuer to pay Fees but never is there a contractual obligation for the noteholders to pay Fees, for the obvious reason that the identity of the noteholders changes from time to time in the same way that the identity of public shareholders changes from time to time.

if the Debtors have their way – for which LDTC will not be compensated in the future.

## IV.    THE PLAN CANNOT BE CONFIRMED BECAUSE IT FAILS TO COMPLY WITH TITLE 11 AND OTHER APPLICABLE LAW

Section 1129(a)(1) requires that a plan "compl[y] with the applicable provisions of [title 11]"

before it can be confirmed. *See In re PWS Holdings*, 228 F.3d 224, 248 (3d Cir. 2000). Here, the Plan

fails to comply with Bankruptcy Rule 3021 because it contemplates distributions on account of the 1993

Note Guarantees that do not pass through LDTC.

Similarly, the Debtors cannot satisfy the requirement of section 1129(a)(3) that the Plan "has

been proposed in good faith and not by any means forbidden by law." *See In re Century Glove*, C.A. No.

90-400-SLR, C.A. No. 90-401-SLR, 1993 U.S. Dist. LEXIS 2286 at *15 (D. Del. Feb. 10, 1993).

Specifically, the Plan seeks to render LDTC's charging lien valueless and to override the Debtors'

contractual obligations by distributing funds directly to the holders of Senior Indebtedness rather than

through LDTC.

## V.    THE PLAN CANNOT BE CONFIRMED UNDER SECTION 1129(b) OF THE BANKRUPTCY CODE AND THE PROPOSED SETTLEMENT OF THE 7-3/4% SWD REVENUE BOND DISPUTE SHOULD NOT BE APPROVED

The Plan's (non)treatment of LDTC's Fees is also unfairly discriminatory in light of the Debtors'

proposed settlement with the holders of Parish of St James, State of Louisiana, Solid Waste Disposal

Revenue Bonds Series 1992 (the "**SWD Revenue Bonds**"). *See* Motion of Debtors and Debtors in

Possession for an Order (A) Approving Settlement of Claims in Respect of Potential Subordination

Rights of Holders of Parish of St. James, State of Louisiana, Solid Waste Disposal Revenue Bonds

(Kaiser Aluminum Project) Series 1992 and (B) Dismissing Adversary Proceeding with Prejudice, dated

March 2, 2005 (D.I. 6290, the "**Settlement Motion**"); *see also* Plan at 39-40 (discussing 7 3/4 % SWD

Revenue Bond Dispute and proposed settlement thereof). In particular, and according to the Settlement

Motion, the SWD Revenue Bonds will receive partial "Senior Indebtedness" treatment and, in direct

contrast to their proposed treatment of LDTC, the Debtors will pay as much as $500,000 to reimburse

certain holders of the SWD Revenue Bonds *and their indenture trustee* for their collective fees and

expenses. *See* Term Sheet at 1 and 2 (defining "Gramercy Creditors" to include the 7 3/4% SWD Revenue Bond Indenture Trustee, and providing for reimbursement of Gramercy Creditors' fees and expenses up to $500,000), attached as Exhibit A to the Settlement Motion. At the same time, the Settlement Motion seeks to dismiss with prejudice LDTC's counterclaims against the plaintiffs and LDTC's cross-claims against the Debtors for indemnification and for payment of LDTC's Fees.[4]

Thus, the Plan and the Settlement Motion seek to treat the claims of similarly situated indenture trustees in vastly different ways. Bankruptcy law, however, prohibits such disparate treatment. Specifically, under the cramdown standard for confirmation, debtors cannot discriminate unfairly against similarly situated creditors -- like indenture trustees. *See* 11 U.S.C. 1129(b)(1). Here, the Debtors have sought to subordinate payment of LDTC's fees and expenses, even though the 1993 Indenture clearly provides that its fees must be paid before distributions can be made to the holders of Senior Indebtedness. Adding insult to injury, the Debtors will pay as much as $500,000 in cash to the 7-3/4% SWD Revenue Bond Indenture Trustee, while LDTC will receive nothing if the Plan is confirmed. Such disparate treatment is *per se* "unfair" under the section 1129(b) and applicable case law. *See, e.g., In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999) (a plan is unfairly discriminatory when there is: "(1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a *materially lower percentage recovery for the dissenting class*. . .[,] or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proper distribution.") (emphasis added). Here, there can be no doubt that LDTC stands to receive a "materially lower" recovery in comparison to the

---

[4] LDTC's cross-claim against KACC for indemnification and third party complaint against the Subsidiary Guarantors for indemnification cannot be dismissed by the Settlement Motion. As stated previously, Section 8.06 of the 1993 Indenture specifically provides LDTC with a right to be indemnified by KACC and the Subsidiary Guarantors for the costs and expenses associated with defending itself against any claim or liability under the 1993 Indenture in connection with the exercise of its powers or duties thereunder. Therefore, pursuant to the 1993 Indenture, LDTC is entitled to indemnification for its having to defend against the adversary proceeding that the Debtors propose to settle pursuant to the Settlement Motion.

7 3/4% SWD Revenue Bond Indenture Trustee, even though LDTC's claim is of the same priority.

## CONCLUSION

Accordingly, even if this Court determines that the 1993 Note Guarantees are subordinated to the 1994/96 Note Guarantees, any distribution under the Plan on account of the 1993 Note Guarantees must still be made in the first instance to LDTC. Upon payment of any distributions, LDTC is entitled to exercise its charging lien on the distributions until its Fees are paid in full. Thereafter, consistent with both the 1993 Indenture and Bankruptcy Rule 3021, LDTC will pay the balance of the moneys received either to the holders of the 1993 Note Guarantees or the holders of the 1994/96 Note Guarantees, depending on the resolution of the Classification Dispute. Absent such treatment and preservation of LDTC's charging lien, the Plan cannot be confirmed under section 1129(a) or 1129(b) of the Bankruptcy Code. As well, the proposed settlement with respect to the SWD Revenue Bonds should either be rejected or be modified to provide payment of LDTC's Fees just as it provides payment of the 7-3/4% SWD Revenue Bond Indenture Trustee's fees.

Dated April 5, 2005

MONZACK AND MONACO, P.A.

Francis A. Monaco (#2078)
Joseph J. Bodnar (#2512)
P.O. Box 2031
1201 North Orange Street, Suite 400
Wilmington, DE 19899-2031
Tel.    (302) 656-8162

and

BINGHAM McCUTCHEN LLP
Evan D. Flaschen (ct10660)
Gregory W. Nye (ct06028)
Patrick J. Trostle (ct20301)
One State Street
Hartford, CT 06103-3178
Tel.    (860) 240-2700

*Special Counsel to Law Debenture Trust Company*
*of New York*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | : |
| KAISER ALUMINUM CORPORATION, et al., | : |
| Debtors. | : |

Chapter 11
Case No. 02-10429 (JKF)
Jointly Administered

Hearing Date: January 10, 2006

Related to D.I. 8008 and 8009

### ORDER GRANTING RECONSIDERATION OF GUARANTY DECISION
### AND SUSTAINING FEE OBJECTION

Upon consideration of the Motion of Law Debenture Trust Company of New York for Reconsideration of Order Overruling Fee Objection (the "**Guaranty Decision**") [8] and for good cause shown, it is hereby

**ORDERED,** that (a) the factual error in the Guaranty Decision be corrected to note that the Subsidiary Plans, as modified, do not provide for the payment of LDTC's Fees; and (b) in light of such circumstance, LDTC's Fee Objection is hereby sustained and the Distribution Trustee shall pay LDTC's Fees prior to any distributions to the 1994/96 Indenture Trustees.

**SO ORDERED** this ___ day of _____, 2006.

_____
The Honorable Judith K. Fitzgerald
United States Bankruptcy Judge

---

[8]    All capitalized terms herein used above are defined in the Motion of Law Debenture Trust Company of New York for Continuation of Stay Pending Appeal.

CTDOCS/1648899.3