# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **KAISER ALUMINUM CORP., et al.,** | **Jointly Administered** |
| Debtors. | **Bankruptcy Case No. 02-10429 (JKF)** |
| **LAW DEBENTURE TRUST COMPANY OF NEW YORK,** | |
| Appellant, | **Civil Action No. 06-00088 JJF** |
| v. | |
| **KAISER ALUMINUM CORP., et al.,** | |
| Appellees. | |
| **LIVERPOOL LIMITED PARTNERSHIP,** | |
| Appellant, | |
| v. | **Civil Action No. 06-00160 JJF** |
| **ALPART JAMAICA, INC., KAISER JAMAICA CORPORATION, KAISER ALUMINA AUSTRALIA CORPORATION, AND KAISER FINANCE CORPORATION** | (Administratively Consolidated with 06-88 JJF) |
| Appellees. | |

## CERTIFICATE OF SERVICE

I, Heidi E. Sasso, certify that I am not less than 18 years of age, and that I caused service of the foregoing document to be made on May 3, 2006 upon the following parties via electronic mail and Hand Delivery or US Mail:

```
Isaac M. Pachulki              Karen C. Bifferato
K. John Shaffer                Marc J. Phillips  (#4445)
Stutman, Treister & Glatt, P.C. Connolly Bove Lodge & Hutz, LLP
1901 Avenue of the Stars, 12th Floor  The Nemours Building
Los Angeles, California 90067  1007 North Orange Street
```

Document #: 54344

Telephone: (310) 228-5600
Facsimilie: (310) 228-5788
E-mail: kjshaffer@Stutman.com


David J. Baldwin (# 1010)
Rebecca S. Beste
Potter Anderson & Corroon LLP
1313 N. Market St. Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899-0951
Tel. (302) 984-6067
Facsimile: (302) 658-1192


Gregory M. Gordon
Daniel P. Winikka
Jones Day
2727 North Harwood St.
Dallas, TX 75201
E-mail: gmgordon@jonesday.com
E-mail: dpwinikka@jonesday.com

Daniel J. DeFranceschi
Kimberly D. Newmarch
Richards, Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
E-mail: defranceschi@rlf.com
E-mail: newmarch@rlf.com

George A. Davis
Diane Harvey
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
E-mail: diane.harvey@weil.com
        george.davis@weil.com

Clark T. Whitmore
Alain M. Baudry
Christina A. Smith
Maslon, Edelman, Borman & Brand, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140


Michael B. Joseph
Theodore J. Tacconelli
Ferry, Joseph & Pearce, P.A.

Wilmington, DE 19801
Telephone: (302) 658-9141
Facsimile: (302) 658-5614
E-mail: kbifferato@cblh.com


David N. Crapo
Gibbons, Del Deo, Dolan, Griffinger &
Vecchione, P.C.
One Riverfront Plaza
Newark, New Jersey 07102-5496
Telephone: (973) 596-4523
Facsimile: (973) 639-6244
E-mail: dcrapo@gibbonslaw.com


Duane D. Werb,
Jennifer H. Unhoch
Werb & Sullivan
300 Delaware Ave. - 13th Fl.
P.O. Box 25046
Wilmington, DE 19899
Telephone: (302) 652-1100
Facsimile: (302) 652-1111


Harold L. Kaplan, Esq.
Mark F. Hebbeln, Esq.
Gardner Carton & Douglas LLP
191 North Wacker Drive - Suite 3700
Chicago, IL 60606-1698
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
E-mail: hkaplan@gcd.com
E-mail: mhebbeln@gcd.com


Carl N. Kunz, III, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Ave. - 10th Fl.
Wilmington, DE 19801
Telephone: (302) 888-6811
Facsimile: (302) 571-1750
E-mail: ckunz@morrisjames.com


Elizabeth J. Futrell, Esq.
Aimee M. Quirk, Esq.
Jones, Walker, Waechter, Poitevent,
Carrère & Denègre, L.L.P.
201 St. Charles Ave.
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 582-8011
E-mail: efutrell@joneswalker.com


    David M. Klauder

```
824 Market St. - Suite 904
Wilmington, DE  19899
Telephone:  (302) 575-1555
Facsimile:  (302) 575-1714
E-mail:  ttacconelli@ferryjoseph.com
         mjoseph@ferryjoseph.com
```

Mark T Hurford
Campbell & Levine, LLC
800 King Street
Suite 300
Wilmington, DE 19801
302-426-1900
Fax : 302-426-9947
Email: mhurford@camlev.com

Sharon M Zieg
Donald Brown
Young, Conaway, Stargatt & Taylor
The Brandywine Bldg., 17th Floor
1000 West Street
PO Box 391
Wilmington, DE 19899

Trial Attorney
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801

William P. Bowden, Esq.
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899
E-mail:  wbowden@ashby-geddes.com

Marc Stephen Casarino, Esq.
White & Williams LLP
824 Market Street, Ste. 902
Wilmington, DE 19801
casarinom@whiteandwilliams.com

Under penalty of perjury, I declare that the foregoing is true and correct.

__/s/ Heidi E. Sasso_____

Dated:  May 3, 2006                    Heidi E. Sasso

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br>KAISER ALUMINUM CORP., et al.,<br><div align="right">Debtors.</div> | )<br>)<br>)<br>) | Chapter 11<br>Jointly Administered<br>Bankruptcy Case No. 02-10429<br>(JKF) |
| LAW DEBENTURE TRUST COMPANY OF<br>NEW YORK,<br><div align="center">Appellant,</div><br><div align="center">v.</div><br>KAISER ALUMINUM CORP., et al.,<br><div align="center">Appellees.</div> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 06-00088 JJF |
| LIVERPOOL LIMITED PARTNERSHIP,<br><div align="center">Appellant,</div><br><div align="center">v.</div><br>ALPART JAMAICA, INC., et al.,<br><div align="center">Appellees.</div> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 06-00160 JJF<br>(Administratively Consolidated<br>with 06-00088 JJF) |

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

**BRIEF OF APPELLANT LAW DEBENTURE TRUST COMPANY OF NEW YORK**

Evan D. Flaschen, Esq.
Gregory W. Nye, Esq.
William C. Heuer, Esq.
Kate K. Simon, Esq.
BINGHAM McCUTCHEN LLP
One State Street
Hartford, CT 06103-3178
Tel.:    (860) 240-2700

Francis A. Monaco, Esq. (#2078)
Joseph J. Bodnar, Esq. (#2512)
MONZACK AND MONACO, P.A.
P.O. Box 2031
1201 North Orange Street, Suite 400
Wilmington, DE 19899-2031
Tel.:    (302) 656-8162

*Counsel to Appellant Law Debenture Trust Company of New York*

Dated:  May 3, 2006

TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................................. 1

II. JURISDICTION ............................................................................................................... 3

III. STATEMENT OF ISSUES ............................................................................................. 3

IV. STANDARD OF REVIEW ............................................................................................. 3

V. STATEMENT OF THE CASE ......................................................................................... 4

    A.    The 1993 Indenture ................................................................................................ 4

    B.    The Bankruptcy Proceedings and the Subsidiary Plans ....................................... 5

            1.    The 1994/96 Parties' Trial Briefs .......................................................... 5

            2.    LDTC's Objections to the Subsidiary Plans ......................................... 6

    C.    The Bankruptcy Court's Trial ............................................................................... 6

    D.    The Bankruptcy Court's Findings and Judgment ................................................. 8

VI. SUMMARY OF ARGUMENT ........................................................................................ 8

VII. ARGUMENT ................................................................................................................. 9

    A.    The Bankruptcy Court Erred In Its Construction of the Plain and
           Unambiguous Language of the 1993 Indenture ................................................... 9

            1.    Article Three Addresses Subordination of The Company's
                 Primary Payment Obligation on The 1993 Notes And Nothing
                 More ..................................................................................................... 10

            2.    Article Sixteen Addresses The 1993 Note Guarantees ......................... 13

            3.    The Definition of "Senior Indebtedness" Does Not Include
                 Upstream Guarantees ............................................................................ 14

            4.    The Bankruptcy Court's Construction of the 1993 Indenture Is
                 Not Supported By the COMMENTARIES .......................................... 20

    B.    The Bankruptcy Court Erred In Considering Extrinsic and Parol
           Evidence ............................................................................................................. 25

    C.    The Bankruptcy Court's Consideration Of Extrinsic and Parol Evidence
           Was Especially Inappropriate In Connection With Construction Of A
           Public Indenture ................................................................................................. 30

    D.    The Doctrine of *Contra Proferentem* Requires that Any Doubts in the
           Construction of the 1993 Indenture Be Resolved in Favor of the 1993
           Noteholders ........................................................................................................ 34

    E.    Strict Construction Is Particularly Important In the Context of
           Subordination Provisions Of A Public Indenture ............................................... 37

    F.    The Subordination Provisions Do Not Extend To The Debtors'
           Obligations In Respect Of LDTC's Fees ........................................................... 38

VIII. CONCLUSION ............................................................................................................ 40

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

Air Master Sales Co. v. Northbridge Park Co-Op, 748 F. Supp. 1110 (D.N.J. 1990) .................... 34

Badgley v. United States, 31 Fed. Cl. 508 (Fed. Cl. 1994) .............................................................. 34

In re Best Prods. Co., Inc., 168 B.R. 35 (Bankr. S.D.N.Y. 1994) ............................................. 32-33

Broad v. Rockwell Int'l, 642 F.2d 929 (5th Cir. 1981) .................................................................... 29

Chem. Bank v. First Trust (In re Southeast Banking), 156 F.3d 1114 (11th Cir. 1998) ................ 37

Cruden v. Bank of New York, 957 F.2d 961 (2d Cir. 1992) ............................................................ 32

In re Envirodyne Indus., 29 F.3d 301 (7th Cir. 1994) ............................................. 21, 27, 28-29, 31

Fed. Deposit Ins. Corp. v. Prann, 694 F. Supp. 1027 (D.P.R. 1988), aff'd sub nom.
    Fed. Deposit Ins. Corp. v. Bracero & Rivera, 895 F.2d 824 (1st Cir. 1990) ..................... 18

Gen. Elec. v. Compagnie Euralair S.A., 945 F. Supp. 527 (S.D.N.Y. 1996) ................................. 18

General Overseas Films, Ltd. v. Robin Int'l, Inc., 542 F. Supp. 684 (S.D.N.Y. 1982),
    aff'd 718 F.2d 1085 (2d Cir. 1983) ................................................................................... 18

Goodheart Clothing Co. v. Laura Goodman Enterprises, 962 F.2d 268 (2d Cir. 1992) ................ 32

In re Joe Newcomer Fin. Co., 226 F. Supp. 387 (D. Colo. 1964) .................................................. 21

JP Morgan Chase Bank v. U.S. Nat'l Bank Assn. (In re Oakwood Homes), 329 B.R. 19
    (D. Del. 2005) ...................................................................................................................... 3

LaSalle Nat'l Bank v. Perelman, 141 F. Supp. 2d 451 (D. Del. 2001) .......................................... 32

In re Leasing Consultants, 2 B.R. 165 (Bankr. E.D.N.Y. 1980) ............................................... 33, 37

Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635 (3d Cir. 1991) ......................... 3

Metro. Life Ins. Co. v. RJR Nabisco, 716 F. Supp. 1504 (S.D.N.Y. 1989) ............ 21, 29, 30-33, 36

Metro. Life Ins. Co. v. RJR Nabisco, 906 F.2d 884 (2d Cir. 1990) .......................................... 32, 33

Metro. W. Asset Mgmt. v. Magnus Funding, No. 03-5539, 2004 U.S. Dist. LEXIS 11761
    (S.D.N.Y. June 25, 2004) ............................................................................................. 35, 36

In re Netia Holdings S.A., 278 B.R. 344 (Bankr. S.D.N.Y. 2002) ................................................ 33

Pearlman v. Reliance Ins. Co., 371 U.S. 132 (1962) .................................................... 19

PMI Investment v. Rose (In re Prime Motor Inns), 167 B.R. 261 (Bankr. S.D. Fla. 1994) ..... 11-13

Prescott, Ball & Turben v. LTV Corp., 531 F. Supp. 213 (S.D.N.Y. 1981).................................. 36

Resolution Trust Corp. v. BVS Dev., Inc., 42 F.3d 1206 (9th Cir. 1994) ..................................... 37

Shannon-Vail Five v. Bunch, 270 F.3d 1207 (9th Cir. 2001).................................................. 11, 18

Shaw Group Inc. v. Triplefine Int'l, 322 F.3d 115 (2d Cir 2003)................................................ 18

In re Smith, 77 B.R. 624 (Bankr. N.D. Ohio 1987) ....................................................... 37

In re Thomson McKinnon Sec., Inc., 149 B.R. 61 (Bankr. S.D.N.Y. 1992) ................................. 18

U.S. Trust Co. of New York v. Executive Life Ins. Co., 602 F. Supp. 930 (S.D.N.Y. 1984)........................................................................................................................... 32

U.S. Trust Co. of New York v. Jenner, 168 F.3d 630 (2d Cir. 1999)............................................ 32

Valley Reg'l Med. Ctr. v. Wright, 276 F. Supp. 2d 620 (S.D. Tex. 2001).............................. 33-34

Whetstone Candy Co. v. Kraft Foods, 351 F.3d 1067 (11th Cir. 2003) .................................. 12-13

Zim v. West. Publ'g Co., 573 F.2d 1318 (5th Cir. 1978) ...................................................... 12, 29

## STATE CASES

William C. Atwater & Co. v. Panama R. Co., 159 N.E. 418 (N.Y. 1927) ...................................... 26

Ban-Co Inv. Co. v. Loveless, 587 P.2d 567 (Wash. Ct. App. 1978) .............................................. 37

Bergson Ice Cream v. NewBerg LP, 2002 Mass. Super. LEXIS 310 (2002) ................................. 13

Bethlehem Steel Co. v. Turner Constr. Co., 141 N.E.2d 590 (N.Y. 1956).................................... 26

CCG Assoc. I v. Riverside Assoc., 157 A.D.2d 435 (N.Y. App. Div. 1990) ................................ 27

Fehr Bros. Inc. v. Scheinman, 121 A.D.2d 13 (N.Y. App. Div. 1986)........................................... 18

Graff v. Billet, 64 N.Y.2d 899 (1985) ............................................................................... 35

Guarantee Bank v. Magness Constr. Co., 462 A.2d 405 (Del. 1983).............................................. 37

Kaiser Alum. Corp. v. Matheson, 681 A.2d 392 (Del. 1996)........................................30-31, 34, 36

Mazzola v. County of Suffolk, 533 N.Y.S.2d 297 (N.Y. App. Div. 1988) .................................... 33

Miller v. Citizens Sav. & Loan Ass'n, 248 Cal. App. 2d 655 (1967).............................................. 37

Namad v. Salomon, Inc., 543 N.E.2d 722 (N.Y. 1989) ................................................................. 27

Sargent v. Halsey, 348 N.Y.S.2d 661 (N.Y. Sup.Ct. 1973), aff'd, 42 A.D.2d 375 (N.Y.
     App. Div. 2d Dep't 1973)................................................................................................... 27

Teitelbaum Holdings Ltd. v. Gold, 396 N.E.2d 1029 (N.Y. 1979) ................................................ 26

Vermont Teddy Bear v. 538 Madison Realty, 807 N.E.2d 876 (N.Y. 2004) ................................ 26

W.W.W. Assoc., Inc. v. Giancontieri, 566 N.E.2d 639 (N.Y. 1990) ............................................ 27

West, Weir & Bartel, Inc. v. Mary Carter Paint Co., 255 N.E.2d 709 (N.Y. 1969) ...................... 26

## DOCKETED CASES

Purcell v. Flying Tiger Line, No. 82-3505 (S.D.N.Y. Jan. 12, 1984)........................................ 29, 32

## STATUTES AND RULES

28 U.S.C. § 158.................................................................................................................................. 3

28 U.S.C. § 1334................................................................................................................................ 3

## MISCELLANEOUS

RESTATEMENT (SECOND) OF CONTRACTS § 206 cmt. a (1981) ..................................................... 35

AMERICAN BAR FOUNDATION, COMMENTARIES ON MODEL DEBENTURE INDENTURE
     PROVISIONS 567 (1971) ....................................................................... 20, 21, 22, 23, 25, 37

Dee Martin Calligar, Subordination Agreements, 70 Yale L.J. 376 (1961) ................................... 21

William A. Klein, C. David Anderson and Kathleen G. McGuiness, The Call Provision
     of Corporate Bonds: A Standard Form in Need of Change, 18 J. Corp. L. 653
     (1993)................................................................................................................................... 20

5 MARGARET N. KNIFFIN, CORBIN ON CONTRACTS § 24.27 (Joseph M. Perillo, ed., rev.
     ed. 1998) ............................................................................................................................. 35

LAW OF SURETYSHIP 419 (Edward G. Gallagher, ed. 2d ed. 2000) ............................................. 19

ROBERT I. LANDAU & JOHN E. KRUEGER, CORPORATE TRUST ADMINISTRATION & MANAGEMENT 29 (5th ed. 1998) ............................................................... 31, 36

Lawrence E. Mitchell, *The Fairness Rights of Corporate Bondholders*, 65 N.Y.U.L.Rev. 1165 (1990).................................................................................................. 30, 31

Harvey L. Pitt and Karl A. Groskaufmanis, *A Tale of Two Instruments: Insider Trading in Non-Equity Securities*, 49 Bus. Law. 187 (1993) ............................................ 31

JAMES E. SPIOTTO, DEFAULTED SECURITIES:  THE PRUDENT INDENTURE TRUSTEE'S GUIDE XVII-14 (Am. Bankers Ass'n 1990).......................................................... 10, 37-38

1 SANDRA SCHNITZER STERN, STRUCTURING & DRAFTING COMMERCIAL LOAN AGREEMENTS ¶ 13.07[3][c][ii] & [c][iii] (rev. ed. 2004) ............................................ 16-17

MARK B. TRESNOWSKI & GERALD T. NOWAK, THE HIGH YIELD OFFERING: AN ISSUER'S PERSPECTIVE A-9 (2004) ................................................................. 22

## I. PRELIMINARY STATEMENT

This appeal arises out of the chapter 11 bankruptcy cases of Kaiser Aluminum & Chemical Corporation ("**Kaiser**" or the "**Company**") and several of its subsidiaries (the "**Subsidiary Guarantors**"). Appellant ("LDTC") is the indenture trustee in respect of certain 12 ¾% senior subordinated notes (the "**1993 Notes**") that Kaiser issued pursuant to a certain public indenture (the "**1993 Indenture**"). Under the terms of the 1993 Indenture, the Subsidiary Guarantors guaranteed Kaiser's obligation to pay the 1993 Notes (the "**1993 Note Guarantees**").[1]

Appellees include the holders of a series of different notes (collectively, the "**1994/96 Notes**") that Kaiser subsequently issued pursuant to two additional public indentures (collectively, the "**1994/96 Indentures**").[2] Like the 1993 Notes, the Subsidiary Guarantors guaranteed Kaiser's obligation to pay the 1994/1996 Notes (the "**1994/96 Note Guarantees**").

Under the terms of the 1993 Indenture, Kaiser's obligation to pay the 1993 Notes is expressly subordinated to Kaiser's obligation to pay subsequent senior note issuances, which would include the 1994/96 Notes. This means that the holders of the 1994/96 Notes are entitled to payment of their notes from *Kaiser* ahead of the holders of the 1993 Notes. At the same time, however, the *Subsidiary Guarantors'* obligation to pay the 1993 Note Guarantees is *not* subordinated to the Subsidiary Guarantors' obligation to pay the 1994/96 Note Guarantees. Specifically, nothing in the 1993 Indenture provides that the 1993 Note Guarantees are subordinated to the 1994/96 Note Guarantees. Accordingly, the 1994/96 Noteholders and the 1993 Noteholders enjoy the same right to payment from the *Subsidiary Guarantors* with neither subordinated to the other.

---

[1] This kind of guarantee -- a subsidiary's guarantee of an obligation of its corporate parent -- is what is known as an "upstream" guarantee.

[2] Appellees also include the Subsidiary Guarantors, the indenture trustee and an ad hoc committee in connection with the 1994/96 Notes, and the indenture trustee and holders of certain

Notwithstanding the unambiguous terms of the 1993 Indenture, the Bankruptcy Court concluded that the Subsidiary Guarantors' obligation to pay the 1993 Note Guarantees *is* subordinated to the Subsidiary Guarantors' obligation to pay the 1994/96 Note Guarantees. As a result of the Bankruptcy Court's determination, the 1993 Noteholders have been cut off from any distribution from the Subsidiary Guarantors in their bankruptcy cases. This Court should reverse the Bankruptcy Court's determination for each of the following reasons.

First, the language of the 1993 Indenture is unambiguous. Although the indenture expressly subordinates *Kaiser's* obligation to pay the 1993 Notes to the 1994/96 Notes, the indenture does not expressly subordinate the *Subsidiary Guarantors'* obligations under the 1993 Note Guarantees. Under applicable law, the contractual subordination of one obligation to another must be clearly and expressly stated. If it is not, then there is no subordination. Accordingly, LDTC was entitled to prevail as a matter of law.

Second, the Bankruptcy Court erred in considering extrinsic and parol evidence to vary through "interpretation" the express terms of the 1993 Indenture. The 1993 Indenture is plainly *un*ambiguous: it does not subordinate the Subsidiary Guarantors' obligations under the 1993 Note Guarantees. Accordingly, the admission of extrinsic or parol evidence to add subordination terms was improper under applicable law. In addition, the Bankruptcy Court's determination conflicts with applicable canons of construction that the Bankruptcy Court was not at liberty to ignore.

Third, the Bankruptcy Court compounded its error by concluding that *the fees and expenses* incurred by LDTC (**"LDTC's Fees"**) should also be subordinated to the 1994/96 Note Guarantees.    Once again, nothing in the 1993 Indenture subordinates these amounts. Accordingly, this Court should reverse the judgment of the Bankruptcy Court.

---

public utility bonds. The unsecured creditors' committee (together with appellees, the **"1994/96 Parties"**) also litigated below but is not a party to this appeal.

## II. JURISDICTION

The Bankruptcy Court entered its decision subordinating the Subsidiary Guarantors' obligations under the 1993 Notes Guarantees (the "**Guaranty Decision**") on December 22, 2005 (D.I. 8008). Appendix ("**App.**") 0125-58. LDTC timely appealed the Guaranty Decision (D.I. 8052 and 8260) and obtained a stay pending appeal (D.I. 8370). This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 158 and 1334.

## III. STATEMENT OF ISSUES

1.     Did the Bankruptcy Court err in entering its Guaranty Decision?

2.     Did the Bankruptcy Court err, as a matter of law, in construing the subordination provisions of the 1993 Indenture so as to include the subsequent 1994/96 Note Guarantees, ignoring the plain language of the 1993 Indenture?

3.     Did the Bankruptcy Court err, as a matter of law, in considering parol and extrinsic evidence to construe the plain language of the 1993 Indenture's subordination provisions?

4.     Did the Bankruptcy Court err, as a matter of law, in construing the subordination provisions of the 1993 Indenture so as to subordinate LDTC's Fees?

## IV. STANDARD OF REVIEW

This appeal involves purely questions of law, which the Court "reviews . . . on a *de novo* basis in the first instance." *JP Morgan Chase Bank v. U.S. Nat'l Bank Assn. (In re Oakwood Homes)*, 329 B.R. 19, 22 (D. Del. 2005). Although the Bankruptcy Court considered extrinsic and parol evidence in connection with its decision, this Court "exercise[s] 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Id.* (quoting *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991)).

## V. STATEMENT OF THE CASE

### A.    THE 1993 INDENTURE

Kaiser issued the 1993 Notes pursuant to the 1993 Indenture (App. 0001-124). Kaiser drafted the 1993 Indenture in coordination with certain third-party underwriters that it selected. The 1993 Noteholders had no part in drafting the 1993 Indenture, for the obvious reason that there were no noteholders until the 1993 Notes were formally issued to the public after the drafting of the 1993 Indenture.

All parties agree that *Kaiser's* obligation to pay the 1993 Notes is subordinated to Kaiser's obligation to pay the 1994/96 Notes. Specifically, section 3.01 of the 1993 Indenture provides that Kaiser's obligation to pay the 1993 Notes is subordinated to all "Senior Indebtedness" of Kaiser. The term "Senior Indebtedness" is defined in the 1993 Indenture itself, and clearly includes Kaiser's obligation to pay the 1994/96 Notes as funds that Kaiser itself borrowed. The issue presented is whether the *Subsidiary Guarantors'* separate "upstream" guarantee obligations under the 1993 Notes Guarantees are also subordinated to the Subsidiary Guarantors' obligations under the 1994/96 Notes Guarantees.

Section 16.01 of the 1993 Indenture sets forth the 1993 Notes Guarantees. In turn, section 16.02 provides that the Subsidiary Guarantors' obligations under the 1993 Note Guarantees are subordinated to (and only to) "Senior Indebtedness" of the Subsidiary Guarantors. Resolution of what constitutes the "Senior Indebtedness" *of the Subsidiary Guarantors* is critical to the present controversy because, under the express terms of the 1993 Indenture, the Subsidiary Guarantors' obligations under the 1993 Note Guarantees are subordinated *only* to the Senior Indebtedness *of the Subsidiary Guarantors*, without regard to what may or may not constitute Senior Indebtedness *of the Company*.

Critically, the defined term "Senior Indebtedness" does not include indebtedness for any "upstream" guarantees -- the kind of guaranty that a corporate subsidiary gives for an obligation of its corporate parent. Rather, the defined term "Senior Indebtedness" specifically includes only

indebtedness for "downstream" guarantees -- the guaranty that a corporate parent gives for an obligation of its corporate subsidiary. Accordingly, the Subsidiary Guarantors' "upstream" guarantee obligations under the 1994/94 Note Guarantees *are not included* as part of the "Senior Indebtedness" of the Subsidiary Guarantors. As a result, the 1993 Note Guarantees are not subordinated to the 1994/96 Note Guarantees under the plain terms of the 1993 Indenture.

## B.    THE BANKRUPTCY PROCEEDINGS AND THE SUBSIDIARY PLANS

The Subsidiary Guarantors sold all of their assets and the Bankruptcy Court decided the present controversy in the context of the proposed distributions in the liquidating chapter 11 plans of reorganization that the Subsidiary Guarantors filed on February 25, 2005 (the "**Subsidiary Plans**") (D.I. 6261, 6265, 7792 and 7970).[3] The Subsidiary Plans provided for the absolute subordination of the 1993 Note Guarantees to the 1994/96 Note Guarantees, as well as full subordination of LDTC's Fees incurred in performing its duties under the 1993 Indenture.

### 1.    The 1994/96 Parties' Trial Briefs

On March 15, 2005, the 1994/96 Parties filed briefs in support of the Subsidiary Plans' subordination of the 1993 Note Guarantees to the 1994/96 Note Guarantees (D.I. 6344, 6356 & 6361).[4]    The 1994/96 Parties in large part supported their position by little more than self-serving declarations (the "**Declarations**") regarding Kaiser's purported intent when it drafted the 1993 Indenture (*i.e.*, that, without regard to the actual language of the 1993 Indenture, Kaiser had *intended* to subordinate the 1993 Note Guarantees to the not-yet-extant 1994/96 Note Guarantees). Declarations were submitted from (a) John T. La Duc, Kaiser's Chief Financial Officer of at the time of the issuance of the 1993 Indenture; (b) Martin Balsam, Kaiser's outside

---

[3] The Subsidiary Plans (D.I. 6261 & 6265), as modified (D.I. 7792 & 7970), are substantially identical.

[4] LDTC first formally addressed the subordination issue in its August 2004 Motion Pursuant to Bankruptcy Rule 3013 To Determine Classification of 1993 Note Guarantee Claims (D.I. 4849). Certain of the 1994/96 Parties responded by filing a Complaint for Declaratory Judgment Relief Pursuant to 11 U.S.C. §§ 105(a) and 510(a) and 28 U.S.C. § 2201 (D.I. 4947).

counsel with respect to the 1993 Indenture; and (c) Theodore Sands, a Managing Director at Merrill Lynch, Kaiser's lead underwriter with respect to the issuance of the 1993 Indenture.

### 2.    LDTC's Objections to the Subsidiary Plans

On April 5, 2005, LDTC filed its objections to the subordination under the Subsidiary Plans of (i) the 1993 Note Guarantees (D.I. 6504) and (ii) the Indenture Trustee fees and expenses (D.I. 6505). The LDTC objections opposed the use of extrinsic and parol evidence, including the Declarations, to supply an intention or terms that were not contained in the 1993 Indenture. LDTC argued that the 1993 Note Guarantees were not subordinated pursuant to the plain and unambiguous language of the 1993 Indenture. LDTC argued further that, in any event, LDTC's Fees were not subordinated to payment in full of the 1994/96 Note Guarantees.

### C.    THE BANKRUPTCY COURT'S TRIAL

The Bankruptcy Court conducted a trial on April 13, April 27 and May 2, 2005. During trial, the 1994/96 Parties offered into evidence numerous documents and deposition testimony extrinsic to the 1993 Indenture (but no live testimony). Both at trial and in their subsequent evidentiary objections as requested by the Bankruptcy Court (the "**Evidentiary Objections**" (D.I. 6759)), LDTC objected to the admission of all such evidence on numerous general and specific grounds, including that it was legally irrelevant to the construction of a public indenture.

On the first day of trial, the Bankruptcy Court stated that, if the 1993 Indenture was found to be unambiguous (which the Bankruptcy Court ultimately found it to be), it would not be appropriate for the court to consider extrinsic evidence to interpret the 1993 Indenture, particularly because of the nature of a public indenture:

> [I]t appears to me that if I find that this document is ambiguous -- which I haven't thought so far -- that what I then will do is call you all back. And you will have an opportunity to present extrinsic evidence. Otherwise, if I think it is unambiguous -- although I understand your argument -- I believe, under New York law, I am to look at the four corners of the document. . . . That is my understanding of the law.

---

The Bankruptcy Court, however, directed that all subordination issues relative to the 1993 Note Guarantees and LDTC's Fees be addressed in the context of the Subsidiary Plans.

The cases that you [Debtor's counsel] cite, with respect to the totality of the circumstances -- I think in a case like this, where I'm dealing with an indenture that's publicly traded -- have to be taken in mind of the comments that indicate that there is a market out there. *And if I start, somehow or other, looking to what parties' intentions were 12 or 14 years ago, in a publicly traded market, there is no assurance to the market, at all, as to what the documents mean.* So I see no basis upon which, in this kind of a situation -- looking at an indenture -- to go beyond the four corners of the documents, if the documents are clear on their face.

Tr. 4/13/05 at 224 (D.I. 6722) (emphasis added).

However, the Bankruptcy Court did not follow the procedure it had put in place at the outset of trial. Instead, on the second day of trial, without first deciding whether or not the 1993 Indenture was ambiguous on its face, the Bankruptcy Court heard almost all of the extrinsic and parol evidence offered by the 1994/96 Parties, either admitting it into evidence or deeming it "conditionally" admitted, over the objections of LDTC. *See* Tr. 4/27/05 at 155-229 (D.I. 6857).

In addition to objecting to all documentary evidence other than the 1993 Indenture itself, LDTC also objected to the admission of the Declarations and the transcripts of depositions (the **"Depositions"**) taken of John T. La Duc, Martin Balsam and Theodore Sands, proffered by the 1994/96 Parties purportedly to provide background on the Company's financing efforts over the years and to prove the intent of *Kaiser, Kaiser's* counsel, and the *Kaiser's* lead underwriter, respectively, with respect to the 1993 Indenture. D.I. 6759 & 6857.

The Bankruptcy Court "conditionally" admitted the La Duc, Balsam and Sands Declarations and Depositions, subject to two further determinations. D.I. 6857. First, the Court reserved the determination of whether the Declarations and Depositions should be entirely excluded on the basis of one or more of the general objections asserted by LDTC. *Id.* Second, if the Court decided that the Declarations and Depositions should not be excluded in their entirety, the Court reserved the determination of the extent, if any, to which it would exclude portions of the Declarations and Depositions for one or more of the specific reasons identified by the LDTC in its Evidentiary Objections (D.I. 6759).

**D.    THE BANKRUPTCY COURT'S FINDINGS AND JUDGMENT**

On December 22, 2005, the Bankruptcy Court ruled on LDTC's objections to the Subsidiary Plans in its Guaranty Decision (D.I. 8008), finding that the 1993 Indenture "unambiguously" subordinated the 1993 Note Guarantees to the 1994/96 Note Guarantees. This determination was based upon (a) the Bankruptcy Court's overly expansive construction of the 1993 Indenture and (b) the consideration of extrinsic and parol evidence to "confirm" the Court's construed intent of the 1993 Indenture. Contrary to the colloquy at trial, the Bankruptcy Court concluded that, under New York law, extrinsic evidence is nonetheless admissible to interpret the terms of an unambiguous public indenture. *See* Guaranty Decision at 16-17, 23. Thus, the Bankruptcy Court, without actually ruling on LDTC's Evidentiary Objections, admitted into evidence *in toto* all of the documents, Declarations and Depositions that were "conditionally" admitted during the trial and considered it in the Guaranty Decision. Guaranty Decision at 15-18. It was only after the Bankruptcy Court considered this evidence that it found the 1993 Indenture to be unambiguous. The Bankruptcy Court also decided that the fees and expenses incurred by LDTC were subordinated to payment in full to the holders of the 1994/96 Note Guarantees. (D.I. 8008, as amended by D.I. 8240).

## VI. SUMMARY OF ARGUMENT

The Bankruptcy Court's Guaranty Decision rests fundamentally on the erroneous rationale that the Subsidiary Guarantors' obligations under the 1993 Note Guarantees must be subordinated to the Subsidiary Guarantors' obligations under the 1994/96 Note Guarantees unless the 1993 Indenture expressly says that they are *not* subordinated. *See* Guaranty Decision at 12 ("The Indenture refers to the [1993] Notes as subordinated. . . . There is no reference therein that indicates that the [1993 Note] Guarantees are to be treated on a par with the Subsidiary Guarantors' guarantee of Senior Indebtedness of the Company."). The Bankruptcy Court thus got the analysis exactly backwards. Regardless of whether Kaiser's obligations under the 1993 Notes are subordinated to its obligations under the 1994/96 Notes, the Subsidiary Guarantors'

obligations under the 1993 Note Guarantees can be subordinated to the Subsidiary Guarantors' obligations under the 1994/96 Note Guarantees if and only if the 1993 Indenture expressly so provides. Because the 1993 Indenture does *not* so provide, the decision of the Bankruptcy Court must be reversed.

The Bankruptcy Court likewise committed reversible error for several additional reasons. First, the Bankruptcy Court misconstrued the plain language of the 1993 Indenture. Second, the Bankruptcy Court improperly admitted extrinsic and parol evidence of the purported intent of the Company regarding subordination of the 1993 Note Guarantees, which "intent" was not expressed in the 1993 Indenture itself. Third, the Bankruptcy Court failed to consider authority specific to the construction of public indentures, which differ significantly from typical bilateral private contracts. In light of these prejudicial errors, this Court should exercise its plenary review, reverse the Guaranty Decision, and direct entry of judgment for LDTC.

## VII. ARGUMENT

### A.     THE BANKRUPTCY COURT ERRED IN ITS CONSTRUCTION OF THE PLAIN AND UNAMBIGUOUS LANGUAGE OF THE 1993 INDENTURE

In the Guaranty Decision, the Bankruptcy Court focused on two articles of the 1993 Indenture: (i) Article Three, entitled "Subordination of Notes," and (ii) Article Sixteen, entitled, "Guarantee of Notes." The fact that the very structure of the 1993 Indenture separates these two fundamental aspects of noteholder rights is telling, but not surprising. The 1993 Indenture, by its terms, makes a clear distinction between subordination of the underlying, primary obligation, on the one hand, and the treatment of the guarantees, on the other. Indeed, the Bankruptcy Court recognized as much in the Guaranty Decision. Guaranty Decision at 14.

That the 1993 Indenture makes this distinction is unremarkable. This very treatment of guarantee obligations -- as distinct from the underlying primary payment obligation -- is commonplace. As noted by a leading treatise, it is not uncommon for public debt (like the 1993 Notes) to be subordinated at one level, but to have a guarantee of that debt (like the 1993 Note

Guarantees) be treated on a *pari passu* basis at another level:

> If subordinated debt is guaranteed by a third party, the indenture trustee should be aware that unless there are specific provisions governing the subordination of the payment received [from] the third party [(*i.e.*, payment under the guarantee)], general subordination provisions with regard to the *original obligor's obligation* may not prevent payment *from the third party* [(*i.e.*, payment on the guarantee)] being on a parity with senior debt.

JAMES E. SPIOTTO, DEFAULTED SECURITIES: THE PRUDENT INDENTURE TRUSTEE'S GUIDE

XVII-14 (Am. Bankers Ass'n 1990) at III-29 (emphasis supplied).

By its plain terms Article Three simply does not apply to the guarantee claims. Rather, the guarantee claims are subject to the terms of Article Sixteen -- again, entitled "Guarantee of Notes." Moreover, the terms and definitions in Article Sixteen demonstrate that the precise situation discussed in THE PRUDENT INDENTURE TRUSTEE'S GUIDE, exists here: payment under the guarantee obligations is entitled to *pari passu* treatment at the subsidiary level. The Court need look no further than the terms of the 1993 Indenture to come to this result.

### 1.    Article Three Addresses Subordination of The Company's Primary Payment Obligation on The 1993 Notes And Nothing More

There is no dispute that the clear language of Article Three of the 1993 Indenture provides for the subordination of the 1993 Notes to Senior Indebtedness *of the Company*. The point of contention in this case, however, is not whether the primary payment obligations under the 1993 Notes are subordinated; rather, it is whether the separate and distinct obligations under the 1993 Note Guarantees are also subordinated to the 1994/96 Note Guarantees.

Plainly, Article Three does not govern this question. The Bankruptcy Court appears to agree with this statement in many parts of the Guaranty Decision, including at 14:

> In other words, the Indenture contains two separate Articles -- one with respect to subordination in connection with [the Company's] obligations on the Notes and the other in connection with its subsidiaries' guarantee of [the Company's] obligations on the Notes.

Indeed, by its own title -- "Subordination of Notes" -- Article Three addresses subordination of the Company's primary payment obligations under the 1993 Notes, nothing more. This reading

of Article Three is then reinforced by the language and definitions contained within Article Three. Section 3.01 addresses subordination of the 1993 Notes to obligations "of the Company." While the Company is the obligor on the primary payment obligation under the Notes, the Company is not at all liable under the 1993 Note Guarantees. *See Shannon-Vail Five v. Bunch*, 270 F.3d 1207, 1211 (9th Cir. 2001) ("[B]y definition, a guarantee is a separate undertaking in which the principal obligor does not join, and a guarantee exists independent of the original obligations between the principal obligor and the obligee.").

If Article Three were intended to be binding on the Subsidiary Guarantors or to affect payments by them, it would have said so explicitly, as it does elsewhere in the 1993 Indenture where the intention is to bind both the Company and its Subsidiaries, and as it does in Article Sixteen where the intention is to subordinate payments by the Subsidiary Guarantors to Senior Indebtedness of the Subsidiary Guarantors. The court in *PMI Investment v. Rose (In re Prime Motor Inns)*, 167 B.R. 261 (Bankr. S.D. Fla. 1994), came to this very conclusion in construing a subordination provision that is substantially similar to section 3.01. *Prime Motor* involved a dispute over whether the following subordination language applied only to a loan or also applied to a guaranty of that loan:

> 2.2 Anything in the Subordinated Indebtedness notwithstanding, *all payments of or in connection with the Subordinated Indebtedness* are and shall be expressly subordinate and junior in right of payment and exercise to the prior payment in full of the Senior Indebtedness *to the extent and in the manner provided herein*, and the Subordinated Indebtedness is hereby subordinated as a claim *against the Borrowers or any of the assets of the Borrowers* to the prior indefeasible payment in full of the Senior Indebtedness . . . . In furtherance of the foregoing, the Borrowers will not make, and PMI [the subordinated creditor] will not accept, *any payment of or on account of Subordinated Indebtedness*, whether such payments are made or attributable to any Borrower . . . before, during or after a Reorganization and whether such payments are attributable to principal, premium, if any, interest or other amounts . . . , until all the Senior Indebtedness has been indefeasibly paid in full in cash . . . .

*Id.* at 281 (emphasis added). While ordered differently, section 3.01 of the 1993 Indenture and section 2.2 of the *Prime Motor* subordination agreement are quite similar in substance, particularly in that neither section 3.01 nor section 2.2 refer to "guarantees."

In *Prime Motor*, the senior creditor (FSA) argued that "because any payment by Northeast, Universal *or the guarantors* is either 'in connection with', 'on account of', or 'as protection for' the Subordinated Indebtedness, then all such payments are to be covered [by section 2.2]." *Id.* at 282 (emphasis added). In rejecting FSA's argument, the *Prime Motor* court reasoned as follows.

First, the *Prime Motor* court rejected a construction that viewed certain terms in isolation without regard to the entire section and the agreement as a whole. *Id.* at 282.

Second, the court noted that section 2.2, like section 3.01 of the 1993 Indenture, is only an agreement by "the Company" and does not bind the Subsidiary Guarantors:

> The next sentence of Section 2.2 begins with the phrase, "[i]n furtherance of the foregoing, *the [PMI] Borrowers* will not make, and PMI will not accept, any payment of or on *account of* ..." the Subordinated Indebtedness. (emphasis added) While FSA in its argument emphasizes the words "on account of", when examined in the context of the entire sentence it appears an awkward way to state that payments by a guarantor are being referred to, especially considering that the sentence begins with the phrase "the Borrowers will not make ...".

*Id.* at 283 (emphasis and alterations in original); *see also Whetstone Candy Co. v. Kraft Foods*, 351 F.3d 1067, 1075 (11th Cir. 2003) ("[T]he Settlement Agreement explicitly uses the term 'subsidiary' elsewhere in the agreement and, consequently, we should be reluctant to read this term into the 'waiver' clause. Using the words 'under, by or through' would be a cryptic method to bind the subsidiaries of Kraft NA . . . . If the parties had intended to bind the affiliates or subsidiaries of Kraft NA, they would have included language similar to that used [elsewhere in the agreement].");  *Zim v. West. Publ'g Co.*, 573 F.2d 1318, 1323 (5th Cir. 1978).

Third, the *Prime Motor* court rejected the construction advanced by FSA that ignored the fact that section 2.2's scope is limited by the phrase "to the extent and in the manner provided herein" (at 282):

> For example, FSA places great emphasis on the phrase "in connection with" that appears in the first sentence of Section 2.2. But FSA's interpretation ignores that this same sentence then goes on to expressly provide that the scope of the subordination being agreed upon is "to the extent and in the manner provided herein". The terms used in this second phrase are words of limitation and required that one look to the following

12

provisions and the entire document to determine exactly what the "extent" and "manner" of the subordination is.

Fourth, the court noted that the phrase "on account of" refers to payments in an insolvency situation involving the parent company (at 283):

> The phrase "on account of" appears more naturally to refer to the long list of payments that are included in the parenthetical at the end of this sentence, which are various types of payments that may be made in the context of a Reorganization proceeding. These payments, such as adequate protection payments or distributions on a claim, are payments not technically made by the Borrower, but most certainly are "on account of" the underlying debt and have as their source the assets and property of the Borrower's estate.

The *Prime Motor* court got it right. Fundamentally, subordination provisions must be read in their entirety and in the context of the agreement as a whole, and if there is an intention (i) to subordinate a guaranty as well as the guaranteed obligation and (ii) to bind subsidiaries as well as the parent, the subordination agreement should say so. *See also Bergson Ice Cream v. NewBerg LP*, 2002 Mass. Super. LEXIS 310, at *4-5 (2002) (Given that the note was identified as subordinated debt but "the Guaranty is not specifically identified as subordinated debt, . . . Bergson remained free to pursue [the Guarantor] in the event of NewBerg's default on the Note, even though it is barred (at least until the Bank is paid) from collecting from NewBerg directly."). Here, it did not, and the arguments made by the 1994/96 Parties below rely on a manufactured and strained interpretation of "on account of" and "with respect to." These arguments must fail. By its plain language, Article Three applies only to the primary payment obligations under the Notes, not the Subsidiary Guarantees.[5]

### 2.    Article Sixteen Addresses The 1993 Note Guarantees

As compared with Article Three, Article Sixteen, by its very title -- "Guarantees of Notes" -- addresses the 1993 Note Guarantees. Section 16.02 addresses the conditions under which the 1993 Note Guarantees are subordinated to certain obligations of the Subsidiary

---

[5] At trial and in its pleadings, LDTC cited extensively to *Prime Motor* (D.I. 6845). Yet, inexplicably, the Bankruptcy Court simply ignored *Prime Motor* altogether, as well as ignoring *Shannon-Vail Five, Whetstone Candy, Zim* and *Bergson Ice Cream.*

Guarantors, subject to one of the triggering events set forth in sections 16.03 and 16.04, such as

the commencement of a bankruptcy case for the Subsidiary Guarantors. Section 16.02 states:

> SECTION 16.02. <u>Guarantee Subordinated to Senior Indebtedness</u>. Each Subsidiary Guarantor . . . covenants and agrees, and the Trustee and each holder of the Notes . . . likewise covenants and agrees, for the benefit of all present and future holders of Senior Indebtedness of such Subsidiary Guarantor, that all payments pursuant to the Guarantee by such Subsidiary Guarantor are hereby expressly subordinated, to the extent and in the manner hereinafter set forth, in right of payment to the prior payment in full  . . . of all Senior Indebtedness of such Subsidiary Guarantor.

As such, the 1993 Note Guarantees rank equally with all obligations of the Subsidiary

Guarantors except for Senior Indebtedness *of such Subsidiary Guarantor*. Therefore, in order for

the 1994/96 Note Guarantees to be senior to the 1993 Note Guarantees, the 1994/96 Note

Guarantees must qualify as "Senior Indebtedness" of the Subsidiary Guarantors.

### 3.     The Definition of "Senior Indebtedness" Does Not Include Upstream Guarantees

Section 1.01 of the 1993 Indenture defines "Senior Indebtedness" as follows:

<u>Senior Indebtedness</u>: The term "Senior Indebtedness" shall mean, with respect to any Person . . . :

> (i)(A) the Obligations of Such Person under the Credit Agreement and (B) penalties, [etc.] and all other monetary obligations (other than monetary Obligations referred to in clause (i)(A) above) of such Person under the Credit Agreement, and

> (ii) to the extent (x) incurred by such Person from a Person that is a Bank . . . at the time of such incurrence or (y) designated in writing by the Company as Senior Indebtedness in a notice to the Trustee pursuant to the terms of this Indenture, which notice shall indicate the amount of such Senior Indebtedness and the trustee or representative thereof,

>> (A)(1) the principal of, premium, if any, and interest on all indebtedness of such Person for money borrowed (including all such indebtedness evidenced by notes, debentures or other securities issued for money, whether issued or assumed by such Person), (2) all indebtedness incurred by such Person in the acquisition . . . of any business, Capital Stock, real property or other assets . . ., (3) all lease obligations of such Person . . . , (4) all reimbursement obligations of such Person with respect to letters of credit and letter of credit fees in connection therewith, (5) all guarantees by such Person of any indebtedness referred to in this clause (ii)(A) of any Subsidiary of such Person or any Non-Affiliate Joint Venture of such person, (6) all obligations of such Person in connection with the sale of its receivables, and (7) all obligations of such Person in connection with the issuance of industrial revenue bonds.

(B)  all Currency Hedging Obligations of such Person,

(C)  all Interest Hedging Obligations of such Person,

(D)  all penalties, fees, premiums, expenses, reimbursements, indemnity obligations and all other monetary obligations of such Person in respect of any Indebtedness, obligation or guarantee described in this clause (ii), and

(E)  any renewals, extensions, refundings, replacements, restructurings, refinancings, amendments and modifications by such Person of any such indebtedness, obligation or guarantee described in clauses (i) and (ii) . . . .

Thus, there are two separate and distinct ways for a given obligation to qualify as "Senior Indebtedness" of a Subsidiary Guarantor:  the obligation must (a) arise under the "Credit Agreement" pursuant to subsection (i) (not relevant here), or (b) be an obligation of a Subsidiary Guarantor of the type described in subsection (ii).

The Bankruptcy Court's construction of the definition of "Senior Indebtedness" was erroneous.  This is apparent from the structure of the definition of "Senior Indebtedness" in section 1.01, the specific text of the definition, and the absurd resulting analysis which the Bankruptcy Court conducted as a direct result of its incorrect reading of this definition.  Indeed, the Bankruptcy Court ignored the boundaries between different sections of the 1993 Indenture, incorporated defined terms into subsections where they were not present, and incorporated the meanings of different defined terms into one another.

In its analysis of the definition of "Senior Indebtedness," the Bankruptcy Court stated in error that "clause (ii) of the definition provides that 'Obligations' shall constitute Senior Indebtedness when, *inter alia*, so designated in writing by the Company,"  Guaranty Decision at 10. In point of fact, the defined term "Obligations" simply is not contained in the introduction to subsection (ii). Rather, that defined term only is used in subsection (i), with reference to the Credit Agreement.  In effect, by insinuating the defined term "Obligations" into subsection (ii), what the Bankruptcy Court did was meld subsections (i) and (ii) together, erroneously creating one consolidated subsection where there are two.  However, the very structure of the section 1.01 definition of Senior Indebtedness reveals that subsections (i) and (ii) are separate and distinct.

Moreover, the text used by the Company when it drafted this section supports the conclusion that there are two separate ways for something to qualify as Senior Indebtedness: under the terms of subsection (i) and under the terms of subsection (ii). Finally, the language contained in each of subsections (i) and (ii) reveals that they are designed to deal with different situations.

"Obligations" is a broadly defined term that includes all guarantees, including upstream guarantees. 1993 Indenture § 1.01. It is used in subsection (i) to give broad protections to the Company's bank lenders in connection with the Credit Agreement. However, subsection (ii) is narrower in scope than subsection (i), as is evidenced by the extent of the text and detail it contains. Subsection (ii) does not reference the Credit Agreement; rather, it addresses several specific kinds of debts and does not use the defined term "Obligations." Clause (ii)(A)(1) deals with the indebtedness "of such Person for money borrowed . . . ." Clause (2) speaks to debts incurred "by such Person" in acquisitions. Clause (3) governs "all lease obligations of such Person . . ." Clause (4) applies to the "obligations of such Person" under letters of credit. Clauses (6) and (7) address "such Person['s]" obligations in the sale of receivables and in connection with the issuance of industrial revenue bonds, respectively.

None of the clauses listed above relate to upstream guarantees. Clause (5) is the only place in subsection (ii) where guarantees are addressed. Clause (5) addresses "all guarantees by such Person of any indebtedness referred to in this clause (ii)(A) of any Subsidiary of such Person or any Non-Affiliate Joint Venture of such person." Clearly, this clause deals only with *downstream* guarantees -- "guarantees . . . of any indebtedness . . . of any Subsidiary." Indeed, the parties agree, and the Bankruptcy Court correctly found, that clause (ii)(A)(5) includes "downstream" guarantees, but not "upstream" guarantees.[6] Guaranty Decision at 7 (noting that

---

[6] As noted by commentators, it makes sense for indebtedness to be subordinated to downstream guarantees but not to upstream guarantees. *See, e.g.,* 1 SANDRA SCHNITZER STERN, STRUCTURING & DRAFTING COMMERCIAL LOAN AGREEMENTS ¶ 13.07[3][c][ii] & [c][iii] (rev. ed. 2004) ("Because the parent has an equity ownership in its subsidiary, the proceeds of the

the clause "renders all downstream guarantees of any indebtedness covered by clause (ii)(A) as Senior Indebtedness"). Critically, the 1994/96 Note Guarantees are *upstream* guarantees and cannot be considered "Senior Indebtedness" under this subsection (ii).

Yet this is precisely what the Bankruptcy Court found. The Bankruptcy Court imported the defined term "Obligations" from subsection (i) into subsection (ii). Then, the Bankruptcy Court found that the "designation" provisions of subsection (ii) (which were not contained in subsection (i)) could be applied to the defined terms contained in subsection (i). Again, quoting from the Guaranty Decision at 10, the Bankruptcy Court found that (emphasis added) "clause (ii) of the definition provides that *'Obligations' shall constitute Senior Indebtedness* when, *inter alia*, so designated in writing by the Company." (Emphasis added.). *See also id.* at 7 ("Clause (ii) of the definition provides that other debt will also qualify as Senior Indebtedness if incurred from a bank *or if a written notice to that effect is delivered by the Company to the 1993 Indenture Trustee when such debt is issued*.") (emphasis added). In other words, the Company could render the 1993 Note Guarantees subordinate to any Obligation under the sun, as long as the Company delivered a written notice to that effect.

This was plain error. By insinuating "Obligations" as a defined term into subsection (ii), the Bankruptcy Court found that subsection (ii) applied to both upstream and downstream guarantees. Yet, if subsection (ii) were intended to cover all "Obligations" as long as designated in writing, there would be no purpose to any of the remainder of subsection (ii). And, in particular, if subsection (ii) were intended to apply to cover all "Obligations" including both upstream and downstream guarantees, there would be no purpose in specifying only downstream guarantees in clause (5).

The simple truth is that subsection (ii) does not apply to upstream guarantees. By

---

underlying loan enhance the value of the subsidiary. . . ." Conversely, "[w]here an upstream or cross-stream guaranty is involved, there is no equity investment of the guarantor to protect. . . .").

eliminating the boundaries between subsections (i) and (ii), the Bankruptcy Court effectively struck the terms of all of subsection (ii)(A) from the 1993 Indenture, including clause (ii)(A)(5). This violates fundamental principles of contract construction. *See Shaw Group v. Triplefine Int'l,* 322 F.3d 115, 124 (2d Cir 2003) ("[W]e recognize that under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (citation and internal quotation marks omitted); *Gen. Elec. v. Compagnie Euralair,* 945 F. Supp. 527, 532-33 (S.D.N.Y. 1996) (a contract should be interpreted to make every part effective).

In its analysis of the definition of "Senior Indebtedness," the Bankruptcy Court also concluded that the 1994/96 Note Guarantees constitute indebtedness "assumed" by the Subsidiary Guarantors and, therefore, qualify as "indebtedness . . . for money borrowed" under clause (ii)(A)(1). *See* Guaranty Decision at 10 n.13 ("Assumption of debt is the function of a guarantee."), 29 n. 33 (same) & 30. However, this misconstrues the distinct natures of assumptions and guarantees. An assumption of debt is a "vehicle whereby a third party, with the consent of the creditor [takes] on a preexisting debt, thus making himself a debtor while liberating the original debtor without changing the basic elements of the original contract." *Fed. Deposit Ins. Corp. v. Prann,* 694 F. Supp. 1027, 1035 n.12 (D.P.R. 1988), *aff'd sub nom. Fed. Deposit Ins. Corp. v. Bracero & Rivera,* 895 F.2d 824 (1st Cir. 1990). Assumption of a debt must be express. *See In re Thomson McKinnon Sec., Inc.,* 149 B.R. 61, 71 (Bankr. S.D.N.Y. 1992). A guarantee of a debt, on the other hand, is an independent obligation: "[B]y definition, a guarantee is a separate undertaking in which the principal obligor does not join, and a guarantee exists independent of the original obligations between the principal obligor and the obligee." *Shannon-Vail Five Inc. v. Bunch,* 270 F.3d 1207, 1211 (9th Cir. 2001); *see also Fehr Bros. Inc. v. Scheinman,* 121 A.D.2d 13, 15 (N.Y. App. Div. 1986); *General Overseas Films, Ltd. v. Robin Int'l, Inc.,* 542 F. Supp. 684, 691 (S.D.N.Y. 1982) ("A guarantee is not . . . an 'evidence of indebtedness'; it is an agreement collateral to the debt itself."), *aff'd* 718 F.2d 1085 (2d Cir. 1983).

The issuance of a guarantee does not in the least "liberate" the original debtor. Thus, were the Subsidiary Guarantors to make payment in full on the 1994/96 Note Guarantees, the Company would still be obligated to pay the amount owing on the 1994/96 Notes, but the obligation would then be owed to the Subsidiary Guarantors pursuant to the doctrine of subrogation:

> Historically, subrogation has been described as the substitution of one person (the surety) in place of another (the creditor) with respect to the other's lawful claim or right. The substitution occurs when the surety discharges an obligation of the principal to the creditor. The surety then acquires the lawful claims or rights of the creditor.

THE LAW OF SURETYSHIP 419 (Edward G. Gallagher, ed. 2d ed. 2000) (citations omitted). *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962) (generally discussing and re-affirming the right of subrogation).

The Bankruptcy Court (at 11) also looked to clause (ii)(D) to justify its broad reading of the definition of "Senior Indebtedness" to include upstream guarantees. The error of the Bankruptcy Court is apparent. The Bankruptcy Court seized upon the use in clause (D) of the defined term "Indebtedness," but failed to recognize that, as used in this subsection, the term "Indebtedness" is not given the broad reading used in the definition section of the Indenture. Rather, by its very terms, clause (D) limits use of the term "Indebtedness" to only that Indebtedness "*described in this clause (ii)*." The Bankruptcy Court ignored this important limitation.[7] Clause (ii)(D) encompasses contractual obligations that are in addition to principal and interest, such as penalties and fees, but only those that relate to an "Indebtedness, obligation or guarantee" described in subsection (ii). Subsection (ii), however, does not contain language encompassing upstream guarantees of the Subsidiary Guarantors.

In sum, the Bankruptcy Court ignored the fundamental structure of the 1993 Indenture

---

[7] Clause (ii)(D) also serves as a useful example that the drafters knew how to use the word "guarantees" by name when they intended to include guarantees, even though the same sentence already included the word "Indebtedness." *See also* clause (ii)(E), which refers to both "indebtedness" and "guarantees."

that maintained the distinct nature of two separate items -- the 1993 Notes, on the one hand, and the 1993 Note Guarantees, on the other hand. Moreover, the Bankruptcy Court ignored the limitations placed upon defined terms in certain sections, and even incorporated defined terms into subsections where they simply were not present. In doing so, the Bankruptcy Court ignored fundamental rules of contract construction, and rendered superfluous provisions of the 1993 Indenture that, by their plain language, required that LDTC's subordination objection (D.I. 6504) be sustained below.

### 4. The Bankruptcy Court's Construction of the 1993 Indenture Is Not Supported By the COMMENTARIES

The American Bar Foundation's COMMENTARIES ON MODEL DEBENTURE INDENTURE PROVISIONS (1971) ("COMMENTARIES") is "[p]robably the best source of analysis of the language of corporate bonds." William A. Klein, C. David Anderson and Kathleen G. McGuiness, *The Call Provision of Corporate Bonds: A Standard Form in Need of Change*, 18 J. Corp. L. 653, 696 n.3 (1993).[8] Yet, although cited extensively by LDTC below, not once does the Guaranty Decision even mention the COMMENTARIES. In fact, the Bankruptcy Court's construction of the 1993 Indenture is at odds with this important text in numerous respects. The point of the discussion that follows is not that indenture drafters need slavishly follow the guidance and sample provisions in the COMMENTARIES, but that, in every relevant instance, the COMMENTARIES consistently support LDTC's reading of the 1993 Indenture. Thus, as a guide to how indentures *should* be drafted and the matters that indenture drafters *should* take into consideration, the COMMENTARIES to this day remain the single most important source materials

---

[8] The full title is "Commentaries on Model Debenture Indenture Provisions 1965, Model Debenture Indenture Provisions - All Registered Issues 1967 and Certain Negotiable Provisions Which May Be Included in a Particular Incorporating Indenture". The purpose of the COMMENTARIES "is not only to comment on the "Model Debenture Indenture Provisions" but also to present material which will be of assistance to lawyers and their clients in negotiating and preparing indenture provisions of the types customarily subject to negotiation." *Id.* at ix-x.

and serve as consistent support for reversal of the Guaranty Decision.[9]

The very reason that the 1993 Indenture contains a lengthy definition of "Senior Indebtedness" is that, "since there are various types of subordinated debt and *the mere term 'subordination'* may not sufficiently describe all of the characteristics of subordination which may be considered relevant by the parties, some definition of the term is desirable." *Id.* at 384 (emphasis added);[10]) *see also In re Joe Newcomer Fin. Co.*, 226 F. Supp. 387, 392 (D. Colo. 1964) (the fact that instruments are denominated "subordinated debenture notes" is "not significant" to determination of priority). In fact, "[a] review of currently outstanding indentures will reveal *wide variations* among such definitions [of "Senior Debt"]. The range extends from only a single presently outstanding indebtedness of the debtor, at the one extreme, to any and all present and future indebtedness, at the other." COMMENTARIES at 565 (emphasis added).

The lack of specificity of the term "subordinated," together with the "wide variations" among definitions, demands that subordination provisions be drafted with utmost precision:

> It should go without saying that a careful analysis of what is or is not included in the definition of "Senior Debt" is of *paramount importance* to any potential lender, senior or junior. *The exact wording of the definition* will determine the type and amount of senior debt which will be entitled to the benefits of the subordination.

*Id.* at 567 (emphasis added). *See also* Dee Martin Calligar, *Subordination Agreements*, 70 Yale L.J. 376, 392 (1961) ("The importance of making certain that the senior debt qualifies as such within the limitations provided in the subordination agreement, indenture or other instrument creating or evidencing the subordinated debt *cannot be overemphasized.*") (emphasis added). The

---

[9] As the seminal text on the use, construction and interpretation of trust indentures, courts often rely upon the COMMENTARIES in construing indenture provisions. *See, e.g., In re Envirodyne Indus.*, 29 F.3d 301, 305 (7th Cir. 1994) (citing with approval the routine use of the COMMENTARIES by various courts); *Metro. Life Ins. Co. v. RJR Nabisco*, 716 F. Supp. 1504, 1518 (S.D.N.Y. 1989) (quoting from the COMMENTARIES in the context of an indenture interpretation dispute and noting that they were "relied upon and respected by both plaintiffs and defendants").

[10] Indeed, the COMMENTARIES themselves provide five alternative definitions of "Senior Debt." *Id.* at 384.

"exact wording" of the definition of "Senior Indebtedness" as relevant here includes only downstream guarantees, not upstream guarantees such as the 1994/96 Note Guarantees.

According to the 1994/96 Parties, "[LDTC] cannot come close to demonstrating that the [1994/96 Note Guarantees are unambiguously excluded from the definition of Senior Indebtedness." 1994/96 Noteholders' Trial Brief at 32 (D.I. 6361). However, the critical question is not whether the 1994/96 Note Guarantees are *excluded*, but rather whether they are expressly *included*. The COMMENTARIES provide that, when the intention is to include guarantees in the definition of senior debt, there should be specific language to that effect:

> It is important to clarify by definition the types of liabilities which are to be comprehended by the defined term "Debt". *Debt for money borrowed* is invariably included. However, *in the absence of specific language* in the covenant or *in the definitions*, there might be some question as to the applicability of the covenants to such liabilities as the following: (a) assumptions or *guaranties of indebtedness of other persons*; . . . .

COMMENTARIES at 378-79. (emphasis added). Simply put, if someone drafting an indenture intends to include "guaranties of indebtedness of other persons" in the definition of "Senior Debt," *they should say so with specific language.* To illustrate the point, the COMMENTARIES provide numerous examples of specific language that clearly distinguish between a company's "indebtedness for money borrowed" and the company's indebtedness for money "guaranteed to" others or "debt of others guaranteed by" the company. *See id.* at 93-95 (alternative definitions of "Senior Debt"), & 72-73 (alternative definitions of "Debt"); *see also* MARK B. TRESNOWSKI & GERALD T. NOWAK, THE HIGH YIELD OFFERING: AN ISSUER'S PERSPECTIVE A-9 (2004) (describing "for borrowed money" as a limiting phrase to definition of "indebtedness"). The definition of "Indebtedness" in the 1993 Indenture itself (at 17) makes this very distinction by referring to "all obligations (unconditional or contingent) of such Person *for money borrowed*" in clause (a) and separately referring to "all Indebtedness *of others* guaranteed by such Person" in clause (f).

With respect to whether section 3.01 of the 1993 Indenture is relevant in any way to the

subordination of the 1993 Note Guarantees, section 3.01 is an agreement that the Company made on its own behalf without binding its subsidiaries. The COMMENTARIES are very clear on this point: if the intention is to bind subsidiaries, the provision should say so *explicitly*:

> [T]he covenants contained in the Model Provisions are by their terms applicable to the Company only and not to its subsidiaries. . . . Whether or not the standard protective covenants … *and the negotiated protective covenants* … are to be applicable to subsidiaries *is a matter of negotiation.*

COMMENTARIES at 312-13 (emphasis added); *see also id.* at 345 (with respect to a covenant to maintain insurance); *id.* at 443 (with respect to a covenant concerning sale-leasebacks).

Lastly, and most importantly, the COMMENTARIES address the exact subsidiary guarantee issue that is the subject of the present case:

> In the rare case in which payment of the subordinated debt is guaranteed by a third party, counsel for the holder of the subordinated debt should be cognizant of a special problem presented. Unless *provisions to the contrary* are included in the relevant instruments, there is a possibility that a payment by the guarantor to the holder of the subordinated debt, while reducing the guarantor's obligation under the guaranty, may not be retained by the holder of the guaranteed subordinated debt by reason of the subordination provision requiring that "payments" be turned over to the holder of the senior debt.

*Id.* at 576 (emphasis added). In other words, the COMMENTARIES teach that, when subordinated debt is guaranteed, bondholders are generally entitled to retain payments on the guarantee even though the underlying debt is subordinated. However, the COMMENTARIES also identify the risk of an argument that payments on the guarantee should be equated with "payments" on the debt. To guard against this "possibility," the COMMENTARIES recommend the inclusion of "provisions to the contrary."

In fact, the 1993 Indenture *does* include several "provisions to the contrary," *removing any possibility* that payments on the 1993 Note Guarantees could be misconstrued as "direct or indirect payments with respect to the [1993] Notes" or "on account of" the 1993 Notes.

First, the 1993 Indenture provides an entirely separate article -- Article Sixteen -- to address the extent to which the 1993 Note Guarantees are subordinated, in order to ensure the distinction between, on the one hand, subordination of the 1993 Note Guarantees pursuant to

Article Sixteen and, on the other hand, subordination of the 1993 Notes pursuant to Article Three.

Second, as noted above, section 3.01 only binds Kaiser, not the Subsidiary Guarantors, and only refers to the 1993 Notes, not the 1993 Note Guarantees.

Third, section 3.02, which concerns distributions on dissolution, liquidation and reorganization,[11] only addresses distributions of assets *of the Company* in an insolvency situation involving *the Company*. The only reference in the entire 1993 Indenture to distributions of assets *of the Subsidiary Guarantors* is section 16.03, which is identical to section 3.02 except that it limits itself to distributions of assets *of such Subsidiary Guarantor* in an insolvency situation involving *such Subsidiary Guarantor*.

Fourth, after the occurrence of a non-bankruptcy default with respect to Senior Indebtedness of the Company, section 3.03 of the 1993 Indenture requires subordination of all "direct or indirect payments or distributions by or on behalf of the Company with respect to the [1993] Notes." While section 3.02 clearly involves distributions of assets *of the Company* only, section 3.03 refers to distributions by *or on behalf of* the Company. In order to dispel any doubt as to whether payments "on behalf of" the Company could include payments by the Subsidiary Guarantors, the last sentence of the first paragraph of section 3.03 (at 40) reads as follows:

> A payment made by any Subsidiary Guarantor under its Guarantee shall not be deemed to be a payment on behalf of the Company if, at the time of such payment, payment by such Subsidiary Guarantor would not have been prohibited by Article Sixteen.

Stated differently, if a payment on the 1993 Note Guarantees is not subordinated under Article Sixteen, then such payment will not be deemed a payment "on behalf of the Company" within the

---

[11] Section 3.02, entitled "Distribution on dissolution, liquidation and reorganization; subrogation of Notes," provides, in part:

> Upon any direct or indirect payment or distribution of assets or securities *of the Company* of any kind or character, whether in cash, property or securities, upon any dissolution, winding up, liquidation or reorganization *of the Company*, whether voluntary or involuntary or in bankruptcy, insolvency, reorganization, receivership or other proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities *of the Company* or otherwise . . . .

meaning of section 3.03, and therefore it will not come within the subordination provisions of section 3.03.

> Fifth, section 16.05 of the 1993 Indenture provides in relevant part that:

> Nothing contained in this Indenture or in any of the [1993] Notes shall (a) affect the obligation of any Subsidiary Guarantor to make, or prevent any Subsidiary Guarantor from making, at any time, *except as provided in Sections 16.03 and 16.04*, payments on the Guarantee or (b) prevent the application by the Trustee of any money deposited with it hereunder to the payment of or on account of the Guarantee, unless the Trustee shall have received at its principal office written notice of any event prohibiting the making of such payment.... This Section 16.05 shall be construed for the sole benefit of the Trustee and shall not otherwise affect the rights of the holders of Senior Indebtedness.

1993 Indenture at 108 (emphasis added). This section is intended to provide clear direction to the 1993 Indenture Trustee that *nothing* in the 1993 Indenture is intended to prevent the Trustee from distributing to the 1993 Noteholders all payments the Trustee receives *except* to the extent the Trustee receives notice that it is required to turn over the payments to holders of Senior Indebtedness of the Subsidiary Guarantors pursuant to section 16.03 or section 16.04.

The Bankruptcy Court erred in ignoring the structure and text of the 1993 Indenture, and as a result arrived at an interpretation that simply cannot withstand scrutiny on appeal. The Bankruptcy Court also failed to consider clear guidance from the COMMENTARIES on industry standards for the use and construction of provisions in trust indentures in its consideration of the 1993 Indenture, and ultimately crafted a decision that is at odds with both the plain terms of the indenture and the industry norms for interpreting it. As a result, reversal is warranted.

## B. THE BANKRUPTCY COURT ERRED IN CONSIDERING EXTRINSIC AND PAROL EVIDENCE

Despite the fact that the Bankruptcy Court ultimately found the 1993 Indenture unambiguous, it did not do so until after considering extrinsic evidence. This violated basic rules of construction and is error requiring reversal, especially since the terms of the 1993 Indenture stand on their own.

All agree that the 1993 Indenture is governed by and should be construed in accordance with New York law. *See* 1993 Indenture § 15.04. The Court of Appeals of New York, the

highest court in that state, recently reaffirmed the long-standing rule that in construing an unambiguous contract, the court will look "solely to the language used by the parties to discern the contract's meaning." *Vermont Teddy Bear v. 538 Madison Realty*, 807 N.E.2d 876, 879 (N.Y. 2004); *see also Teitelbaum Holdings Ltd. v. Gold*, 396 N.E.2d 1029, 1032 (N.Y. 1979); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 255 N.E.2d 709, 711-12 (N.Y. 1969); *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1956). The Bankruptcy Court, however, did not apply black letter New York law. Instead, the Bankruptcy Court held that "New York law . . . permits extrinsic evidence to the extent it is of circumstances surrounding the formation of a contract when that evidence explains the contract and does not contradict the plain meaning of the contract. . . . The evidence admitted here merely is explanatory and so is admissible." Guaranty Decision at 16-17.

The Bankruptcy Court quoted *William C. Atwater & Co. v. Panama R. Co.*, 159 N.E. 418 (N.Y. 1927) in support of its interpretation of New York law. In *Atwater*, the court stated:

> Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish. The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties *as manifested thereby*.

*Id.* at 524 (emphasis added) (internal citations and quotation marks omitted).

*Atwater* did not create the lax standard that the Bankruptcy Court applied. The *Atwater* court reversed a lower court decision that relied on a strict reading of *one isolated sentence* in the contract at issue. On appeal, the court instead looked not only at the isolated sentence, but, rather, looked at the sentence within the context of the *rest of the paragraph* in which it appeared and within *the contact as a whole* to determine the intent of the parties. *Atwater* simply stands for the proposition that contact terms should not be read in isolation to arrive at a construction of those terms that is at odds with the rest of the contract. *Atwater* does not permit the wholesale admission of extrinsic evidence that may somehow be related to a contract. Such a rule would

undermine any incentive for parties to ensure that the terms of their written agreements are accurate and complete and would erode confidence in contracts as written.

Further, even if "surrounding circumstances" are relevant, the Bankruptcy Court erred in including circumstances occurring well *after* the 1993 Indenture was drafted. The Bankruptcy Court stated that it admitted the prospectuses with respect to the 1993, 1994, and 1996 Indentures and the Notices regarding the Indentures to "provide historical context for the dispute." Guaranty Decision at 15. This was in clear violation of New York law. *See Sargent v. Halsey*, 348 N.Y.S.2d 661, 664 (N.Y. Sup.Ct. 1973) ("To interpret the meaning of a contract, at the time and place it was made, all the surrounding circumstances *at that time* necessarily throw light upon it . . . .") (emphasis added), *aff'd*, 42 A.D.2d 375 (N.Y. App. Div. 2d Dep't 1973). It is the historical context *of the 1993 Indenture* that arguably would be relevant as "surrounding circumstances," not the "historical context for *the dispute*." Prospectuses and Notices that postdated the 1993 Indenture by one or more years simply do not provide historical context for the 1993 Indenture.

The Bankruptcy Court also relied on New York's parol evidence rule to justify its consideration of certain extrinsic evidence. The Bankruptcy Court (at 23) stated that "only that parol evidence which contradicts an unambiguous contract is inadmissible." However, in *W.W.W. Assoc., Inc. v. Giancontieri*, 566 N.E.2d 639 (N.Y. 1990), New York's highest court stated:

> A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing . . . . That rule imparts stability to commercial transactions . . . .

*Id.* at 642 (internal citations and quotation marks omitted). *See also Namad v. Salomon, Inc.*, 543 N.E.2d 722, 723 (N.Y. 1989); *CCG Assoc. I v. Riverside Assoc.*, 157 A.D.2d 435, 440 (N.Y. App. Div. 1990). Indeed, "[i]f the written contract is clear without extrinsic evidence, then such evidence could have no office other than to contradict the writing, and is therefore excluded." *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 305 (7th Cir. 1994) (interpreting subordination

provisions in a public indenture under New York law). Here, there was no basis in law or fact for

the Bankruptcy Court to look to extrinsic or parol evidence under New York law.

It is briefly worth highlighting the dangers inherent in considering the so-called

"evidence" proffered by the 1994/96 Parties.

As to all of the proffered indentures, credit agreements and prospectuses, they are

irrelevant *per se* as a contractual matter. Section 15.12 of the 1993 Indenture provides that

(emphasis added):

> This Indenture shall not be used to interpret another indenture, loan or debt agreement of
> the Company or any Subsidiary or Affiliate of the Company. *Any such indenture, loan or
> debt agreement may not be used to interpret this Agreement.*

The logic for this is self-evident -- the 1993 Indenture should be interpreted based on its own

words, not based on the words of any other document that does not form a part of the contract

between the Company and its noteholders.

As to the proffered Declarations and Depositions, there is simply no credibility to an

issuer, an issuer's lawyer and the issuer's hand-picked underwriter supposedly recalling what

they "intended" 12 years earlier in private discussions among themselves and within the recesses

of their own minds, particularly since they may well be sued if the indenture does not say what

they "intended" it to say.[12]    As the Bankruptcy Court originally said, before inexplicably

reversing itself: "And if I start, somehow or other, looking to what parties' intentions were 12 or

14 years ago, in a publicly traded market, there is no assurance to the market, at all, as to what the

documents mean." Tr. 4/13/05 at 224 (D.I. 6722). *See, e.g., In re Envirodyne Indus.,* 29 F.3d

---

[12] In fact, the section of the Subsidiary Plans entitled "General Releases by Holders of
Claims" generally releases all possible "Claims" against "any of the Debtor's former directors,
*officers,* employees, agents, advisors, *attorneys,* accountants, *underwriters, investment bankers* or
other representatives of the Debtors . . . *except* for such Claims or rights based on . . . if the
holders of the [1993 Note Guarantees] are determined . . . to be entitled to a distribution in respect
of such Claims, acts or omissions of any such person related to or giving rise to the circumstances
underlying any of the Contractual Subordination Disputes."    Subsidiary Plans at § 4.1(b)
(emphasis added).  In other words, if LDTC prevails, the 1994/96 Parties will be free to sue the

301, 305 (7th Cir. 1994) (rejecting the use of "self-serving testimony or documents . . . purporting to show that the parties didn't mean what they said in the written contract"); *Zim v. West. Publ'g Co.*, 573 F.2d 1318, 1322-23 (5th Cir. 1978) (rejecting opinion of lawyer who negotiated the contract); *Metro. Life Ins. Co. v. RJR Nabisco*, 716 F. Supp. 1504, 1514 (S.D.N.Y. 1989) (rejecting "the opinions of various individuals -- what, for instance, former RJR Nabisco Treasurer Dowdle personally did or did not 'firmly believe' the indentures meant"); *Purcell v. Flying Tiger Line*, No. 82-3505, at 5, 8 (S.D.N.Y. Jan. 12, 1984) ("In light of our holding that the Indenture unambiguously permits the transaction at issue in this case ..., [i]t would be improper to consider evidence as to the subjective intent, collateral representations, and either the statements or the conduct of the parties in performing the contract.") (as quoted in *Metro. Life* at 1515).

As for the 1993 Prospectus, it simply cannot serve as a substitute for the 1993 Indenture itself. As noted by the Fifth Circuit Court of Appeals:

> Broad has argued from time to time in this litigation that we should look to various documents other than the Indenture e.g., the face of the Debentures [and] the prospectus under which the Debentures were marketed . . . . With regard to the Debentures and the prospectus, those documents specifically and repeatedly incorporate the Indenture by reference, and warn the investor that the contractual obligations and rights that attend the Debentures are governed solely by the Indenture . . . . Those documents may be highly relevant, of course, to Broad's federal securities claims; but they are not a source of contractual rights.

*Broad v. Rockwell Int'l*, 642 F.2d 929, 948 n.21 (5th Cir. 1981).[13]

Finally, it is worth emphasizing that, as to testimony, the Bankruptcy Court chose to rely exclusively on Declarations and Depositions. In addition to its general and repeated objections at trial as to any use of these items, LDTC made numerous specific objections in its Evidentiary Objections (D.I. 6759), not even one of which was addressed by the Bankruptcy Court in the

---

very persons who made the Declarations and Depositions, notwithstanding the otherwise general releases set forth in the Subsidiary Plans.

Guaranty Decision.

## C.    THE BANKRUPTCY COURT'S CONSIDERATION OF EXTRINSIC AND PAROL EVIDENCE WAS ESPECIALLY INAPPROPRIATE IN CONNECTION WITH CONSTRUCTION OF A PUBLIC INDENTURE

Strict construction and the prohibition of extrinsic and parol evidence to interpret an unambiguous contract are particularly important in the context of public indentures. Indeed, the very nature of a public indenture – which is unilaterally drafted -- makes the consideration of evidence beyond the four corners of the contract inappropriate. Rather, rules of construction provide a framework for interpreting the indenture and resolving any ambiguity found to exist. Regardless of whether the Bankruptcy Court found the 1993 Indenture unambiguous or ambiguous, the consideration of extrinsic and parol evidence was error as a matter of law.

The 1993 Indenture is a public indenture issued in compliance with the Trust Indenture Act of 1939. Whereas loan agreements and other private financing transactions are negotiated directly between the borrower and the lenders, public indentures are very different. The "lenders" (i.e., the purchasers of the notes issued pursuant to the indenture), do not come into being until after the indenture has been filed publicly in final form. *See* Lawrence E. Mitchell, *The Fairness Rights of Corporate Bondholders*, 65 N.Y.U. L. Rev. 1165, 1179 (1990) ("Mitchell") ("[B]ondholders do not participate in [bond contract] negotiation because they do not yet exist."). As a result, only the issuer of the notes and the issuer's underwriters have any role in drafting the indenture. *See, e.g., Metro. Life Ins. Co. v. RJR Nabisco*, 716 F. Supp. 1504, 1509 (S.D.N.Y. 1989) ("No one disputes that the holders of public bond issues, like plaintiffs here, often enter the market after the indentures have been negotiated and memorialized. Thus, those indentures are often not the product of face-to-face negotiations between the ultimate holders and the issuing company."); *Kaiser Aluminum v. Matheson*, 681 A.2d 392, 397-98 (Del. 1996) (recognizing that

---

[13] In any event, even if not barred as an evidentiary matter, if anything, the 1993 Prospectus supports LDTC's interpretation of the 1993 Indenture, *see* Tr. 4/27/05 at 52-54 & 148-154:2 (D.I. 6857).

with public indentures and similar documents, the purchaser of the securities is not a party to the drafting of the instrument which determines her rights).

Moreover, the underwriter that negotiates the indenture is not a party to the indenture and does not act for the benefit of the bondholders. Rather, "underwriters have a strong self-interest in pleasing management, since it is management that selects the underwriters and it is management on whom they are dependent for repeat business." Mitchell at 1183; Harvey L. Pitt and Karl A. Groskaufmanis, *A Tale of Two Instruments: Insider Trading in Non-Equity Securities*, 49 Bus. Law. 187, 223-24 n.249 (1993) (same).

As one commentator has explained, because the bond contract, which "serves as the font of all bondholder rights and duties," is "typically negotiated and drafted by corporate management . . . , [t]he consequence for bondholders is that their rights are determined by the same persons who are to bear the corresponding duties and who hold all of the power in defining and regulating the relationship." Mitchell at 1167-68.

In referring to the fact that noteholders do not themselves negotiate and are not parties to the indenture, a leading treatise on corporate trust administration summarized the law as follows:

> These considerations have led many courts not only to construe indenture provisions as being strictly against the obligor but also to try to find some other legal theory or precedent with which to protect the interests of the security holders.

ROBERT I. LANDAU & JOHN E. KRUEGER, CORPORATE TRUST ADMINISTRATION & MANAGEMENT 29 (5th ed. 1998).

Because a public indenture is not negotiated and drafted like a typical bilateral private contract, courts interpreting unambiguous indentures consistently have ruled against admitting extrinsic evidence in construing provisions therein. *See, e.g., In re Envirodyne Indus.*, 29 F.3d 301, 305 (7th Cir. 1994) (holding that the court would not look beyond the four corners of an unambiguous public indenture governed by New York law for further evidence of the meaning and intent of a non-boilerplate clause since doing so would allow parties to slip out of their clearly stated contractual obligations); *Metro. Life Ins. Co. v. RJR Nabisco*, 716 F. Supp. 1504,

1514-15 (S.D.N.Y. 1989) (refusing to admit opinions or statements of various executives regarding the parties' intent and holding that in interpreting indentures "this Court must be concerned with what the parties intended, but only to the extent that what they intended is evidenced by what is written in the indentures").

In perhaps the leading decision concerning the construction of public indentures, the Second Circuit Court of Appeals, applying New York law, stated that:

> Contract language is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion. Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation. . . .
>
> *The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.* In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement.

*Metro. Life Ins. Co. v. RJR Nabisco*, 906 F.2d 884, 889 (2d Cir. 1990) (emphasis added) (citations and internal quotation marks omitted).[14]

---

[14] *See also* the following decisions involving the interpretation of public indentures under New York law:  *U.S. Trust Co. of New York v. Jenner*, 168 F.3d 630, 632 (2d Cir. 1999) (construing an indenture under New York Law and holding "courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning") (citation omitted); *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992) ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument."); *Goodheart Clothing Co. v. Laura Goodman Enterprises*, 962 F.2d 268, 272 (2d Cir. 1992) ("[I]f a writing, or the term in question, appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature."); *LaSalle Nat'l Bank v. Perelman*, 141 F. Supp. 2d 451, 459 (D. Del. 2001) (interpreting indenture provisions under New York law and holding "[a]s a preliminary matter, the court finds that the language of the no recourse provision [in the indenture] is unambiguous, and therefore, the court will interpret the provisions as a matter of law without reference to extrinsic materials."); *U.S. Trust Co. of New York v. Executive Life Ins. Co.*, 602 F. Supp. 930, 938 (S.D.N.Y. 1984) ("[U]nder New York law, matters extrinsic to an unambiguous indenture agreement may not be considered."); *Purcell v. Flying Tiger Line*, No. 82-3505, at 5, 8 (S.D.N.Y. Jan. 12, 1984) (holding that, with respect to an unambiguous indenture, consideration of extrinsic evidence of "subjective intent, collateral representations, and either the statements or the conduct of the parties in performing the contract" is improper) (as quoted in *Metro. Life Ins. Co. v. RJR Nabisco*, 716 F. Supp. 1504, 1516 (S.D.N.Y. 1989)); *In re Best Prods. Co., Inc.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) ("[U]nder

"In interpreting these [indentures], this Court must be concerned with what the parties intended, but only to the extent that what they intended is evidenced by what is written in the indentures." *Metro. Life Ins. Co. v. RJR Nabisco*, 716 F. Supp. 1504, 1515 (S.D.N.Y. 1989) (citations omitted); *see also Mazzola v. County of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988) ("The words and phrases used in an agreement must be given their plain meaning so as to define the rights of the parties . . . ."); *In re Leasing Consultants*, 2 B.R. 165, 168-69 (Bankr. E.D.N.Y. 1980) (in determining whether indenture trustee's claim was subordinated, court looked to four corners of the indenture document and where it was clear and specific, words of the indenture were given their plain, ordinary and usual meaning).

In reversing a district court decision reading an "express intention" into an unambiguous public indenture, the Second Circuit of Court of Appeals stated:

> [W]e reject the district court's view that "[w]here cure periods are present, by extending them the Court merely gives effect to the express intention of the parties that a cure option be available." Where the parties have expressly agreed that the availability of a cure period shall be temporally limited, the court does not give effect to the parties' intention by removing the time limitation.

*Metro. Life Ins. Co. v. RJR Nabisco*, 906 F.2d 884, 890 (2d Cir. 1990).

Indeed, the subjective, unexpressed intentions of the party that drafts an indenture are wholly irrelevant to the construction of that indenture. *In re Netia Holdings S.A.*, 278 B.R. 344, 355 (Bankr. S.D.N.Y. 2002) ("Where the parties' intention is clearly and unambiguously set forth in the agreement, effect must be given to the expressed intent. . . . The objective intent of the parties 'expressed or apparent in the writing controls' the agreement's interpretation, while the 'undisclosed, subjective intent of the parties has no bearing' on the construction of the contract.") (citation omitted) (alteration in original); *Valley Reg'l Med. Ctr. v. Wright*, 276 F. Supp. 2d 620, 627 (S.D. Tex. 2001) ("Unambiguous contract language should be enforced as written, and the

---

New York law, when a contractual subordination agreement is unambiguous, the parties' rights are governed exclusively by that agreement and the words of that agreement are given their plain, ordinary and usual meaning.").

applicable standard is the objective intent, not subjective intent."); *Badgley v. United States*, 31 Fed. Cl. 508, 511 (Fed. Cl. 1994) ("a party's subjective, unexpressed intent plays no role in interpreting a contract"); *Air Master Sales Co. v. Northbridge Park Co-Op*, 748 F. Supp. 1110, 1115 (D.N.J. 1990) ("[I]t is not necessarily the parties' true intent, but the intent as expressed or apparent in the writing, that controls.") (citation omitted).

**D.    THE DOCTRINE OF *CONTRA PROFERENTEM* REQUIRES THAT ANY DOUBTS IN THE CONSTRUCTION OF THE 1993 INDENTURE BE RESOLVED IN FAVOR OF THE 1993 NOTEHOLDERS**

Even in the rarest of circumstances where a public indenture has been found to be ambiguous, courts have refused to consider extrinsic evidence of any purported intent for the simple reason that public indentures are not the product of negotiations involving the noteholders. Kaiser Aluminum is surely aware of this, given that it was the losing party in the leading Delaware decision on this subject. In *Kaiser Aluminum v. Matheson*, 681 A.2d 392 (Del. 1996), the Delaware Supreme Court was presented with a Kaiser Aluminum public document governing the rights of preferred shareholders. Finding the document to be "hopelessly ambiguous," *id.* at 398, the court noted as follows:

> When a contract is ambiguous, a court normally relies upon extrinsic evidence of the parties' intent. Such a course is not appropriate in this case for two reasons. First, such an investigation would reveal information about the thoughts and positions of, at most, the issuer and the underwriter. Whether these parties can legitimately be viewed as "negotiating" indenture provisions is a subject of some dispute. Since these sorts of provisions are not the consequences of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture, evidence of the course of negotiations would not be helpful.

*Id.* at 397-98 (citations omitted) (internal quotation marks and alteration omitted). Accordingly, extrinsic and parol evidence, whether of "surrounding circumstances" or otherwise, should not have been admitted to aid in interpreting the 1993 Indenture, regardless of whether the indenture was found to be unambiguous.

Rather, like other contracts of adhesion in which one party does not participate in negotiating the contract terms, the doctrine of *contra proferentem* applies to resolve any

ambiguity, by providing that any ambiguity in a public indenture should be construed against the drafter. *See id. at* 398-99 (citing the "well-accepted principle that ambiguities in a contract should be construed against the drafter" and concluding that this principle should be applied against the issuer in the case of "detailed indentures or similar documents . . . , particularly when alternative formulations [of the ambiguous provisions] indicate that these provisions could easily have been made clear" by the issuer in the drafting process). *Contra proferentem* provides a clear, consistent and decisive rule of decision in cases such as this.

The rule of *contra proferentem*, like the rules of "strict construction" and "four corners," is a "well-settled maxim" of New York law. *See Graff v. Billet*, 64 N.Y.2d 899, 902 (1985). The purpose of the rule is to aid a party whose bargaining power was less than that of the drafter of the contract. *See* 5 MARGARET N. KNIFFIN, CORBIN ON CONTRACTS § 24.27 (rev. ed. 1998). According to RESTATEMENT (SECOND) OF CONTRACTS § 206 cmt. a (1981), "[w]here one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of another party. . . . In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party."

Simply stated, if there are any doubts as to the proper interpretation of the 1993 Indenture, such doubts must be resolved against the Company as a matter of law. *Metro. W. Asset Mgmt. v. Magnus Funding*, No. 03-5539, 2004 U.S. Dist. LEXIS 11761, at *20 (S.D.N.Y. June 25, 2004) ("[B]ecause the [indenture] clause in question contains apparent inconsistencies, any doubts must be resolved against the drafter.") (citing to RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981)). This is so regardless of the relative roles of the issuer and the issuer's underwriter in the drafting process. It strains credulity to argue that an underwriter -- hired by the issuer -- assumes an adversarial role in negotiations and "looks out" for noteholders' interests. Rather, the noteholder is the only party that would be "on the other side of the table," but is also the one party who was not present during negotiations and does not choose or have a voice in drafting the terms of the indenture. Because of this, almost every published decision to consider

the issue has concluded that, where there is any doubt, a public indenture should be interpreted against the issuer. *See, e.g., Metro. W. Asset Mgmt. v. Magnus Funding*, No. 03-5539, 2004 U.S. Dist. LEXIS 11761, at *20 (S.D.N.Y. June 25, 2004); *Prescott, Ball & Turben v. LTV Corp.*, 531 F. Supp. 213, 217 (S.D.N.Y. 1981); *Kaiser Aluminum v. Matheson*, 681 A.2d 392, 398 (Del. 1996); *see also* ROBERT I. LANDAU & JOHN E. KRUEGER, CORPORATE TRUST ADMINISTRATION & MANAGEMENT 29 (5th ed. 1998) (noting that due to the nature of public indentures, courts not only strictly construe indenture provisions *against the obligor*, but also seek other legal theories and precedent to protect the interests of the security holders).

As the noteholders are not parties to the indenture when it is formed, do not participate in negotiating the indenture, and are not privy to the subjective, unexpressed intentions of the issuer or the underwriter, the noteholders have access to only one source for determining the meaning of the indenture -- the indenture itself. Thus, as the 1993 Noteholders have no alternative but to rely on the actual terms and provisions in the 1993 Indenture, their expectation can only be that the 1993 Indenture will be enforced as written. *See Metro. Life Ins. Co. v. RJR Nabisco*, 716 F. Supp. 1504, 1520 (S.D.N.Y. 1989) ("Nor can [this Court] ignore the expectations of that market -- expectations, for instance, that the terms of an indenture will be upheld, and that a court will not, *sua sponte*, add new substantive terms to that indenture as it sees fit.").

In fact, the 1993 Indenture itself imposes *contra proferentem* as a matter of contract. Section 11.01(c) of the 1993 Indenture prohibits the Company from seeking "to cure any ambiguity or to correct or supplement any provision contained herein" without bondholder consent unless the cure "shall not adversely affect the rights of the holders of the Notes."

In sum, and whether by law or by contract, if there are any doubts as to the proper interpretation of the subordination provisions of the 1993 Indenture, the 1994/96 Parties' interpretation must fail because it would "adversely affect" the rights of the 1993 Noteholders.

E.    **STRICT CONSTRUCTION IS PARTICULARLY IMPORTANT IN THE CONTEXT OF SUBORDINATION PROVISIONS OF A PUBLIC INDENTURE**

The ability of a noteholder to rely upon the public indenture as written is especially critical with respect to subordination provisions, which have the potential to limit noteholder recoveries against issuers and guarantors. "[A] careful analysis of what is or is not included in the definition of 'Senior Debt' is of paramount importance to any potential lender, senior or junior." COMMENTARIES at 567.

"In enforcing subordination agreements . . . the courts have emphasized that the junior creditor's agreement to subordinate must be express." *Chem. Bank v. First Trust (In re Southeast Banking)*, 156 F.3d 1114, 1119 (11th Cir. 1998); *see also Resolution Trust Corp. v. BVS Dev., Inc.*, 42 F.3d 1206, 1214 (9th Cir. 1994) ("[T]he law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement."); *In re Smith*, 77 B.R. 624, 628 (Bankr. N.D. Ohio 1987) (applying contra proferentem to subordination agreement); *Guarantee Bank v. Magness Constr. Co.*, 462 A.2d 405, 408-09 (Del. 1983) (construing terms of a subordination clause strictly where terms were unambiguous); *Ban-Co Inv. Co. v. Loveless*, 587 P.2d 567, 574 (Wash. Ct. App. 1978) (subordination agreements are to be strictly construed); *Miller v. Citizens Sav. & Loan Ass'n*, 248 Cal. App. 2d 655, 663 (1967) ("The law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement.") (citation omitted).

Indeed, the term "senior debt" "should be defined with the utmost precision" and "[t]he importance of making certain that senior debt qualifies as such within the limitations provided in the subordination agreement, indenture, or other instrument creating or evidencing the subordinated debt cannot be overemphasized." *In re Leasing Consultants, Inc.*, 2 B.R. 165, 169 (Bankr. E.D.N.Y. 1980) (citation omitted); *see also* JAMES E. SPIOTTO, DEFAULTED SECURITIES: THE PRUDENT INDENTURE TRUSTEE'S GUIDE XVII-14 (Am. Bankers Ass'n 1990) ("It is clear

that the terms of the subordination agreement control, which means that the words should be given their meaning as an ordinary, average or reasonable person would understand them.").

This brings us full circle back to the beginning of this Argument -- the Bankruptcy Court simply turned the rules of construction on their head. The question cannot be, "Is there an explicit provision that treats the 1993 Note Guarantees on a par with the 1994/96 Note Guarantees?" Instead, the question *must* be: "Is there an explicit provision that requires the 1993 Note Guarantees to be subordinated to the 1994/96 Note Guarantees?" There simply is no such provision.

**F.     THE SUBORDINATION PROVISIONS DO NOT EXTEND TO THE DEBTORS' OBLIGATIONS IN RESPECT OF LDTC'S FEES**

The Bankruptcy Court also decided that LDTC's Fees incurred in administering the 1993 Indenture were subordinated to payment in full under the 1994/96 Note Guarantees. (D.I. 8008 as amended by D.I. 8240). As noted, section 16.02 of the 1993 Indenture provides that the 1993 Note Guarantees are subordinated to Senior Indebtedness of the Subsidiary Guarantors "to the extent and in the matter hereinafter set forth." However, even if the obligations under the 1993 Note Guarantees were otherwise fully subordinated to the obligations under the 1994/96 Note Guarantees (which they are not), the subordination provisions do not extend to the Debtors' obligations in respect of LDTC's Fees. The relevant provisions of the 1993 Indenture are discussed below.

The fee payment provisions of the 1993 Indenture provide that LDTC's right to compensation and reimbursement is not subordinated to the claims of the holders of the 1994/96 Notes. Rather, LDTC's Fees are to be paid before amounts must be paid under the 1993 Indenture's debt subordination provisions.

First, Section 7.03 of the 1993 Indenture provides as follows (emphasis added):

Any moneys collected by the Trustee pursuant to Section 7.02 shall be applied to the payment of all amounts due to the Trustee pursuant to Section 8.06 and *thereafter*, subject to Article Three and Article Sixteen, in the order following. . . .

Thus, the 1993 Indenture dictates that payments due under Section 8.06 must be paid first to

LDTC, and only thereafter are moneys received by LDTC subject to the subordination provisions

(Articles Three and Sixteen).

Second, Section 7.02 of the 1993 Indenture sets forth a typical payment default provision

(emphasis added):

> [The 1993 Indenture Trustee] shall be entitled to institute any actions or proceedings at
> law or in equity for the collection of the sums so due and unpaid . . . , to file and prove a
> claim or claims [in the Company's bankruptcy] for the whole amount of principal,
> premium . . . and interest owing and unpaid in respect of the [1993] Notes . . . , to file
> such other papers or documents as may be necessary or advisable in order to have *the
> claims of the Trustee and of the noteholders allowed* . . . , and to collect and receive any
> moneys or other property *payable or deliverable on any such claims* and to distribute the
> same after the deduction of its reasonable charges and expenses . . . .

Thus, Section 7.02 accomplishes the following: (i) distinguishes between claims of LDTC, on the

one hand, and claims of the 1993 Noteholders, on the other hand, (ii) permits LDTC to pursue

remedies in order to seek payment with respect to both types of claims, and (iii) contemplates that

the 1993 Indenture Trustee will receive *any* moneys payable or deliverable on *any* such claims.

Third, Section 8.06 confirms LDTC's right to payment of its Fees (emphasis added):

> The Company covenants and agrees to pay the Trustee . . . reasonable compensation . . .
> and the Company will pay or reimburse the Trustee upon its request for all reasonable
> expenses, disbursements and advances . . . . The Company also covenants to indemnify
> the Trustee for . . . any loss, liability or expenses . . . . The obligation of the Company
> under this Section 8.06 . . . *shall constitute additional indebtedness hereunder and shall
> survive the satisfaction and discharge of this Indenture*. . . . Such additional indebtedness
> shall be secured by a Lien upon all property and funds held or collected by the Trustee as
> such, except funds held in trust for the benefit of the holders of particular Notes.

Considering Sections 7.03, 7.02 and 8.06 together, the Debtors must pay LDTC's claim

for Fees independently of and in addition to the claims of the 1993 Noteholders.

Further, the subordination provisions of the 1993 Indenture only extend to payments

owing to the 1993 Noteholders, not to the independent payments owing to LDTC.  Section

16.03(a) requires payment in full to holders of Senior Indebtedness of the Subsidiary Guarantors

"before the holders of the Notes or the Trustee on behalf of the noteholders shall be entitled to

receive, pursuant to the Guarantee, any direct or indirect payment or distribution on or with

respect to the Notes." Fee payments owing to LDTC are neither payable to LDTC "on behalf of the noteholders" nor payments "on or with respect to the Notes." Rather, fee payments are payable to LDTC on its own behalf and comprise payments to LDTC on or with respect to the Debtors' independent contractual obligations to pay the same as "additional indebtedness."

Section 16.03(b) applies to any payments "to which the holders of the Notes or the Trustee would be entitled except for the provisions of this Article Sixteen." Pursuant to section 7.03, concerning application of moneys collected by the trustee, the provisions of Article Sixteen do not apply until *after* payment of LDTC's Fees.

Section 16.03(c) requires turnover of any payments "received by the Trustee or any holder of the Notes, whether pursuant to the terms of the Notes, or upon acceleration or otherwise, including by way or on account of a Claim or the payment of the principal of, premium, if any, Change of Control Purchase Price, Asset Sale Purchase Price, or interest on any of the Notes." Fee payments are not received "pursuant to the terms of the Notes," meaning they are not part of the scheduled principal and interest payments. Fee payments are payable "upon acceleration," but as independent obligations, not as part of the 1993 Notes, which is made clear by the examples listed (Claim, principal, premium, interest, etc.), so section 16.03(c) also does not apply. Section 16.04 is to the same effect, as can be seen from its penultimate paragraph.

Despite these clear provisions of the 1993 Indenture, and without written explanation, the Bankruptcy Court found that LDTC's Fees were subordinated to payment in full to the holders of the 1994/96 Note Guarantees. This finding was in error.

### VIII. CONCLUSION

For all of the foregoing reasons, the Court should reverse the Guaranty Decision and render judgment in favor of LDTC.

Dated May 3, 2006

MONZACK AND MONACO, P.A.

Francis A. Monaco, Jr. (#2078)
Joseph J. Bodnar (#2512)
1201 North Orange Street, Suite 400
Wilmington, DE 19801
Tel.    (302) 656-8162

and

BINGHAM McCUTCHEN LLP
Evan D. Flaschen (ct10660)
Gregory W. Nye (ct06028)
William C. Heuer (ct24946)
Kate K. Simon (ct23489)
One State Street
Hartford, CT  06103-3178
Tel.    (860) 240-2700

*Special Counsel to Law Debenture Trust Company of New York*