**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br>KAISER ALUMINUM CORP., *et al.*,<br>               Debtors. | )<br>)<br>)<br>) | Chapter 11<br>Jointly Administered<br>Bankruptcy Case No. 02-10429<br>(JKF) |
| LAW DEBENTURE TRUST COMPANY OF<br>NEW YORK,<br>               Appellant,<br><br>          v.<br><br>KAISER ALUMINUM CORP., *et al.*,<br><br>               Appellees. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 06-00088 JJF |
| THE LIVERPOOL LIMITED PARTNERSHIP,<br><br>               Appellant,<br><br>          v.<br><br>ALPART JAMAICA, INC., *et al.*,<br><br>               Appellees. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 06-00160 JJF<br>(Administratively Consolidated<br>with 06-00088 JJF) |

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

**<u>CORRECTED</u> OPENING BRIEF OF APPELLANT
THE LIVERPOOL LIMITED PARTNERSHIP**

Isaac M. Pachulski, Esq.
K. John Shaffer, Esq.
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Tel.: (310) 228-5785
Facsimile: (310) 228-5788

David J. Baldwin (ID No. 1010)
Rebecca S. Beste (ID No. 4154)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Wilmington, DE 19899-0951
Tel.: (302) 984-6000
Facsimile: (302) 658-1192

Counsel to Appellant The Liverpool Limited Partnership

## TABLE OF CONTENTS

I.    BASIS OF APPELLATE JURISDICTION ............................................................................ 1

II.   ISSUES PRESENTED AND STANDARD OF REVIEW ................................................... 1

III.  STATEMENT OF CASE ..................................................................................................... 2

      A.   The 1993 Indenture And The Priority Of The 1993 Guarantees ............................... 2

      B.   The Bankruptcy Cases And The Relative Priority Dispute ...................................... 3

      C.   The Bankruptcy Court's Decision ............................................................................ 6

IV.   SUMMARY OF ARGUMENT ........................................................................................... 8

V.    ARGUMENT ....................................................................................................................... 10

      A.   The Plain Language And Structure Of The 1993 Indenture Provides That
           The 1993 Guarantees Are Not Subordinated To The 1994/96 Guarantees .............. 10

           1.   Article Sixteen Of The 1993 Indenture Provides That The 1993
                Guarantees Are Subordinated Only To "Senior Indebtedness Of
                Such Subsidiary Guarantors." ...................................................................... 10

           2.   "Senior Indebtedness" Only Includes *Downstream* Guarantees Of
                Subsidiary Liabilities, Not *Upstream* Guarantees Of Parent Liabilities ....... 12

      B.   The Bankruptcy Court Misconstrued The Plain Language And Structure
           Of The 1993 Indenture And Erroneously Held That the 1993 Guarantees
           Are Subordinated To The 1994/96 Guarantees ........................................................ 15

           1.   The Bankruptcy Court Failed To Construe The Indenture's
                Subordination Provisions Strictly And In Accordance With
                Their Plain Terms ........................................................................................ 15

           2.   The Bankruptcy Court Erred In Holding That "Senior Indebtedness" Includes
                Upstream Guarantees Of Parent Company Liabilities .................................... 18

           3.   The Bankruptcy Court Disregarded The Plain Language And Structure
                Of The 1993 Indenture's Subordination Provisions, Which Distinguish
                Between The Subordination Of The Notes And The Subordination Of The 1993
                Guarantees .................................................................................................... 23

                a.   Article Three Only Applies To Distributions By The Company On
                     Behalf Of "Senior Indebtedness *Of The Company*." ............................ 23

                b.   Section 3.01 Versus Section 16.02 ..................................................... 24

                c.   Section 3.02 Versus Section 16.03 ..................................................... 27

           4.   The 1994/96 Guarantees Are Not Senior Indebtedness .............................. 29

C. The 1993 Indenture Is Unambiguous And, Therefore, The Bankruptcy Court Erred As A Matter Of New York Law In Considering Extrinsic Evidence ............................ 30

1. New York Law Bars The Consideration Of Extrinsic Evidence Unless The Contract Is Ambiguous *On Its Face.* ............................................................................ 30

2. New York's Prohibition Against The Introduction Of Extrinsic Evidence Applies With Particular Force In The Case Of Publicly Traded Debt And Other Commercial Settings. ............................................................................................ 36

3. The Court Erred In Considering Other Extrinsic Evidence. ........................................ 38

VI. CONCLUSION ....................................................................................................................... 40

ii

# TABLE OF AUTHORITIES

## CASES

*767 Third Ave. LLC v. Orix Capital Mkts., LLC,*
    812 N.Y.S. 2d 8 (N.Y. App. Div. 2006) ......................................................... 31

*Ban-Co Inv. Co. v. Loveless,*
    587 P.2d 567 (Wash. Ct. App. 1978) ............................................................ 16

*Beadleston v. Morton,*
    37 N.Y.S. 663 (N.Y. App. Div. 1896) ........................................................... 21

*Bethlehem Steel Co. v. Turner Constr. Co.,*
    141 N.E.2d 590 (N.Y. 1957) ..................................................................... 2, 31

*Brenner v. Ebbets-McKeever Exhibition Co.,*
    10 N.Y.S.2d 323 (N.Y. App. Div. 1939) ....................................................... 20

*Broad v. Rockwell Int'l Corp.,*
    642 F.2d 929 (5th Cir. 1981) (en banc) ........................................... 22, 23, 37, 39

*Chemical Bank v. First Trust,*
    710 N.E.2d 1083 (N.Y. 1999) ............................................................. 15, 16, 17

*Colantuno v. Aetna Ins. Co.,*
    980 F.2d 908 (3rd Cir. 1992) ................................................................... 17, 32

*Devoe & Raynolds Co. v. Pell City Pipe & Foundry Co.,*
    233 N.Y.S.2d 632 (N.Y. Sup. Ct., Spec. Term 1962) .................................... 20

*Estate of Anglin v. Estate of Kelly,*
    705 N.Y.S.2d 769 (N.Y. App. Div. 2000) ..................................................... 39

*Garza v. Marine Transport Lines, Inc.,*
    861 F.2d 23 (2d Cir. 1988) ......................................................................... 32

*Guarantee Bank v. Magness Constr. Co.,*
    462 A.2d 405 (Del. 1983) ........................................................................... 16

*Hopwood Plays, Inc. v. Kemper,*
    189 N.E. 461 (N.Y. 1934) ........................................................................... 39

*HSBC Bank v. Branch,*
    364 F.3d 355 (1st Cir. 2004) ....................................................................... 17

*In re Oster's Estate,*
    16 N.Y.S.2d 612 (N.Y. App. Div. 1939) ....................................................... 20

*In re Prime Motor Inns,*
    167 B.R. 261 (Bankr. S.D. Fla. 1994) .......................................................... 26

*In re Time Sales Fin. Corp.*,
  491 F.2d 841 (3d Cir. 1974)..............................................................................................17

*JP Morgan Chase Bank v. U.S. Nat'l Bank Assn. (In re Oakwood Homes)*,
  329 B.R. 19 (D. Del. 2005)...................................................................................................1

*Kass v. Kass*,
  696 N.E.2d 174 (N.Y. 1998),................................................................................34, 35, 36

*Leverso v. Southtrust Bank*,
  18 F.3d 1527 (11th Cir. 1994) .............................................................................................37

*Lyon v. Clochessy*,
  86 N.Y.S. 245 (N.Y. App. Div. 1904) ..................................................................................20

*Marriott Family Rest. v. Lunan Family Rest. (In re Lunan Family Rest.)*,
  194 B.R. 429 (Bankr. N.D. Ill. 1996)....................................................................................16

*McConnell v. Mortgage Inv. Co.*,
  292 S.W.2d 293 (Fla. Ct. App. 1992 .....................................................................................16

*Mercantil Intercontinental, Inc. v. Gen. Bank*,
  601 So.2d 293 (Fla. Ct. App. 1992).......................................................................................16

*Metropolitan Life Ins. Co. v. RJR Nabisco*,
  906 F.2d 884 (2d Cir. 1990)...................................................................................................32

*Metropolitan Life Ins. v. RJR Nabisco, Inc.*,
  716 F.Supp. 1504 (S.D.N.Y. 1989)........................................................................................38

*Midland Steel Warehouse Corp. v. Godinger Silver Art Ltd.*,
  714 N.Y.S.2d 466 (N.Y. App. Div. 2000) .............................................................................20

*Myers v. State Tax Comm'n*,
  475 N.Y.S.2d 560 (N.Y. App. Div. 1984) .............................................................................20

*Resolution Trust Corp. v. BVS Dev., Inc.*,
  42 F.3d 1206 (9th Cir. 1994) .................................................................................................16

*South Road Assocs., LLC v. Intn'l Bus. Machs. Corp.*,
  826 N.E.2d 806 (N.Y. 2005)....................................................................23, 30, 31, 32, 40

*Sunrise Mall Assocs. v. Import Alley*,
  621 N.Y.S. 2d 662 (N.Y. App. Div. 1995) ............................................................................22

*Teitelbaum Holdings, Ltd. v. Gold*,
  396 N.E.2d 1029 (N.Y. 1979).................................................................................................30

*Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*,
  472 N.E.2d 315 (N.Y. 1984)...................................................................................................22

iv

*United States v. Victory Highway Village, Inc.,*
    662 F.2d 488 (8th Cir. 1981) ....................................................... 37

*Vermont Teddy Bear v. 538 Madison Realty,*
    807 N.E.2d 876 (N.Y. 2004) .......................................... 5, 29, 30, 37

*Weissman v. Sinorm Deli, Inc.,*
    669 N.E.2d 242 (N.Y. 1996) .......................................................... 16

*West, Weir & Bartel v. Mary Carter Paint Co.,*
    255 N.E.2d 709 (N.Y. 1969) ....................................................... 9, 30

*White Rose Food v. Saleh,*
    788 N.E.2d 602 (N.Y. 2003) .......................................................... 16

*William C. Atwater & Co. v. Panama R. Co.,*
    159 N.E. 418 (N.Y. 1927 ................................................... 32, 33, 35

*William Higgins & Sons, Inc. v. State,*
    231 N.E.2d 285, 286 (N.Y. 1967) .................................................. 22

## STATUTES

11 U.S.C. § 510(a) ............................................................................... 17

28 U.S.C. § 158(a)(1) ............................................................................ 1

## OTHERS

1993 Indenture § 1.01 .......................................... 3, 6, 7, 12, 13, 14, 19

1993 Indenture § 3.01 ......................................................................... 25

1993 Indenture § 3.02 .................................................................. 7, 24, 27

1993 Indenture § 12.01(b) ................................................................... 21

1993 Indenture § 15.04 .......................................................................... 5

1993 Indenture § 15.12 .................................................................... 8, 40

1993 Indenture § 16.01 ........................................................................ 10

1993 Indenture § 16.02 ............................................................... 3, 11, 25

1993 Indenture § 16.03 ............................................................. 11, 27, 28

1993 Indenture § 16.04 ........................................................................ 12

American Bar Foundation, Commentaries on ....................................... 15

Black's Law Dictionary, Seventh Edition (1999)...............................................................................23

Fed. R. Bankr. P. 8002 (a) & b ..............................................................................................................1

vi

## I.     BASIS OF APPELLATE JURISDICTION

The Bankruptcy Court, Judge Judith Fitzgerald presiding, entered its "Order Overruling Objection to Plan Confirmation by Law Debenture Trust Company of New York and by Liverpool Limited Partnership" and "Memorandum Opinion" (D.I. 8008, 8009) on December 22, 2005.  Law Debenture Trust Company ("LDTC") and The Liverpool Limited Partnership ("Liverpool") timely appealed this final order on January 3, 2006, and January 12, 2006, respectively (D.I. 8052, 8134).  *See* Fed. R. Bankr. P. 8002(a) & (b).  This Court has jurisdiction under 28 U.S.C. § 158(a)(1).

## II.     ISSUES PRESENTED AND STANDARD OF REVIEW

Kaiser Aluminum & Chemical Corporation ("Company") issued $400 million in notes pursuant to a public indenture ("1993 Indenture").[1]  Certain of the Company's subsidiaries ("Subsidiary Guarantors") guaranteed the notes ("1993 Guarantees").  The Bankruptcy Court held that the 1993 Guarantees were contractually subordinated to the Subsidiary Guarantors' guarantees of other notes subsequently issued by the Company ("1994/96 Guarantees").  The issues presented by this appeal are:

1.     Did the Bankruptcy Court err as a matter of law in broadly construing the subordination provisions of the 1993 Indenture so as to conclude that the 1993 Guarantees were subordinated to the 1994/96 Guarantees?

2.     Did the Bankruptcy Court err as a matter of law in considering extrinsic evidence to "explain" the plain language of the 1993 Indenture's provisions?

The foregoing are questions of law, and thus this Court "reviews the Bankruptcy Court decision on a *de novo* basis in the first instance." *JP Morgan Chase Bank v. U.S. Nat'l Bank Assn. (In re Oakwood Homes)*, 329 B.R. 19, 22 (D. Del. 2005).  Although the

---

[1]     Trial Exhibit D-4 (Tab 6 of the Trial Exhibits in the designated appeal record).  The 1993 Indenture and the Bankruptcy Court's Memorandum Opinion are included in the Appendix to LDTC's opening brief.

Bankruptcy Court erroneously relied upon extrinsic evidence, this Court "exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Id.*, 329 B.R. at 22 (internal quotations omitted); *see also Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957) (construction of unambiguous contractual terms is a question of law).

### III.    STATEMENT OF THE CASE

**A.       The 1993 Indenture And The Priority Of The 1993 Guarantees.**

The Company issued $400 million in publicly held "Senior Subordinated Notes" ("1993 Notes") pursuant to the 1993 Indenture. The 1993 Notes were guaranteed by the 1993 Guarantees issued by the Subsidiary Guarantors. In so doing, the Subsidiary Guarantors provided what are often referred to as "*upstream guarantees*" of their parent's liabilities. The converse of an "upstream guarantee" is a "*downstream guarantee*," pursuant to which a parent guarantees a subsidiary's liabilities.

The Company subsequently issued approximately $173 million in "Senior Notes" in 1994 ("1994 Notes") and an additional $225 million in "Senior Notes" in 1996 (together with the 1994 Notes, the "1994/96 Notes"). The Subsidiary Guarantors again provided upstream guarantees of the Company's liabilities ("1994/96 Guarantees").

This appeal involves whether the Subsidiary Guarantors' upstream 1993 Guarantees are subordinated to the Subsidiary Guarantors' upstream 1994/96 Guarantees, or whether all such upstream guarantees are entitled to equal priority. This determination will affect the allocation of more than $200 million in value between the holders of the 1993 Guarantees and the holders of the 1994/96 Guarantees.

The 1993 Indenture establishes the extent to which the 1993 Guarantees are – and are not – subordinated to the Subsidiary Guarantors' other indebtedness. Article Sixteen of the 1993 Indenture provides that each 1993 Guarantee by a Subsidiary Guarantor is subordinated to "all Senior Indebtedness of such Subsidiary Guarantor":

2

> Each Subsidiary Guarantor . . . covenants and agrees, and the Trustee and each holder of the Notes by his acceptance thereof likewise covenants and agrees, for the benefit of all present and future holders of Senior Indebtedness of such Subsidiary Guarantor, that *all payments pursuant to the Guarantee by such Subsidiary Guarantor are hereby expressly subordinated, to the extent and in the manner hereinafter set forth,* in right of payment *to the prior payment in full . . . of all Senior Indebtedness of such Subsidiary Guarantor.*

1993 Indenture § 16.02 at 104 (emphasis added). Article Sixteen further establishes that payments pursuant to the 1993 Guarantees are subordinated to – and only to – "Senior Indebtedness of the Subsidiary Guarantors." *See* pp 10-12, *infra*.

The 1993 Indenture contains a specific and detailed definition of what constitutes "Senior Indebtedness." Clause (ii)(A)(5) of the definition provides that "[t]he term 'Senior Indebtedness' shall mean, with respect to any Person . . . *all guarantees by such Person of any indebtedness . . . of any Subsidiary of such Person . . . .*" 1993 Indenture § 1.01 at 27-28 (emphasis added). Thus, not all guarantees are "Senior Indebtedness." Rather, "Senior Indebtedness" only includes guarantees by a person of indebtedness of "any Subsidiary of such Person." In other words, "Senior Indebtedness" only includes downstream guarantees of a subsidiary's liabilities. *See* pp 12-15, *infra*. Upstream guarantees of a parent's liabilities are not "Senior Indebtedness."

The 1994/96 Guarantees were upstream guarantees of the parent Company's liabilities. Accordingly, the 1994/96 Guarantees are not "Senior Indebtedness of the Subsidiary Guarantors." The plain language of the 1993 Indenture provides that the 1993 Guarantees are not subordinated to the 1994/96 Guarantees.

**B.        The Bankruptcy Cases And The Relative Priority Dispute.**

The Company, the Subsidiary Guarantors, and certain of their affiliates (together, "Debtors") filed chapter 11 petitions in the Bankruptcy Court. On August 16, 2004, appellant LDTC (the 1993 Note indenture trustee) filed a motion to determine the relative priority of the 1993 Guarantees vis-à-vis the later-issued 1994/96 Guarantees. Based upon the plain language of the 1993 Indenture, LDTC's motion demonstrated that the

upstream 1993 Guarantees were equal in priority to the upstream 1994/96 Guarantees. Liverpool joined in LDTC's position that the 1993 Guarantees generally were equal in priority to the 1994/96 Guarantees.[2]

Various parties, including an indenture trustee for the 1994/96 Notes, an *ad hoc* group of 1994/96 Note holders, and the Debtors (*inter alia*, "Appellees") opposed LDTC's motion. Appellees contended that the definition of "Senior Indebtedness" should be read broadly to include all types of guarantees – both upstream and downstream – notwithstanding the absence of any express reference to upstream guarantees in the definition. Appellees also contended that, notwithstanding the express limitation on the subordination of each 1993 Guarantee to "Senior Indebtedness of such Subsidiary Guarantor" in Article Sixteen, other provisions of the 1993 Indenture should be read to subordinate the 1993 Guarantees to the parent Company's own "Senior Indebtedness." The Bankruptcy Court ordered that the priority issue be determined in connection with confirmation of the plans of reorganization ("Subsidiary Plans") that the Subsidiary Guarantors had filed in their bankruptcy cases.

The confirmation hearing on the Subsidiary Plans was held on April 13, April 27, and May 2, 2005. The first hearing date was devoted principally to legal argument on the interpretation of the 1993 Indenture and the relative priority of the guarantees. Near the end of the hearing, however, Debtors' counsel sought to introduce extrinsic evidence, including affidavit and deposition testimony of three witnesses: (a) Theodore Sands, a former employee of the Company's lead underwriter for the 1993 Notes and the 1994/96 Notes; (b) John La Duc, the Company's former Chief Financial Officer, and (c) Martin Balsam, an outside counsel for the Company at the time the 1993 Notes were issued.

---

[2]    Liverpool also contended that a limited portion of the 1994 Notes had refinanced a prior bank credit agreement, and that this refinancing provided an independent basis for granting priority only to a portion of the guarantees of the 1994 Notes. The Bankruptcy Court rejected this argument, *see* Memorandum Op. at 31-32, and Liverpool is not pursuing this issue in this appeal.

Each of these proposed witnesses were to testify as to their twelve-year-old memories of the purpose, meaning, and effect of the 1993 Indenture.

Liverpool and LDTC objected to the introduction of this extrinsic evidence as both irrelevant and improper under controlling New York law, which governs the Indenture. 1993 Indenture § 15.04 at 101. New York law requires that, in the absence of an ambiguity, the court *must "look **solely** to the language used by the parties to discern the contract's meaning."* *Vermont Teddy Bear v. 538 Madison Realty*, 807 N.E.2d 876, 879 (N.Y. 2004) (emphasis added). Moreover, when dealing with a public indenture, the language of the indenture itself must control, rather than the unwritten memories, beliefs, or intentions of various individuals who worked with the Company in issuing the 1993 Indenture more than a dozen years ago. Liverpool and LDTC also raised various other evidentiary objections to the testimony (D.I. 6759) ("Evidentiary Objections").

At first, the Court correctly declined to admit or rely upon any extrinsic evidence:

> [I]t appears to me that if I find that this document is ambiguous – which I haven't thought so far – that what I then will do is call you all back. And you will have an opportunity to present extrinsic evidence. Otherwise, if I think it is unambiguous . . . I believe, *under New York law, I am to look at the four corners of the document. And I do not need to and should not consider extrinsic evidence*, that is not part of an integrated transaction. That is my understanding of the law.

> The cases [Appellees] cite, with respect to the totality of the circumstances – I think in a case like this, where *I'm dealing with an indenture that's publicly traded* – have to be taken in mind of the comments that indicate that there is a market out there. *And if I start, somehow or other, looking to what parties' intentions were 12 or 14 years ago, in a publicly traded market, there is no assurance to the market, at all, as to what the documents mean.* So I see no basis upon which, in this kind of a situation – looking at an indenture – to go beyond the four corners of the documents, if the documents are clear on their face.

Transcript of April 13, 2005 Hearing at 224 (D.I. 6722) (emphasis added).

The Bankruptcy Court, however, promptly reversed itself on the second day of trial. Without first deciding whether or not the 1993 Indenture was ambiguous on its face, the Court decided to hear nearly all of the extrinsic evidence offered by the Appellees, over the objections of Liverpool and LDTC. As detailed in the Memorandum Opinion, this evidence included testimony from the Company's former underwriter,

lawyer, and Chief Financial Officer regarding the Company's historical efforts to obtain financing, Memorandum Op. at 18-21, the Company's alleged "objective" with respect to the Indenture, *id.* at 22, and the witnesses' own, twelve-year-old recollections and "understanding of the structure" of the relative priority of the guarantees. *Id.* at 21. This evidence also included prospectuses for the 1993 and 1994/96 Notes and other extrinsic documents – some of which were drafted three years after the 1993 Indenture.

**C.        The Bankruptcy Court's Decision.**

The Bankruptcy Court entered its Subordination Order and Memorandum Opinion on December 22, 2005. The Court concurred with Liverpool and LDTC that "the 1993 Indenture is unambiguous." Memorandum Op. at 16. The Court nonetheless disagreed with Liverpool's and LDTC's interpretation of the Indenture's language, holding that the 1993 Guarantees were subordinated to the 1994/96 Guarantees.

The Bankruptcy Court broadly read the definition of "Senior Indebtedness" to include all forms of guarantees – both upstream and downstream. The Court recognized that the only express reference to "guarantees" in the definition of "Senior Indebtedness" was in clause (ii)(A)(5), and that clause only applied to downstream guarantees. Memorandum Op. at 30. The Court nonetheless concluded that the upstream 1994/96 Guarantees could qualify under two other categories of "Senior Indebtedness."

First, the Bankruptcy Court held that the 1994/96 Guarantees could qualify as "Obligations," provided that the Company designated them as such. *Id.* at 10-11 & n.13. However, the 1993 Indenture limits the term "Obligations" to those liabilities arising under the Debtors' 1989 Credit Agreement with certain bank lenders. *See* 1993 Indenture § 1.01 at 15 & 21 (defining "Obligations" and "Credit Agreement"). The 1994/96 Guarantees are not Obligations under the Credit Agreement.

Second, the Bankruptcy Court held that the 1994/96 Guarantees could be treated as an "assumption" of the parent's liabilities, and thus would qualify under clause

6

(ii)(A)(1) of the definition of "Senior Indebtedness." *Id.* at 29 n.33 & 30. The Court held that "assuming a debt" was the same thing as "guaranteeing a debt." *Id.* In so holding, the Bankruptcy Court ignored an abundance of New York law to the contrary, as well as the plain language and structure of the Indenture. *See* pp. 19-23, *infra*.

The Court also relied upon various provisions of the 1993 Indenture that, by their terms, are inapplicable to the 1993 Guarantees. Although Article Sixteen of the Indenture governs the extent to which the 1993 Guarantees are – and are not – subordinated, the Court relied extensively on Article Three. Article Three, however, only applies to the priority of the Company's liabilities; it does *not* apply to the Subsidiary Guarantors or to their guarantees. 1993 Indenture § 3.02 at 38 ("It is understood that the provisions of this Article Three are and are intended solely for the purpose of defining the relative rights of the holders of the Notes, on the one hand, and the holders of Senior Indebtedness of the Company, on the other hand."). Nor does Article Three apply to payments made by the Subsidiary Guarantors, which are the only payments at issue here.

The Bankruptcy Court acknowledged the distinct functions that Article Three and Article Sixteen perform in the 1993 Indenture. *See* Memorandum Op. at 28 (holding that "Article Three applies to the Company and Article Sixteen applies to the Subsidiary Guarantors"). The Court also acknowledged that, pursuant to Article Sixteen, "[t]he 1993 Note Guarantees are subordinated only to the 'Senior Indebtedness' of each Subsidiary Guarantor and then only to the extent and manner set forth in the rest of Article Sixteen." *Id.* at 6. The Court nonetheless appears to have concluded that Articles Three and Sixteen had the same purpose, which the Court believed was "to subordinate all payments with respect to the [1993] Notes regardless of source, including payments on the [1993] Guarantees, to any 'Senior Indebtedness' of [the Company] or the Subsidiary Guarantors outstanding then or in the future." *Id.* at 9.

The Bankruptcy Court also relied extensively upon the witnesses' testimony and other extrinsic evidence in reaching its decision. *See* Memorandum Op. at 15-27. In

7

addition to the affidavit and deposition testimony, the evidence included prospectuses and other documents drafted as many as three years *after* the 1993 Indenture was issued. The Court considered this evidence despite the Indenture's integration clause which provides that "any [other] indenture, loan or debt agreement may not be used to interpret this Indenture." 1993 Indenture § 15.12 at 103.

The Bankruptcy Court repudiated its prior holding that "I do not need to and should not consider extrinsic evidence." *See* p 5, *supra*. The Court instead held "that only . . . parol evidence which contradicts an unambiguous contract is inadmissible." Memorandum Op. at 23. The Court further held that it could consider the Appellees' extrinsic evidence because, in the Court's view, the evidence "served to explain [the 1993 Indenture] and the context in which it was formulated." *Id.* at 16. The Bankruptcy Court ignored entirely the other Evidentiary Objections filed with respect to this evidence.

Liverpool and LDTC timely appealed the Bankruptcy Court's decision. The parties have stipulated to a partial stay of the decision pending appeal, so as to permit interim distributions to the holders of the 1994/96 Guarantees, and to facilitate the making of future distributions to the holders of the 1993 Guarantees.

## IV.    SUMMARY OF ARGUMENT

The Bankruptcy Court erred in holding that the 1993 Guarantees are subordinated to the 1994/96 Guarantees.

Article Sixteen of the 1993 Indenture provides that the 1993 Guarantees are subordinated to – and only to – "Senior Indebtedness of the Subsidiary Guarantors." The definition of "Senior Indebtedness," in turn, excludes upstream guarantees of the parent Company's liabilities, such as the 1994/96 Guarantees. Upstream guarantees are not "Senior Indebtedness of the Subsidiary Guarantors," and the 1993 Guarantees are not subordinated to such upstream guarantees.

8

The Bankruptcy Court recognized that the 1993 Indenture was structured so that Article Sixteen governed the priority of the 1993 Guarantees at the subsidiary level, while Article Three governed the priority of the 1993 Notes at the parent Company level. Nonetheless, the Court treated both the language and the purpose of these two Articles as effectively interchangeable, and in so doing ignored the plain language and structure of the 1993 Indenture. By concluding that the 1993 Guarantees were subordinated to the 1994/96 Guarantees, the Court effectively treated the 1993 Guarantees as being subordinated not only to "Senior Indebtedness of the Subsidiary Guarantors" (which they are), but also to "Senior Indebtedness of the Company" (which they are not).

The Bankruptcy Court's overly broad reading of the 1993 Indenture violated established principles of contract interpretation under New York law. The Court also violated the rule that subordination agreements must be strictly construed in accordance with their plain terms, a rule that has particular force in the context of a public indenture.

The Bankruptcy Court further erred in considering extrinsic evidence to "explain" the terms of the 1993 Indenture. The Court held that the terms of the Indenture were unambiguous. The Court nonetheless relied extensively upon the testimony of witnesses who purported to know what certain parties had intended more than a dozen years ago when the Indenture was drafted. The Court's reliance upon this extrinsic evidence is directly contrary to the mandates of New York's highest court that "*circumstances extrinsic to the agreement will not be considered* when the intention of the parties can be gathered from the instrument itself." *West, Weir & Bartel v. Mary Carter Paint Co.*, 255 N.E.2d 709, 711-12 (N.Y. 1969) (emphasis added). The Court also ignored all of the other Evidentiary Objections to the testimony, and did not rule upon them in its decision.

New York law requires the resolution of this appeal both to begin, and to end, with the express language and structure of the 1993 Indenture itself. Liverpool respectfully submits that New York law requires a reversal of the decision below, and a holding that the 1993 Guarantees are not subordinated to the 1994/96 Guarantees.

9

## V.    ARGUMENT

**A.    The Plain Language And Structure Of The 1993 Indenture Provides That The 1993 Guarantees Are Not Subordinated To The 1994/96 Guarantees.**

      **1.    Article Sixteen Of The 1993 Indenture Provides That The 1993 Guarantees Are Subordinated Only To "Senior Indebtedness Of Such Subsidiary Guarantors."**

The 1993 Indenture contains an entire article dedicated solely to the respective rights and obligations of the 1993 Guarantees.  Article Sixteen – titled "Guarantee of Notes" – both establishes the 1993 Guarantees and sets forth the conditions upon which they are, and are not, subordinated to the Subsidiary Guarantors' other liabilities.

Section 16.01 creates the 1993 Guarantees.  It provides:

> SECTION 16.01.  Guarantee.  *Subject to the provisions of this Article Sixteen*, each Subsidiary Guarantor, jointly and severally, hereby unconditionally guarantees, *on a subordinated basis*, to each holder of a [1993 Note] . . . the due and punctual payment of the principal of . . . and interest on such Note, when and as the same shall become due and payable . . . .

1993 Indenture § 16.01 at 103 (emphasis added).

The 1993 Guarantees thus were issued on a "subordinated basis."  The extent of the subordination, however, is not unlimited.  Rather, it is "[s]ubject to the provisions of this Article Sixteen" of the 1993 Indenture.  In order to determine the extent and nature of the subordination, therefore, it is necessary to consider the other relevant provisions of Article Sixteen, including sections 16.02 through 16.04.

Section 16.02 expressly governs the extent to which the 1993 Guarantees are subordinated.  It provides unequivocally that the 1993 Guarantees are subordinated to "Senior Indebtedness of the Subsidiary Guarantors":

> SECTION 16.02.  Guarantee subordinated to Senior Indebtedness.  Each Subsidiary Guarantor . . . covenants and agrees, and the Trustee and each holder of the Notes by his acceptance thereof likewise covenants and agrees, for the benefit of all present and future holders of Senior Indebtedness of such Subsidiary Guarantor, that *all payments pursuant to the Guarantee by such Subsidiary Guarantor are hereby expressly subordinated*, to the extent and in

the manner hereinafter set forth, in right of payment *to the prior payment in full ... of all Senior Indebtedness of such Subsidiary Guarantor*.

1993 Indenture § 16.02 at 104 (emphasis added).

Section 16.02 thus provides that payments by a Subsidiary Guarantor on account of its 1993 Guarantee are subordinated to – and only to – the *"Senior Indebtedness of such Subsidiary Guarantor."* Notably, the 1993 Guarantees are *not* subordinated to "Senior Indebtedness" generally; nor are the 1993 Guarantees subordinated to "Senior Indebtedness of the Company" (the Subsidiary Guarantors' parent). The 1993 Guarantees are subordinated only to "Senior Indebtedness of the Subsidiary Guarantors" themselves.

Section 16.03 of the 1993 Indenture further establishes that the 1993 Guarantees are subordinated only to "Senior Indebtedness of the Subsidiary Guarantors." Section 16.03 provides that, upon a bankruptcy, reorganization, liquidation, or other dissolution, all payments that would otherwise be made by a Subsidiary Guarantor to holders of the 1993 Guarantees shall instead be made to the holders of "Senior Indebtedness of such Subsidiary Guarantor," until such holders are paid in full:

> *Upon any direct or indirect payment or distribution of assets or securities of any Subsidiary Guarantor* of any kind or character, whether in cash, property or securities, upon any dissolution, winding up, liquidation or reorganization *of such Subsidiary Guarantor*, whether voluntary or involuntary or in bankruptcy, insolvency, reorganization, receivership or other proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities *of such Subsidiary Guarantor* or otherwise,
>
> > (a) the holders of all *Senior Indebtedness of such Subsidiary Guarantor* shall be entitled to receive payment in full . . . before the holders of the Notes shall be entitled to receive, *pursuant to the Guarantee*, any direct or indirect payment or distribution on or with respect of the Notes . . . .

1993 Indenture § 16.03 at 104-05 (emphasis added).[3]

---

[3]    The only reference to "the Company" in section 16.03 is in subparagraph (a), which contains a derivation of the so-called "X-Clause" found in many indentures. It provides that, notwithstanding the subordination to "Senior Indebtedness of the Subsidiary Guarantors," holders of the guarantees may receive certain distributions, provided that they are not treated in the same class under a plan as "Senior Indebtedness of the Company." The clause, however, is inapplicable to the present dispute, since the Plans at issue only deal with the Subsidiary Guarantors.

11

Section 16.04 similarly subordinates the 1993 Guarantees outside of the bankruptcy context. It also makes clear that the 1993 Guarantees are subordinated only to "Senior Indebtedness of the Subsidiary Guarantors." 1993 Indenture § 16.04 at 107-08. Sections 16.03 and 16.04 are the only provisions in the Indenture that refer to payments by the Subsidiary Guarantors to holders of the 1993 Guarantees. They are also among the few provisions that refer to payments being made "pursuant to the Guarantee."

Accordingly, all of the relevant provisions of Article Sixteen make clear that the 1993 Guarantees are subordinated only to the "Senior Indebtedness of the Subsidiary Guarantors." Moreover, section 16.01 provides that the subordination of the 1993 Guarantees is "[s]ubject to the provisions of this Article Sixteen." Thus, the *only* issue in this dispute should be whether the upstream 1994/96 Guarantees by the Subsidiary Guarantors constitute "Senior Indebtedness of such Subsidiary Guarantors." If they do not, then the 1993 Guarantees are not subordinated to the 1994/96 Guarantees.

### 2.    "Senior Indebtedness" Only Includes *Downstream* Guarantees Of Subsidiary Liabilities, Not *Upstream* Guarantees Of Parent Liabilities.

The 1993 Indenture contains a detailed definition of "Senior Indebtedness." Although clause (ii) of the definition creates various categories of "Senior Indebtedness," only one makes any mention whatsoever of "guarantees":

The term "Senior Indebtedness shall mean, *with respect to any Person* (whether heretofore Incurred or provided for or Incurred after the date hereof):

* * *

(ii)  to the extent . . . (y) designated in writing by the Company as Senior Indebtedness in a notice to the Trustee pursuant to the terms of this Indenture, which notice shall indicate the amount of such Senior Indebtedness and the trustee or representative thereof,

(A) . . . (5) *all guarantees by such Person* of any indebtedness referred to in this clause (ii)(A) *of any Subsidiary of such Person* or any Non-Affiliate Joint Venture of such Person . . . .

1993 Indenture § 1 01 at 27-28 (emphasis added).

The first important thing to note about this definition is that "Senior Indebtedness" is determined on a person-by-person and entity-by-entity basis. "Senior Indebtedness" exists "with respect to any Person" based upon whether the liability in question is a liability "by such Person" or "of such Person." Thus, for example, every conceivable guarantee is not "Senior Indebtedness" under the 1993 Indenture. Rather, "Senior Indebtedness" of a particular person is limited to "all guarantees *by such Person* . . . *of any Subsidiary of such Person."* In fact, every category of debt in the definition of "Senior Indebtedness" is limited by the phrases "by such Person" or "of such Person," phrases which appear more than two dozen times in the definition.

The parent Company and the Subsidiary Guarantors are different "Persons" under the Indenture, which defines "Person" as being "any . . . corporation." 1993 Indenture § 1.01 at 25. "Senior Indebtedness of the Subsidiary Guarantors" thus is not the same thing as "Senior Indebtedness of the Company." The relevant provisions of Article Sixteen, for example, refer only to "Senior Indebtedness of the Subsidiary Guarantors." Many other provisions of the Indenture, by contrast, refer exclusively to "Senior Indebtedness of the Company." The two terms are not interchangeable.

"Senior Indebtedness of the Subsidiary Guarantors" means exactly what it says – indebtedness of the Subsidiary Guarantors that is senior to other indebtedness of the Subsidiary Guarantors. "Senior Indebtedness of the Company," by contrast, means indebtedness of the Company that is senior to other indebtedness of the Company. "Senior Indebtedness of the Company" is not senior to the Subsidiary Guarantors' own indebtedness, and "Senior Indebtedness of the Subsidiary Guarantors" is not senior to the Company's own indebtedness – they are distinct concepts under the 1993 Indenture. The fact that a particular liability may constitute "Senior Indebtedness" at one corporate level does not mean that it, or its guarantee, is "Senior Indebtedness" at another corporate level.

The second important thing to recognize about the definition of "Senior Indebtedness" is that *upstream* guarantees of a parent's obligations do not fall within any

13

of the enumerated categories of "Senior Indebtedness."    Rather, the only types of guarantees that qualify as "Senior Indebtedness" are *downstream* guarantees by a person *"of any Subsidiary of such Person,"* as set forth in clause (ii)(A)(5):

> "Senior Indebtedness" shall mean with respect to any Person . . . all ***guarantees by such Person of any indebtedness referred to in this clause (ii)(A) of any Subsidiary of such Person*** or any Non-Affiliate Joint Venture of such Person.

1993 Indenture § 1.01 at 27-28 (emphasis added).

Clause (ii)(A)(5) unambiguously states that *downstream* guarantees by a Person are "Senior Indebtedness"; if a Person guarantees "any indebtedness . . . of any Subsidiary of such Person," then that guarantee may qualify as "Senior Indebtedness." The Indenture, however, *omits any reference to upstream guarantees by a Person of the indebtedness of such Person's parent.* Thus, while a Subsidiary Guarantor could have guaranteed on a senior basis the indebtedness of its own, second-tier subsidiaries, the Subsidiary Guarantor could not guarantee on a senior basis the indebtedness of its parent (the Company).

It would have been very easy for the drafters of the 1993 Indenture to make both upstream and downstream guarantees senior.  For example, the drafters could have written clause (ii)(A)(5) so as to provide that "Senior Indebtedness" includes "all guarantees of any affiliate's indebtedness," or "all guarantees of the Company's indebtedness," or "all guarantees of any indebtedness," period.  The drafters could have done so, but they did not.  Instead, they included within "Senior Indebtedness" only downstream guarantees – "*guarantees by such Person of any indebtedness referred to in this clause (ii)(A) of any Subsidiary of such Person*" – and not upstream guarantees.

Accordingly, Article Sixteen of the 1993 Indenture establishes that the 1993 Guarantees are subordinated only to "Senior Indebtedness of the Subsidiary Guarantors." The definition of "Senior Indebtedness," in turn, provides that the Subsidiary Guarantors' "Senior Indebtedness" includes downstream guarantees of their own second-tier

14

subsidiaries' indebtedness, but not upstream guarantees of their parent, the Company's indebtedness. Because the 1994/96 Guarantees were upstream guarantees of the Company's indebtedness, they are not "Senior Indebtedness of the Subsidiary Guarantors," and thus are not senior to the 1993 Guarantees.

**B.     The Bankruptcy Court Misconstrued The Plain Language And Structure Of The 1993 Indenture And Erroneously Held That the 1993 Guarantees Are Subordinated To The 1994/96 Guarantees.**

   **1.     The Bankruptcy Court Failed To Construe The Indenture's Subordination Provisions Strictly And In Accordance With Their Plain Terms.**

The leading authority on public indentures makes clear that subordination provisions must be narrowly construed in accordance with their precise terms:

> It should go without saying that a careful analysis of what is or is not included in the definition of "Senior Debt" is of paramount importance to any potential lender, senior or junior. *The __exact wording__ of the definition will determine the type and amount of senior debt which will be entitled to the benefits of the subordination.*

American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions 1965, Model Debenture Indenture Provisions 1967* (1971) at 567 (emphasis added). The reason for this rule is simple – there is no single "model" subordination provision in public indentures. Rather, there are "wide variations" among the types of subordinated debt, and "the mere term 'subordination'" does not by itself establish either the nature or the extent of the subordination. *Id.* at 384, 565. Accordingly, the specific, express terms of a particular subordination provision must control.

New York law has a long tradition of strictly construing subordination agreements, guarantees, and other undertakings to make another party "whole." *See, e.g., Chemical Bank v. First Trust*, 710 N.E.2d 1083, 1088 (N.Y. 1999) (holding that junior creditors cannot be subordinated to senior creditors' post-bankruptcy interest "unless the subordination agreement *explicitly* alerted the subordinated creditors to the enhanced

risk") (emphasis in original); *White Rose Food v. Saleh*, 788 N.E.2d 602, 603 (N.Y. 2003) ("A guaranty is to be *interpreted in the strictest manner.*") (emphasis added); *Weissman v. Sinorm Deli, Inc.*, 669 N.E.2d 242, 246 (N.Y. 1996) ("When a party is under no legal duty to indemnify, a contract assuming that obligation must be *strictly construed* to avoid reading into it a duty which the parties did not intend to be assumed.") (emphasis added). Many other jurisdictions concur that the "law is well settled that *rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement.*" *Resolution Trust Corp. v. BVS Dev., Inc.*, 42 F.3d 1206, 1214 (9th Cir. 1994) (emphasis added).[4]

Consistent with these principles, New York's highest court has adopted a "Rule of Explicitness" in interpreting subordination agreements. In *Chemical Bank*, the question before the court was "[w]hat, if any, language does New York law require in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the senior creditor's post-petition interest?" 710 N.E.2d at 1084. By adopting the "Rule of Explicitness" as a matter of New York law, New York's Court of Appeals held that, if a junior creditor is to be deemed subordinated to a senior creditor's post-bankruptcy interest (which is normally disallowed in bankruptcy), then the subordination agreement must be *"absolutely clear"* in that regard. *Id.* at 1087 (emphasis added). In other words, the subordination to post-bankruptcy interest will not be enforced under New York law "unless the subordination agreement *explicitly* alerted the subordinated

---

[4]    *See also Mercantil Intercontinental, Inc. v. General Bank*, 601 So.2d 293, 295 (Fla. Ct. App. 1992) (same); *Guarantee Bank v. Magness Constr. Co.*, 462 A.2d 405, 409 (Del. 1983) ("In construing the terms of a subordination clause in a purchase money mortgage Delaware law requires such agreements to be strictly construed where their terms are unambiguous."); *Ban-Co Inv. Co. v. Loveless*, 587 P.2d 567, 574 (Wash. Ct. App. 1978) ("The law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement."); *Marriott Family Restaurants v. Lunan Family Restaurants (In re Lunan Family Restaurants)*, 194 B.R. 429, 445 (Bankr. N.D. Ill. 1996) (same, applying Illinois law); *McConnell v. Mortgage Inv. Co.*, 292 S.W.2d 636, 640 (Tex. App. 1956) (a "subordination agreement must be strictly construed").

creditors to the enhanced risk." *Id.* at 1088 (emphasis in original). New York's highest court recognized that this was a situation "where reliance, definiteness and predictability are such important goals of the law itself, designed so that parties may intelligently negotiate and order their rights and duties." *Id.* at 1086. Accordingly, the New York Court of Appeals adopted the Rule of Explicitness "as a guiding interpretive principle of State contract dispute resolution" under New York law. *Id.*

The New York Court of Appeal's adoption of the "Rule of Explicitness" as a matter of New York state law is consistent with the holdings of other courts that have adopted the Rule as a matter of federal common law, including the Third Circuit in *In re Time Sales Fin. Corp.*, 491 F.2d 841, 844 (3d Cir. 1974). The First Circuit has recently disagreed, contending that the adoption of Bankruptcy Code section 510(a) eliminated any "Rule of Explicitness" under *__federal law__* beyond what state law would require. *HSBC Bank v. Branch*, 364 F.3d 355 (1st Cir. 2004).[5] The New York Court of Appeals, however, reached its decision in *Chemical Bank* "as a guiding interpretive principle of *__State__* contract dispute resolution." 710 N.E.2d at 1086 (emphasis added). Thus, whether the Rule of Explicitness exists as a matter of federal law is irrelevant here. New York law, which governs this dispute, plainly holds that subordinations, guarantees, and other such agreements must be "*__strictly construed__*" in accordance with New York's own legal principles. The New York Court of Appeals is the final authority on principles of New York law. "[W]hen federal courts are required to interpret or apply state law, we consider and accept the decisions of the state's highest court as the ultimate authority of state law." *Colantuno v. Aetna Ins. Co.*, 980 F.2d 908, 909 (3rd Cir. 1992).

The Bankruptcy Court failed to apply – or even to cite – any of the foregoing authorities. Instead, the Court deemed the interpretation of subordination provisions in a

---

[5]   Bankruptcy Code section 510(a) (11 U.S.C. § 510(a)) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."

public indenture to be no different than the interpretation of any, garden variety contract. In fact, the Bankruptcy Court went so far as to note that there was no statement in the Indenture expressly providing "that the [1993] Guarantees are to be treated on par with the Subsidiary Guarantors' guarantee of Senior Indebtedness of the Company." Memorandum Op. at 12. In so doing, the Court turned the rule of strict construction on its head. The Bankruptcy Court erred as a matter of New York law, which requires the Court to strictly construe the 1993 Indenture *against* a finding of subordination.

In this case, the "exact wording of the definition" of "Senior Indebtedness" in the Indenture includes downstream guarantees, but excludes upstream guarantees. Moreover, the provisions of the Indenture which apply to the 1993 Guarantees – those in Article Sixteen – explicitly provide that the 1993 Guarantees are subordinated only to "Senior Indebtedness of the Subsidiary Guarantors," which excludes the 1994/96 Guarantees.

As discussed below, the Bankruptcy Court's erroneous interpretation of 1993 Indenture also violated numerous other New York principles of contract construction – principles that apply when interpreting *any* contract governed by New York law. Thus, even if it were appropriate not to strictly construe the subordination provisions in the Indenture, the Court still erred as a matter of New York law when it concluded that the 1993 Guarantees were subordinated to the 1994/96 Guarantees.

## 2. The Bankruptcy Court Erred In Holding That "Senior Indebtedness" Includes Upstream Guarantees Of Parent Company Liabilities.

The Bankruptcy Court erroneously concluded that the definition of "Senior Indebtedness" includes all types of guarantees – both upstream and downstream. The Court acknowledged that clause (ii)(A)(5) of the definition refers only to downstream guarantees. Memorandum Op. at 30. Yet, the Bankruptcy Court nonetheless held that the upstream 1994/96 Guarantees could qualify as "Senior Indebtedness" under two other categories in the definition.

First, the Bankruptcy Court held that the 1994/96 Guarantees could qualify as senior "Obligations" under the 1993 Indenture. According to the Court, "clause (ii) of the definition [of Senior Indebtedness] provides that 'Obligations' shall constitute Senior Indebtedness when, *inter alia*, so designated in writing by the Company." Memorandum Op. at 10-11 (footnote omitted). The Court held that "[t]he term [Obligations] is broad enough to include guarantees." *Id.* at 10 n.13. The Court further held that "[t]his is what occurred when" the 1994/96 Guarantees were issued. *Id.* at 11.

The Bankruptcy Court's holding is patently incorrect. The 1993 Indenture defines the term "Obligations" as only those liabilities arising under the Debtors' 1989 Credit Agreement with certain bank lenders. *See* 1993 Indenture § 1.01 at 15 & 21 (defining "Obligations" and "Credit Agreement"). The 1994/96 Guarantees are not Obligations under the 1989 Credit Agreement; they are guarantees of public bond debt issued in 1994 and 1996. Moreover, clause (ii) of the definition of "Senior Indebtedness" makes no reference whatsoever to the term "Obligations." The only reference to "Obligations" is in clause (i) of the definition, which the Bankruptcy Court found to be inapplicable.

Second, the Court relied upon clause (ii)(A)(1) of the definition of "Senior Indebtedness," under which "Senior Indebtedness" includes, with respect to a Person, the:

> principal of, premium if any, and interest on all indebtedness of such Person for money borrowed (including all such indebtedness evidenced by notes, debentures or other securities issued for money, whether issued or assumed by such Person).

1993 Indenture § 1.01 at 27-28.

The Bankruptcy Court held that the reference to "indebtedness for money borrowed" in clause (ii)(A)(1) includes all guarantees – both upstream and downstream ones. Memorandum Op. at 7. The Court further held that, by guaranteeing the Company's obligations, the Subsidiary Guarantors "assumed" them. *Id.* at 29 n.33 & 30.

The 1993 Indenture contains literally ***dozens*** of explicit references to "guarantees" and "guarantors." One of those references is, in fact, contained in the definition of

19

"Senior Indebtedness" itself; clause (ii)(A)(5) of the definition refers explicitly to *downstream* "guarantees by such Person of any indebtedness referred to in clause (ii)(A) of any Subsidiary of such Person . . . ." The words "guarantee" or "guarantor," however, are conspicuously absent from clause (ii)(A)(1). The drafters of the 1993 Indenture obviously knew how to make specific references to "guarantees" and "guarantors," which they did in clause (ii)(A)(5), but not in clause (ii)(A)(1).

The Bankruptcy Court overlooked this glaring difference by concluding that "assuming a debt" and "guaranteeing a debt" are really just the same thing. Memorandum Op. at 29 n.33 & 30. They are not. Under New York law, one who "assumes payment" of a debt "becomes the principal debtor." *Brenner v. Ebbets-McKeever Exhibition Co.*, 10 N.Y.S.2d 323, 324 (N.Y. App. Div. 1939); *see also In re Oster's Estate*, 16 N.Y.S.2d 612, 613 (N.Y. App. Div. 1939). By contrast, "[a] guaranty . . . is a contract of *secondary liability*. Thus, a guarantor will be required to make payment only when the primary obligor has first defaulted." *Weissman*, 669 N.E.2d at 246 (internal citations omitted). In explaining the contrasting roles of the principal debtor and a guarantor, the New York Appellate Division has held:

> A *guarantee* is an agreement to pay a debt owed by another which *creates a secondary liability* and thus is collateral to the contractual obligation. The principal debtor is not a party to the guarantee and *the guarantor is not a party to the principal obligation*.

*Midland Steel Warehouse Corp. v. Godinger Silver Art Ltd.*, 714 N.Y.S.2d 466, 468 (N.Y. App. Div. 2000) (emphasis added). Accordingly, the New York courts routinely have distinguished between guarantees of debts, on the one hand, and outright assumptions of debts, on the other.[6]

---

[6]   *See, e.g., Myers v. State Tax Commission*, 475 N.Y.S.2d 560 (N.Y. App. Div. 1984) (contrasting the effect of having guaranteed a bank note, which resulted in a "secondary" liability, with having "assumed primarily liability on the note"); *Devoe & Raynolds Co. v. Pell City Pipe & Foundry Co.*, 233 N.Y.S.2d 632 (N.Y. Sup. Ct., Spec. Term 1962) (an oral assumption of debt, as opposed to an oral guarantee, is not void under New York's statute of frauds); *Lyon v. Clochessy*, 86 N.Y.S. 245 (N.Y. App. Div. 1904) (one who agrees "to assume as part of the consideration the debts of

20

The Bankruptcy Court failed to recognize any of these New York authorities and the clear distinctions that New York law makes between a "guarantee" and an "assumption." Instead, the Court relied upon a single dictionary definition of "guarantee." *See* Memorandum Op. at 30 (quoting one of a number of alternative dictionary definitions of "guarantee" as "[t]o assume responsibility for the . . . execution of."). Black's Law Dictionary, by contrast, makes clear that a "guaranty" (the preferred spelling of the noun) is "an undertaking that a person will pay or do some act [and] *is collateral to the duty of the primary obligor*." Black's Law Dictionary, Seventh Edition (1999) at 712 (emphasis added). A guarantee involves a continuing, three-party relationship, in which there is not only the guarantor and the creditor, but also the primary obligor who remains liable for the debt. *Id.*

The Bankruptcy Court also failed to recognize that the drafters of the 1993 Indenture clearly knew the difference between "assuming" a debt and "guaranteeing" one. In addition to the dozens of express references to "guarantees" in the Indenture, there are also numerous references to "assuming" debts. For example, section 12.01 of the 1993 Indenture requires that the surviving company following a merger with a Debtor to "expressly assume" (not "guarantee") the obligations under the Indenture. *See* 1993 Indenture § 12.01(b) at 97. This includes mergers with entities that already had guaranteed the obligations under the 1993 Indenture, who then would be required to "assume" those obligations instead. The terms "guarantee" and "assume" simply are not interchangeable within the terms of the 1993 Indenture.

Even if a "guarantee" might be considered in a different context to be a subset of "assumed indebtedness," it cannot be so under the 1993 Indenture. New York law is

---

the sellers, becomes not a surety or guarantor as to such debts, but principal"); *Beadleston v. Morton*, 37 N.Y.S. 663 (N.Y. App. Div. 1896) (distinguishing between a guarantee and an assumption by holding that "*defendants were more than guarantors; they assumed the debt,* made it their own, and unconditionally agreed to discharge it") (emphasis added).

21

clear that, when interpreting contracts, "[a] specific provision will not be set aside in favor of a catchall clause." *William Higgins & Sons, Inc. v. State*, 231 N.E.2d 285, 286 (N.Y. 1967); *see also Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 947, 952 (5th Cir. 1981) (en banc) (holding that the more specific provision controls over a general one "under principles of New York contract law"). Here, clause (ii)(A)(5) specifically refers to "guarantees by such Person," and it expressly provides that only certain types of guarantees (notably, downstream ones) are "Senior Indebtedness." Clause (ii)(A)(1), on the other hand, does not mention "guarantees" at all. Rather, it refers generally to "indebtedness for money borrowed" that has been "issued or assumed by such Person." It cannot be disputed that clause (ii)(A)(5) is far more specific with respect to the subject of "guarantees" than is clause (ii)(A)(1). Thus, even if the references to "indebtedness for money borrowed" and "issued or assumed" in clause (ii)(A)(1) could conceivably include guarantees in some other context, they cannot here because, under New York law, the specific reference to "guarantees" in clause (ii)(A)(5) must prevail.

New York law is also clear that, when interpreting contracts, courts must "avoid an interpretation that would leave contractual clauses meaningless." *Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 472 N.E.2d 315, 318 (N.Y. 1984); *see also Sunrise Mall Assocs. v. Import Alley*, 621 N.Y.S.2d 662, 663 (N.Y. App. Div. 1995) (holding that "a court should not adopt an interpretation which would leave any provision without force and effect"). The Court's construction of "Senior Indebtedness" violates this rule. Were the reference to "assumed" debt in clause (ii)(A)(1) read to include "guarantees," as the Court held, then the express reference to "guarantees" in clause (ii)(A)(5) would be rendered meaningless. There simply would be no reason for the 1993 Indenture to refer expressly to *certain* types of guarantees in clause (ii)(A)(5) (i.e., downstream guarantees), if *all* types of guarantees were included in clause (ii)(A)(1).

Moreover, unlike clause (ii)(A)(5), which extends "Senior Indebtedness" status only to certain types of affiliate guarantees, clause (ii)(A)(1) contains *no* restrictions in

22

terms of affiliation with the Debtors. Thus, while clause (ii)(A)(5) expressly limits "Senior Indebtedness" to downstream guarantees of "subsidiaries" and certain (narrowly defined) joint ventures, clause (ii)(A)(1) would, under the Bankruptcy Court's construction, apply to *any* guarantee of *anyone's* debt. Thus, the narrowly crafted, specific limitations on guarantees in clause (ii)(A)(5) would be completely eviscerated by a broad, general interpretation of clause (ii)(A)(1).

New York law requires courts to "read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases." *South Road Assocs., LLC v. Int'l Bus. Machs. Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005). New York law further requires that "[a]ll parts of the agreement . . . be reconciled, if possible, in order to avoid an inconsistency." *Broad*, 642 F.2d at 947. A court cannot accept what "might be a plausible construction, but for the fact that it would make meaningless the qualification to that phrase that follows immediately thereafter." *Id.* at 950. Thus, even if the Court's broad construction of clause (ii)(A)(1) would have been a plausible interpretation of that clause in isolation, it is not an acceptable interpretation when one reads the definition of "Senior Indebtedness" as a whole.

>      **3.    The Bankruptcy Court Disregarded The Plain Language And Structure Of The 1993 Indenture's Subordination Provisions, Which Distinguish Between The Subordination Of The Notes And The Subordination Of The 1993 Guarantees.**
>
>>     **a.    Article Three Only Applies To Distributions By The Company On Behalf Of "Senior Indebtedness *Of The Company*."**

The Bankruptcy Court acknowledged the distinct functions that Article Three and Article Sixteen perform in the 1993 Indenture, correctly holding that that "Article Three applies to the Company and Article Sixteen applies to the Subsidiary Guarantors." Memorandum Op. at 28. The Court also correctly held that, pursuant to Article Sixteen, "[t]he 1993 Note Guarantees are subordinated only to the 'Senior Indebtedness' of each Subsidiary Guarantor and then only to the extent and manner set forth in the rest of

23

Article Sixteen." *Id.* at 6. The Bankruptcy Court nonetheless concluded that Articles Three and Sixteen had the same purpose, which the Court believed was "to subordinate all payments with respect to the [1993 Notes] regardless of source, including payments on the [1993 Guarantees], to any 'Senior Indebtedness' of [the Company] or the Subsidiary Guarantors outstanding then or in the future.'" *Id.* at 9.

The Bankruptcy Court's holding eviscerates the purpose and effect of creating separate Articles for the Company's Senior Indebtedness and the Subsidiary Guarantors' Senior Indebtedness. In so doing, the Bankruptcy Court ignored the plain language of Article Three, which expressly does not apply to "Senior Indebtedness of the Subsidiary Guarantors," as well as the contractual mandate that Article Three not apply to the 1993 Guarantees issued by the Subsidiary Guarantors. As made clear in section 3.02:

> the ***provisions of this Article Three*** are and are intended ***solely for the purpose of defining the relative rights of*** the holders of the Notes, on the one hand, and the holders of ***Senior Indebtedness of the Company,*** on the other hand.

1993 Indenture § 3.02 at 38 (emphasis added).

As discussed above, "Senior Indebtedness of the Company" is not the same thing as "Senior Indebtedness of the Subsidiary Guarantors." *See* p. 13, *supra.* The term "Senior Indebtedness of the Company" does not include the 1994/96 Guarantees (which are not even the Company's obligations), nor any other alleged "Senior Indebtedness of the Subsidiary Guarantors." Thus, on its face, Article Three is inapplicable to the question of whether the subsidiary guarantees are *pari passu* or subordinated to "Senior Indebtedness of the Subsidiary Guarantors." Moreover, because Article Sixteen is the most specific (indeed, the only) article in the Indenture that addresses the priority of the 1993 Guarantees, it (and not Article Three) governs the priority of the guarantees.

### b.  Section 3.01 Versus Section 16.02.

Section 3.01 is virtually identical in structure to section 16.02, the provision that governs the subordination of the 1993 Guarantees vis-à-vis "Senior Indebtedness of the

Subsidiary Guarantors." *See* pp. 10-11, *supra.* The difference, however, is that section 3.01 was a promise *by the Company* that payments *with respect to the Notes* would be subordinated to *Senior Indebtedness of the Company*, while section 16.02 was a promise *by each Subsidiary Guarantor* that payments *pursuant to the Guarantee* would be subordinated to *Senior Indebtedness of such Subsidiary Guarantor.*

The different roles of section 3.01 and section 16.02 are readily apparent when the two sections are reviewed side-by-side:

| Article Three ("Subordination of Notes"), Section 3.01 | Article Sixteen ("Guarantee of Notes"), Section 16.02 |
| --- | --- |
| <u>Agreement to subordinate.</u> The *Company* . . . covenants and agrees, and the Trustee and each holder of Notes, by his acceptance thereof, likewise covenants and agrees, for the benefit of all present and future holders of *Senior Indebtedness of the Company*, that *all direct or indirect payments or distributions on or with respect to the Notes*, whether pursuant to the terms of the Notes or upon acceleration or otherwise, . . . is [sic] hereby expressly subordinated, to the extent and in the manner hereinafter set forth, in right of payment to the prior payment in full . . . of all *Senior Indebtedness of the Company*.<br><br>1993 Indenture § 3.01 at 36 (emphasis added). | <u>*Guarantee* subordinated to Senior Indebtedness.</u> Each *Subsidiary Guarantor* . . . covenants and agrees, and the Trustee and each holder of the Notes by his acceptance thereof likewise covenants and agrees, for the benefit of all present and future holders of *Senior Indebtedness of such Subsidiary Guarantor*, that *all payments pursuant to the Guarantee by such Subsidiary Guarantor* are hereby expressly subordinated, to the extent and in the manner hereinafter set forth, in right of payment to the prior payment in full . . . of all *Senior Indebtedness of such Subsidiary Guarantor*.<br><br>*Id.* § 16.02 at 104 (emphasis added). |

As illustrated by the 1993 Indenture's plain language and structure:

(i)     Section 3.01 is a promise by (and only by) "the Company." Section 16.02, by contrast, is a promise by (and only by) each "Subsidiary Guarantor."

(ii)    Section 3.01 refers repeatedly (and only) to "the Company." Section 16.02 refers repeatedly, and only, to the "Subsidiary Guarantors."

(iii)   Section 3.01 refers to "all direct or indirect payments or distributions on or with respect to the Notes," while section 16.02 refers to "all payments pursuant to the Guarantee by such Subsidiary Guarantor."

(iv)   Section 3.01 refers to "all Senior Indebtedness of the Company," while section 16.02 refers to "all Senior Indebtedness of such Subsidiary Guarantor."

The foregoing leads to but one reasonable interpretation – section 3.01 was intended to address the priority of the 1993 Notes vis-à-vis "Senior Indebtedness of the Company" at the parent level. Section 16.02, by contrast, was intended to address the relative priority of the 1993 Guarantees at the subsidiary level.

As discussed above, when a contract contains both specific references and general, catch-all clauses, the specific references will govern. *See* pp. 22-23, *supra*. The Indenture contains literally scores of specific references to the terms "guarantees" and "guarantors," including in section 16.02. Yet, *the words "guarantee" and "guarantor" do not appear anywhere in section 3.01*. The Court below nonetheless suggested that guarantees could be encompassed within the general phrase "direct or indirect payments." Memorandum Op. at 8-9, 28. It would be strange indeed, however, for the drafters of the Indenture to use the phrase "indirect payments" to refer to "guarantees," when the actual term "guarantees" appears dozens of times throughout the Indenture (including the reference to downstream guarantees in the definition of Senior Indebtedness). *See In re Prime Motor Inns*, 167 B.R. 261, 281-83 (Bankr. S.D. Fla. 1994).[7] Moreover, the general reference to "indirect payments" in section 3.01 contrasts markedly with the very specific references to "guarantees" and "guarantors" in section 16.02.

If the intention of the 1993 Indenture were to subordinate the 1993 Guarantees to all future indebtedness of both the Company and the Subsidiary Guarantors, then the

---

[7]   The term "indirect payments" has other meanings that do not conflict with the language and structure of the 1993 Indenture, including (i) the earmarking of loan, sale, or insurance proceeds for the creditor; (ii) the directing of payments of accounts receivable to the creditor; or (iii) the debtor's payoff of the creditor's own third party obligations in satisfaction of the debtor's obligations to the creditor. Unlike "guarantees," none of the foregoing is addressed in other provisions of the Indenture.

26

drafters of the Indenture easily could have provided for that. The drafters would not have needed a multi-part, entity-by-entity definition of "Senior Indebtedness." Nor would the drafters have needed to create a bifurcated structure with Article Three applying to "Senior Indebtedness of the Company," and Article Sixteen applying to "Senior Indebtedness of the Subsidiary Guarantors." Instead, the drafters simply could have written one single sentence:  "The 1993 Guarantees are subordinated to all future liabilities of both the Company and the Subsidiary Guarantors." That clearly is not what the drafters did, however, and it is not what the plain language and structure of the 1993 Indenture provide.

c.          **Section 3.02 Versus Section 16.03.**

Section 3.02 governs the mechanics of distributing property of the Company in the event of the Company's bankruptcy. As quoted above, section 3.02 makes clear that *"the provisions of this Article Three are and are intended solely for the purpose of defining the relative rights of the holders of the Notes, on the one hand, and the holders of Senior Indebtedness of the Company, on the other hand."* 1993 Indenture § 3.02 at 38 (emphasis added). By its terms, section 3.02 applies to "Senior Indebtedness of the Company" and the "Subordination of Notes"; it does not apply to "Senior Indebtedness of the Subsidiary Guarantors" and the "Subordination of Guarantees," which are governed solely by Article Sixteen.

Once again, there is a parallel provision in Article Sixteen that deals specifically with the guarantees and "Senior Indebtedness of the Subsidiary Guarantors" – section 16.03. *See* 1993 Indenture § 16.03 at 104-07. Section 16.03 is similar in form to section 3.02. However, while section 3.02 clearly applies to "Senior Indebtedness of the Company," section 16.03 only applies to "Senior Indebtedness of the Subsidiary Guarantors." A side-by-side comparison of these two sections again reveals that the purpose of Article Three is to deal with (and only with) the assets and liabilities of the

27

Company, while the purpose of Article Sixteen is to deal with (and only with) the assets and liabilities of the Subsidiary Guarantors.

| Article Three ("Subordination of Notes"), Preamble of Section 3.02 | Article Sixteen ("Guarantee of Notes"), Preamble of Section 16.03 |
|---|---|
| Upon any direct or indirect payment or distribution of assets or securities *of the Company* of any kind or character, whether in cash, property or securities, upon any dissolution, winding up, liquidation or reorganization *of the Company*, whether voluntary or involuntary or in bankruptcy, insolvency, reorganization, receivership or other proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities *of the Company* or otherwise . . . .<br><br>1993 Indenture § 3.02 at 36 (emphasis added). | Upon any direct or indirect payment or distribution of assets or securities *of any Subsidiary Guarantor* of any kind or character, whether in cash, property or securities, upon any dissolution, winding up, liquidation or reorganization *of such Subsidiary Guarantor,* whether voluntary or involuntary or in bankruptcy, insolvency, reorganization, receivership or other proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities *of such Subsidiary Guarantor* or otherwise . . . .<br><br>*Id.* § 16.03 at 104 (emphasis added) |

The only assets and plans that are at issue here are the Subsidiary Guarantors' Plans. Section 16.03 governs distributions under those Plans. None of the parent Company's assets are being distributed under the Plans. Section 3.02 is inapplicable by its terms.

The Bankruptcy Court nonetheless appeared to rely upon the fact that the remainder of section 3.02 contains the same "direct or indirect payment" language that, as discussed above, is included in section 3.01. *See* Memorandum Op. at 27-28. In all instances, however, that language is subject to the phrase "Senior Indebtedness *of the Company*," a phrase that occurs more than two dozen times throughout section 3.02. There can be no reasonable dispute that section 3.02, as with the rest of Article Three, governs the relative priority of the obligations of the parent Company, and not of the Subsidiary Guarantors.[8]

---

[8]    The *only* reference to any guarantee is in section 3.02(a), which is inapplicable for the same reasons as is the "X-Clause" in section 16.03(a). *See* footnote 3, *supra.*

By relying upon section 3.02, the Bankruptcy Court again violated established principles of New York law. First, section 16.03 is, by far, the more specific contractual provision governing the Subsidiary Guarantors and their guarantees, and thus must control. *See* pp. 22-23, *supra*. Second, an overly broad reading of section 3.02 so as to include the Subsidiary Guarantors would render section 16.03 a virtual nullity, and would create internal inconsistencies in the document with respect to the scope of the subordination of the guarantees. New York law does not permit such a construction.

### 4.        The 1994/96 Guarantees Are Not Senior Indebtedness.

The two provisions of the 1993 Indenture that govern this dispute unequivocally show that the Subsidiary Guarantors' upstream 1993 Guarantees are not subordinated to the Subsidiary Guarantors' upstream 1994/96 Guarantees. Section 16.02 provides that the 1993 Guarantees are only subordinated to "Senior Indebtedness of such Subsidiary Guarantors," and the definition of "Senior Indebtedness" does not include upstream guarantees of parent obligations. Thus, under the plain language of the 1993 Indenture, the 1994/96 Guarantees are *pari passu* with, and not senior to, the 1993 Guarantees. The Bankruptcy Court erred as a matter of law when it held otherwise.

One can only speculate today – more than thirteen years after the fact – why the 1993 Indenture subordinated the 1993 Notes at the Company level, but provided for *pari passu* treatment of the 1993 Guarantees. What matters, however, is what the 1993 Indenture actually says, and that its plain language must be enforced. New York law prohibits any other result since, "[i]n the absence of any ambiguity, ***we look solely to the language used by the parties to discern the contract's meaning***." *Vermont Teddy Bear*, 807 N.E.2d at 879 (emphasis added). Under New York law, "the language used by the parties" is all the Court needs to consider in order to resolve the priority dispute. The Court should look at the plain language of section 16.02 and the definition of "Senior

29

Indebtedness" and, based upon the 1993 Indenture's own words, conclude that the 1993 Guarantees are not subordinated to the 1994/96 Guarantees.

**C.    The 1993 Indenture Is Unambiguous And, Therefore, The Bankruptcy Court Erred As A Matter Of New York Law In Considering Extrinsic Evidence.**

**1.    New York Law Bars The Consideration Of Extrinsic Evidence Unless The Contract Is Ambiguous *On Its Face*.**

The Bankruptcy Court permitted the Appellees to introduce extrinsic evidence in the form of affidavits and deposition testimony of a former Company officer, lawyer, and underwriter, each of whom were involved in the issuance of the 1993 Indenture. Each witness attested to what he or others purportedly "intended" more than thirteen years ago. The Court also admitted into evidence various extrinsic documents, including prospectuses and other documents prepared by the Company and its advisors, some more than *three years after* the 1993 Guarantees were issued. The Court held that this evidence was admissible "to explain" the 1993 Indenture. Memorandum Op. at 16.

The Bankruptcy Court erred as a matter of New York law when it admitted and relied upon extrinsic evidence. New York law bars the introduction of extrinsic evidence unless, and until, the trial court first establishes that the contract is ambiguous:

*    "*extrinsic evidence may not be considered unless the document itself is ambiguous*." *South Road*, 826 N.E.2d at 809 (quotations omitted; emphasis added);

*    absent ambiguity, "*we look solely to the language used by the parties to discern the contract's meaning*." *Vermont Teddy Bear*, 807 N.E.2d at 879 (emphasis added);

*    "*matters extrinsic to the agreement may not be considered* when the intent of the parties can be gleaned from the face of the instrument." *Teitelbaum Holdings, Ltd. v. Gold*, 396 N.E.2d 1029, 1032 (N.Y. 1979) (emphasis added); and

*    "*circumstances extrinsic to the agreement will not be considered* when the intention of the parties can be gathered from the instrument itself." *West, Weir*, 255 N.E.2d at 711-12 (emphasis added).

30

Thus, New York's highest court has made clear that New York law bars the consideration of any extrinsic evidence when the contract is unambiguous. The Bankruptcy Court found that the relevant provisions of the 1993 Indenture are unambiguous. Memorandum Op. at 16. As such, the Court erred as a matter of New York law when it considered extrinsic evidence regarding what certain parties allegedly believed or intended years ago when the Indenture was first drafted.

The Bankruptcy Court held that it could consider the extrinsic evidence because it "did not contradict the plain language of the 1993 Indenture but rather *served to explain it* and the context in which it was formulated." Memorandum Op. at 16 (emphasis added). In so doing, the Court violated New York's clear mandates that "extrinsic evidence may not be considered unless the document itself is ambiguous," *South Road*, 826 N.E.2d at 809, and that "where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law and no trial is necessary to determine the legal effect of the contract." *Bethlehem Steel*, 141 N.E.2d at 593.

In contrast to the Bankruptcy Court's erroneous reliance on extrinsic evidence, New York's Appellate Division recently made clear that testimony regarding extrinsic "circumstances" such as "current industry practice or custom" is inadmissible to construe the terms of unambiguous loan documents. The court held:

> Nor was there any ambiguity in the loan documents, which contained no mention of the claimed right to assignment of the mortgage and loan. *Since parol evidence is inadmissible absent ambiguity* (South Rd. Assocs., LLC v IBM Corp., 4 N.Y.3d 272, 278, 826 N.E.2d 806, 793 N.Y.S.2d 835 [2005]), *there is no basis to admit evidence of current industry practice or custom to construe the loan documents*.

*767 Third Ave. LLC v. Orix Capital Mkts., LLC*, 812 N.Y.S.2d 8 (N.Y. App. Div. 2006) (emphasis added).

The Bankruptcy Court justified its reliance on extrinsic evidence by looking to federal court interpretations of New York law. Yet, the decisions the Court cited are, in

31

fact, contrary to the Court's own holding. For example, the Court cited a Second Circuit decision for the proposition that "[t]he parol evidence rule does not prevent the introduction of extrinsic evidence to aid in interpretation of a contract." Memorandum Op. at 17 (citing *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)). The Bankruptcy Court, however, failed to quote the first half of this sentence, which reads ***"when the obligations are not clearly stated – when they are ambiguous*** – the parol evidence rule does not prevent the introduction of extrinsic evidence . . . ." *Garza*, 861 F.2d at 27 (emphasis added). The Second Circuit found the contract at issue in *Garza* to be ambiguous, and thus considered parol evidence. *Id.* By contrast, the Bankruptcy Court here held that the 1993 Indenture was unambiguous. Accordingly, the Bankruptcy Court erred as a matter of New York law in using parol and other extrinsic evidence to "explain" its terms.

Moreover, just two years after *Garza*, the Second Circuit made clear that extrinsic evidence must not be considered when construing the plain terms of a public indenture:

> parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable.

*Metropolitan Life Ins. Co. v. RJR Nabisco*, 906 F.2d 884, 889 (2d Cir. 1990).

In any event, the Third Circuit has directed that "when federal courts are required to interpret or apply state law, we consider and accept the decisions of the state's highest court as the ***ultimate authority of state law***." *Colantuno*, 980 F.2d at 909. Thus, the Bankruptcy Court was obligated to follow the clear edicts of the New York Court of Appeals regarding the interpretation of unambiguous contracts – "***extrinsic evidence may not be considered***," *South Road*, 826 N.E.2d at 809 (emphasis added).

The Bankruptcy Court also purported to rely upon a nearly eighty-year-old New York Court of Appeals decision for the proposition that the "evidence [the Bankruptcy Court] admitted here merely is explanatory and so is admissible." Memorandum Op. at 17 (citing *William C. Atwater & Co. v. Panama R. Co.*, 159 N.E. 418 (N.Y. 1927)). This

32

begs the question:    If the Bankruptcy Court held that the 1993 Indenture was unambiguous, then why did the Bankruptcy Court need extrinsic evidence to explain it? The simple answer is that the Bankruptcy Court did not need such evidence, and its admission of extrinsic evidence was contrary to New York law.

A close examination of the *Atwater* decision shows that it does not stand for the proposition for which the Bankruptcy Court cited it.  Indeed, ***no extrinsic evidence whatsoever was considered by the court in Atwater***, and *Atwater* does not hold that such evidence may be considered when the agreement is clear on its face**.**

The plaintiff in *Atwater* had contracted to sell 36,000 tons of coal to the defendant, which was to be delivered in regular installments during a one-year period. Paragraph 4 of the agreement provided that, if the defendant failed to accept an installment of coal, the plaintiff would have the right to either "cancel any tonnage of coal not taken by the purchaser up to that time," or reduce the amount of future shipments.  159 N.E. at 418-19.  Paragraph 4 ended with the following sentence:  "Any portion of the tonnage remaining unshipped at the date of expiration of this agreement shall be considered as canceled without notice."  *Id.* at 419.

A dispute arose about six months into the contract.  The defendant then refused to accept any more monthly shipments of coal.  When the contract year ended, the plaintiff claimed that the defendant had failed to accept more than 12,500 tons of coal as required under the contract.  The defendant countered that its obligation to accept the coal ceased when the contract expired, citing the last sentence of Paragraph 4.  *Id.*  Thus, the defendant claimed, its obligations to accept the coal that it had previously refused evaporated automatically when the contract expired.

The trial court ruled in the plaintiff's favor, but the New York Court of Appeals reversed.  The Court of Appeals held that the expiration of the year-term did not absolve the defendant of its failure to accept the coal shipments.  The Court reasoned that when the last sentence of Paragraph 4 "is read in connection with the entire contract, and

33

particularly with the other provisions of paragraph 4, it is evident that the plaintiff had not the remotest intention of releasing any claims against defendant for damages for breach of contract which had accrued at the date of the expiration of the agreement and that the defendant could not reasonably have so understood the language thus used." *Id.*

The Court of Appeals then addressed the reasoning of the trial court:

> The learned referee says that [Paragraph 4] is plaintiff's own and in case of ambiguity is to be taken most strongly against it as the party who prepared the contract. He, however, takes the isolated clause in dispute and finds its meaning plain. In this we think he disregarded the proper rule for construction of contracts. Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish. The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of the words should be sought.

*Id.* (internal quotations omitted).

Contrary to the Bankruptcy Court's decision below, the Court of Appeals did not hold that extrinsic evidence can be used to "explain" the contract. Rather, it made clear that the trial court erred by relying upon a single sentence in the contract without any consideration of the context in which the sentence was used. The "apparent purpose" of Paragraph 4 was not to be determined by extrinsic evidence, but rather by examining the contract as a whole and the circumstances under which it applied. On this basis, the Court of Appeals concluded that "the court below [had] placed the seller at the mercy of the buyer and the agreement to buy has become a mere option. . . . . A reading of the whole agreement" refuted the trial court's erroneous conclusion. *Id.*

The New York Court of Appeals has cited *Atwater* only once during the last half-century. In *Kass v. Kass*, 696 N.E.2d 174 (N.Y. 1998), the court was called upon to decide a dispute over the ownership of frozen embryos. A couple had entered into an "Informed Consent" agreement which provided that, in the event that the couple divorced, the disposition of the embryos would be determined by a property settlement.

34

The Informed Consent also provided that, if the couple did not use the embryos, the embryos would be donated to the hospital for research purposes.

When the couple subsequently divorced, they entered into an "uncontested divorce" agreement, which provided that "neither Maureen Kass [or] Steve Kass . . . will lay claim to custody of these" embryos, and that the embryos would instead by used by the hospital in accordance with the Informed Consent. *Id.* at 177. Less than a month later, however, Ms. Kass changed her mind and decided that she wanted custody of the embryos. Litigation followed, and the trial court awarded custody to Ms. Kass.

The New York Court of Appeals reversed. After considering the constitutional implications of the case, the Court concluded that the dispute should be resolved as a matter of contract law. *Id.* at 179. The Court held that the terms of the Informed Consent and divorce agreement were clear, and on that basis denied Ms. Kass custody.

In considering whether or not the agreement was ambiguous, the Court made clear that this inquiry was not a question of fact, but rather was "a question of law for the courts." *Id.* at 180. The Court then turned to its *Atwater* decision, holding:

> And in deciding whether an agreement is ambiguous courts "should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought."

*Id.* at 180-81 (quoting *Atwater*, 159 N.E. at 419).

Thus, the Court of Appeals did ***not*** hold that the trial court should consider extrinsic evidence to "explain" the agreement. Rather, it held that, "***in deciding whether an agreement is ambiguous***," the trial court should consider the entire contract and its purpose "as manifested thereby." Contrary to what the Bankruptcy Court did below, the Court of Appeals did not consider the testimony of the parties to "explain" their agreement, or to describe their alleged intentions, desires, or beliefs when they entered into the agreement. Rather, the Court of Appeals considered the "four corners" of the

35

agreement itself to conclude that its terms were clear, and that Ms. Kass had agreed not to assert any further claim to the embryos.

In the present case, the Bankruptcy Court held that the 1993 Indenture was unambiguous. As a result, there simply was no reason to examine extrinsic evidence to "explain" what the Indenture means. The Court should have looked solely at the text and structure of the Indenture itself – including the relationships between the definition of "Senior Indebtedness" and the respective articles that separately govern the subordination of the 1993 Notes to "Senior Indebtedness of the Company," and the 1993 Guarantees to "Senior Indebtedness of the Subsidiary Guarantors."

Furthermore, the Court was not permitted to consider extrinsic evidence in determining whether the Indenture was ambiguous. "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Kass*, 696 N.E.2d at 180. "[E]xtrinsic evidence cannot *create* an ambiguity in an agreement," but rather can only be used to *"resolve"* an ambiguity once one has been established based upon the language of the agreement itself. *Id.* at 181 (emphasis in original).

Given that the Bankruptcy Court held that there was no ambiguity to resolve in the Indenture, New York law precluded the Court from considering extrinsic evidence to "explain" the Indenture's terms. Thus, the Court erred as a matter of law when it relied upon extrinsic evidence of what certain parties allegedly intended years ago.

> **2.      New York's Prohibition Against The Introduction Of Extrinsic Evidence Applies With Particular Force In The Case Of Publicly Traded Debt And Other Commercial Settings.**

New York's rule against the introduction of extrinsic evidence applies with particular force in the commercial setting:

> [W]here commercial certainty is a paramount concern, and where the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length, . . . courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.

731460v 1

*Vermont Teddy Bear,* 807 N.E.2d at 879 (internal quotations and citations omitted).

When publicly held bonds are at issue, "it is imperative that the terms of the indenture govern the parties' contractual rights as determined by the judiciary." *Leverso v. Southtrust Bank*, 18 F.3d 1527, 1531 (11th Cir. 1994). "Not least among the parties who must comply with or refer to the indenture are the members of the investing public and their investment advisors." *Broad*, 642 F.2d at 943 (quotations omitted). Thus, publicly traded bonds must be interpreted "according to the contract terms." *Leverso*, 18 F.3d at 1535. This is essential to protect not only initial buyers of bonds, but also "bondholders who purchased bonds on the secondary market." *Id.,* 18 F.3d at 1536 n.11.

> It is essential to the confidence of public and private lenders that the clear written terms of mortgages be implemented and enforced by the courts. Without such enforcement, extrinsic judicial doctrines that frustrate the terms of the mortgage documents . . . will impair the confidence of public and private lenders.

*United States v. Victory Highway Village, Inc.*, 662 F.2d 488, 495 (8th Cir. 1981).

The danger of allowing extrinsic evidence to affect the interpretation of publicly traded bonds is clear – "there is a significant likelihood . . . that different [fact finders], construing identical indentures in an attempt to divine 'the intent of the parties,' would reach different conclusions." *Broad*, 642 F.2d at 947 n.20. Public holders cannot have known what the Company's lawyer or underwriter were thinking among themselves; public holders are entitled to rely upon the plain language of the Indenture. If the Company's professionals thought that "the 1993 Guarantees should be subordinated to guarantees of Senior Indebtedness *of the Company*," they were capable of writing those words into the Indenture. They did not. Their willingness to assert their beliefs a dozen years later, in the course of litigation, cannot change the plain terms of the 1993 Indenture itself. The Bankruptcy Court erred in permitting these same professionals to testify as to what they allegedly "intended," as opposed to what they wrote in the public Indenture in 1993.

37

The Southern District of New York rejected the same kind of testimony when interpreting a public indenture in accordance with New York law:

> nothing in [the court's] evaluation is substantively altered by the speeches given or remarks made by RJR Nabisco executives, or the opinions of various individuals – what, for instance, former RJR Nabisco Treasurer Dowdle personally did or did not "firmly believe" the indentures meant. . . . . The parol evidence rule bars plaintiffs from arguing that the speeches made by company executives prove defendants agreed or acquiesced to a term that does not appear in the indentures.

*Metropolitan Life Ins. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1514-15 (S.D.N.Y. 1989).

The 1993 Guarantees have been transferred in the public markets countless times since they were issued years ago. There is no evidence that the multitude of parties that have participated in these transactions had any knowledge of extrinsic statements regarding the priority of the guarantees. Moreover, even if they did have such knowledge, they were entitled to rely upon the express terms of the Indenture itself.

In any event, even if it were appropriate for the Bankruptcy Court to consider the witnesses' testimony, the Court failed to rule upon any of the other Evidentiary Objections raised to their testimony, including lack of foundation, hearsay, and other problems. The Court's wholesale failure even to consider these timely raised objections mandates reversal.

### 3.    The Court Erred In Considering Other Extrinsic Evidence.

The Bankruptcy Court further violated New York's bar on the consideration of extrinsic evidence by relying upon prospectuses and other documentary evidence. As with the witnesses' testimony, New York law barred the Court's consideration of this extrinsic evidence in light of its holding that the 1993 Indenture is unambiguous.

The Bankruptcy Court cited various passages from the prospectus for the 1993 Indenture. Memorandum Op. at 25-26 n.30. The 1993 prospectus, however, mostly parroted language from the Indenture itself, and in fact did not even mention that the 1993 Guarantees were subordinated to "Senior Indebtedness of the Subsidiary

38

Guarantors" until 48 pages into the document. *See* Trial Exhibit D-5, at 48 (Tab 7 in Liverpool's designation); Tr. 4/27/05 at 52-54 & 148-154:2 (D.I. 6857). *At no point did the prospectus purport to advise investors that the 1993 Guarantees would be subordinated to upstream guarantees of the Company's liabilities.*

Accordingly, even if the 1993 prospectus were admissible, it added nothing to the Court's understanding of the Indenture's terms. The prospectus was not admissible, however, because it was extrinsic to the 1993 Indenture and "not a source of contractual rights." *Broad*, 642 F.2d at 948 n.21.

The Bankruptcy Court also relied upon notices that the Company sent to the 1993 indenture trustee in 1994 and 1996 ("Notices"), unilaterally declaring the 1994/96 Guarantees to be "Senior Indebtedness." The Court considered these Notices as part of "the evidence adduced at trial of the surrounding circumstances." Memorandum Op. at 23. The Company's declaration alone, however, could not convert the upstream guarantees into "Senior Indebtedness." The 1994/96 Guarantees still had to qualify under one of the specific categories in the definition of "Senior Indebtedness." Because the 1994/96 Guarantees did not so qualify, the 1994/96 Guarantees were not "Senior Indebtedness," regardless of the Company's unilateral declaration to the contrary.

Appellees nonetheless contended that the Notices were evidence of the parties' subsequent conduct, and thus should be considered on those grounds. The Bankruptcy Court appeared to accept Appellees' "practical construction" argument by holding that the Notices were part of the "surrounding circumstances" evidence. The Court's holding, however, is contrary to well-established New York law. New York bars the consideration of subsequent conduct when interpreting a contract, unless it is *first* established that the contract is ambiguous on its face. "[T]he doctrine of practical construction has no application in the absence of any ambiguity." *Estate of Anglin v Estate of Kelly*, 705 N.Y.S.2d 769, 771 (N.Y. App. Div. 2000) (following *Hopwood Plays, Inc. v. Kemper*, 189 N.E. 461, 463 (N.Y. 1934)). Nor may evidence of subsequent

39

conduct be used to create an ambiguity. *See South Road*, 826 N.E.2d at 809 (holding that "[n]either may the conduct of [the defendant] in paying all real estate taxes pursuant to a lease provision create an ambiguity").

Moreover, Appellees failed to introduce any evidence whatsoever that the Notices were sent to any of the actual holders of the 1993 Guarantees. Thus, at most, the Notices were unilateral declarations of what the Company believed to be the case, rather than what the 1993 Indenture actually provided.

In any event, the 1993 Indenture itself makes clear that the Notices are irrelevant to the interpretation of the 1993 Indenture. Section 15.12 of the Indenture provides that "any [other] indenture, loan or debt agreement may not be used to interpret this Indenture." 1993 Indenture § 15.12 at 103. For the same reason, the prospectuses for the 1994/96 Notes are irrelevant, and the Bankruptcy Court's reliance upon them was in error. *See* Memorandum Op. at 26. By its plain terms, the 1993 Indenture bars the use of these extrinsic documents "to interpret this Indenture." Thus, even if the documentary evidence otherwise was admissible under New York law (which it is not), the evidence is irrelevant based upon the plain terms of the 1993 Indenture itself.

## VI.    CONCLUSION

This Court should reverse the Bankruptcy Court's decision and conclude that the 1993 Guarantees are not subordinated to the 1994/96 Guarantees.

**STUTMAN, TREISTER & GLATT, P.C.**
Isaac M. Pachulski
K. John Shaffer
1901 Avenue of the Stars, 12th Floor
Los Angeles, California 90067
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

May 9, 2006

Attorneys For The Liverpool Limited Partnership

**POTTER ANDERSON & CORROON LLP**

By *Rebecca S. Beste*

David J. Baldwin (ID No. 1010)
Rebecca S. Beste (ID No. 4154)
1313 North Market Street
Wilmington, DE 19899-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

## CERTIFICATE OF SERVICE

I, Rebecca S. Beste, hereby certify that I am not less than 18 years of age, and that on this 9th day of May, 2006, I caused to be served a copy of the foregoing **Corrected Opening Brief of Appellant The Liverpool Limited Partnership** to delivered to the following parties on the attached Service List via First Class U. S. Mail, postage prepaid and Electronic Mail.

Under penalty of perjury, I declare that the foregoing is true and correct.

*Rebecca S. Beste,*
Rebecca S. Beste

## SERVICE LIST

Gregory M. Gordon, Esq.
Daniel P. Winikka, Esq.
Nick Bowen, Esq.
Jones Day
2727 North Harwood St.
Dallas, TX 75201
E-mail: gmgordon@jonesday.com
E-mail: dpwinikka@jonesday.com
E-mail: nbowen@jonesday.com
**(Debtors' Counsel)**

Elizabeth J. Futrell, Esq.
Aimee M. Quirk, Esq.
Jones, Walker, Waechter, Poitevent, Carrère &
Denègre, L.L.P.
201 St. Charles Ave.
New Orleans, LA 70170
Telephone: (504) 582-8000
Facsimile: (504) 582-8011
E-mail: efutrell@joneswalker.com
**(Counsel for J.P. Morgan Trust Company,**
**National Association, Successor to Bank One**
**Trust Company, N.A., as Indenture Trustee)**

Michael B. Joseph, Esq.
Theodore J. Tacconelli, Esq.
Ferry, Joseph & Pearce, P.A.
824 Market St. - Suite 904
Wilmington, DE 19899
Telephone: (302) 575-1555
Facsimile: (302) 575-1714
E-mail: ttacconelli@ferryjoseph.com
        mjoseph@ferryjoseph.com
**(Counsel for U.S. Bank National**
**Association, as Indenture Trustee)**

Clark T. Whitmore, Esq.
Alain M. Baudry, Esq.
Christina A. Smith, Esq.
Maslon, Edelman, Borman & Brand, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140
Telephone: (612) 672-8335
Facsimile: (612) 642-8335
E-mail: alain.baudry@maslon.com
        clark.whitmore@maslon.com
**(Counsel for U.S. Bank National Association, as**
**Indenture Trustee)**

Karen C. Bifferato, Esq.
Marc J. Phillips, Esq.
Connolly Bove Lodge & Hutz, LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Telephone: (302) 658-9141
Facsimile: (302) 658-5614
E-mail: kbifferato@cblh.com
        mphillips@cblh.com
**(Counsel for Ad Hoc Group of Senior Note**
**Holders)**

George A. Davis, Esq.
Diane Harvey, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
E-mail: diane.harvey@weil.com
        george.davis@weil.com
**(Counsel for Ad Hoc Group of Senior Note**
**Holders)**

2

Harold L. Kaplan, Esq.
Mark F. Hebbeln, Esq.
Gardner Carton & Douglas LLP
191 North Wacker Drive - Suite 3700
Chicago, IL  60606-1698
Telephone:  (312) 569-1000
Facsimile:  (312) 569-3000
E-mail: hkaplan@gcd.com
E-mail: mhebbeln@gcd.com
**(Counsel to Deutsche Bank Trust
Company, National Association, as
Successor Trustee for 9-7/8% Notes)**

Duane D. Werb, Esq.
Werb & Sullivan
300 Delaware Ave. - 13th Fl.
P.O. Box 25046
Wilmington, DE  19899
Telephone:  (302) 652-1100
Facsimile:  (302) 652-1111
E-mail: dwerb@werbsullivan.com
**(Co-Counsel for Bear, Stearns & Co., Inc.,
Citadel Equity Fund Ltd. and Citadel
Credit Trading Ltd.)**

Mark T. Hurford
Campbell & Levine, LLC
800 King Street
Suite 300
Wilmington, DE  19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947
E-mail: mth@camlev.com
**(Counsel to Asbestos Creditors Committee)**

David M. Klauder
Trial Attorney
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE  19801
Telephone:  (302) 573-6491
Facsimile:  (302) 573-6497
E-mail: david.klauder@usdoj.gov
**(Office of the United States Trustee)**

Carl N. Kunz, III, Esq.
Morris, James Hitchens & Williams LLP
222 Delaware Ave. - 10th Fl.
Wilmington, DE  19801
Telephone:  (302) 888-6811
Facsimile:  (302) 571-1750
E-mail: ckunz@morrisjames.com
**(Counsel to Deutsche Bank Trust Company,
National Association, as Successor Trustee for 9-
7/8% Notes)**

Francis A. Monaco
Joseph J. Bodnar
Monzack And Monaco, P.A.
P.O. Box 2031
1201 North Orange Street, Suite 400
Wilmington, DE  19899-2031
Telephone:  (302) 656-8162
E-mail: fmonaco@monlaw.com
**(Counsel to Law Debenture Trust Company of
New York)**

Sharon M. Zieg
Donald Brown
Young, Conaway, Stargatt & Taylor
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE  19899
Telephone:  (302) 571-6600
Facsimile:  (302) 576-3350
E-mail: szieg@ycst.com
**(Counsel to Asbestos Futures Representative)**

Evans Wohlforth
David N. Crapo
Gibbons, Del Deo, Dolan, Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ  07102
E-mail: Ewohlforth@gibbonslaw.com
        Dcrapo@gibbonslaw.com
**(Co-Counsel for Bear, Stearns & Co., Inc.,
Citadel Equity Fund Ltd. And Citadel Credit
Trading Ltd.)**

3

Marc S. Casarino
White & Williams LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899-0709
Telephone:  (302) 467-4520
E-mail:  casarinom@whiteandwilliams.com
**(Counsel to ACE Insurance Company)**

4