**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| KAISER ALUMINUM CORP., *et. al.,* | : | Case No. 02-10429 (JFK) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| LAW DEBENTURE TRUST COMPANY OF NEW YORK | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | 06-00088 (JJF) |
| | : | |
| KAISER ALUMINUM CORP., *et al.,* | : | |
| | : | |
| Appellees. | : | |
| | : | |
| THE LIVERPOOL LIMITED PARTNERSHIP, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | 06-00088 (JJF) |
| | : | |
| ALPART JAMAICA, INC., *et al.,* | : | |
| | : | |
| Appellees. | : | |

**BRIEF OF APPELLEES**

Karen C. Bifferato (DE 3279)
Marc J. Phillips (DE 4445)
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE 19801
Telephone: (302) 658-9141
Facsimile: (302) 658-5614

*Counsel for Ad Hoc Group of Senior Note Holders*

George A. Davis
Diane Harvey
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Counsel for Ad Hoc Group of Senior Note Holders*

*List of Additional Counsel on Next Page*

LIST OF ADDITIONAL COUNSEL

Gregory S. Coleman
Christian J. Ward
WEIL, GOTSHAL & MANGES LLP
8911 Capital of Texas Highway, Suite 1350
Austin, Texas 78759
Telephone: (512) 349-1930
Facsimile: (512) 527-0798

*Counsel for Ad Hoc Group of Senior
Note Holders*

Gregory M. Gordon
Daniel P. Winikka
JONES DAY
2727 North Harwood St.
Dallas, Texas 75201
Telephone: 214.220.3939
Facsimile: 214.969.5100

*Counsel for Kaiser Aluminum Corporation and
Kaiser Aluminum & Chemical Corporation*

Carl N. Kunz, III (DE 3201)
MORRIS, JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
Telephone: (302) 888-6811
Facsimile: (302) 571-1750

Harold L. Kaplan (Illinois Bar No. 3125293)
Mark F. Hebbeln (Illinois Bar No. 6272385)
GARDNER CARTON & DOUGLAS LLP
191 North Wacker Drive - Suite 3700
Chicago, IL 60606-1698
Telephone: (312) 569-1000
Facsimile: (312) 569-3000

-- and –

Kristin K. Going
GARDNER CARTON & DOUGLAS LLP
1301 K Street, N.W.
Suite 900, East Tower
Washington, D.C. 20005
Telephone: (202) 230-5177
Facsimile: (202) 230-5377

*Counsel to Deutsche Bank Trust Company,
National Association, as Successor Trustee for 9
7/8 % Notes*

Michael B. Joseph.
Theodore J. Tacconelli
FERRY, JOSEPH & PEARCE, P.A.
824 Market St., Suite 904
Wilmington, DE 19899
Telephone: (302) 575-1555
Facsimile: (302) 575-1714

David F. Herr
Clark T. Whitmore
Alain M. Baudry
Christina A. Smith
MASLON, EDELMAN, BORMAN &
  BRAND, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 672-8335
Facsimile: (612) 642-8335

*Counsel for U.S. Bank National
Association as Indenture Trustee for
the 10 7/8% Senior Noteholders*

Duane D. Werb
WERB & SULLIVAN (DE 1042)
300 Delaware Ave. – 13th Fl.
P.O. Box 25046
Wilmington, DE 19899
Telephone: (302) 652-1100
Facsimile: (302) 652-1111

*Co-Counsel for Bear, Sterans & Co.,
Inc., Citadel Equity Fund Ltd. and
Citadel Credit Trading Ltd.*

David N. Crapo
Brian McMahon
Anthony Callaghan
GIBBONS, DEL DEO, DOLAN,
GRIFFINGER &          VECCHIONE
One Riverfront Plaza
Newark, NJ 07102
Telephone: 973-596-4500
Facsimile: 973-596-0545

*Co-Counsel for Bear, Stearns & Co.,
Inc., Citadel Equity Fund Ltd. And
Citadel Credit Trading Ltd.*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. i

Introduction ........................................................................................................... 1

Statement of Facts ................................................................................................. 2

Procedural History .............................................................................................. 12

Standard of Review ............................................................................................. 18

Summary of the Argument ................................................................................... 18

Argument ............................................................................................................ 19

I.      The Plain Language of the Subordinated Indenture Prohibits Subordinated
Noteholders from Receiving Any Payments Pursuant to the Guarantees Before
Senior Noteholders Are Paid in Full. .................................................................. 19

      A.      Article Three Mandates Subordination of the Subordinated Guarantees to
Prior Payment in Full of the Senior Notes ............................................ 20

      B.      Section 16.03 Further Confirms §3.02's Subordination of the Guarantees
in the Event of Bankruptcy ................................................................... 22

      C.      The Bankruptcy Court Properly Rejected the Argument That §3.02 Was
Inapplicable to Distribution of Assets From Subsidiary Guarantors ....... 23

      D.      Section 16.02 Expressly Subordinates the Subordinated Guarantees to
Senior Indebtedness of the Subsidiary Guarantors ................................ 24

      E.      Article Three Works Harmoniously with Article Sixteen. ....................... 30

      F.      The Overall Structure of the Subordinated Indenture Is Inconsistent with
a Hybrid Financial Structure. ................................................................ 32

      G.      New York Law Does Not Apply Special Rules of Construction to an
Indenture Contract. .............................................................................. 33

            1.      *Contra Proferentem* Provides No Short Cut for Determining the
Meaning of a Negotiated Indenture ........................................... 34

            2.      New York Does Not Recognize a "Rule of Explicitness" for
Subordination Agreements Generally. ........................................ 36

            3.      The Commentaries to the 1971 Model Indenture Provisions Are
Irrelevant and Do Not Support Appellants' Position. ................... 38

i

II.    The Bankruptcy Court's Admission of Extrinsic Evidence That Explained the
       Context of the Subordinated Note Offering Is Not Reversible Error. ..............................40

       A.    The Bankruptcy Court's Admission of Evidence for the Limited Purpose
             of Understanding the Context of the Indenture Was Not Error Because
             New York Law Permits That Use of Extrinsic Evidence.....................................42

       B.    In Any Event, the Bankruptcy Court's Admission of Evidence Can
             Provide No Ground for Reversal........................................................................46

III.   LDTC Is Not Entitled to Fees and Expenses Before the Senior Noteholders
       Receive Payment in Full......................................................................................................47

Conclusion.....................................................................................................................................49

Certificate of Service .....................................................................................................................52

TABLE OF AUTHORITIES

**Cases**

*Albany Sav. Bank, F.S.B. v. Halpin,*
   117 F.3d 669 (2d Cir. 1997) ............................................................................... 35

*Banking Corp. v. First Trust of N.Y., (In re Southeast Banking Corp.),*
   710 N.E.2d 1083 (N.Y. 1999) ............................................................................ 37

*Becker v. Peter A. Frasse & Co.,*
   173 N.E. 905 (N.Y. 1930) .................................................................................. 43

*Bldg. Serv. Employees Pension Trust v. Horsemen's Quarter Horse Racing Assoc.,*
   609 F.Supp. 1075 (N.D. Cal. 1985) ................................................................... 29

*Cable Sci. Corp. v. Rochdale Vill., Inc.,*
   920 F.2d 147 (2d Cir. 1990) ............................................................................... 43

*Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.),*
   156 F.3d 1114 (11th Cir. 1998) .......................................................................... 36

*Cob Shipping Canada, Inc. v. Trans Mktg Houston, Inc.,* No. 93 Civ. 0033 (PKL),
   1993 WL 300043 (S.D.N.Y. Aug. 4, 1993) ........................................................ 35

*Colwell v. Lawrence,*
   38 N.Y. 71 (N.Y. 1868) ..................................................................................... 43

*Crisafulli Bros. v. Clanton,*
   512 N.Y.S.2d 927 (N.Y. App. Div. 1987) .......................................................... 29

*De Laval Turbine, Inc. v. West India Indus., Inc.,*
   502 F.2d 259 (3d Cir. 1974) ......................................................................... 18, 47

*FDIC v. Prann,*
   694 F.Supp. 1027 (D.P.R. 1988) ........................................................................ 29

*Federal Ins. Co. v. Americas Ins. Co.,*
   258 A.D.2d 39 (N.Y. App. Div. 1999) ............................................................... 42

*House v. Walch,*
   39 N.E. 327 (N.Y. 1895) .................................................................................... 45

*HSBC Bank USA & JPMorgan Chase Bank v. Branch (In re Bank of New England Corp.),*
   364 F.3d 355 (1st Cir. 2004) ................................................................... 19, 36, 37

*IBJ Schroder Bank & Trust Co v. Resolution Trust Corp.,*
   26 F.3d 370 (2d Cir. 1994) ................................................................................ 42

*In re Envirodyne Indus., Inc.*,
    29 F.3d 301 (7th Cir. 1994) ....................................................................... 7, 31, 39

*In re Estate of Stravinsky*,
    770 N.Y.S.2d 40 (N.Y. App. Dist., 2003)
    *aff'd*, 2003 WL 23028345 (N.Y. App. Dist. 2003) ............................................. 44

*In re Gibraltor Amusements, LTD.*,
    187 F.Supp. 931 (E.D.N.Y. 1960),
    *aff'd*, 291 F.2d 22 (2d Cir. 1961), *cert. denied*, 368 U.S. 925 (1961) ............... 16, 28

*In re Leasing Consultants, Inc.*,
    2 B.R. 165 (Bankr. E.D.N.Y. 1980) .................................................................. 36

*In re Sharon Steel Corp.*,
    871 F.2d 1217 (3d Cir. 1989) ......................................................................... 18

*In re Thomson McKinnon Sec., Inc.*,
    149 B.R. 61 (Bankr. S.D.N.Y. 1992) ................................................................ 29

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
    309 F.3d 76 (2d Cir. 2002) ............................................................................ 35

*Jamie Sec. Co. v. Ltd., Inc.*,
    880 F.2d 1572 (2d Cir. 1989) ......................................................................... 19

*Kaiser Aluminum Corp. v. Matheson*,
    681 A.2d 392 (Del. 1996) ............................................................................... 34

*Kozan v. Levin*,
    374 N.Y.S.2d 829 (N.Y. App. Div. 1975) .......................................................... 30

*Lewis v. Rahman*,
    147 F.Supp.2d 225 (S.D.N.Y. 2001) ................................................................ 41

*Lichtenstein v. Anderson (In re E. Continuous Forms, Inc.)*,
    302 B.R. 320 (Bankr. E.D. Pa. 2003) ............................................................... 34

*Marine Midland Bank-Southern v. Thurlow*,
    425 N.E.2d 805 (N.Y. 1981) ........................................................................... 43

*Mayo v. Royal Ins. Co. of Am.*,
    662 N.Y.S.2d 654 (N.Y. App. Div. 1997) .......................................................... 41

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
    716 F.Supp. 1504 (S.D.N.Y. 1989) ....................................................... 33, 34, 35, 39

*Metro W. Asset Mgmt. LLP. v. Magnus Funding, Ltd.*,
    No. 03-5339 (NRB), 2004 U.S. Dist. LEXIS 11761 (S.D.N.Y. June 25, 2004) ............... 35

*Morgan Stanley & Co. v. Archer Daniels Midland Co.*,
570 F.Supp. 1529 (S.D.N.Y. 1983) .......................................................................... 34

*Nelse Mortensen & Co. v. Group Health Coop.*,
566 P.2d 560 (Wash. Ct. App. 1977), *aff'd* 586 P.2d 469 (Wash. 1978) ................ 29

*Newburger v. Lubell*,
193 N.E. 440 (N.Y. 1934) ........................................................................................ 29

*Old Colony Trust Co. v. Omaha*,
230 U.S. 100 (1913) ................................................................................................. 42

*PMI Inv., Inc. v.  Rose (In re Prime Motor Inns, Inc.)*,
167 B.R. 261 (Bankr. S.D. Fla 1994) ........................................................ 21, 22, 42, 46

*Prescott, Ball & Turben v. LTV Corp.*,
531 F.Supp. 213 (S.D.N.Y. 1981) ........................................................................... 35

*Record Club of Am., Inc. v. United Artists Records, Inc.*,
890 F.2d 1264 (2d Cir. 1989) .................................................................................. 35

*Robertson v. Ongley Elec. Co.*,
40 N.E. 390 (N.Y. 1895) .......................................................................................... 44

*Ruttenberg v. Davidge Data Sys. Corp.*,
626 N.Y.S.2d 174 (N.Y. App. 1995) ....................................................................... 25

*Ryan, Beck & Co. v. Fakih*,
268 F.Supp.2d 210 (E.D.N.Y. 2003) ...................................................................... 41

*Sargent v. Halsey*,
348 N.Y.S.2d 661 (N.Y. Sup. Ct. 1973),
*aff'd*, 348 N.Y.S.2d 160 (N.Y. App. Div. 1973) ................................................... 43

*Savoy Record Co. v. Cardinal Exp. Corp.*,
203 N.E.2d 206  (N.Y. 1964) .................................................................................. 29

*Schering Corp. v. Home Ins. Co.*,
712 F.2d 4 (2d Cir. 1983) ........................................................................................ 35

*Schlumberger Res. Mgmt. Servs. Inc. v. Cellnet Data Sys., Inc.(In re Cellnet Data Sys., Inc.)*,
327 F.3d 242 (3d Cir. 2003) .................................................................................... 18

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d  Cir. 1982) ................................................................................. 19

*Simons v. Cogan*,
542 A.2d 785 (Del. Ch. 1987), *aff'd*, 549 A.2d 300 (Del. 1998).......................... 33

*S. Rd. Assocs. v. Int'l Bus. Mach. Corp.*,
   770 N.Y.S.2d 126 (N.Y. App. Div. 2003),
   *aff'd*, 826 N.E.2d 806 (N.Y. 2005) ................................................................ 44

*Spaulding v. Benenati*,
   442 N.E.2d 1244 (N.Y. 1982) ...................................................................... 28

*Terwilliger v. Terwilliger*,
   206 F.3d 240 (2d Cir. 2000) ......................................................................... 43

*This Is Me, Inc. v. Taylor*,
   157 F.3d 139 (2d Cir. 1998) ......................................................................... 41

*Thomson McKinnon Sec., Inc. v. Harris (In re Thomson McKinnon Sec., Inc)*,
   139 B.R. 267 (S.D.N.Y. 1992) ..................................................................... 46

*Tobin v. Gen. Elec. Co.*,
   No. CIV. A. 95-4003,
   1996 WL 544230 (E.D. Pa. Sept. 26, 1996) .................................................. 27

*Traders' Nat'l Bank v. Laskin*,
   144 N.E. 784 (N.Y. 1924) ............................................................................ 43

*U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*,
   949 F.2d 569 (2d Cir. 1991) ......................................................................... 34

*United States v. Local 560 of Int'l Bhd. of Teamsters*,
   780 F.2d 267 (3d Cir. 1985 as amended Feb. 3, 1986) ............................... 46, 47

*United States v. Mathis*,
   264 F.3d 321 (3d Cir. 2001) ......................................................................... 18

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
   807 N.E.2d 876 (N.Y. 2004) ....................................................................... 43

*Wack v. Wack*,
   74 N.Y.S.2d 435 (N.Y. Sup. Ct. 1947) ........................................................ 43

*William C. Atwater & Co. v. Panama R. Co.*,
   159 N.E. 418 (N.Y. 1927) ............................................................................ 43

**Statutes**

11 U.S.C. §510(a) ........................................................................................... 36

11 U.S.C. §503(b)(5) ...................................................................................... 48

**Rules**

Fed. R. Bankr. P. 8013 ................................................................................................. 18

**Other**

11 Charles Alan Wright et al., Federal Practice
    & Procedure § 2885 (2d ed. 1995) ................................................................ 46

28 Williston on Contract §70:141 (4th ed. 1990) ............................................... 41

1971 Commentaries on Model Indenture Provisions .................................... 39

James E. Spiotto, Defaulted Securities: The Prudent Indenture Trustee's Guide XVII-14
    (Am. Bankers Ass'n 1990) ............................................................................. 36

Restatement (Second) of Contracts §202 (1981) ........................................... 41

Restatement (Second) of Contracts §203 cmt. b (1981) ................................ 27

## INTRODUCTION

No one disputes that Kaiser Aluminum & Chemical Corporation's (KACC) 1993 notes are subordinated to the 1994 and 1996 notes, and for more than ten years no one ever disputed that the subsidiaries' guarantees of those notes are also subordinated to the 1994 and 1996 notes. The bankruptcy court saw through the sophistry of appellants' arguments and correctly recognized that the plain language of the indenture creating the subordinated notes unambiguously provides that the 1993 subsidiary guarantees are subordinated to the same extent as the notes. The indenture does so by using terms that expansively describe the intended subordination, by unambiguously including guarantees as a form of indebtedness to which the notes are subordinated, and by requiring written notice to the subordinated note trustee of precisely what is being designated as senior indebtedness. In this case, three separate written notices expressly designating the Senior Guarantees as Senior Indebtedness senior to the Subordinated Guarantees were indisputably sent and received by the trustees for the subordinated noteholders.

In addition, and to the extent that there was any lingering question about the interpretation of the indenture's subordination provisions, the bankruptcy court's plain reading of the Subordinated Indenture is uniformly buttressed by every conceivable manifestation of the surrounding circumstances, including KACC's reasons for deciding to issue new subordinated debt, the negotiations over the terms of the indenture, the contemporaneous documents describing the Subordinated Indenture (including the prospectus), the parties' subsequent designation of the guarantees as subordinated, the absence of any contemporaneous market activity consistent with appellants' theory of partial subordination, and the parties' consistent treatment of the guarantees as subordinated for a decade after the notes issued. The bankruptcy court's common-sense recognition that its interpretation was consistent not only with the text, but also with the entire history of the issuance and management of the notes ensured that the bankruptcy court's determination was both correct and inevitable.

1

**STATEMENT OF FACTS**

In the market for high-yield debt, there is a very clear distinction between senior notes and subordinated notes. Deposition of Theodore Sands at 24-25, 107.[1] Purchasers understand that "there's a clear delineation between senior and subordinated, and if it's subordinated, it's subordinated, and if it's senior, it's senior." Deposition of Theodore Sands at 24. "Subordinated" is a term of art, Deposition of Theodore Sands at 94-95, and when an issuer uses the term, a buyer can determine that the notes being offered will be subordinated. *Id.* Those purchasers of subordinated debt understand that they will be compensated for the attendant higher risk by higher interest rates. Deposition of Theodore Sands at 24.

This case arises out of a $400 million offering of 12¾% Subordinated Notes by debtor KACC in 1993. Those 12¾% Subordinated Notes were guaranteed by four wholly-owned subsidiaries of KACC: debtors Kaiser Alumina Australia Corporation (KAAC), Alpart Jamaica, Inc. (AJI), Kaiser Jamaica Corporation (KJC), and Kaiser Finance Corporation (KFC) (collectively, the Subsidiary Guarantors). Appellant Law Debenture Trust Company of New York (LDTC) is the successor indenture trustee for the holders of the Subordinated Notes under the Subordinated Note Indenture dated February 1, 1993.

After KACC issued the Subordinated Notes, it issued up to $450 million in Senior Notes through the following three indentures: (a) the indenture dated February 17, 1994, for up to $225 million in 9⅞% Senior Notes due 2002; (b) the indenture dated October 23, 1996, for the issuance of up to $175 million of 10⅞% Senior Notes due 2006; and (c) the indenture dated December 23, 1996, for the issuance of up to $50 million of 10⅞% Senior Notes. Like the Subordinated Notes, each series of Senior Notes was guaranteed by the Subsidiary Guarantors. Appellees U.S. Bank National Association and Deutsche Bank Trust Company, N.A. are the Indenture Trustees for the 10⅞% and 9⅞% Senior Noteholders respectively. Appellant Liverpool Limited Partnership now

---

[1] The depositions admitted into evidence by the bankruptcy court were designated as exhibits 19-20 to appellants' Designation of Record on Appeal.

claims to be a holder of both Subordinated and 9⅞% Senior Notes but has consistently advanced theories that would limit the seniority of those Senior Notes.

### The Subordinated Note Issuance

The 1993 issuance was part of an interrelated series of financial transactions designed both to refinance existing, fully subordinated, short-term debt of KACC with longer term subordinated debt and to facilitate replacement of a 1989 Credit Agreement between KACC and its lenders.  In 1989, KACC issued $350 million in 14¼% subordinated notes as part of a refinancing of existing debt.  *See* Deposition of John La Duc at 14-16.  Because of the high interest rate payable on the 14¼% Notes, in 1992 KACC began to explore a possible refinancing of the notes.  Deposition of John La Duc at 20; Deposition of Theodore Sands at 17, 19.  KACC was assisted by Merrill Lynch Capital Markets, which had originally been retained in 1991 to assist Kaiser Aluminum Corporation, KACC's parent, with its initial public offering.  Deposition of John La Duc at 19; Deposition of Theodore Sands at 17.  Merrill Lynch, was the lead underwriter with respect to the issuance of the Subordinated Notes in 1993 and the three Senior Note issuances in 1994 and 1996.  D.I. 8008 at 18.  Theodore Sands, a managing director of Merrill Lynch, was the senior investment banker on each of these offerings and Merrill Lynch, as the lead underwriter, had the primary responsibility for due diligence and negotiation of the indenture as well as for marketing of the issues.  *Id.*  Merrill Lynch, as lead underwriter for the Subordinated Notes, represented the interests of prospective purchasers.  Deposition of Theodore Sands at 26.

In 1993, KACC and Merrill Lynch ultimately decided to conduct a $350 million tender offer and consent solicitation to retire all of the outstanding 14¼% notes.  D.I. 8008 at 19; Deposition of John La Duc at 11-12; Deposition of Theodore Sands at 17-19.  That effort was part of a financing to eliminate the impending maturity of the 14¼% notes and "stretch-out" the length of the debt.  D.I. 8008 at 19; Deposition of Theodore Sands at 17-19; Deposition of John La Duc at 17.

3

The Subordinated Notes contained a lower interest rate (12¾%) than the 14¼% notes and did not mature until 2003.  D.I. 6356, Ex. A at cover page 32; D.I. 6356, Ex. E at cover page Al. KACC had to issue subordinated rather than senior debt in 1993 due to restrictions in the 1989 credit agreement that were in effect in 1993.  D.I. 8008 at 20; Deposition of John La Duc at 17-18; Deposition of Theodore Sands at 21-23.  In particular, the 14¼% notes were part of the borrowing base and certain ratios had to be maintained among the borrowing base, the equity, the subdebt, and senior debt.  Merrill Lynch confirmed in a careful study of the covenants in the 1989 credit agreement that the issuance of credit in 1993 needed to be done on a subordinated basis. Deposition of Theodore Sands at 21-23.  Therefore, "in order to provide financial flexibility so that Kaiser could continue to extend maturities, a subordinated debt issue was the only option." D.I. 8008.

As with the 14¼% Notes (and all subsequent issuances), the Subordinated Notes were supported by subsidiary guarantees.  In order to issue subordinated debt, the issue would have to be subordinated not only at the issuer but also at the guarantor level.  Otherwise, the result would be a "hybrid security," which did not then exist and that the bond markets would not have readily accepted.  *Id.*  The pricing of the Subordinated Notes reflected that they were fully subordinated, *i.e.*, at both the KACC and Subsidiary Guarantor levels.  *Id.*

A primary business objective was to preserve KACC's ability to issue senior debt in the future.  D.I. 8008 at 20; Deposition of Theodore Sands at 22-23; Deposition of John La Duc at 24; *see also* Deposition of Martin Balsam at 17, 21-22.  It was anticipated at the time that KACC would issue future senior debt in the form of public notes, which would require the same parent-issuer, subsidiary-guarantor structure, utilized in the 1989 and 1993 offerings.  D.I. 8008 at 22; Deposition of Theodore Sands at 16, 22-23; D.I. 6792, Tab I ¶ 15.  The replacement of the 14¼% Notes with the Subordinated Notes extended the maturity date of the subordinated debt from 1995 to 2003.  This facilitated the replacement of the 1989 Credit Agreement, in early 1994, with a

new five-year senior credit agreement expiring in 1999.  D.I. 6792, Tab I ¶ 10; Deposition of John La Duc at 16-17.

The circumstances and market realities surrounding the 1993 Subordinated Note issuance indisputably demonstrated that the 1993 issue was "a subordinated deal" at all levels.  D.I. 8008 at 21.  There is no evidence that KACC ever intended to issue anything other than fully subordinated debt.  The unorthodox hybrid structure advocated by appellants would have directly contradicted the commercial objectives behind the Subordinated Note issuance.  Appellants offered absolutely no evidence to the contrary, leading the bankruptcy court to "find that there was no evidence at all that the guarantees of the Subordinated Notes were *pari passu* with the guarantees of future senior notes."  *Id.*

### The Subordinated Note Indenture

Numerous features of the Subordinated Notes and the Indenture confirm that both the Subordinated Notes and Guarantees were fully subordinated to the Senior Notes and Guarantees. The Subordinated Notes are described as "12¾% Senior *Subordinated* Notes due 2003" (emphasis added) in the Subordinated Note Indenture, including in the title of the form of note, which is set forth in the recitals in the Subordinated Note Indenture.  D.I. 6356, Ex. A at cover page, 1-8, and 32.  The form of note states in part:

> The indebtedness evidenced by the Notes is, to the extent provided in the Indenture, subordinate and subject in right of payment to the prior payment in full of all Senior Indebtedness as defined in the Indenture, and this Note is issued subject to such provisions and each holder of this Note, by accepting the same, agrees to and shall be bound by such provisions, and authorizes the Trustee on his behalf to take such action as may be necessary or appropriate to effectuate the subordination as provided in the Indenture and appoints the Trustee his attorney-in-fact for such purpose.
>
> ***
>
> Payment of the Notes is guaranteed on a senior subordinated basis by [KAAC], [AJI], and [KJC].

D.I. 6356, Ex. A at 3.

In the Subordinated Note Indenture, "Senior Indebtedness" is a defined term that includes "the principal of, premium, if any, and interest on all indebtedness of [any] Person for money borrowed (including all such indebtedness evidenced by notes, debentures or other securities issued for money, whether issued or assumed by such Person)" as long as that indebtedness is "designated in writing by [KACC] as Senior Indebtedness, in a notice to the [Subordinated Note Indenture Trustee]." *Id.* at 28. The definition of Senior Indebtedness also includes "(D) all . . . indemnity obligations and all other monetary obligations of such Person in respect of any Indebtedness, obligation or guarantee described [in the definition]." *Id.* The Senior Indebtedness definition contains a list of types of indebtedness that are not included in the definition, and that list of exclusions makes no reference to excluding guarantees of KACC obligations by KACC subsidiaries. *Id.* at 29. "Person" is defined in the Subordinated Note Indenture to include a corporation, and the defined term "Indebtedness" includes, with respect to any Person, "all Indebtedness of others guaranteed by such Person." *Id.* at 17, 25. The term "indebtedness" (with a lower case "i"), which is used in section (ii)(A)(1) of the Senior Indebtedness definition, is not defined in the Subordinated Note Indenture.

Pursuant to §3.01 of the Subordinated Note Indenture, KACC, the Subordinated Note Indenture Trustee, and each holder of the Subordinated Notes covenanted and agreed, "for the benefit of all present and future holders of Senior Indebtedness of [KACC], that all direct or indirect payments or distributions on or with respect to the Notes, whether pursuant to the terms of the Notes or upon acceleration or otherwise, including, without limitation, by way or on account of a Claim" were "expressly subordinated, to the extent and in the manner hereinafter set forth, in right of payment to the prior payment in full . . . of all Senior Indebtedness of [KACC]." *Id.* at 36. "Claim" is defined in the Subordinated Note Indenture as "any claim against [KACC] or any of its subsidiaries . . . for monetary damages from, or in connection with the purchase of the Notes, or for reimbursement or contribution on account of such a claim." *Id.* at 12.

Section 3.02 of the Subordinated Note Indenture provides that, "upon any . . . reorganization of KACC, whether voluntary or involuntary or in bankruptcy, insolvency, reorganization, receivership or other proceedings . . . (a) the holders of all Senior Indebtedness of [KACC] shall be entitled to receive payment in full . . . of such Senior Indebtedness of KACC before the holders of the Notes or the Trustee on behalf of the noteholders shall be entitled to receive any direct or indirect payment or distribution on or with respect to the Notes, whether pursuant to the terms of the Notes or upon acceleration or otherwise, including by way or on account of a Claim." *Id.* at 36-37. Section 3.02(a) also contains a proviso in its "x-clause"[2] that permits certain limited distributions in a reorganization proceeding provided that "payments or distributions pursuant to this [x-] clause . . . shall be permitted only so long as such payments or distributions do not cause the [Subordinated] Notes or any Guarantee to be treated in any case or proceeding or similar event . . . as part of the same class of claims as the Senior Indebtedness of [KACC] or any Subsidiary Guarantor that is a debtor in any such case, proceeding or similar event." *Id.* at 37.

Under §16.02, the Subsidiary Guarantors, the Subordinated Note Indenture Trustee, and each holder of the Subordinated Notes covenanted and agreed, "for the benefit of all present and future holders of Senior Indebtedness of such Subsidiary Guarantor, that all payments pursuant to the Guarantee by such Subsidiary Guarantor are hereby expressly subordinated, to the extent and in the manner hereinafter set forth, in right of payment to the prior payment in full . . . of all Senior Indebtedness of such Subsidiary Guarantor." *Id.* at 104.

---

[2] As explained by Judge Posner in *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 306 (7th Cir. 1994), an x-clause is common in bond debentures. It qualifies subordination agreements that would otherwise require junior creditors to turn over all securities received in the reorganized debtor unless the senior creditors had been paid in full by allowing the junior creditors to retain certain junior bankruptcy securities when the rights of senior creditors will not be prejudiced. Without an x-clause the senior creditors would have to liquidate the securities received by the junior creditors until the seniors are paid in full, at which point the remaining securities would be turned back to the junior creditors. The x-clause shortcuts this cumbersome procedure by permitting uninterrupted ownership (but not pocketing of the proceeds) of the securities by the junior creditors. *Id.*

7

Like §3.02, §16.03 of the Subordinated Note Indenture provides that, "upon any . . . reorganization of [a] Subsidiary Guarantor, whether voluntary of involuntary or in bankruptcy, insolvency, reorganization, receivership or other proceedings . . . (a) the holders of all Senior Indebtedness of such Subsidiary Guarantor shall be entitled to receive payment in full . . . of the principal thereof, premium, if any, and the interest due thereon before the holders of the Notes or the Trustee on behalf of the noteholders shall be entitled to receive, pursuant to the Guarantee, any direct or indirect payment or distribution on or with respect to the Subordinated Notes, whether pursuant to the terms of the Subordinated Notes, or upon acceleration or otherwise, including by way or on account of a Claim." *Id.* Section 16.03(a)'s x-clause permits certain limited distributions in a reorganization proceeding, provided that "payments or distributions pursuant to this [x-] clause . . . shall be permitted only so long as such payments or distributions do not cause the Subordinated Notes or any Guarantee to be treated in any case or proceeding or similar event . . . as part of the same class of claims as the Senior Indebtedness of [KACC] or any Subsidiary Guarantor that is a debtor in any such case, proceeding or similar event." *Id.* at 105.

Section 5.05 of the Indenture permits any Subsidiary Guarantor to "(a) merge or consolidate with or into [KACC] or any other Subsidiary Guarantor or transfer all or substantially all of its property to [KACC] or any other Subsidiary Guarantor." D.I. 8008 at 9 n.12.

### The Notices Provided to the Subordinated Note Trustee

As required by the Subordinated Note Indenture, the Senior Guarantees were all designated as Senior Indebtedness of the Subsidiary Guarantors by three separate notices sent to the trustee for the Subordinated Noteholders. D.I. 8008 at 9-11. LDTC conceded at the hearing that the Notices were timely delivered to and received by the Subordinated Note indenture trustees acting at the time pursuant to the terms of the Subordinated Indenture. *Id.* at 24.

The 1994 Notice provides in part:

[E]ach Subsidiary Guarantor hereby expressly designates the Guarantee (as defined) in the Senior Note Indenture (as defined) in respect of the payment of the principal of, premium, if any, and interest on the Senior Notes as "Senior

Indebtedness" of such Subsidiary Guarantor under the terms, and for all purposes, of the [Subordinated Note] Indenture.

D.I. 6356, Ex. K.

The two 1996 notices similarly stated that "Senior Indebtedness" as defined in the Subordinated Note Indenture included the "related guarantees" of the Senior Notes. D.I. 8008 at 25 (citing D.I. 6356, Ex. K). Neither the indenture trustee for the Subordinated Noteholders nor any Subordinated Noteholder ever objected to or otherwise challenged the unequivocal designation of the Senior Guarantees as Senior Indebtedness set forth in the Notices, until over ten years after the 1994 Notice was issued, long after the Senior Noteholders had invested over $400 million of cash into KACC.

### Other Evidence of Intent to Fully Subordinate the Subordinated Guarantees to Senior Guarantees

In addition to the Notices, differences between the subordination and related provisions in a 1988 subordinated indenture employed by Kaiser Aluminum Corporation (KAC) and the 1993 Subordinated Note Indenture further demonstrate the parties' intent to subordinate the Subordinated Guarantees to the Senior Guarantees. In the 1988 indenture for subordinated increasing rate notes, which were issued by KAC and not supported by any subsidiary guarantees, "Senior Indebtedness" is defined as follows:

"Senior Indebtedness" means . . . (ii) the principal of and premium, if any, and interest on (a) *all indebtedness of* [*KAC*] *for borrowed money* (including all indebtedness evidenced by notes, bonds, debentures or other securities *issued and sold by the Company for money*) . . . .

D.I. 6356, Ex. E (emphasis added).

In contrast, "Senior Indebtedness" in the Subordinated Note Indenture applies not just to KACC, the issuer of the notes, but to any "Person," *i.e.*, including the Subsidiary Guarantors, and includes "all such indebtedness evidenced by notes, debentures or other securities issued for money, *whether issued or assumed by such Person*." D.I. 6356, Ex. A (emphasis added).

There were no discussions or negotiations between any of the parties involved in the issuance of the Subordinated Notes regarding a hybrid subordination structure. Deposition of

Theodore Sands at 23; Deposition of John La Duc at 26-28; Deposition of Martin Balsam at 19-26. As Sands explained, in the marketing and presentation of the Subordinated Notes, the 9⅞% Senior Notes, and the 10⅞% Senior Notes, Merrill Lynch never represented to any investor that the guarantees of the Subordinated Notes were *pari passu* with the guarantees of future senior notes. Deposition of Theodore Sands at 32-33. The marketing efforts for the Subordinated Notes included a two-week "roadshow," during which Merrill Lynch and KACC met with prospective purchasers. Deposition of John La Duc at 21-22. At no time during these roadshows did any party mention a hybrid structure. *Id.* at 27-28.

Prospective purchasers of the Subordinated Notes were provided a prospectus, D.I. 6356, Ex. C, that clearly advised prospective investors they were purchasing subordinated debt. D.I. 8008 at 25 n.30. Nowhere does the prospectus state that the Subordinated Guarantees would be *pari passu* with later-issued upstream guarantees of senior debt of KACC. Deposition of Theodore Sands at 25-26; Deposition of John La Duc at 29-30. Sands testified that such a disclosure would have been necessary because such an unusual feature of that type would be material under the federal securities law. *Id.*; Deposition of Theodore Sands at 25-26.

Similarly, John La Duc, KACC's former vice president and chief financial officer, who was KACC's point person on each of these transactions, testified that if it had been the intention of the parties that KACC's obligations on the Subordinated Notes be subordinated while the obligations of the Subsidiary Guarantors with respect to the guarantees would not, this unconventional term, which would have been a significant selling point, would have been clearly disclosed in the prospectus. D.I. 6792, Tab I ¶17; *see also* D.I. 6356, Ex. D ¶ 7; Deposition of Martin Balsam at 17-18.

Far from stating that the Subordinated Guarantees were *pari passu* with later-issued subsidiary guarantees of KACC senior debt, the prospectus makes clear that the "[r]ights of the holders of the Notes pursuant to the Guarantee of each respective Subsidiary Guarantor will be subordinate to the rights of holders of Senior Indebtedness of the Subsidiary Guarantors in the

same manner and to the same extent as the rights of the holders of the Notes are subordinate to those of holders of Senior Indebtedness of the Company." D.I. 6356, Ex. C at 48. In fact, an entire section of the prospectus discusses subordination and guarantee issues at length, restating the relevant terms of the Subordinated Note Indenture. *Id.* at 46-48.

### *The 1994 and 1996 Senior Notes*

After KACC issued the Subordinated Notes, it issued the Senior Notes in 1994 and 1996. The Senior Notes used the same parent-issuer, subsidiary-guarantor structure and reflected the clear and stated intention that they would be fully senior to the Subordinated Notes from any source, including guarantees. Deposition of Theodore Sands at 70-72; D.I. 6356, Ex. G at cover page 1, 92; D.I. 6356, Ex. H at cover page 1, 110; D.I. 6356, Ex. I at cover page 1, 111.

The Senior Note Indentures and related prospectuses were negotiated and drafted by the same parties who negotiated and drafted the Subordinated Note Indenture. Deposition of Theodore Sands at 8-14; Deposition of Martin Balsam at 9; Deposition of John La Duc at 39-41. The 1994 Indenture and Prospectus consistently described the understanding of all parties that the Subordinated Notes and related Subordinated Guarantees would be subordinated in right and priority of payment to the Senior Notes and the Senior Guarantees. D.I. 6356, Ex. F ¶11; Deposition of Theodore Sands at 28-30. Similarly, both of the 1996 Indentures and Prospectuses consistently described the understanding of all parties that the Subordinated Notes and related Subordinated Guarantees would be subordinated in right and priority in payment to the Senior Notes and the Senior Guarantees. D.I. 8008 at 26 n.30; Deposition of Theodore Sands at 29-31.

For example, the 1994 Senior Note Indenture and 1996 Senior Note Indentures each provided: "Each Subsidiary Guarantor, for itself, its successors and assigns, hereby acknowledges that the Guarantee issued hereunder in respect of the Notes shall hereafter constitute for all purposes Senior Indebtedness of such Subsidiary Guarantor under the terms of the 12¾% Note Indenture to the extent that such Subsidiary Guarantor is a guarantor under the 12¾% Note Indenture." D.I. 6356, Ex. G at 92, §15.02; D.I. 6356, Ex. H at 111, §15.02; D.I. 6356, Ex. I at

111, §15.02.  Similarly, the 1994 Senior Note Prospectus and 1996 Senior Note Prospectuses state that "[t]he Guarantee issued by each Subsidiary Guarantor will rank senior in right and priority of payment to all Indebtedness of such Subsidiary Guarantor that by its terms is expressly subordinated to the Notes, including the guarantee of the 12¾% issued by such Subsidiary Guarantor."  D.I. 6792, Tab P at 69; D.I. 6792, Tab O at 81; D.I. 6792, Tab Q at 81.

None of the evidence explaining the parties' intent to subordinate all payments or distributions on or with respect to the Subordinated Notes, including payments on the Subordinated Guarantees, to senior indebtedness of KACC or any of its subsidiaries was controverted.  Appellants introduced no evidence that the Subordinated Trustees or any Subordinated Noteholder ever believed or understood that the Senior Notes contained the unusual, hybrid structure advocated by appellants.  Indeed, counsel for LDTC candidly conceded that Subordinated Noteholders did not believe this theory even when it was finally explained to them in 2005.  *See* D.I. 6722 at 214 ("They would call and say, we heard about this issue.  I'd explain it to them.  Call back again, that can't be right.  How about this, this and this?  Call back a third time; that can't be right.").

## PROCEDURAL HISTORY

On February 12, 2002, fifteen of the debtors, including KACC, KAAC, and KFC, commenced chapter 11 reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On March 15, 2002, two other debtors filed voluntary petitions. Nine other debtors, including two of the Subsidiary Guarantors, AJI and KJC, filed their chapter 11 petitions on January 14, 2003.  All of the debtors' cases were administratively consolidated and heard by the Honorable Judith K. Fitzgerald.

In an unripe motion before reorganization plans were filed, LDTC sought to classify the Subordinated Guarantees in the same class as the Senior Notes and Guarantees.  D.I. 4849.  After plans were filed, LDTC filed objections to plan confirmation, including to the plans' treatment of the Subordinated Guarantees.  D.I. 6504.  Liverpool also objected to confirmation on essentially

the same grounds.  D.I. 6508.  However, Liverpool maintained that only $100 million (and all interest and fees relating to them) of the 1994 Senior Guarantees qualified as Senior Indebtedness that was senior to the Subordinated Guarantees.  The bankruptcy court rejected Liverpool's position, *see* D.I. 8008 at 31-32, and Liverpool has abandoned it on appeal.  Accordingly, Liverpool now contends that none of the Senior Guarantees constitute "Senior Indebtedness" that is senior to the Subordinated Guarantees.

In light of the newly minted assertion that the Subordinated Guarantees were not subordinated debt, a group of holders of the Senior Notes and U.S. Bank as trustee for the Senior Noteholders commenced an adversary proceeding seeking a declaratory judgment that the Subordinated Guarantees are subordinated as well as equitable claims for reformation in the alternative.  D.I. 1.  The adversary proceeding was stayed by the bankruptcy court and the subordination issue was resolved by it as contemplated by the liquidation plans for the Subsidiary Guarantors.  The ultimate issue of whether or not the Subordinated Guarantees were in fact subordinated to the Senior Guarantees was decided on December 22, 2005, two days after those plans for the Subsidiary Guarantors had been confirmed.  The plans provided that the bankruptcy court would decide the subordination issue under applicable state law as required by 11 U.S.C. §510.

The bankruptcy court held a two-day evidentiary hearing prior to plan confirmation to resolve the subordination issue.  On the first day, the bankruptcy court ruled, as an initial matter, that the 1993 Indenture and Notices unambiguously demonstrated that the 1993 Guarantees were fully subordinated to the Senior Notes and Guarantees and recognized that the notices, expressly referenced in the 1993 Indenture, were intrinsic evidence admissible as part of the Indenture. *See* D.I. 6722 at 222-25.  The bankruptcy court initially declined to accept any other extrinsic evidence of surrounding circumstances.

Upon review of a contemporaneous decision issued by this Court under seal in the *Combustion Engineering* case permitting evidence of surrounding circumstances to be considered

in construing an unambiguous contract, the bankruptcy court indicated that, subject to its need to do additional research under New York law, it was prepared to conditionally admit evidence of the circumstances surrounding the Subordinated Indenture to corroborate its understanding of that contract. D.I. 6857 at 11. Accordingly, over LDTC's and Liverpool's objections, on the second day of the hearing, the bankruptcy court admitted into evidence Sands's video deposition, the depositions of La Duc and Balsam, and exhibits to the depositions, including Kaiser's credit agreements, prospectuses, and indentures.

### *The Bankruptcy Court's Opinion*

The bankruptcy court recognized that under New York law its job was to construe the Subordinated Indenture "to give effect to the parties' intent as expressed in the contract itself." D.I. 8008 at 15-16. It observed that Article Three provided protection to senior creditors of KACC and Article Sixteen protected the senior creditors of the Subsidiary Guarantors, groups that overlap in the case of the Senior Notes and Guarantees.

#### *The Article Three Analysis*

The bankruptcy court correctly concluded that Article Three, by itself, subordinated indirect payments on the Subsidiary Guarantees after KACC filed for bankruptcy. The bankruptcy court first noted that §3.01 provides the general rule of subordination, §3.02 addresses the scope of subordination once the triggering event of a KACC bankruptcy petition occurs, and §3.03 addresses the mechanics of subordination for non-bankruptcy defaults. D.I. 8008 at 4-5. The court determined that §3.01 makes "clear that the parties (KACC, the 1993 Indenture Trustee and Subordinated Noteholders) agreed that all direct or indirect payments with respect to the 1993 Notes could be subordinated to future debt that did not exist in 1993 . . . to the extent and in the manner hereinafter set forth." D.I. 8008 at 8.

The court observed that §3.02 constituted "an agreement by the holders of the Subordinated Notes that in the event KACC filed bankruptcy, the Noteholders would not receive direct or indirect payments or distributions until holders of Senior Indebtedness of KACC are

paid in full." *Id*. at 8. The bankruptcy court found additional support for the absolute subordination rule of §3.02 following a KACC bankruptcy in a proviso to its x-clause, which permits the Subordinated Noteholders to receive certain limited types of reorganization securities in bankruptcy, but only so long as such distributions do not cause the Subordinated Guarantees to be treated "as part of the same class of claims as the Senior Indebtedness of KACC or the Subsidiary Guarantors" in the bankruptcy cases of KACC or any Subsidiary Guarantor. *Id*. at 4 n.7.

The bankruptcy court also rejected LDTC's argument that §3.02 is concerned only with direct or indirect distribution or payments of the assets of KACC, and not those of the Subsidiary Guarantors:

> This is a misreading of Section 3.02 which provides simply that when the Company's assets or securities are distributed through, *inter alia*, bankruptcy, Senior Indebtedness is paid in full first. The Company, KACC, filed bankruptcy. That the Subordinated Noteholders are not to receive payment on their claims until Senior Indebtedness is paid in full is further clarified by Section 3.02 which contains an x-clause, applicable in a bankruptcy case, providing that the Subordinated Notes and Subordinated Guarantees cannot be in the same class of claims as Senior Indebtedness of the Company or the Subsidiary Guarantors that are debtors. *Id*. at Section 3.02(a), at 37.

*Id*. at 13 n.17.

### The Article Sixteen Analysis

Turning to Article Sixteen of the Subordinated Indenture, the court rejected LDTC's argument that the Senior Guarantees did not qualify as Senior Indebtedness of the Subsidiary Guarantors. *Id*. at 11. The court noted that each of the three notices to the Subordinated Note Indenture Trustee specifically designated the Senior Guarantees as Senior Indebtedness of the Subsidiary Guarantors within the meaning of the Indenture. D.I. 8008 at 9-10.

The court determined that the guarantees of the Senior Notes qualified as Senior Indebtedness of the Subsidiary Guarantors under clause (ii)(A)(1) of the definition of Senior Indebtedness because they were an assumption of debt or a debt, finding that under New York law "[a]ssumption of debt is the function of debt. A guarantee is a debt." D.I. 8008 at 10 n.13,

(*citing In re Gibraltor Amusements*, *LTD.*, 187 F.Supp. 931, 935 (E.D.N.Y. 1960) (liability on a guarantee is a non-contingent liquidated debt provable in bankruptcy), *aff'd*, 291 F.2d 22 (2d Cir. 1961)).

The court directly considered and rejected appellants' contention that an inference must be drawn against guarantees being included in (ii)(A)(1) because (ii)(A)(5) expressly included downstream guarantees (*i.e.*, guarantees of a subsidiary's debt by the parent KACC). The court observed that the definition of Senior Indebtedness contained specific exclusions, none of which excluded guarantees of KACC obligations by its subsidiaries. *Id.* at 11. The bankruptcy court further noted that, while clause (ii)(A)(5) adds all downstream guarantees—even those not "for money borrowed"—to the definition of Senior Indebtedness, clause (ii)(A)(1) already includes all indebtedness that is "for money borrowed," encompassing upstream guarantees that meet that criterion. D.I. 8008 at 7.

Based on its careful review of the entire Indenture, the bankruptcy court found that "it is clear from the documents and the court finds, that the purpose of the Indenture was to subordinate all payments with respect to the Subordinated Notes regardless of source, including payments on the Subordinated Guarantees, to any 'Senior Indebtedness' of KACC or the Subsidiary Guarantors outstanding then or in the future." *Id.* at 9.

*The Extrinsic Evidence of Surrounding Circumstances*

Finally, the bankruptcy court found that nothing in the admissible evidence of surrounding circumstances supported appellants' claim that a hybrid financial structure was intended or contradicted the court's interpretation of the plain text of the Subordinated Indenture establishing that the Subordinated Notes and Guarantees were intended to be fully subordinated. The bankruptcy court then made extensive factual findings about the circumstances surrounding the issuance of the Subordinated Notes, basing its findings principally on Sands's videotaped deposition testimony, which the court determined was "credible and particularly illustrative." *Id.* at 18. The bankruptcy court's factual findings included the following:

o    The 1993 12¾% Subordinated Notes replaced $350 million of 14¼% subordinated notes expiring in 1995, which were likewise guaranteed by certain KACC subsidiaries on a subordinated basis. The 14¼% notes were issued on a subordinated basis because of restrictions in KACC's 1989 Credit Agreement with its lenders that made subdebt the only choice. *Id.* at 19-20 & n.23.

o    The commercial purpose of the 1993 Subordinated Note offering was to extend the maturity of the existing 1989 subordinated notes and guarantees, which expired in 1995. KACC hoped to replace existing bank financing under its 1989 credit agreement with long-term senior debt, but before more senior debt could be issued, the maturity of the subordinated debt had to be extended because the subordinated debt has to be paid after senior debt. *Id.* at 21-22.

o    When the Subordinated Notes were issued it was anticipated that Senior Notes would be issued in the future, using the same note-guarantee structure as had been used in 1989 and 1993. In 1993 issuance of subordinated debt had to be fully subordinated at both the issuer and guarantor level because of KACC's preexisting lending covenants and capital structure. *Id.*

o    The Subordinated Notes were priced as fully subordinated at both the parent and guarantor levels. *Id.* at 20.

o    The hybrid structure suggested by LDTC (subordinated notes, *pari passu* guarantees) did not exist and would not have been accepted by the bond markets and a security would not have been designed in that way. *Id.*

o    The statements in the 1994 and 1996 Senior Note prospectuses specifically stating that the Senior Note Guarantees were senior to the 1993 Subordinated Note guarantees were consistent with Sands's understanding of the structure. *Id.* at 21.

The bankruptcy court accepted Sands's testimony and found "that there was no evidence at all that the guarantees of the Subordinated Notes were *pari passu* with the guarantees of the future senior notes. All the evidence, including that of the 1993 Indenture itself, is clearly to the contrary." *Id.*

*LDTC's Claim for Fees*

LDTC had also filed an objection asserting that it was entitled to receive certain fees and expenses before the Senior Noteholders received payment in full. The bankruptcy court rejected that claim, holding that the fees and expenses to LDTC, as indenture trustee for the Subordinated Noteholders, were also subordinated to payment in full on the Senior Notes and Guarantees. D.I. 8240.

17

STANDARD OF REVIEW

The bankruptcy court's conclusions of law regarding the interpretation of the Indenture are subject to *de novo* review. *E.g.*, *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989). This Court must affirm the bankruptcy court's findings of fact drawn from the uncontroverted evidence of the parties' intent unless they are clearly erroneous. *See*, *e.g.*, Bankruptcy Rule 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). A factual determination is "clearly erroneous" only when a review of all of the evidence gives rise to a firm conviction that a mistake has been committed. *Schlumberger Res. Mgmt. Servs. Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.)*, 327 F.3d 242, 244 (3d Cir. 2003).

An appellate court reviews a trial court's findings on admission of evidence for abuse of discretion. *United States v. Mathis*, 264 F.3d 321, 335 (3d Cir. 2001). And, "even if there had been an abuse of discretion, the same would not constitute *reversible* error" in a nonjury case except in very limited circumstances. *De Laval Turbine, Inc. v. West India Indus., Inc.*, 502 F.2d 259, 263 (3d Cir. 1974) (emphasis added).

SUMMARY OF THE ARGUMENT

Indentures are interpreted like any other contract. As the bankruptcy court correctly recognized, interpretation begins with the contract's plain language. And the plain language of the Subordinated Indenture unambiguously subordinates payments pursuant to the Subordinated Guarantees by several independently sufficient means.

Article Three effects the complete subordination by precluding any payment—including indirect payments—with respect to the Subordinated Notes until after Senior Indebtedness of KACC is paid in full. Article Sixteen confirms the subordination by expressly subordinating the Subordinated Guarantees to payment in full of Senior Indebtedness of the Subsidiary Guarantors, which must be construed to include the Senior Guarantees. Articles Three and Sixteen work in

18

harmony, as evidenced in part by their x-clauses, which expressly tie the two articles together in the case of Senior Indebtedness of KACC guaranteed by the Subsidiary Guarantors.

Further, after properly finding the subordination within the four corners of the Subordinated Indenture, the bankruptcy court properly considered the uncontroverted evidence of the circumstances surrounding that contract. That evidence uniformly supports the bankruptcy court's independently sufficient analysis of the contract's plain language by unequivocally demonstrating the intent of all involved that the Subordinated Notes and Guarantees be fully subordinated debt.

Finally, as the bankruptcy court correctly recognized, LDTC's fees are also subordinated to the same extent as the Subordinated Notes and Guarantees. The fee provisions carve out no exception that would permit LDTC to receive payments before the Senior Noteholders are paid in full.

## ARGUMENT

## I. THE PLAIN LANGUAGE OF THE SUBORDINATED INDENTURE PROHIBITS SUBORDINATED NOTEHOLDERS FROM RECEIVING ANY PAYMENTS PURSUANT TO THE GUARANTEES BEFORE SENIOR NOTEHOLDERS ARE PAID IN FULL.

Indentures are contracts. Thus, "[i]nterpretation of indenture provisions is a matter of basic contract law." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir. 1982) (applying New York law); *accord, e.g.*, *Jamie Sec. Co. v. Ltd., Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989); *HSBC Bank USA & JPMorgan Chase Bank v. Branch (In re Bank of New England Corp.)*, 364 F.3d 355, 368 (1st Cir. 2004). "Contract language is thus the starting point in the search for meaning." *Sharon Steel*, 691 F.2d at 1049. And, as the bankruptcy court correctly recognized, the language of the Subordinated Indenture unambiguously subordinates payments pursuant to the Subsidiary Guarantees to payment in full of the Senior Notes and Guarantees.

A.    **Article Three Mandates Subordination of the Subordinated Guarantees to Prior Payment in Full of the Senior Notes.**

Article Three of the Subordinated Indenture establishes that payments pursuant to the Subordinated Guarantees are subordinated to Senior Indebtedness of KACC and is thus independently sufficient to dispose of appellants' claims. The bankruptcy court correctly held that pursuant to §§3.01 and 3.02, the holders of Subordinated Guarantees were precluded from receiving any payment from any source until the Senior Notes were paid in full:

> Section 3.01 of the 1993 Indenture is clear that the parties (KACC, the 1993 Indenture Trustee and Subordinated Noteholders) agreed that all direct or indirect payments with respect to the 1993 Notes could be subordinated to holders of indebtedness that did not exist in 1993. Section 3.01 provides that subordination will be "to the extent and in the manner hereinafter set forth." *Falling under that proviso is an agreement by the holders of the Subordinated Notes that, in the event that KACC filed bankruptcy, the noteholders would not receive direct or indirect payments or distributions until holders of Senior Indebtedness of KACC are paid in full.*

D.I. 8008 at 8 (emphasis added).

The operative language of §3.01 could not be clearer: "[T]he Trustee and each holder of Notes, by his acceptance thereof, likewise covenants and agrees, for the benefit of all present and future holders of Senior Indebtedness of the Company, that *all* direct or *indirect payments or distributions on or with respect to the Notes* . . . [are] hereby expressly subordinated . . . in right of payment to the prior payment in full . . . of all Senior Indebtedness of the Company [*i.e.*, KACC]." D.I. 6356, Ex. A (emphasis added). No one disputes that the Senior Notes are Senior Indebtedness of KACC. And it cannot be disputed that §3.01, by its terms, subordinates all payments or distributions—including "indirect payments"—to that Senior Indebtedness. The inclusion of "indirect payments" "on or with respect to the Notes" has no meaning if it does not refer to payments pursuant to the Subordinated Guarantees because the guarantees are the only likely source of indirect payments. The Subordinated Indenture identifies no other possible source, nor have appellants ever explained what "indirect payments" could refer to if not the guarantees. Section 3.01 thus only makes sense if read to establish that the Subordinated

20

Noteholders cannot be entitled to any payments with respect to the Subordinated Notes until the Senior Noteholders are paid in full.

The bankruptcy court appropriately rejected LDTC's argument that §3.01 does not apply because it "only binds [KACC], not the Subsidiary Guarantors." LDTC Br. 24. That argument ignores not only the "direct or indirect" language and the x-clauses but also the fact that both the Subordinated Note Trustee and each Subordinated Noteholder are bound by §3.01. "Section 3.01 of the 1993 Indenture is clear that the parties (KACC, the 1993 Indenture Trustee and Subordinated Noteholders) agreed that all direct or indirect payments with respect to the 1993 Notes could be subordinated." D.I. 8008 at 8. In other words, it is enough that §3.01 binds the Indenture Trustee and Subordinated Noteholders to accept the subordination.

As part of its argument that Article Three is not "intended to be binding on the Subsidiary Guarantors," LDTC relies heavily on the nonprecedential decision in *PMI Investment, Inc. v. Rose (In re Prime Motor Inns, Inc.)*, 167 B.R. 261 (Bankr. S.D. Fla 1994). LDTC Br. 11. That reliance is misplaced. The issue is not whether the Subsidiary Guarantors are bound with respect to making payments but rather whether LDTC and the Subordinated Noteholders are bound to accept subordination of those indirect payments on the Subordinated Notes. And *Prime Motor Inns* involved a fundamentally different type of agreement—a negotiated agreement between two secured creditors, having two separate secured real-estate loans to support sets of hotel company borrowers.

The collateral and debt obligations of the borrowers in that case overlapped slightly, and the lenders negotiated their intercreditor agreement to clarify which secured lender had resort to which sources of payment. *In re Prime Motor Inns*, 167 B.R. at 265. The issue was whether that intercreditor agreement required payments received by one lender from guarantors to be turned over to the other lender. And the operative language in that agreement was critically different from that of §3.01 (and elsewhere in the Subordinated Indenture). It did not encompass "indirect payments or distributions," like payments made by a guarantor to satisfy obligations of a

borrower.  Rather, the *Prime Motor Inns* agreement expressly provided only that "*the Borrowers* [would] not make," and the subordinated creditor "[would] not accept any payment *of or on account of Subordinated Indebtedness*."  *Id.* at 281.  In short, nothing in *Prime Motor Inns* could help appellants overcome the plain import of §3.01's words subordinating any payments with respect to the Subordinated Notes, including pursuant to the Subordinated Guarantees.

Further, using the same "indirect payment" language, §3.02 preserves the subordination in the event of bankruptcy.  Section 3.02 by its terms prohibits the Subordinated Noteholders from receiving any "direct or indirect payment on or with respect to the Notes" once KACC files for bankruptcy.  The language in §3.02 ("all direct *or indirect* payments or distributions *on or with respect to the Notes* or upon acceleration *or otherwise,* including *without limitation, by way or on account of a Claim*") makes clear that the subordination provision is extremely broad and clearly encompasses far more than payments on the Subordinated Notes by KACC itself.  Additionally, "Claim" is a defined term that means "any claim against the Company *or any of its subsidiaries* for . . .  monetary damages from, or in connection with, the purchase of notes."  D.I. 8008 at 12 n.16.   Logic compels the conclusion that a claim for damages against the Subsidiary Guarantors from, or in connection with, the purchase of the notes necessarily implicates payments pursuant to the subsidiaries' guarantees of those notes.  Indeed, the Subsidiary Guarantors are the only parties likely to make "indirect" payments on or with respect to the notes.  Under any reasonable and common sense interpretation of §3.02, payments pursuant to guarantees are included.

**B.    Section 16.03 Further Confirms §3.02's Subordination of the Guarantees in the Event of Bankruptcy.**

Section 16.03 parallels §3.02 and further confirms that distributions pursuant to the Subordinated Guarantees remain subordinated in the event of bankruptcy of the Subsidiary Guarantors.  Section 16.03 of the Subordinated Indenture uses the same phrase employed in §3.02—"direct or indirect payments or distributions"—in a way that makes clear that payments or

distributions on account of the Subordinated Guarantees are included. Specifically, it provides in connection with the subordination of the Subsidiary Guarantor:

> (a) the holders of all Senior Indebtedness of such Subsidiary Guarantor shall be entitled to receive payment in full . . . before the holders of the Subordinated Notes . . . shall be entitled to receive, *pursuant to the Guarantee, any direct or indirect payment or distribution on or with respect to the* [*Subordinated*] *Notes*, whether pursuant to the terms of the Notes or upon acceleration or otherwise, including by way or on account of a Claim.

(emphasis added). This section clearly indicates that a payment pursuant to the guarantee is a "direct or indirect payment or distribution" made on or with respect to the Subordinated Notes. When this phrase is given the same meaning in §§3.01 and 3.02, the result is clear: the payments or distributions that the Subordinated Noteholders would otherwise receive on account of the Subordinated Guarantees are considered indirect payments or distributions and therefore are subordinated to the prior payment in full of the Senior Notes following KACC's bankruptcy.

### C.    The Bankruptcy Court Properly Rejected the Argument That §3.02 Was Inapplicable to Distributions of Assets From Subsidiary Guarantors.

Appellants also argued that §3.02, by its terms, addresses only distributions or assets from KACC, and not from the Subsidiary Guarantors, so that by its terms it does not reach payments from the Subsidiary Guarantors. The bankruptcy court carefully considered and rejected this argument as contrary to the explicit language of §3.02:

> LDTC also argues that Section 3.01 (the specific section that provides that holders of Senior Indebtedness of the Company are entitled to payment in full before noteholders of the trustee receive any payment or distribution) applies only to direct or indirect payment or distribution of the Company's assets or securities. This is a misreading of Section 3.02 which provides simply that when the Company's assets or securities are distributed through, *inter alia*, bankruptcy, Senior Indebtedness is paid in full first. The Company, KACC, filed bankruptcy.

D.I. 8008 at 13 n.17.

Appellants misread the plain language of §3.02 to apply only in the event of a payment or distribution of the assets or securities of KACC. This ignores that there are *three* ways in which §3.02 can be triggered, only one of which is payment or distribution of assets or securities of KACC:

> *Upon* any direct or indirect payment or distribution of assets or securities of [KACC] of any kind or character . . . *upon* any dissolution winding up, liquidation or reorganization of [KACC] . . . *or upon* an assignment for the benefit of creditors or any other marshalling of the assets and liabilities of [KACC] or otherwise.

(emphasis added).  The bankruptcy filing of KACC in fact indisputably occurred, in addition to the bankruptcy reorganizations and distribution of assets of the Subsidiary Guarantors.

LDTC also mistakenly relies on language in §3.03 to argue that "if a payment on the 1993 Note Guarantees is not subordinated under Article Sixteen, then such payment will not be deemed a payment on behalf of the Company within the meaning of Section 3.03, and therefore it will not come within the subordination provisions of Section 3.03."  LDTC Br. 24-25.  But §3.03 deals solely with non-bankruptcy defaults and simply has no application here.  That is made clear by the final sentence of §3.03:  "The provisions of this Section 3.03 shall not apply to any payment with respect to which Section 3.02 would be applicable."  As the bankruptcy court appropriately noted, §3.02 was triggered once KACC filed for reorganization.  D.I. 8008 at 13.  Its plain language is clear:  "[u]pon reorganization or receivership, holders of Senior Indebtedness are entitled to be paid in full before holders of the Subordinated Notes or the Subordinated Note Trustee on behalf of the noteholders can be paid directly or indirectly."  *Id.*

**D.    Section 16.02 Expressly Subordinates the Subordinated Guarantees to Senior Indebtedness of the Subsidiary Guarantors.**

Section 16.02 further confirms the subordination of the Subordinated Guarantees by restating plainly that those guarantees are also subordinate to Senior Indebtedness of the Subsidiary Guarantors.  Just as the Senior Notes are Senior Indebtedness of KACC, the Senior Guarantees are Senior Indebtedness of the Subsidiary Guarantors.  And §16.02 leaves no room for doubt that the Subordinated Guarantees are fully subordinated.

Just as §3.01 subordinates all payments—direct or indirect—on the Subordinated Notes to Senior Indebtedness of KACC, §16.02 expressly subordinates the Subordinated Guarantees to Senior Indebtedness of the Subsidiary Guarantors:

SECTION 16.02. <u>Guarantee subordinated to Senior Indebtedness</u>. Each Subsidiary Guarantor, for itself, its successors and assigns, covenants and agrees, and the Trustee and each holder of Notes, by his acceptance thereof, likewise covenants and agrees, for the benefit of all present and future holders of Senior Indebtedness of such Subsidiary Guarantor, that *all payments pursuant to the Guarantee by such Subsidiary Guarantor are hereby expressly subordinated, to the extent and in the manner hereinafter set forth, in right of payment to the prior payment in full (in the case of clause (i) Senior Indebtedness, in cash or Cash Equivalents) of all Senior Indebtedness of such Subsidiary Guarantor.*

D.I. 6356, Ex. A (emphasis added).

Unable to get around §16.02's plain statement that the guarantees are subordinated to Senior Indebtedness, appellants' only recourse is the untenable position that, somehow, the Senior Guarantees are not Senior Indebtedness of the Subsidiary Guarantors.  Clause (ii)(A)(1) of the definition of Senior Indebtedness, however, unambiguously provides that any Person's Senior Indebtedness includes "the principal of, premium, if any, and interest on *all indebtedness* of such Person *for money borrowed* (including all such indebtedness evidenced by notes, debentures or other securities issued *for money*, *whether issued or assumed* by such Person)."  D.I. 6356, Ex. A at 28 (emphasis added).  It is beyond question that the Senior Guarantees were incurred "for money borrowed"; the whole purpose of issuing the Senior Notes was for KACC to raise up to $450 million.

Importantly, clause (ii)(A)(1) contains no limitation that the Person incurring Senior Indebtedness must be the same Person that borrowed the money.  That is, the clause does not add "by such Person," or words to like effect, to qualify "for money borrowed."  *Cf.* Liverpool Br. 13 (attempting to place significance on the use of limiting phrases "by such Person" and "of such Person" appearing "more than two dozen times" elsewhere in the definition of Senior Indebtedness).  New York courts enforce contracts as written and refuse to add terms not contained in a contract, *see, e.g.*, *Ruttenberg v. Davidge Data Sys. Corp.*, 626 N.Y.S. 2d 174, 178 (N.Y. App. Civ. 1995), and reading such a limitation into the definition would directly conflict with the definition's express statement that Senior Indebtedness includes debt merely "assumed by such Person."  One who assumes a debt is, by definition, not the one who borrowed the

money.  Clause (ii)(A)(1) is thus certainly broad enough to encompass indebtedness that includes upstream guarantees, like the Senior Guarantees, incurred by Persons, like the Subsidiary Guarantors, "for money borrowed" by KACC.[3]

Because clause (ii)(A)(1) embraces substantially any type of indebtedness "for money borrowed," the bankruptcy court appropriately rejected LDTC's assertion that clause (ii)(A)(5) "is the only place in subsection (ii) where guarantees are addressed." LDTC Br. 16.  That assertion is inaccurate because, as the bankruptcy court noted, the breadth of the clauses is substantially different.  Clause (ii)(A)(5)'s definition of Senior Indebtedness is for all downstream guarantees, not just downstream guarantees for money borrowed, but it does not preclude the upstream guarantees for money borrowed that are already encompassed by clause (ii)(A)(1) from qualifying as Senior Indebtedness.  Clause (ii)(A)(5) expressly provides that "all guarantees" of a Person of indebtedness of any subsidiary of that Person—that is, downstream guarantees—are included within the definition of Senior Indebtedness.  D.I. 6356, Ex. A.  Clause (ii)(A)(5) does not address upstream guarantees at all; and it does not need to because those upstream guarantees that the parties intended to include in Senior Indebtedness, *i.e.*, those incurred for money borrowed, are already captured by clause (ii)(A)(1).

Clause (ii)(A)(5) is both narrower and broader than clause (ii)(A)(1): narrower because it is specific to downstream guarantees, not indebtedness in general, and broader because it sweeps in downstream guarantees that are not for money borrowed.  The two clauses may well overlap— that is, clause (ii)(A)(1) will include downstream guarantees "for money borrowed" that are also included by clause (ii)(A)(5)'s reference to all downstream guarantees.  But the clauses are not

---

[3]  Indeed, the main difference between the definition of Senior Indebtedness in the 1993 Subordinated Note Indenture and that used for the 1988 Kaiser issuance of subordinated notes— which were not supported by guarantees—is that the 1988 definition was limited to the indebtedness of the borrower and accordingly lacked any reference to debt "assumed" by another. D.I. 6792, Tab S at 11 (referencing "*all indebtedness of* [*KAC*] *for borrowed money* (including all indebtedness evidenced by notes, bonds, debentures or other securities *issued and sold by the Company for money*)" (emphasis added)).  The 1993 definition's inclusion of indebtedness of any Person "whether issued or assumed" by that Person was clearly intended to reach guarantors and guarantees in recognition that future issuances would have a note-guarantee debt structure.

redundant, and neither is superfluous as each includes forms of indebtedness not within the ambit of the other. Overlapping terms in complex instruments are neither uncommon nor unenforceable. *See* RESTATEMENT (SECOND) OF CONTRACTS § 203, cmt. b ("[E]ven agreements tailored to particular transactions sometimes include overlapping . . . provisions."); *cf. Tobin v. Gen. Elec. Co.*, No. CIV. A. 95-4003, 1996 WL 544230, at *6 (E.D. Pa. Sept. 26, 1996) (unpublished) ("At most, . . . defendants' construction renders the language redundant. The drafters of legal documents commonly include redundant or unnecessary terms to guard against potential loopholes.").

Indeed, other clauses in subsection (ii)(A) besides clause (ii)(A)(1) could also include upstream guarantees by KACC subsidiaries of obligations of KACC or KAC: clause (ii)(A)(2) (indebtedness incurred in the acquisition "of any business, Capital Stock, real property or other assets"); clause (ii)(A)(3) (lease obligations); clause (ii)(A)(4) (reimbursement obligations with respect to letters of credit and connected fees); and clause (ii)(A)(7) (obligations in connection with issuance of industrial revenue bonds). And clause (ii)(D) expressly includes "all other monetary obligations in respect of any Indebtedness, obligation or guarantee described in this clause (ii)." The fact that guarantees potentially qualify under many different clauses in the definition negates appellants' argument that clause (ii)(A)(5) reflects an intent to exclude upstream guarantees from the definition of Senior Indebtedness. To the contrary, the broad scope of the Subordinated Indenture's definition of Senior Indebtedness, taken as a whole, is fully consistent with the parties' intent to achieve full subordination of the Subordinated Notes and Guarantees.

From the broad, inclusive description of "Senior Indebtedness" embodied in subsections (i) and (ii) of the definition, paragraphs (a)-(e) of the definition carve out specific exceptions, excluding specifically identified categories of "Indebtedness." *Id.*[4]   Upstream guarantees by a

---

[4] As discussed further below, capitalized "Indebtedness" is a defined term that, while broad enough to encompass the senior guarantees, is narrower than simple "indebtedness," which must be given the full scope of that word's ordinary meaning.

subsidiary of indebtedness of its parent are emphatically not among the excluded types of debt. *Id.* (excluding only "Indebtedness . . . incurred . . . in violation of the covenants of this Indenture"; Indebtedness that, by its terms, is not Senior Indebtedness or is subordinated to or *pari passu* with the Subordinated Notes or Guarantees; or Indebtedness of a Person to a subsidiary or affiliate, trade payables, and redeemable stock). Simply put, because upstream guarantees for money borrowed are included in clause (ii)(A)(1) and not excluded by paragraphs (a)-(e), the Senior Guarantees are Senior Indebtedness of the Subsidiary Guarantors to which §16.02 subordinates the Subordinated Guarantees. The contortions by which appellants attempt to get around the plain words of the Senior Indebtedness definition have no merit.

The bankruptcy court's slight misreading of the text to include the defined term "Obligations" in subsection (ii) cannot, as LDTC posits, change the conclusion that clause (ii)(A)(1) includes upstream guarantees for money borrowed. Whether or not the Senior Guarantees fall within the definition of Obligations, they certainly fall within the broad, undefined term "indebtedness" used in clause (ii)(A)(1). *See, e.g.*, *Gibraltor Amusements,* 187 F.Supp. at 935 (finding that "liability on a guaranty is a non-contingent liquidated *debt* provable in bankruptcy" (emphasis added)). LDTC's attempt to impose an unnaturally constricted meaning on "indebtedness" fails. The defined, capitalized term "Indebtedness" unmistakably includes upstream guarantees, encompassing as it does "the principal amount of all obligations . . . of [a] Person for borrowed money" and "all Indebtedness *of others guaranteed* by [a] Person." D.I. 6356, Tab A at 17 (emphasis added). If defined "Indebtedness" includes upstream guarantees, *a fortiori* undefined "indebtedness" must be read at least as broadly. *See, e.g.*, *Spaulding v. Benenati*, 442 N.E.2d 1244, 1247 (N.Y. 1982) ("There is no valid reason advanced why the term good will, not otherwise defined or restricted in this agreement, should

28

not be construed broadly.").[5]  Appellants' claim effectively turns on that lower-case "i"; but it fails because the general, undefined term cannot be narrower than its defined corollary.

Moreover, as the bankruptcy court correctly recognized, clause (ii)(A)(1)'s use of the phrase "whether issued or assumed by such Person" further demonstrates the intent to include guarantees as a form of indebtedness covered by the clause.  In its attempt to get around the plain implication of that phrase, LDTC grasps at hypertechnical distinctions in inapposite cases drawn from other contexts and jurisdictions.  For example, *FDIC v. Prann*, 694 F.Supp. 1027 (D.P.R. 1988), *aff'd sub nom. FDIC v. Bracero & Rivera*, 895 F.2d 824 (1st Cir. 1990),  on which LDTC heavily relies, applied Puerto Rico law and discussed the difference between the civil law concepts of assumption and novation.  *Id.* at 1035 & n.12.  But another of the very cases on which LDTC relies uses the verbs "guaranty" and "assume" interchangeably.  *In re Thomson McKinnon Sec., Inc.*, 149 B.R. 61, 74 (Bankr. S.D.N.Y. 1992) ("In determining whether McAden had apparent authority to cause TMSI to *guaranty* Kimball's deferred compensation, the court must ascertain if Kimball reasonably believed that McAden was authorized to obligate TMSI to *assume* TMI's deferred compensation obligation to Kimball." (emphasis added)).  That usage is common in New York law.  *See Savoy Record Co. v. Cardinal Exp. Corp.,* 203 N.E.2d 206, 209 (N.Y. 1964) (considering whether "a *guarantor* . . . intended to *assume* such a liability" (emphasis added)); *Newburger v. Lubell*, 193 N.E. 440, 441 (N.Y. 1934) (noting, in the context of considering whether a *guarantee* had come into existence that "[i]t is many times hard enough for a man to pay his own debts without *assuming* the debts of others, and the law has very wisely required such an *assumption* or obligation to be reduced by formality to writing." (emphasis added)); *Crisafulli Bros. v. Clanton*, 512 N.Y.S.2d 927, 928 (N.Y. App. Div. 1987) ("Here, a personal *guarantee* was exacted from defendant in return for further deliveries.  The document

---

[5] *Accord, e.g.*, *Bldg. Serv. Employees Pension Trust v. Horsemen's Quarter Horse Racing Assoc.*, 609 F.Supp. 1075, 1081 (N.D. Cal. 1985) (accepting the interpretation that the noncapitalized term "employee" "might have a broader meaning" than the capitalized term "Employee"); *Nelse Mortensen & Co. v. Group Health Coop.*, 566 P.2d 560, 570 (Wash. Ct. App. 1977), *aff'd* 586 P.2d 469 (Wash. 1978) (imputing a broader meaning to "change order work" than to the capitalized term "Change Orders").

did not speak to an *assumption* of prior debts of the Place." (emphasis added)); *Kozan v. Levin*, 374 N.Y.S.2d 829, 831-32 (N.Y. App. Div. 1975) (holding that, despite the failure to use "words such as '*guaranty*,'" "[a]n agreement to pay the monthly installments under a mortgage with specific reference to the mortgage note and mortgage can be construed only as an *assumption* of such mortgage" (emphasis added)).  As the New York cases demonstrate, the most natural—indeed, necessary—reading of clause (ii)(A)(1) is that it includes the Senior Guarantees, which are a form of debt assumed, not issued, by the Subsidiary Guarantors for money borrowed.

**E.    Article Three Works Harmoniously with Article Sixteen.**

Although Article Three by itself subordinates the Subordinated Guarantees to the prior payment in full of the Senior Notes, appellants continue to advance the wholly artificial hypothesis that the Subordinated Guarantees are governed only by Article Sixteen and in no way affected by Article Three.  That assertion—unavailing in any event as Article Sixteen subordinates the Subordinated Guarantees just as surely—ignores not only the language of the Indenture, but also the reality of how indentures are negotiated and drafted.

Appellants misleadingly argue that if Article Three applied to guarantees, Article Sixteen would be rendered completely superfluous.  As the bankruptcy court observed, that argument ignores that Articles Three and Sixteen provide protections to separate, but potentially overlapping, groups of senior creditors:  holders of Senior Indebtedness of both KACC and the Subsidiary Guarantors.  D.I. 8008 at 16.  Conceivably, the Kaiser companies might have incurred forms of Senior Indebtedness that imposed obligations only on KACC or only on Subsidiary Guarantors.  The distinct, yet harmonious, functions of Articles Three and Sixteen account for that possibility.  But the dispute here involves Senior Notes issued by KACC supported by Senior Guarantees incurred by the Subsidiary Guarantors, implicating both articles.  Each article, however, is independently sufficient to establish subordination of any payments pursuant to the Subordinated Guarantees.  And, taken together, both articles demonstrate the clear intent that the Subordinated Notes and Guarantees remain fully subordinated in all circumstances.

Any possible confusion over the synergy between Article Three and Article Sixteen in the circumstances this case presents is laid to rest by the express words of the x-clauses in each article. *See* D.I. 8008 at 4 n.7, 8 n.11, 13 n.12.[6] Both §3.02(a), which contains the Article Three x-clause, and §16.03(a), the Article Sixteen x-clause, *expressly prohibit* "the Notes or any Guarantee" from being "treated in any" bankruptcy reorganization distribution of KACC or the Subsidiary Guarantors "as part of the same class of claims as the Senior Indebtedness of the Company [*i.e.*, KACC] or any Subsidiary Guarantor." D.I. 6356, Ex. A. Those x-clause provisos enforce the complete subordination of both the Subordinated Notes and Guarantees by requiring that bankruptcy distributions of securities in the reorganized debtor to subordinated creditors be fully subordinate to the securities or distributions that senior creditors are to receive. These provisions reveal a clear intent that the Senior Notes are to be senior in all respects in all bankruptcy proceedings of KACC or the Subsidiary Guarantors.

The x-clauses in both articles reveal the full scope of the intended subordination scheme they were designed to preserve and negate appellants' central claim that Article Three deals only with Notes and Article Sixteen deals solely with Guarantees. Section 3.02(a) references the Subordinated Guarantees, §16.03(a) references the Subordinated Notes, and both clauses contain prohibitions in the event of bankruptcy filings by either KACC or the Subsidiary Guarantors. By protecting both the Senior Indebtedness of KACC and of the Subsidiary Guarantors in the x-clause provisos relating to any and all possible bankruptcy filings, these provisos strengthen the conclusion that Articles Three and Sixteen operate together to fully subordinate the Subordinated Notes and Guarantees to the prior payment in full of the Senior Notes. These coordinated provisions thus require interpreting Article Three's reference to "indirect payments or distributions" as including any payments or distributions arising from any bankruptcy case of KACC or any Subsidiary Guarantor to achieve complete subordination. *See*, *e.g.*, *Envirodyne Indus., Inc.*, 29 F.3d at 306 (interpreting an x-clause and holding that its clear meaning was that

---

[6] As noted above, note 2, *supra*, an x-clause preserves ownership of subordinated securities while keeping payments on such securities subordinated in a bankruptcy distribution.

"any securities, including stock, that the junior creditors receive in a reorganization are subordinated to the claims of the senior creditors").

F.    The Overall Structure of the Subordinated Indenture Is Inconsistent with a Hybrid Financial Structure.

In addition to the language of both Articles Three and Sixteen, certain other features of the Subordinated Indenture are fundamentally irreconcilable with appellants' *pari passu* hypothesis advocated by appellants. These include the fact that the form of Subordinated Note included in the Indenture was denominated as "Subordinated" and provides that the "[p]ayment of the Notes is guaranteed on a Senior Subordinated basis by [the Subsidiary Guarantors.]" D.I. 8008 at 12. It was undisputed that the term "Subordinated" is a term of art in the bond markets that indicates that a security is fully subordinated. Deposition of Theodore Sands at 94-95. The *pari passu* structure claimed by LDTC would not have been a subordinated security. *Id. at* 11.

Finally, as the bankruptcy court noted, the Subordinated Indenture permitted KACC to merge or consolidate the Guarantors into KACC or transfer all or substantially all of the Guarantors' property to KACC. D.I. 8008 at 9 n.12. Had such mergers or transfers been effected, they would have completely eliminated the purported benefit of the *pari passu* structure advocated by appellants. Yet there is absolutely nothing in the Subordinated Indenture that would prevent that kind of action or otherwise protect in any way the alleged hybrid structure, again suggesting that such a structure was neither contemplated nor intended. Appellants criticize the bankruptcy court for observing that "[t]here is no reference [in the Indenture] that indicates that the Subordinated Guarantees are to be treated on par with the Subsidiary Guarantors' guarantee of Senior Indebtedness of the Company." D.I. 8008 at 12. They unfairly suggest this evidences that the bankruptcy court "turned the rules of construction on their head." LDTC Br. 38. To the contrary, in analyzing the plain language of the Indenture, the bankruptcy court identified numerous provisions completely inconsistent with a hybrid structure, and no language or evidence that supported it. Because the polestar of New York contract law interpretation is "to give effect to the intention of the parties," D.I. 8008 at 16, it was completely appropriate for the

bankruptcy court to focus on the absence of any contractual language that plausibly supported appellants' position.

### G. New York Law Does Not Apply Special Rules of Construction to an Indenture Contract.

Perhaps recognizing that the plain language of the Subordinated Indenture—without expansive or unnatural interpretation—nullifies their claim, appellants hide behind assertions that special rules of contract interpretation apply to that instrument. In particular, they allege that the bankruptcy court should have strictly construed the Indenture against KACC pursuant to the doctrine of *contra proferentem* or adopted a Rule of Explicitness. Alternatively, they claim that the bankruptcy court should have construed the Subordinated Indenture in light of the American Bar Foundation's COMMENTARIES. None of these arguments has any merit.

Appellants' argument for special rules of contract construction rests on the false premise that the Subordinated Indenture was a contract of adhesion, which should be construed against the drafter, allegedly KACC.[7] As a practical matter, however, LDTC really seeks to construe the Subordinated Indenture against the Senior Noteholders, who indisputably did not participate in the drafting. LDTC Br. 34. Moreover, the Indenture is simply not a contract of adhesion; it was a fully negotiated instrument. *See* D.I. 8008 at 18 (discussing that Merrill Lynch, as lead underwriter, had responsibility for "negotiation of the indenture"). Although LDTC argues that the Subordinated Noteholders were essentially unrepresented because "only the issuer of the notes and the issuer's underwriters ha[d] any role in drafting the indenture," LDTC Br. 30 (citing *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F.Supp. 1504, 1509 (S.D.N.Y. 1989)), this argument misses the point at best. As the *RJR Nabisco* court went on to point out, "[s]ince the underwriters must then sell or place the bonds, they necessarily negotiate in part with the interests of the buyers in mind." 716 F.Supp. at 1509; *see also Simons v. Cogan*, 542 A.2d 785, 791 (Del.

---

[7] In fact, determining whether any party was the "drafter" would require resort to the same extrinsic evidence that appellants vigorously argue was inadmissible. The only evidence on that subject establishes that no single party can be regarded as the drafter of this complex, highly negotiated instrument. *See* D.I. 6792, Tab B at 38, 52-56 (Sands's deposition testimony discussing the exchanges of drafts and mark-ups between Kaiser and Merrill Lynch).

Ch. 1987), *aff'd*, 549 A.2d 300 (Del. 1988). ("Underwriters of convertible securities do have an interest in negotiating protection, on points regarded as material by ultimate purchasers of those securities."). Moreover, "indentures [a]re not secret agreements foisted upon unwitting participants in the bond market." *RJR Nabisco*, 716 F.Supp. at 1509. Rather, they are publicly disclosed by the issuer and voluntarily accepted by "sophisticated investors" who purchase the accompanying notes at arm's length.

      1.      *CONTRA PROFERENTEM* **Provides No Short Cut for Determining the Meaning of a Negotiated Indenture.**

The doctrine of *contra proferentem* has no application when both parties are "sophisticated business entities . . . with relatively equivalent bargaining power." *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 574 (2d Cir. 1991); *Lichtenstein v. Anderson (In re E. Continuous Forms, Inc.)*, 302 B.R. 320, 337 (Bankr. E.D. Pa. 2003) (*contra proferentem* does not dictate interpretation of agreement that is "the product of arms length negotiation between parties of equal bargaining strength"). For this reason, a case involving a negotiated indenture is "a most inappropriate case to construe ambiguous contract language against the drafter." *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F.Supp. 1529, 1541 (S.D.N.Y. 1983).

The provisions of Article Three, Article Sixteen, and the definition of "Senior Indebtedness" were individually negotiated and hence are not boilerplate. Two of the four cases cited by LDTC in support of the *contra proferentem* rule, LDTC Br. 36, are distinguishable on this basis alone, because both emphasized that the provision in dispute was boilerplate. *See RJR Nabisco*, 716 F.Supp. at 1515-16 ("[B]oilerplate provisions are . . . not the consequences of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture . . . ."); *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 398 (Del. 1996) ("[W]e are reluctant to risk disuniformity by adverting to evidence of the course of negotiation in a setting in which the same language can be found in many different contracts . . . . [T]he creation of enduring uncertainties as to the meaning of boilerplate provisions would

decrease the value of all debenture issues and greatly impair the efficient working of capital markets.").

In contrast, the district court in *RJR Nabisco* expressly recognized that "the Second Circuit has established a different rule for [interpreting] customary, or boilerplate, provisions of detailed indentures used and relied upon throughout the securities market," 716 F.Supp. at 1515, than it has for interpreting negotiated provisions specific to a particular transaction. Therefore, these decisions cited by LDTC simply have no application in this case.[8]

Moreover, "it is well settled under New York law that *contra proferentem* . . . should be used only as a last resort." *Cob Shipping Canada, Inc. v. Trans Mktg. Houston, Inc.*, No. 93 Civ. 0033 (PKL), 1993 WL 300043, at *4 (S.D.N.Y. Aug. 4, 1993) (unpublished). As a rule of "last resort," *contra proferentem* is applied only when all other aids to construction, *including* extrinsic evidence, have failed to determine the parties' intent. *Albany Sav. Bank, F.S.B. v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 88 n.7 (2d Cir. 2002); *accord Record Club of Am., Inc. v. United Artists Records, Inc.*, 890 F.2d 1264, 1270 (2d Cir. 1989) ("Rules . . . such as the principle that in certain circumstances a contract may be construed adversely to the party that drafted it are principles of last resort, to be invoked when efforts to fathom the parties' intent have proved fruitless.") (internal citations omitted); *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983) ("*contra proferentem* is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument"). Accordingly, it would have been improper for the court to resort to *contra proferentem* to aid its construction of

---

[8]The remaining cases cited by LDTC also fail to support application of the *contra proferentem* rule. In *Metro W. Asset Mgmt., LLP. v. Magnus Funding, Ltd.*, No. 03-5339 (NRB), 2004 U.S. Dist. LEXIS 11761 (S.D.N.Y. June 25, 2004), the court merely decided to preliminarily construe what it found to be contractual ambiguities against the nonmoving party on a Rule 12 motion. Here, the bankruptcy court found after a full trial that the Indenture unambiguously supports appellees' position, so there is no ambiguity to be resolved by application of the rule. In *Prescott, Ball & Turban v. LTV Corp.*, 531 F.Supp. 213 (S.D.N.Y. 1981), the court *declined* to apply *contra proferentem* after making a similar finding that the Indenture unambiguously supported the issuer's position.

the Indenture, since the Subordinated Indenture is only susceptible of one meaning—the one placed on it by appellees and the bankruptcy court.

> **2.    New York Does Not Recognize a "Rule of Explicitness" for Subordination Agreements Generally.**

LDTC's argument that public indentures are subject to "strict construction" and that an "agreement to subordinate must be express," LDTC Br. 37, is simply its *contra proferentem* argument recast, and should be rejected for the same reasons.  "The New York courts do not appear to have developed any rules of interpretation that apply specifically to subordination agreements."  *Bank of New England Corp.*, 364 F.3d at 364.  Even LDTC's own authorities recognize that "as a specie of contract, a subordination agreement is interpreted in accordance with the *ordinary* meaning of the language contained therein."  *In re Leasing Consultants, Inc.*, 2 B.R. 165, 168 (Bankr. E.D.N.Y. 1980) (emphasis added) (cited in LDTC Br. 37); *see also* JAMES E. SPIOTTO, DEFAULTED SECURITIES: THE PRUDENT INDENTURE TRUSTEE'S GUIDE XVII-14 (Am. Bankers Ass'n 1990) (cited in LDTC Br. 37-38) (words in subordination agreement "should be given their meaning as an ordinary, average or reasonable person would understand them").  Therefore, the strict [*i.e.*, narrower than ordinary] meaning advanced by appellants should be rejected.

The only other case decided under New York law that LDTC cites, *Chemical Bank v. First Trust of New York* (*In re Southeast Banking Corp.*), 156 F.3d 1114 (11th Cir. 1998), hardly supports the sort of rigid "rule" of strict construction that LDTC contends is applicable to subordination agreements generally.  In that case, the court was presented with the narrow issue of whether §510(a) of the 1978 Bankruptcy Code abrogated "a judicially created doctrine that prevents a senior creditor from collecting post-petition interest from a junior creditor pursuant to a subordination agreement unless the agreement expressly provides for that result."  *Id*. at 1115.[9] The court held that this so-called "Rule of Explicitness," which had been fashioned by some

---

[9]Section 510(a) provides that "[a] subordination agreement is enforceable in bankruptcy to the same extent that such agreement is enforceable under non-bankruptcy law."  *Id*. at 1120 (*citing* 11 U.S.C. §510(a)).

bankruptcy courts, was no longer applicable unless supported by nonbankruptcy [*i.e.*, state] law, *id*. at 1122 & n.10, and certified to the New York Court of Appeals the question of whether such a "Rule of Explicitness" applies under New York law to subordination provisions dealing with postpetition interest in bankruptcy, *id*. at 1125. Although the New York Court of Appeals answered this narrow question in the affirmative, *see Banking Corp. v. First Trust of New York (In re Southeast Banking Corp.)*, 710 N.E.2d 1083, (N.Y. 1999), its decision has no bearing on this case, for two reasons.

First, the question of who is entitled to receive post-petition interest is a narrow issue that is not implicated here. Second, as the First Circuit emphasized in its subsequent decision in *Bank of New England Corp.*, *supra*, the limited scope of *Chemical Bank* is confirmed by the absence of any authority suggesting that New York courts have adopted a rule of explicitness with respect to subordination agreements generally, *i.e.*, beyond disfavored provisions dealing with post-petition interest.[10] This "absence of authority is compelling proof that the Rule of Explicitness is not part of New York's general contract law." *Bank of New England Corp.*, 364 F.3d at 365. "The decision in *Chemical Bank* does not alter this conclusion" because the Eleventh Circuit "invited the [New York] state court to fashion a bankruptcy-specific rule — and [the state court] did so without any evidence that New York had incorporated . . . the Rule of Explicitness into its general law of contracts." *Id*. In short, "[t]here is simply no reason to believe that the New York courts would apply the Rule of Explicitness outside the bankruptcy context," *i.e.*, with respect to postpetition interest, and therefore "the Rule of Explicitness cannot hold sway" here. *Id*.[11]

Finally, appellants ignore that the Subordinated Indenture does of course explicitly subordinate the Subordinated Guarantees to both the Senior Notes and Senior Guarantees. It explicitly tells the Subordinated Noteholders that in the event of a KACC reorganization, they

---

[10]Appellants cite no such authority in their briefs, and instead cite to inapplicable (and distinguishable) cases from other states. *See* LDTC Br. 37.

[11]Indeed, this so-called rule carries no sway in *any* context because, as the First Circuit held, "the Rule of Explicitness has no application in the context of bankruptcy where, as here, the state has not adopted the rule as one of general applicability." *Bank of New England Corp.*, 364 F.3d at 368.

cannot receive any direct or indirect payments on or with respect to their notes, including pursuant to their guarantees. It explicitly advised them that to designate debt as Seinor Indebtedness a written notice would be sent to their trustee and three separate notices were in fact indisputably sent to the Subordinated Trustee in 1994 and 1996. No Subordinated Noteholder could claim to have been confused or misunderstood the explicit language of complete subordination and none did.

### 3. The Commentaries to the 1971 Model Indenture Provisions Are Irrelevant and Do Not Support Appellants' Position.

The bankruptcy court properly declined to give the Subordinated Indenture an unsupported technical meaning based on the 1971 COMMENTARIES ON MODEL INDENTURE PROVISIONS. This Court should do the same. These obviously nonbinding Commentaries (i) are not helpful to the court because they address boilerplate language that was not incorporated into the negotiated Indenture provisions at issue here; (ii) were not helpful to the drafters of the Indenture, who did not consult the Commentaries; and (iii) are not even helpful to appellants because they actually undercut appellants' interpretation of the Subordinated Indenture.

The very section of the Commentaries that LDTC deems "most important," LDTC Br. 23, specifically states that if the parties do not intend for payments on a guarantee to be turned over to senior debt holders,

> the subordination agreement should provide that any payment made on the subordinated debt by the guarantor is to be received and retained by the holder of the subordinated debt for its own account, and that no holder of senior debt is to have any right with respect to any such payment made by the guarantor.

COMMENTARIES at 576. In other words, unless a subordination agreement expressly provides for exempting guarantees from subordination, the natural inference will be that no such exemption was intended. No such protections were negotiated for the holders of subordinated debt here, and the bankruptcy court properly declined to insert them into the Indenture.[12]

---

[12]LDTC also relies on other, less specific passages from the Commentaries, which recommend that certain Indenture language be precise. LDTC Br. 21-22. It is hardly surprising that the commentators would recommend precision in drafting indenture agreements as a rule of good

Thus, even if the Commentaries applied in these circumstances, they do not help appellants. But the Commentaries have little application to this case for several reasons. The "model" provisions set forth in the Commentaries "are the provisions that are commonly referred to as 'boilerplate,'" *i.e.*, "practically 'non-negotiable.'" COMMENTARIES at 3. "Such boilerplate must be distinguished from contractual provisions which are peculiar to a particular indenture," such as those in this case. *Chase Manhattan,* 691 F.2d at 1048. Because "[b]oilerplate provisions are . . . not the consequence of the relationship of particular borrowers and lenders," their meaning is standardized, and "do[es] not depend upon [the] particularized intentions of the parties to an indenture." *Id.* The necessary corollary is that nonstandardized provisions that *are* the product of negotiation between the parties must be interpreted in accordance with the parties' intent, not by reference to inapposite model provisions.

Although the authors of the Commentaries also included examples of certain "negotiable" provisions, they made clear in their introductory remarks that "[t]he purpose and scope of the Commentaries on the Model Provisions differ from those of the Commentaries on the negotiable provisions." COMMENTARIES at 15. With respect to the negotiable provisions, the commentators noted that "there is insufficient uniformity in actual practice to warrant their being considered as models," and emphasized that "[w]hile these samples may be useful in negotiating and drafting negotiable provisions, they are definitely not intended to serve as models." *Id.* Therefore, it would be inappropriate to draw any conclusions about the meaning of the Indenture from the absence of the sample language set forth in the Commentaries.

It would be doubly inappropriate to draw an inference from the absence of the sample language in this case because the Commentaries were never even consulted during the negotiation process by any drafter of the Subordinated Indenture Deposition of Martin Balsam at 61-68.[13] In

---

practice to practitioners in the field. It is another thing altogether for appellants to suggest that this common-sense guidance creates some sort of legal rule of explicitness.

[13]In this regard, this case is distinguishable from *RJR Nabisco* (cited by LDTC, *e.g.*, LDTC Br. 21 n.9), in which the Commentaries were "relied upon . . . by both plaintiffs and defendants." 716 F.Supp. at 1518. *Envirodyne Indus.*, 29 F.3d at 305 (also cited by LDTC), is also distinguishable

order to draw a negative inference from the failure to incorporate certain contract language, it is axiomatic that the parties must actually have considered such language and made a conscious decision not to include it in their agreement.  No such "decision" was made here, and appellants cannot trump the overwhelming evidence of the parties' intent (and the plain meaning of the Indenture) by hypothesizing what the authors of the Commentaries intended 35 years ago when they drafted certain sample provisions that were never incorporated into the Subordinated Indenture.

## II.    THE BANKRUPTCY COURT'S ADMISSION OF EXTRINSIC EVIDENCE THAT EXPLAINED THE CONTEXT OF THE SUBORDINATED NOTE OFFERING IS NOT REVERSIBLE ERROR.

As discussed above, the plain language within the four corners of the Subordinated Indenture clearly supports the bankruptcy court's interpretation.  Neither the bankruptcy court's analysis nor this Court's review depends on anything outside the Subordinated Indenture. Nevertheless, as the bankruptcy court recognized, the extensive evidence regarding the circumstances surrounding the Subordinated Indenture unanimously confirms the intent of all involved to issue fully subordinated debt, supporting the bankruptcy court's reasoned analysis of the indenture's unambiguous written expression of that intent.   Under New York law, the bankruptcy court was well within its discretion to admit the extrinsic evidence, and, because the admission of that evidence did not induce the court to interpret the Subordinated Indenture differently than it otherwise would have, it could never warrant reversal.

The bankruptcy court's memorandum opinion makes clear that it first reached a conclusion based on the plain language of the indenture and took note of the (uncontroverted) evidence of surrounding circumstances only—at most—to bolster that conclusion.  *See, e.g.*, D.I. 8008 at 12 ("*Reading the Indenture as a whole*, it is abundantly clear that the hybrid financial structure or subordinated treatment of the Subordinated Notes at the parent level and *pari passu*

---

because that case addressed only whether reference to the Commentaries was permissible under the parol evidence rule, not whether they *must* be consulted as a matter of law.  Appellees are unaware of any cases (and appellants have cited none) in which a court's failure to consider the Commentaries was deemed to be reversible error.

treatment of the Subordinated Guarantees at the Subsidiary Guarantor level as suggested by LDTC was not created by *the Indenture*." (emphasis added)); *id.* at 15 (deeming documents "admissible, at least insofar as they provide *historical context* for the dispute" and testimony "inasmuch as the testimony describes *the circumstances and purpose to be served* by the documents" (emphasis added)).

The bankruptcy court also correctly ruled that the 1994 and 1996 notices were not extrinsic evidence but, in fact, intrinsic evidence that can be considered within the four corners of the Subordinated Note Indenture.  The notices are not extrinsic evidence because they are expressly contemplated and referenced in the indenture's definition of Senior Indebtedness. *See Mayo v. Royal Ins. Co. of Am.*, 662 N.Y.S.2d 654, 655 (N.Y. App. Div. 1997) ("Extrinsic matters such as letters and other instruments may be construed as part of a contract where they are referred to therein or annexed thereto" (alteration in original)); *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (upholding a jury instruction that "New York law requires that all writings which form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties"); *see also Ryan Beck & Co. v. Fakih*, 268 F.Supp.2d 210, 223 (E.D.N.Y. 2003); *Lewis v. Rahman*, 147 F.Supp.2d 225, 233 (S.D.N.Y. 2001) ("Under New York Law 'a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.'").  In other words, because the issuance of the notices was a prerequisite for Senior Indebtedness to exist, it was necessary for the court to receive them into evidence.

Moreover, the parties' course of performance is highly relevant evidence that courts consider in construing contracts.  RESTATEMENT (SECOND) OF CONTRACTS §202 (1981) ("Wherever reasonable, the manifestations of the intention of the parties to a promise or agreement are interpreted as consistent with each other  and with any relevant course of performance, course of dealing or usage of trade."); 28 WILLISTON ON CONTRACTS §70:141 (4th

ed. 1990) ("A writing that the parties intend should be the final expression of their agreement may not be contradicted by evidence of any prior agreement or of a contemporaneous agreement, but it may be explained or supplemented by a course of dealing or usage of trade, or by a course of performance.").

In this case, the three separate 1994 and 1996 notices to the Subordinate Note Trustee, which specifically state that the Senior Guarantees are Senior Indebtedness of the Subsidiary Guarantors under the Subordinated Indenture, are compelling evidence of what the parties intended and understood that term to encompass.  *See, e.g.*, *Fed. Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508, 512 (N.Y. App. Div. 1999) ("The parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.'" (citation omitted)).  *See also IBJ Schroder Bank & Trust Co v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) ("Generally speaking, the practical interpretation of a contract by the parties  to it for  any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." (quoting *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913)). [14]

### A.    The Bankruptcy Court's Admission of Evidence for the Limited Purpose of Understanding the Context of the Indenture Was Not Error Because New York Law Permits That Use of Extrinsic Evidence.

The bankruptcy court did not err by admitting the evidence proffered to explain the context surrounding the Subordinated Indenture because New York law requires courts to

---

[14] Again *Prime Motor Inns* weighs against appellants' position, not for it.  In that case, the court found that because one creditor, FSA, knew that the other creditor, PMI, believed that guarantees did not fall within the scope of the agreement, it was bound by PMI's understanding and granted alternative relief for reformation of the agreement.  167 B.R. at 261.  Similarly, in this case, the Subordinated Note Trustee, on behalf of the Subordinated Noteholders, was fully aware when the Senior Notes were issued in 1994 and 1996 that KACC and the Subsidiary Guarantors believed and intended that the Senior Notes and Guarantees constituted Senior Indebtedness of both KACC and the Subsidiary Guarantors (and thus were completely senior to the Subordinated Notes and Guarantees).  The Subordinated Noteholders directly benefited from the investment of over $400 million of senior debt into KACC.  Yet for over a decade, the Subordinated Note Trustee and Subordinated Noteholders remained silent.  Indeed, both U.S. Bank and the Ad Hoc Committee of Senior Noteholders asserted, in the alternative, equitable claims for reformation of the Subordinated Note Indenture in the adversary proceedings that were mooted by the bankruptcy court's ruling.

consider the circumstances surrounding a contract and permits the use of evidence for that purpose. Under New York law, even when construing an unambiguous contract, "a court should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'" *Cable Sci. Corp. v. Rochdale Vill., Inc.*, 920 F.2d 147, 151 (2d Cir. 1990) (alteration in original) (applying New York law and quoting *William C. Atwater & Co. v. Panama R. Co.*, 159 N.E. 418, 419 (N.Y. 1927)); *accord, e.g.*, *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000) (same). "To interpret the meaning of a contract, at the time and place it was made, all the surrounding circumstances at that time necessarily throw light upon it, and this rule applies equally to an ambiguous writing as to an unambiguous one." *Sargent v. Halsey*, 348 N.Y.S.2d 661, 664–65 (N.Y. Sup. Ct. 1973), *aff'd*, 348 N.Y.S.2d 160 (N.Y. App. Div. 1973); *accord Wack v. Wack*, 74 N.Y.S.2d 435, 437 (N.Y. Sup. Ct. 1947) (same). That rule is well established in New York's jurisprudence. *See, e.g.*, *Becker v. Peter A. Frasse & Co.,* 173 N.E. 905, 906 (N.Y. 1930); *William C. Atwater*, 159 N.E. 418, 419 (N.Y. 1927); *Colwell v. Lawrence*, 38 N.Y. 71, 74 (N.Y. 1868).

Only extrinsic evidence offered to vary or contradict the terms of an unambiguous contract is precluded. *See, e.g.*, *Marine Midland Bank-Southern v. Thurlow*, 425 N.E.2d 805, 387-88 (N.Y. 1981); *Traders' Nat'l Bank v. Laskin*, 144 N.E. 784, 786 (N.Y. 1924). For example, in *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876 (N.Y. 2004), on which appellants so heavily rely, the New York Court of Appeals declined to judicially *add* a term that was not in the contract. *Id.* at 880. Indeed, the *Vermont Teddy Bear* opinion contains no indication that the plaintiff attempted to introduce extrinsic evidence in favor of the addition. *See generally id*. But if it had, the evidence would have been inadmissible as offered to vary the terms of the contract. By contrast, in this case, the only evidence offered was not for the purpose of contradicting the terms of the contract but putting the unambiguous terms in context.

As the bankruptcy court correctly recognized:

> Under New York law, a court construing language of a contract "should accord that language its plain meaning giving due consideration to the "surrounding circumstances [and] apparent purpose which the parties sought to accomplish." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000), *quoting William C. Atwater & Co. v. Panama R. Co*, 159 N.E. 418, 419 (N.Y. 1927). That is, the contract must be interpreted to give effect to the parties' intent as expressed in the contract itself. *Id*. . . .
>
> New York law further provides that "[c]ontracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions, without regard to the surrounding circumstances, or the apparent purpose which the parties sought to accomplish." *Robertson v Ongley Electric Co.,* 40 N.E. 390, 391 (N.Y. 1895), cited in *William C. Atwater & Co. v. Panama R. Co.,* 159 N.E. 418 (N.Y. 1927). That principle is still applied as New York law. *See In re Estate of Stravinsky*, 770 N.Y.S.2d 40, 45 (N.Y. App. Dist. 1st Dept., *affirmed* 2003 WL 23028345 (N.Y. App. Dist. 1st Dept.); *South Road Associates, LLC v. International Business Machines Corp.*, 770 N.Y.S.2d 126, 130, (N.Y. App. Dist. 2nd Dept., 2003), *affirmed* 826 N.E.2d 806 (N.Y. 2005*)*.

D.I. 8008 at 15-16.

The evidence of the circumstances surrounding the Subordinated Indenture does nothing but support the conclusion that the text subordinating the Subordinated Guarantees reflects the parties' intent to issue standard, fully subordinated debt. The testimony of Sands, LaDuc, and Balsam—the individuals with lead roles in crafting the Subordinated Indenture and in issuing the Senior Notes—uniformly establishes that KACC and its underwriters always intended the Subordinated Notes and Guarantees to be fully subordinated and, importantly, that KACC could not have issued any form of unsubordinated debt in 1993 even had it wanted to. Deposition of Theodore Sands at 21-23, Tab C at 24, Tab D at 17. The prospectus used to market the 1993 debt clearly communicated its fully subordinated status, establishing not only that the issuer intended the subordination but that purchasers of the Subordinated Notes could have no reasonable expectation that they were anything other than subordinated debt. D.I. 6857, Ex. D-5. The pricing of the Subordinated Notes, which reflected the risk inherent in subordinated debt, was based upon a complete subordination of both the Subordinated Notes and Guarantees. Deposition of Theodore Sands at 24. That expectation was validated by the Subordinated Indenture trustee's uncontested receipt of the notices designating the Senior Notes and Guarantees as Senior

44

Indebtedness to which the Subordinated Notes and Guarantees were subordinated.  D.I. 6356, Ex. K.  And the very fact that hybrid securities of the type posited by appellants did not exist in the bond market in 1993 negates the idea that any party to the Subordinated Note Indenture intended to bring such a highly unorthodox instrument into existence thirteen years ago.  Deposition of Theodore Sands at 24.

New York law's recognition that evidence of surrounding circumstances may help explain a contract merely reflects the reality that even an unambiguous contract may require knowledge of context to understand what the parties intended by particular words.  *Cf., e.g.*, *House v. Walch*, 39 N.E. 327, 422 (N.Y. 1895) ("Evidence to . . . show the meaning of technical terms is not an exception to the general rule, but is allowed to enable the court to understand the contract as written and not to contradict or vary the instrument in any particular.").  For example, a contract might unambiguously provide for the sale of 100 "widgets," but a court may need an understanding of context to know that a "widget" was a new invention by the seller.  But surrounding-circumstances evidence could not be introduced to vary a contract providing for the sale of "black widgets" to provide for the sale of "white widgets."

As applied to this case, the uncontroverted evidence that the Subordinated Notes and Guarantees were always intended and understood to be fully subordinated debt makes it improper to construe any term in the Subordinated Indenture in a way that contradicts that purpose.  As detailed above, LDTC and Liverpool erroneously argue for strained interpretations of terms like "indebtedness," "assumed," "indirect payments," and "Claim."  But the constricted meanings appellants would assign to those terms—aside from being utterly implausible—would require reading the Subordinated Indenture in a way that conflicts with the overwhelming evidence that a hybrid financial structure was never intended.  Because all the relevant terms can be construed in a way that gives effect to the parties' intent to issue fully subordinated debt, those terms must be so construed.

45

Moreover, once again, *Prime Motor Inns* actually supports the bankruptcy court's finding that all the evidence in this case points exclusively in favor of full subordination of the Subordinated Notes and Guarantees. Although appellants insist that the Subordinated Note Indenture is unambiguous, their parsing of its terms—if it had not been completely debunked—at best could establish an ambiguity that must be resolved in favor of full subordination. The *Prime Motor Inns* court, unlike the bankruptcy court in this case, found ambiguity in the agreement at issue. *In re Prime Motor Inns*, 167 B.R. at 283. Having found an ambiguity, that court never construed the relevant language to mean what appellants suggest; rather, it had to look to the parties' intent demonstrated by extrinsic evidence. In *Prime Motor Inns*, the "overwhelming evidence" of the negotiation and drafting history manifested a clear intent not to include the relevant guarantees within the scope of the agreement. *Id.* In this case, the overwhelming— indeed, only—evidence is that the parties to the Subordinated Note Indenture intended the Subordinated Notes and Guarantees to be fully subordinated.

**B.    In Any Event, the Bankruptcy Court's Admission of Evidence Can Provide No Ground for Reversal.**

Appellants have made no showing that the admission of evidence was error, let alone error rising to the level of warranting reversal.[15] Under Third Circuit precedent, a court's admission of evidence in a *bench* trial is almost never reversible error. *See United States v. Local 560 of Int'l Bhd. of Teamsters*, 780 F.2d 267, 278 (3d Cir. 1985 as amended Feb 3, 1986); *De Laval Turbine*, 502 F.2d at 264.[16] "[I]n a non-jury case, an appellate court" will reverse on the basis of erroneous admission of evidence only in two very limited circumstances: when "(1) there

---

[15] Rather than focus on the substantive contract-law aspects of the parol evidence rule, *see Thomson McKinnon Sec., Inc. v. Harris (In re Thomson McKinnon Sec., Inc.)*, 139 B.R. 267, 273 (Bankr. S.D.N.Y. 1992), LDTC and Liverpool assert that the admission of evidence was error in itself. Because they have not shown, and cannot show, that the bankruptcy court's factual findings from the uncontroverted evidence are clearly erroneous or that its interpretation of the Indenture was wrong, appellants' only remaining option is to meet the very high threshold of showing that the admission of evidence was reversible error.

[16] *Accord* 11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2885, 454 (2d ed. 1995) ("In nonjury cases the district court can commit reversible error by excluding evidence but it is almost impossible for it to do so by admitting evidence."(footnote omitted)).

is insufficient evidence other than the challenged evidence to support the district court's conclusion, or (2) the district court is induced by the challenged evidence to make an essential finding that it would not have made otherwise." *Local 560*, 780 F.2d at 278; *accord De Laval Turbine*, 502 F.2d at 264 (same).

The first circumstance obviously cannot apply because this case turns on interpretation of a contract and appellants agree that the contract itself is the only evidence necessary to the decision. Nor does the second circumstance apply. The bankruptcy court was not *induced* by extrinsic evidence to decide the subordination issue as it did because its finding that the Indenture unambiguously subordinates the Subordinated Guarantees was already made before its analysis turned to the corroborating evidence of surrounding circumstances.

## III. LDTC IS NOT ENTITLED TO FEES AND EXPENSES BEFORE THE SENIOR NOTEHOLDERS RECEIVE PAYMENT IN FULL.

Finally, as the bankruptcy court correctly recognized, LDTC's claim for its fees as trustee for the Subordinated Notes is subordinated to the same extent as the Subordinated Notes and Guarantees.[17] The Subordinated Note Indenture does not carve out an exception for fees and expenses owed to LDTC. Thus, the bankruptcy court correctly rejected LDTC's claim that it was entitled to receive certain fees and expenses before the Senior Noteholders received payment in full. D.I. 8008 as amended by D.I. 8240.

First, the subordination provisions of the Indenture do not carve out an exception for fees and expenses owed to LDTC. In §3.01 of the Indenture, LDTC expressly covenants to subordinate all "direct or indirect payments or distributions" on or with respect to the Subordinated Notes to Senior Indebtedness. Similarly, in §16.02, LDTC expressly covenants to subordinate "all payments pursuant to the Guarantee." Further, §§3.02(b) and 16.03(b) provide that "any direct or indirect payment" to which LDTC would be entitled is paid "*directly* to the

---

[17] U.S. Bank and Deutsche Bank do not join in this section of the brief and express no views on this issue in the appeal.

holders of Senior Indebtedness" (or their representatives or trustees). These subordination provisions use broad terms and do not contemplate an exception for fees and expenses.

Nor do other provisions of the Indenture on which LDTC relies (§§7.02, 7.03, and 8.06, *see* LDTC Br. 38-39) carve out an exception for fees and expenses. LDTC might have a claim for fees under §7.02, but the existence of a claim does not prioritize the claim. As the bankruptcy court explained:

> It appears that there is a claim, but I don't see that there's anything other than a general unsecured claim by [LDTC] for whatever those fees may be. I don't see that there is a requirement that they be paid in advance of the distributions of the senior subordinated notes.

D.I. 8135 at 39. Further, §7.03 (entitled "Application of moneys collected by Trustee") is only triggered if the Trustee actually collects any moneys. However, the Trustee never collects any moneys in the event of full subordination if nothing is left over for the Subordinated Noteholders *after* the Senior Noteholders are paid in full. Thus, the bankruptcy court correctly determined that any charging lien argument is valid only "[t]o the extent that there would be a distribution to the indenture holders represented by [LDTC]." *Id.* at 39–40. But the bankruptcy court noted that "with respect to the fee on the distribution that's made, there isn't going to be a distribution, so [LDTC is] not entitled to a fee." *Id.* at 50. Moreover, §8.06 does not separate fees and expenses from other payments. Instead, §8.06 is "just an effort to make sure that the issuer knows that the Trustee is going to have a claim in addition to what the debtor owes on the bonds themselves or on the notes themselves for the fees and expenses." D.I. 7110 at 47. In fact, the bankruptcy court explained that these fees and expenses are considered "either a direct or an indirect payment with respect to the note, because but for the note, the issuer doesn't have any responsibility to pay the Indentured Trustee's fees." D.I. 7110 at 48.

Conclusively, the bankruptcy court correctly held that "[i]f, in fact, the indenture is fully subordinated . . . the Indentured Trustee's fees and expenses are part of that full subordination." D.I. 7110 at 57. LDTC was not without a remedy; under §503(b)(5) of the Bankruptcy Code, LDTC had the opportunity to pursue a substantial contribution claim for fees and expenses of an

indenture trustee.  However, it did not do so, and the parties did not intend to carve out an exception for fees and expenses in the Indenture.  Therefore, LDTC is not entitled to fees and expenses before the Senior Noteholders receive payment in full.

**CONCLUSION**

For these reasons, the Court should affirm the bankruptcy court's judgment.

Dated:  June 2, 2006.

Respectfully submitted,

/s/ Marc J. Phillips
Karen C. Bifferato (DE 3279)
Marc J. Phillips (DE 4445)
CONNOLLY BOVE LODGE & HUTZ, LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19801
Telephone:  (302) 658-9141
Facsimile:  (302) 658-5614
E-mail:  kbifferato@cblh.com
            mphillips@cblh.com

George A. Davis
Diane Harvey
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
E-mail:  george.davis@weil.com
            diane.harvey@weil.com

Gregory S. Coleman
Christian J. Ward
WEIL, GOTSHAL & MANGES LLP
8911 Capital of Texas Highway, Suite 1350
Austin, Texas 78759
Telephone:  (512) 349-1930
Facsimile:  (512) 349-0798
E-mail:  greg.coleman@weil.com
            chris.ward@weil.com

*Counsel for Ad Hoc Group of Senior Note Holders*

Gregory M. Gordon
Daniel P. Winikka
JONES DAY
2727 North Harwood St.
Dallas, Texas  75201
Telephone:  214.220.3939
Facsimile:  214.969.5100
E-mail:  gmgordon@jonesday.com
          dpwinikka@jonesday.com
          nbowen@jonesday.com

*Counsel for Kaiser Aluminum Corporation and
Kaiser Aluminum & Chemical Corporation*

Michael B. Joseph.
Theodore J. Tacconelli
FERRY, JOSEPH & PEARCE, P.A.
824 Market St., Suite 904
Wilmington, DE  19899
Telephone:  (302) 575-1555
Facsimile:  (302) 575-1714
E-mail:  ttacconelli@ferryjoseph.com
          mjoseph@ferryjoseph.com

David F. Herr
Clark T. Whitmore
Alain M. Baudry
Christina A. Smith
MASLON, EDELMAN, BORMAN & BRAND, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
Telephone:  (612) 672-8335
Facsimile:  (612) 642-8335
E-mail:  alain.baudry@maslon.com
          clark.whitmore@maslon.com
          david.herr@maslon.com

*Counsel for U.S. Bank National Association as
Indenture Trustee for the 10 7/8% Senior
Noteholders*

Carl N. Kunz, III (DE #3201)
MORRIS, JAMES HITCHENS & WILLIAMS LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
Telephone:  (302) 888-6811
Facsimile:  (302) 571-1750
Email:  ckunz@morrisjames.com

Harold L. Kaplan (Illinois Bar No. 3125293)
Mark F. Hebbeln (Illinois Bar No. 6272385)
GARDNER CARTON & DOUGLAS LLP
191 North Wacker Drive - Suite 3700
Chicago, IL  60606-1698
Telephone: (312) 569-1000
Facsimile: (312) 569-3000
Email:  hkaplan@gcd.com
Email:  mhebbeln@gcd.com

-- and –

Kristin K. Going
GARDNER CARTON & DOUGLAS LLP
1301 K Street, N.W.
Suite 900, East Tower
Washington, D.C. 20005
Telephone: (202) 230-5177
Facsimile: (202) 230-5377
Email:  kgoing@gcd.com

*Counsel to Deutsche Bank Trust Company,
National Association, as Successor Trustee for
9-7/8 % Notes*

Duane D. Werb (DE 1042)
WERB & SULLIVAN
300 Delaware Ave. – 13th Fl.
P.O. Box 25046
Wilmington, DE  19899
Telephone: (302) 652-1100
Facsimile: (302) 652-1111
Email:  dwerb@werbsullivan.com

*Co-Counsel for Bear, Sterans & Co., Inc.,
Citadel Equity Fund Ltd. and Citadel Credit
Trading Ltd.*

David N. Crapo
Brian McMahon
Anthony Callaghan
GIBBONS, DEL DEO, DOLAN, GRIFFINGER &
    VECCHIONE
One Riverfront Plaza
Newark, NJ  07102
Telephone:  973-596-4500
Facsimile:  973-596-0545
E-mail:  Ewohlforth@gibbonslaw.com
         Dcrapo@gibbonslaw.com
*Co-Counsel for Bear, Stearns & Co., Inc.,
Citadel Equity Fund Ltd. And Citadel Credit
Trading Ltd.*

### CERTIFICATE OF SERVICE

I hereby certify that I served true copies of the enclosed document on the following, on

June 2, 2006.

Issac M. Pachulski
K. John Shaffer
STUTMAN, TREISTER & GLATT P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA  90067
Telephone:  (310) 228-5785
Facsimile:  (310) 228-5788

*Counsel to Appellant The Liverpool Limited Partnership*

David J. Baldwin
Rebecca S. Beste
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Wilmington, DE  19899
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192

*Counsel to Appellant The Liverpool Limited Partnership*

Elizabeth J. Futrell
Aimee M. Quirk
JONES, WALKER, WAECHTER, POITEVENT,
CARRÈRE & DENÈGRE, L.L.P.
201 St. Charles Ave.
New Orleans, LA  70170
Telephone:  (504) 582-8000
Facsimile:  (504) 582-8011

*Counsel for J.P. Morgan Trust Company, National Association, Successor to Bank One Trust Company, N.A., as Indenture Trustee*

Mark T. Hurford
CAMPBELL & LEVINE, LLC
800 King Street
Suite 300
Wilmington, DE  19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947

*Counsel to Asbestos Creditors Committee*

David M. Klauder
Trial Attorney
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE  19801
Telephone:  (302) 573-6491
Facsimile:  (302) 573-6497

*Office of the United States Trustee*

Francis A. Monaco
Joseph J. Bodnar
MONZACK AND MONACO, P.A.
P.O. Box 2031
1201 North Orange Street, Suite 400
Wilmington, DE  19899
Telephone:  (302) 656-8162
Facsimile:  (302) 656-2769

*Counsel to Law Debenture Trust Company of New York*

Sharon M. Zieg
Donald Brown
YOUNG, CONAWAY, STARGATT & TAYLOR
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE  19899
Telephone:  (302) 571-6600
Facsimile:  (302) 576-3350

*Counsel to Asbestos Futures Representatives*

Marc S. Casarino
WHITE & WILLIAMS LLP
824 N. Market Street, Suite 902
P.O. Box 709
Wilmington, DE  19899
Telephone:  (302) 467-4520
Facsimile:  (302) 467-4550

*Counsel to ACE Insurance Company*

/s/ Marc J. Phillips

# INDEX OF UNPUBLISHED OPINIONS

1. *Cob Shipping Canada, Inc. v. Trans Mktg Houston, Inc.*, No. 93 Civ. 0033 (PKL), 1993 WL 300043 (S.D.N.Y. Aug. 4, 1993)

2. *Metro W. Asset Mgmt. v. Magnus Funding*, No. 03-5339, 2004 U.S. Dist. LEXIS 11761 (S.D.N.Y. June 25, 2004)

3. *Tobin v. Gen. Elec. Co.*, No. CIV. A. 95-4003, 1996 WL 544230 (E.D. Pa. Sept. 26, 1996)



C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
COB SHIPPING CANADA INC., Petitioner,
v.
TRANS MARKETING HOUSTON, INC.,
Respondent.
**No. 93 Civ. 0033 (PKL).**

Aug. 4, 1993.

Mooney & Eagan, New York City (Thomas M. Eagan, of counsel), for petitioner.

Andrews & Kurth, L.L.P., New York City (Lynne M. Fischman Uniman, of counsel), for respondent.

OPINION AND ORDER

LEISURE, District Judge,

**\*1** COB Shipping Canada, Inc. ("COB") has petitioned the Court under 9 U.S.C. § 9 to confirm the Final Arbitration Award, dated December 30, 1992, rendered against respondent Trans Marketing Houston, Inc. ("TMHI") in favor of COB.  *See* Arbitration Award, dated December 30, 1992 (the "Award") (Annexed as Exhibit C to the Verified Petition to Confirm Final Arbitration Award, dated January 5, 1993 ("Petition to Confirm")).   COB also requests reimbursement for costs and attorney's fees incurred in seeking confirmation of the Award.  Respondent TMHI has cross-moved to vacate the Award on the grounds that the Panel manifestly disregarded the law in reaching its decision.  For the following reasons, COB's petition to confirm the Award is granted.    COB also is entitled to all attorney's fees and costs incurred in connection with this confirmation proceeding.   Respondent TMHI's cross-motion to vacate is denied.

BACKGROUND
On or about February 21, 1991, TMHI, as charterer, and COB, as owner, of the M/T TOVE COB ("TOVE COB") entered into a charter party agreement using the ASBATANKVOY form.  *See* Tanker Voyage Charter Party ("Charter Party") (Annexed as Exhibit

A to the Petition to Confirm).    Pursuant to the Charter Party, COB agreed to carry TMHI's cargo of "16,000 MT one grade caustic soda solution about 50 pct, metal grade (no mercury grade), 5% more or less Owner's option" from Maceio, Brazil to Taiwan aboard the TOVE COB.  *See* Charter Party, Part I, at ¶ E.   The Charter Party described the vessel's cargo tanks as partly coated and partly fine mild steel.  *See* Charter Party, Part I, at ¶ A.   It also required COB to clean the TOVE COB's tanks to the satisfaction of a TMHI inspector.  *See* Charter Party, Part II, at ¶ 18; Special Provisions, at ¶ 1.

After the TOVE COB arrived at Maceio, Brazil on March 19, 1991, an inspector retained by TMHI found the condition of the TOVE COB's tanks unsuitable for shipping caustic soda due to the inspector's conclusion that shipment in the partially coated tanks would result in an excessive iron content.  *See* Inspection Report of SGS do Brasil, S.A., dated March 21, 1991 (Annexed as Exhibit A to the Affidavit of Lynne M. Fischman Uniman, Esq., sworn to on February 2, 1993 ("Uniman Affidavit")).  During the next three days, two additional inspectors, one retained by each of the parties, also rejected the TOVE COB's tanks because of excessive rust, dirt, and coating problems.  *See* Inspection Report of Caleb Brett do Brasil Ltda., dated March 22, 1991 (Annexed as Exhibit A to the Uniman Affidavit); Inspection Report of Inspecorate do Brasil Ltda., dated March 22, 1991 (Annexed as Exhibit A to the Uniman Affidavit).

TMHI and COB, however, continued to discuss the possibility of loading the caustic soda onto the TOVE COB.  TMHI advised COB that it would check with the ultimate purchaser of the caustic soda to determine whether a solution with an iron content in excess of 10 ppm would be acceptable.    After TMHI's customer refused to accept cargo with an elevated iron content, TMHI cancelled the Charter Party on March 25, 1991.     *See* Facsimile Transmission, dated March 25, 1991 (Annexed as Exhibit D to the Uniman Affidavit).

**\*2** COB commenced arbitration to recover damages for TMHI's cancellation of the Charter Party.    The parties stipulated to proceed before a Panel comprised of R. Glenn Bauer, Esq., Mr. Hammond L. Cederholm, and Robert J. Williams, Esq. (the "Panel").     Both COB and TMHI, represented by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 2
Not Reported in F.Supp., 1993 WL 300043 (S.D.N.Y.)
(Cite as: 1993 WL 300043 (S.D.N.Y.))

counsel, submitted their arguments and evidence at ten hearings. The Panel heard the testimony of eleven witnesses and reviewed over one hundred evidentiary exhibits and approximately 1,500 pages of transcripts.

On December 30, 1992, the Panel issued a Final Award in favor of COB directing TMHI to pay COB damages in the sum of $272,045.60, interest in the amount of $36,074.19, and attorney's fees and disbursements in the sum of $131,391.80. Thus, the total amount of the award was $439,511.59. The Panel also stated that, if payment was not made by January 29, 1993, interest would accrue at eight percent per annum on the principal sum of $272,045.60 from December 30, 1992 until the date of payment or judgment.

On January 4, 1993, COB brought the instant petition to confirm the Award. In response, TMHI cross-moved seeking to vacate the award arguing that the Panel manifestly disregarded the law when it did not construe ambiguous clauses of the Charter Party against COB, the drafter.

DISCUSSION

I. CONFIRMATION OF THE ARBITRATION AWARD

A. STANDARD OF REVIEW

Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9, sets forth the procedures under which arbitration awards are to be confirmed by district courts. The statute provides that the district court must grant a petition to confirm an arbitration award if it is brought within one year of the award, unless one of the statutory bases for vacating or modifying the award is established. See 9 U.S.C. § § 10, 11; Ottley v. Schwartzberg, 819 F.2d 373, 376 (2d Cir.1987) ("Absent a statutory basis for modification or vacatur, the district court's task was to confirm the arbitrator's final award as mandated by section 9 of the Act."); see also Smiga v. Dean Witter Reynolds, Inc., 766 F.2d 698, 707 (2d Cir.1985), cert. denied, 475 U.S. 1067 (1986); Sperry Int'l Trade, Inc. v. Gov't of Israel, 689 F.2d 301, 304 (2d Cir.1982); Diapulse Corp. of Am. v. Carba, Ltd., 626 F.2d 1108, 1110 (2d Cir.1980).

Even the fact " 'that a court is convinced [that the arbitrator] committed serious error does not suffice to overturn [the arbitrator's] decision.' " Local 1199, Hosp. and Health Care Employees Union v. Brooks Drug Co., 956 F.2d 22, 25 (2d Cir.1992) (quoting

United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987) (quotation omitted)). Thus, when an arbitral award is challenged, a district court must be guided by the principle that "the arbitrator need only explicate his reasoning ... 'in terms that offer even a barely colorable justification for the outcome reached' in order to withstand judicial scrutiny." In re Marine Pollution Serv., Inc., 857 F.2d 91, 95 (2d Cir.1988) (quoting Andros Compania Maritima S.A. v. Marc Rich & Co. A.G., 579 F.2d 691, 704 (2d Cir.1978)).

*3 In addition to the enumerated statutory grounds for vacatur, it is well settled that a court may vacate an award when the arbitrators manifestly disregarded the law in reaching their decision. See e.g., Folkways Music Publishers, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir.1993); Fahnestock & Co. v. Waltman, 935 F.2d 512, 515 (2d Cir.), cert. denied, 112 S.Ct. 380 (1991); Carte Blanche (Singapore) PTE., Ltd. v. Carte Blanche Int'l, Ltd., 888 F.2d 260, 265 (2d Cir.1989). The manifest disregard of the law ground for vacatur is "extremely limited," Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 934 (2d Cir.1986), and "courts may vacate awards only for an overt disregard of the law and not merely for an erroneous interpretation." Folkways Music Publishers, Inc., 989 F.2d at 111. The Second Circuit has noted that "there must be 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.' " Fahnestock & Co., 935 F.2d at 516 (quoting Siegel v. Titan Indus. Corp., 779 F.2d 891, 892 (2d Cir.1985) (per curiam) (quotation omitted)); see also Merrill Lynch, 808 F.2d at 934 (a court is "not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it"). In other words, the alleged error must be " 'obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator.' " Folkways Music Publishers, Inc., 989 F.2d at 111 (quoting Merrill Lynch, 808 F.2d at 933).

With these principles in mind, the Second Circuit has developed the following test for determining whether an arbitration decision was in manifest disregard of the law:

In order to vacate for "manifest disregard," a court must find that the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether. Moreover, the law ignored by the arbitrators must be "well defined, explicit, and clearly applicable" if the award is to be vacated. Folkways Music Publishers, Inc., 989 F.2d at 112

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(citation omitted) (quoting *Carte Blanche (Singapore) PTE., Ltd.,* 888 F.2d at 265 (quotation omitted)); *see also Merrill Lynch,* 808 F.2d at 933-34). The Second Circuit has explained that "[t]o adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties." *Merrill Lynch,* 808 F.2d at 933.

 In the instant case, TMHI claims that the Panel manifestly disregarded the law because the Panel recognized the existence of a clearly governing principle of New York law relating to contract interpretation and ignored it. According to TMHI, the arbitrators recognized that essential terms of the Charter Party, the description of the cargo tanks aboard the TOVE COB and the description of the cargo, were ambiguous, but in determining whether the Charter Party was breached, the Panel failed to apply the rule of *contra proferentum* which states that any ambiguities in a contract must be construed against the drafter.  [FN1]

 **\*4** As discussed below, the Court finds that TMHI has not demonstrated that the Panel acted in manifest disregard of the law. First, given the Panel's interpretation of the contract, the rule of *contra proferentum* was not "clearly applicable." Moreover, assuming *arguendo* that the rule was clearly applicable, there is absolutely no evidence that the Panel knew of the rule and willfully ignored it.

 B. RULE OF *CONTRA PROFERENTUM* WAS NOT CLEARLY APPLICABLE

 While the rule of *contra proferentum* is a general rule of contract interpretation in New York, TMHI must show that *contra proferentum* is "well defined, explicit, and *clearly applicable,*" to the Panel's decision.  *Merrill Lynch,* 808 F.2d at 934. In supporting its argument, TMHI cites New York authority on contract interpretation requiring that ambiguous language be construed against the party that drafted the agreement.  [FN2] *See* Respondent's Memorandum of Law in Support of Cross-Motion To Vacate Arbitration Award, dated February 2, 1993, at 9 & n. 2 (citing *e.g., Jacobson v. Sassower,* 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 382 (1985) (mem.); *Lai Ling Cheng v. Modansky Leasing Co.,* 73 N.Y.2d 454, 460, 541 N.Y.S.2d 742, 745 (1989); *67 Wall St. Co. v. Franklin Nat'l Bank,* 37 N.Y.2d 245, 249, 371 N.Y.S.2d 915, 918 (1975); *Proteus Books Ltd. v. Cherry Lane Music Co.,* 873 F.2d 502

(2d Cir.1989); *Watling v. Hiawatha Plaza Assoc.,* 59 N.Y.2d 964, 965, 466 N.Y.S.2d 311, 311 (1983)).

 Although the rule of *contra proferentum* states that an ambiguous contractual provision must be construed against the drafter, it is well settled under New York law that *contra proferentum* is a general rule of construction that should be used only as a last resort. For example, in *William C. Atwater & Co. v. Panama R.R. Co.,* 246 N.Y. 519, 524, 159 N.E. 418, 419 (1927), the Court of Appeals reversed a referee's decision based upon *contra proferentum* and held that, in some instances, ambiguities should not be construed against the drafter for the following reason:

 Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances.... Particular words should be considered, not as if isolated from context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance....

246 N.Y. at 524, 159 N.E. at 419. Applying these principles in that case, the Court refused to construe the contract's language against the drafter because, after the clause was considered in light of the entire obligation, the intent of the parties was clear. *Id.; see also* 22 N.Y.Jur.2d Contracts § 228 (1982) (*contra proferentum* "does not justify the taking of an isolated clause in dispute without examining any other relevant rules of construction").

 Similarly, the Second Circuit, applying New York law, has repeatedly held that rules of construction, such as *contra proferentum,* should only be applied when all other guides to interpretation of the contract have failed to resolve the ambiguity. *See United States Naval Inst. v. Charter Communications, Inc.,* 875 F.2d 1044, 1050 (2d Cir.1989) ("if, *after all of the other guides to interpretation have been exhausted* and the court concludes that there remain two reasonable interpretations of the contract ... the court should, as a policy matter ... choose the interpretation that is adverse to the party that drafted the contract") (emphasis added) (citing *67 Wall St. Co.,* 37 N.Y.2d at 249, 371 N.Y.S.2d at 918; *Rentways, Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 348, 126 N.E.2d 271, 273-74 (1955); 3 A. Corbin, *Corbin on Contracts* § 559, at 262 (1960)); *Record Club of Am., Inc. v. United Artists Records,* 890 F.2d 1264, 1270 (2d Cir.1989) ("Rules of construction such as the principle that in certain circumstances a contract may be construed adversely to the party that drafted it are principles of last resort, to be invoked when efforts to fathom the parties'

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1993 WL 300043 (S.D.N.Y.)
**(Cite as: 1993 WL 300043 (S.D.N.Y.))**

intent have proved fruitless.") (citations omitted); *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 n. 2 (2d Cir.1983) ("*contra preferentem* is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument") (citations omitted). Accordingly, the Panel was not required to construe the ambiguous language against the drafter of the document if, in the light of the contract as a whole, such an interpretation did not reflect the parties' intent.

**\*5** In interpreting the contract in the instant case, the Panel was required to examine the description of the cargo set forth in the Charter Party and determine whether TMHI was excused from performance by a material breach of the Charter Party by COB. COB described the cargo in the Charter Party as "16,000 MT one grade caustic soda solution about 50 pct, metal grade (no mercury grade), 5% more or less Owners' option." Charter Party, Part I, at ¶ E. According to the Panel, that description "turned out to be ambiguous," because "metal grade" is not a standard term in the industry. Award, at 11.

If the cargo description is interpreted against COB to include only "diaphragm" grade caustic soda, then COB breached the Charter Party when it supplied a vessel unable to safely transport the cargo of "diaphragm" grade caustic soda. If, however, the contractual term is construed to denote any grade of caustic soda where iron content is unimportant, then TMHI's cancellation of the Charter Party cannot be excused because COB had no obligation to provide a vessel that could protect the "diaphragm" grade caustic soda from an increase in iron content.

After noting that there was ambiguity in the contract as to the cargo's description, the Panel looked to other portions of the contract and the surrounding circumstances to ascertain the parties' intent. The Panel found that, despite the ambiguity, "[a] meeting of the minds had been reached to this extent: the cargo would be caustic soda solution, it would not be the mercury grade, and would be the type compatible with carriage in mild steel tanks that were partially coated." Award, at 11-12. The Panel noted that TMHI knew that the purchasers of the cargo required delivery of caustic soda with an iron content of less than 10 ppm, but never inquired into whether the transport of "diaphragm" grade caustic soda in partly coated and mild steel tanks would result in an unacceptably high iron content. *Id.* at 12. Moreover, the Panel noted that COB provided a vessel with tanks that were "partly" coated and

"partly" fine grade mild steel, which conformed with the provision set forth in the Charter Party. *Id.* at 13. Despite the ambiguity of the cargo description, the Panel was able to ascertain the parties' intent by viewing the Charter Party as a whole and, thus, concluded that COB did not materially breach the Charter Party when it provided a ship incapable of safely transporting "diaphragm grade" caustic soda. Rather than "giving a strict and rigid meaning to general words without regard to the surrounding circumstances," the Panel interpreted the Charter Party's cargo description "in the light of the obligation as a whole and the intention of the parties as manifested thereby." *William C. Atwater & Co.,* 246 N.Y. at 524, 159 N.E. at 419.

Even if the Court disagreed with the Panel's interpretation of the contract, the Panel's interpretation is controlling because "[u]nder [the Court's] limited scope of review, [the Court is] bound by the arbitrators' factual findings and by their interpretation of the contract and of contract law." *S. E. Atl. Shipping Ltd. v. Garnac Grain Co.,* 356 F.2d 189, 191-92 (2d Cir.1966) (footnote omitted); *see also* United Paperworkers Int'l Union, 484 U.S. at 38 ("as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision"). Since the Panel decided that it was able to discern the intent of the parties from the contract, use of the rule of *contra proferentum* was unwarranted. Thus, the rule of *contra proferentum* is not "clearly applicable" in the resolution of this arbitrable dispute and the Court cannot vacate on the grounds of manifest disregard of the law.

C. RULE OF *CONTRA PROFERENTUM* WAS NOT INTENTIONALLY DISREGARDED

**\*6** Assuming *arguendo* that the Panel was required to apply the rule of *contra proferentum* under these circumstances, TMHI failed to satisfy the second-prong of the "manifest disregard" test which requires TMHI to show that the Panel "*knew* of the governing legal principle and refused to apply it or ignored it altogether," *Folkways Music Publishers, Inc.,* 908 F.2d at 112 (citation omitted) (emphasis added).

Although TMHI argues that anyone qualified to serve as an arbitrator would instantly perceive the alleged mistake, TMHI has not sufficiently explained its own failure to argue for an interpretation based upon *contra proferentum.* Having failed to argue that the cargo description should be construed against the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 5
Not Reported in F.Supp., 1993 WL 300043 (S.D.N.Y.)
**(Cite as: 1993 WL 300043 (S.D.N.Y.))**

drafter, TMHI cannot now claim that the rule is so obvious under these circumstances as to be capable of being instantly perceived by the average person qualified to be an arbitrator. The Court finds that TMHI has not presented any evidence that the Panel was aware of the rule of construction and decided not to apply it or chose to ignore it entirely.

Accordingly, since there is no evidence that the Panel knew of the rule of *contra proferentum,* the Panel's failure to apply that rule in interpreting the Charter Party cannot constitute manifest disregard of the law.

II. REQUEST FOR ATTORNEY'S FEES

COB also seeks to recover costs and attorney's fees in connection with this confirmation proceeding pursuant to the express provision of the Charter Party or under Rule 11 of the Federal Rules of Civil Procedure. The general rule in the United States is that each party must pay its own legal fees. *See Bandes v. Harlow & Jones, Inc.,* 852 F.2d 661, 670 (2d Cir.1988) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247 (1975)). However, it is well settled that "[a]n exception to this rule is the existence of an agreement between the parties that legal fees are recoverable." *Trans-Asiatic Oil, Ltd. S.A. v. UCO Marine Int'l, Ltd.,* 618 F.Supp. 132, 137 (S.D.N.Y.1985). In the instant case the Charter Party provides that:

Damages for the breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.
Charter Party, at ¶ 23. Clause 24 of the Charter Party contains an additional reference indicating that the parties intended to spare a wronged party damages in the form of legal fees and costs.

Accordingly, the Court finds that, based upon the agreement of COB and TMHI in the Charter Party, COB is entitled to attorney's fees and other expenses incurred in this confirmation proceeding. *See Trans-Asiatic Oil Ltd.,* 618 F.Supp. at 137 (awarding costs and legal fees in confirmation proceeding pursuant to Charter Party containing the identical provision, Clause 23, used in the instant case).

Respondent TMHI has not challenged the request for legal fees as provided by the Charter Party except to argue that COB never "moved" for such relief. COB, however, petitioned this Court to confirm the Award and "grant[ ] such other and further relief as the Court seems just and proper." Petition to Confirm, at ¶ 10. Moreover, the relief was specifically requested in

COB's opposition to TMHI's cross-motion to vacate. Under these circumstances, TMHI's argument, concerning whether COB properly moved for this relief, is without merit. [FN3]

**\*7** The Court has reviewed the evidence offered by COB with respect to its attorney's fees and costs in seeking confirmation and defending against respondent's cross-motion. *See* Affidavit of Thomas M. Eagan, sworn to on February 5, 1993, at Exhibit D. Petitioner seeks $10,800 in legal fees and $477.55 in disbursements, for a total of $11,277.55. The Court finds the requested amount is reasonable and directs TMHI to pay COB $11,277.55 for costs and attorney's fees incurred in connection with the petition to confirm, including the opposition to the cross-motion to vacate.

CONCLUSION

For the reasons stated above, the Court hereby confirms the Final Arbitration Award dated December 30, 1992, rendered against TMHI in favor of COB. COB is entitled to judgment on the award of $439,511.59 and interest at eight percent per annum on $272,045.60 from December 30, 1992 until the date of payment or until the Award is reduced to judgment. COB also is entitled to $11,277.55 for attorney's fees and costs incurred by COB in this confirmation action.

The Clerk of the Court is directed to enter a judgment reflecting the Court's decision in this Opinion and Order.

SO ORDERED.

> FN1. COB contends that TMHI is barred from arguing for vacatur on the grounds of manifest disregard of the law because TMHI did not raise the *contra proferentum* issue before the Panel. *See* Petitioner's Memorandum of Law in Opposition to Respondent's Cross-Motion to Vacate the Arbitration Award, dated February 5, 1993, at 13-14 (citing *United Food & Comm. Workers, Local 400 v. Marval Poultry,* 645 F.Supp. 1174, 1181 (W.D.Va.1986) ("a party may not raise new legal defenses after the award has been issued"), *aff'd mem.,* 819 F.2d 1138 (4th Cir.1987). However, since the Court finds that the Panel did not manifestly disregard the law, whether or not TMHI's failure to argue *contra proferentum* before the Panel constituted waiver is moot.

Not Reported in F.Supp., 1993 WL 300043 (S.D.N.Y.)
**(Cite as: 1993 WL 300043 (S.D.N.Y.))**

> FN2. The Charter Party states that arbitration will be in New York, as opposed to London, and that "United States Law [is] to apply." *See* Charter Party, Part A, at ¶ K. In addressing these issues of contract law, both sides cite New York cases, or federal cases applying New York law, in their respective memoranda of law. Under these circumstances, the Court can assume that New York law applies to these contractual issues. *See Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir.1989); *see also Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 137 (2d Cir.1991).

> FN3. Since COB will recover attorney's fees under the Charter Party, the Court is not required to examine the propriety of sanctions under Rule 11. *See Shipping Transp. Enter., Ltd. v. Transatlantic Petroleum, Ltd,* 1992 A.M.C. 663, 666 (S.D.N.Y.1991).

Not Reported in F.Supp., 1993 WL 300043 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:93cv00033 (Docket) (Jan. 05, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2004 U.S. DIST. LEXIS 11761

**METROPOLITAN WEST ASSET MANAGEMENT, LLC, Plaintiff, - against - MAGNUS FUNDING, LTD. MAGNUS FUNDING CORP. SHENKMAN CAPITAL MANAGEMENT, INC. JPMORGAN CHASE BANK, Defendants.**

**03 Civ. 5539 (NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 11761*

**June 24, 2004, Decided
June 25, 2004, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by *Metro. W. Asset Mgmt., LLC v. Shenkman Capital Mgmt., Inc., 2005 U.S. Dist. LEXIS 17003 (S.D.N.Y., Aug. 16, 2005)*

**DISPOSITION:** [*1] Defendants' motions to dismiss granted in part and denied in part. Defendants' motion for attorney's fees denied.

**COUNSEL:** For Plaintiff: Ira A. Schochet, Esq., Laurence D. Paskowitz, Esq., Goodkind, Labaton, Rudoff & Sucharow, LLP, New York, NY.

For Defendant: Thomas J. Fleming, Esq., Olshan Grundman Frome Rosenzweig & Wolosky LLP, Robert S. Friedman, Esq., John M. Callagy, Esq., Kelley Drye & Warren LP, New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** NAOMI REICE BUCHWALD

**OPINION:**

**MEMORANDUM & ORDER**

**NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE**

Plaintiff, Metropolitan West Asset Management ("Metropolitan West") a junior noteholder in a pool of high yield bonds, has brought this action against Magnus Funding, Ltd., Magnus Funding Corp. (collectively, "Magnus") n1, Shenkman Capital Management Inc. ("Shenkman") and JP Morgan Chase Bank ("JPMC") (Shenkman and JPMC are collectively referred to as "de-

fendants") alleging breach of contract, breach [*2] of fiduciary duty and gross negligence. Defendants Shenkman and JPMC have each submitted motions to dismiss all claims asserted against them and to recover costs and fees incurred in connection with this action. For the reasons stated below, defendants' motions are granted in part and denied in part.

n1 This action was voluntarily dismissed as against defendants Magnus Funding Ltd. and Magnus Funding Corp. on October 30, 2003.

**BACKGROUND** n2

n2 The following facts have been taken from plaintiff's Amended Complaint and the exhibits attached thereto except where otherwise noted.

Plaintiff is a California limited liability company engaged in the business of investing in securities for institutions and high net worth individuals. Plaintiff alleges that it is a holder of approximately $ 15.25 million face value of the subordinate Class [*3] B notes co-issued by defendants Magnus Funding Ltd. and Magnus Funding Corp. and $ 5 million face value of the subordinate Class C notes issued by defendant Magnus Funding Ltd. JPMC serves as the Indenture Trustee for the Magnus debt pursuant to the Indenture and Shenkman serves as the Investment Manager.

**A. The Indenture**

The Magnus Fund is a special purpose fund formed for sophisticated investors to invest in collateralized

2004 U.S. Dist. LEXIS 11761, *

bond obligations ("CBOs"). The category of investments known as CBOs generally includes high risk, high yield bonds. Magnus was authorized to sell $ 289 million in notes, which were secured by $ 300 million of high yield debt and emerging market securities. In 1998, Magnus issued four classes of notes: Class A Senior, Class B Senior Subordinate, Class C Subordinate and Class D Junior Subordinate Income. Of the $ 289 million notes, the Class A notes comprise $ 202 million. Magnus issued $ 34.5 million of Class B notes, $ 28 million of Class C notes and $ 24.5 million of Class D Junior Subordinate Income notes.

The terms of the notes are set by a Trust Indenture (the "Indenture") executed by the Issuers and JPMC as the Indenture Trustee. The Indenture [*4]  sets out the rights to which each of the different classes of noteholders is entitled. Amongst other contingencies, the Indenture defines the relative rights of the noteholders if an "Event of Default" should occur.

The Indenture defines an "Event of Default" as meaning default in payment or decline in the value of the collateral as described in Section 5.1 of the Indenture. See Compl. Ex. A. The Indenture further provides that once an Event of Default occurs, the collateral may be liquidated upon a vote by at least 66 2/3% of the Holders of all of both the outstanding Class A notes and Class B notes, unless the value of the collateral has dropped below a certain level. Specifically, the Class B noteholders can be excluded from the decision to liquidate only when "the Principal Coverage Amount at such time is less than 110% of the Aggregate Principal Amount of the Class A Notes, in which case the Holders of 66 2/3% of the Class A Notes, acting alone, shall have the right to consent to any sale or liquidation." Compl. Ex. A §  5.4(a). n3 If the Class A Holders elect to liquidate the collateral under such circumstances, then Section 5.4 of the Indenture requires JPMC to effect the [*5]  liquidation.

n3 In order to determine the "Principal Coverage Amount," the market value of the defaulted collateral must be determined as of the date of the vote. See id. §  1.1 at p. 25. If there are any Class A notes outstanding at the time of an Event of Default, then the Class A Holders have the right to accelerate the principal of their notes because those Holders are defined as the "Requisite Noteholders." The Indenture defines "Requisite Noteholders" as "the Holders of more than 66 2/3% of the Aggregate Principal Amount of (a) the Class A Notes, so long as any Class A notes remain Outstanding, (b) thereafter, the Class B Notes ..., (c) thereafter, the Class C Notes ... and (d) thereafter, the Income Notes."

Section 5.4 of the Indenture states that if the Class A noteholders vote to liquidate the collateral,

the Trustee shall ... send notice to each of the Noteholders of any proposed sale or liquidation ... and such notice shall be accompanied by an Accountant's Certificate (i) confirming the [*6]  information with respect to such sale or liquidation ... and (ii) specifying the procedures, if any, undertaken by them to review the data and computations relating to such sale or liquidation.

Id. at 63. The Indenture defines an Accountant's Certificate as "[a] certificate of a firm of independent certified public accountants of national reputation in the United States of America ...." Compl. Ex. A at p. 3. No Accountant's Certificate was issued by JPMC prior to the liquidation in this case.

## B. The Event of Default

On June 18, 2003, JPMC, Magnus and Shenkman entered into a Liquidation Agreement, which was subsequently provided to all holders. The Liquidation Agreement recited that the Trustee had informed the noteholders that an Event of Default had occurred on December 16, 2002 (which was continuing) and that on May 23, 2003, over 66 2/3% of the requisite Class A Holders declared an acceleration and directed JPMC to declare the principal of the notes immediately due and payable pursuant to Section 5.2 of the Indenture. See Compl. Ex. B §  1. The Liquidation Agreement also stated, "notwithstanding Section 5.4(a) of the Indenture, no Accountant's Certificate [*7]  shall be required in connection with the liquidation of the Collateral until the Final Distribution Date." Compl. Ex. B §  3(g). JPMC alleges that as of December 2002, the Principal Coverage Amount was less than 110% of the outstanding Class A notes and that the Class A noteholders thus were entitled to act without any consent from the subordinate noteholders. Plaintiff contests JPMC's assertion regarding the value of the collateral.

## C. The Parties' Claims

Plaintiff complains that JPMC breached the Indenture when it failed to notify the Class B noteholders of the liquidation, by way of Accountant's Certificate, prior to its commencement. JPMC responds that it was not required to issue an Accountant's Certificate prior to the liquidation, but rather, that the Indenture requires JPMC

2004 U.S. Dist. LEXIS 11761, *

to verify information relating to the liquidation only after the fact. JPMC attempted to bolster this argument by asserting at oral argument on May 26, 2004 that the calculation necessary for determining whether an Event of Default has occurred is sufficiently simplistic that there would be no need for an Accountant's Certificate to verify such information prior to a sale.

In addition to its [*8] breach of contract claim, plaintiff also asserts that even though the rights of the Class B and Class C noteholders were subordinate to the Class A Holders, defendants still had a fiduciary duty to protect the rights of the subordinate noteholders but failed to do so. JPMC challenges plaintiff's tort claim of breach of fiduciary duty on the basis that it is duplicative of its contract claim. Finally, plaintiff asserts that both JPMC and Shenkman are grossly negligent in fulfilling their duties under the Indenture.

Shenkman argues that plaintiff is precluded by the terms of the Indenture from bringing suit at all, as subordinate noteholders are prohibited from taking any legal action before all Class A noteholders have been fully paid on their notes. Shenkman further argues that plaintiff has failed to state a claim against it for gross negligence. Additionally, both JPMC and Shenkman seek an award of their costs and fees incurred in connection with this lawsuit.

**DISCUSSION**

**A. Motion to Dismiss Standard**

In considering a motion to dismiss, we accept as true all material factual allegations in the complaint. *Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001).* [*9] We may grant the motion only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* In addition to the facts set forth in the complaint, we may also consider documents attached thereto and incorporated by reference therein, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 67 (2d. Cir. 1998),* as well as matters of public record, *Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998).*

**B. Plaintiff's Right to Bring this Suit**

We first address Shenkman's threshold arguments, which rely on a number of provisions in the Trust Indenture to contend that plaintiff is not entitled to bring this lawsuit. Shenkman argues that plaintiff's claims are barred by the subordination provisions in the Indenture and by Section 5.9 of the Indenture, which precludes any single noteholder from bringing suit without first com-

plying with certain conditions precedent. Plaintiff responds [*10] that these provisions apply to prevent suits for "payment" on the notes and/or suits following an Event of Default, but that the instant suit, rather than seeking payment on the notes, seeks damages in connection with procedural improprieties relating to a declaration of default.

**1. Subordination Provisions of Indenture**

In contesting plaintiff's right to bring suit, Shenkman points to Section 13.1 (a) of the Indenture which provides that if an Event of Default occurs and the notes are accelerated, "the Class A Notes shall be paid in full in cash before any further payment or distribution is made on account of the Class B Notes, Class C Notes or Income Notes." Compl. Ex. A § 13.1(a). Defendant Shenkman asserts that consistent with the priority of payments, Section 5.10 of the Indenture precludes any legal action by Holders of the Class B and Class C notes before all Class A notes are paid. Shenkman argues that because plaintiff has nowhere alleged that the Class A notes have been paid in full, plaintiff, as a subordinate noteholder, is not entitled to commence a suit for payment. Plaintiff responds that it does not seek payment from the underlying collateral, as would be prevented [*11] by the Indenture, but payment of damages by Shenkman and JPMC that would have no effect on other noteholders' receipt of payment in connection with the liquidation of the collateral and that its claims are therefore permissible.

Shenkman cites several cases holding that subordination provisions bar enforcement of junior creditors' claims prior to the satisfaction of senior creditors. Plaintiff correctly points out, however, that each of the cases cited by Shenkman are inapposite because they apply to claims of default in payment by the debtor, rather than claims against third parties. See *First National Bank of Hollywood v. America Foam Rubber Corp., 530 F.2d 450, 454 (2d Cir. 1976); SEC v. White & Co., 546 F.2d 789, 792 (8th Cir. 1976); Resolution Trust Corp. v. Best Products, 177 B.R. 791, 801-02 (S.D.N.Y. 1995); In re Eaton Factors Co., 3 B.R. 20, 22 (Bankr. S.D.N.Y. 1980); Standard Brands Inc. v. Straile, 23 A.D.2d 363, 260 N.Y.S.2d 913, 916-17 (1st Dep't 1965).*

Here, since Metropolitan West does not seek recovery from the issuer on its notes, but rather, seeks damages from the Trustee and Investment [*12] Manager resulting from an alleged wrongful liquidation, without an effect on the priority of payments from the underlying collateral, plaintiff is not barred by the subordination provisions in the Indenture from proceeding on its claims.

**2. Section 5.9 - "No Action" Clause**

2004 U.S. Dist. LEXIS 11761, *

Defendant Shenkman also argues that plaintiff is precluded from bringing suit under Section 5.9 of the Indenture, which sets forth five conditions that must be met before an individual noteholder may bring suit. Section 5.9 provides that:

no Holder of any Note shall have any right to institute Proceedings ... unless:

(a) such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b) the Noteholders of at least 25% of the Aggregate Principal Amount of the most senior Class of Notes then Outstanding shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c) such Holder or Holders have offered to the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d) the Trustee for 30 days after its receipt [*13] of such notice, request and offer of indemnity has failed to institute any such Proceedings; and

(e) no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Holders of a majority of the Aggregate Principal Amount of the most senior Class of Notes then Outstanding.

Compl. Ex. A § 5.9. Defendant Shenkman argues that to state a claim, plaintiff must plead that it has satisfied these conditions. Plaintiff responds that Shenkman's reli-

ance on this provision is misplaced because the provision applies only when a noteholder seeks payment on the notes as a result of an uncured Event of Default. Plaintiff contends that it is not seeking damages from Shenkman as a result of an uncured Event of Default but is seeking damages for mismanagement of the trust collateral and a failure to safeguard plaintiff's rights.

It is well established that "no action" clauses bar claims by individual bondholders who fail to comply with the conditions precedent recited therein. See e.g. *Victor v. Riklis, 1992 U.S. Dist. LEXIS 7025, No. 91 Civ. 2827, 1992 WL 122911 (S.D.N.Y. May 15, 1992)*. However, "no action" provisions apply according to their terms [*14] and are not broadly construed. See *Jackson Nat'l Life Ins. Co. v. Ladish Co., 1993 U.S. Dist. LEXIS 1785, No. 92 Civ. 9358, 1993 WL 43373 at *5 (S.D.N.Y. Feb. 18, 1993)*. Where, as here, a "no action" provision applies by its terms to only claims relating to an "Event of Default" seeking payment on the notes themselves, such clauses do not prevent noteholders from bringing extra-contractual tort claims or breach of contract claims that are not of the type to which the "no action" provision, by its terms, applies. See *Cruden v. Bank of New York, 957 F.2d 961 (2d Cir. 1992)* (permitting suit against trustees where "no action" provision stated that noteholder would not have any right to institute an action unless certain conditions were met even though provision was not specifically limited to actions against issuer). n4

n4 *Feldbaum v. McCrory Corp., 1992 Del. Ch. LEXIS 113, C.A. No. 11866, 1992 WL 119095 (Del. Ch. June 1, 1992)*, upon which Shenkman places heavy reliance, is inapplicable because there was no claim in that case that the Trustee participated in any wrongdoing, as opposed to this case, where such alleged wrongdoing is a central issue. Indeed, in Feldbaum, the Court stated, "I do not mean to imply that courts will apply no action clauses to bar claims where misconduct by the trustee is alleged." *Id. at *23*.

[*15]

Shenkman is thus not shielded from suit in this circumstance. By suing Shenkman and JPMC, plaintiff is not trying to avoid or circumvent other noteholders' priority of payment. Accordingly, the "no action" clause in the Indenture is simply inapplicable here. Plaintiff is entitled to bring this suit.

## C. Breach of Contract - Asserted Against JPMC

As noted earlier, plaintiff argues that by failing to send all noteholders an Accountant's Certificate prior to the liquidation, JPMC breached its contract with plaintiff

and wrongly deprived plaintiff of its rights to assess the nature of the alleged Event of Default or to vote on the liquidation. JPMC responds that plaintiff's breach of contract claim must be dismissed because the issuance of an Accountant's Certificate was not a condition precedent to the sale or liquidation of the trust collateral. Specifically, JPMC asserts that the Accountant's Certificate "has nothing to do with determining whether or not an Event of Default has occurred or whether the Class A Noteholders have the right [] to vote to declare the notes due and payable ...." Id. Rather, argues JPMC, the Accountant's Certificate is supposed to issue after [*16] a liquidation and set forth the prices that were obtained and what procedures were used to verify the prices. Additionally, JPMC also asserts that plaintiff cannot prove that JPMC's actions resulted in any damages.

Under New York law, contracts must be interpreted to give effect to the intent of the parties as expressed in the clear language of the contract. See *Andy Warhol Found. For The Visual Arts, Inc. v. Federal Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999)* (stating that New York law requires contracts to "be construed to effectuate the intent of the parties as derived from the plain meaning of the [contract]"). In interpreting the express provisions of the contract, the Court recognizes that such interpretation is directed to discovering "the meaning of the terms of the writing ... in light of the circumstances [presented]." *Restatement (Second) Contracts § 212*. However, as the Second Circuit has explained, "an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible." *Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992)*. Rather, "where [*17] a contract contains an ambiguity or contradiction or apparently inconsistent provisions, the 'contra proferentem' principle requires that the contract be construed against the drafter." *Matter of Hudson Holding Associates, 108 B.R. 32, 35 (Bkrtcy. S.D.N.Y. 1989)* (citing *Westchester Resco Co., L.P. v. New England Reinsurance Corp., 818 F.2d 2, 3 (2d Cir. 1987))*.

A condition precedent has been defined as "an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises." *Diffusion Fin. S.A.R.L. v. Smith, 1997 U.S. Dist. LEXIS 7129, No. 95 Civ. 2140, 1997 WL 272391 at *3 (S.D.N.Y. May 22, 1997) (citations omitted)*. It is well established that a contract provision will not be interpreted as a condition precedent unless it is clear from the agreement that such result was intended. See 13 Williston on Contracts § 38:13 (4th ed. 2000). Under New York law, "where a contract term is ambiguous, the creation of a condition precedent is disfavored." *Lomaglio Assocs., Inc. v. LBK Mktg. Corp., 1999 U.S. Dist. LEXIS 14185, No. 94 Civ. 3208, 1999 WL 705208*

(S.D.N.Y. Sept. 10, 1999)(citations omitted). If the language [*18] of the condition is explicit and unambiguous, however, it will be enforced. See e.g. *Catskill Development, L.L.C. v. Park Place Entertainment Corp., 154 F. Supp.2d 696 (S.D.N.Y. 2001)*.

Applying these principles to the Indenture, JPMC's reading of Section 5.4 is not clearly correct. Section 5.4 of the Indenture provides:

> provided, further, that the Trustee shall, on behalf of the Issuer, send notice to each of the Noteholders of any proposed sale or liquidation of the Trust Estate together with a brief description thereof and such notice shall be accompanied by an Accountant's Certificate (i) confirming the information with respect to such sale or liquidation (to the extent such accountant shall be able and willing to confirm such information) and (ii) specifying the procedures, if any, undertaken by the accountant to review the data and computations relating to such sale or liquidation.

Compl. Ex. A § 5.4. JPMC interprets Section 5.4 as requiring an Accountant's Certificate after the liquidation to confirm the prices obtained in liquidation. To support its position, JPMC relies on subsections (i) and (ii) of Section 5.4, which can be read to pertain [*19] to post-sale verification. JPMC also argues that the calculation necessary to determine whether an Event of Default has occurred under Section 5.1(d) of the Indenture is sufficiently simplistic that no Accountant's Certificate would be necessary to verify the calculation. n5

> n5 Section 5.1(d) calls for a comparison of the principal amount of the securities held as collateral and the cash on hand with the outstanding principal amount of the Class A and Class B notes. Specifically, the provision states that an Event of Default has occurred where there is a "failure to maintain an Aggregate Principal Amount of Collateral Debt Securities and Eligible Investments at least equal to 100% of the Aggregate Principal Amount of the Class A and Class B notes." Compl. Ex. A § 5.1(d).

Plaintiff's challenge is not aimed solely at the question of whether an Event of Default occurred, however. Plaintiff asserts that an Accountant's Certificate would also have confirmed whether the Class B noteholders were properly excluded from the vote to liquidate. This deter-

mination involves an additional and more complex calculation. Under Section 5.4(a)(v) of the indenture, the Class B noteholders can only be excluded from a vote where "the Principal Coverage Amount at such time is less than 110% of the Aggregate Principal Amount of the Class A notes ...." Id. at § 5.4(a)(v). As explained *supra* in footnote 3, the Principal Coverage Amount is determined by assessing the market value of the defaulted collateral as of the date of the vote. See id. § 1.1.

[*20]

However, Section 5.4 contains other language which renders JPMC's reading problematic. Specifically, the statement that a liquidation may only occur "provided" that the Trustee furnish the noteholders with "notice" of the "proposed" sale indicates that Section 5.4 pertains to conditions leading up to, rather than following the sale. See id. Furthermore, JPMC's proffered interpretation is belied by the language in the Liquidation Agreement that explicitly states, "notwithstanding Section 5.4(a) of the Indenture, no Accountant's Certificate shall be required in connection with the liquidation of the Collateral until the Final Distribution Date." Compl. Ex. B. The use of this language suggests that not only the Class B noteholders who are suing here, but also the parties contemplating the liquidation, were of the belief that Section 5.4 required the issuance of an Accountant's Certificate prior to the sale.

Finally, because the contract clause in question contains apparent inconsistencies, any doubts must be resolved against the drafter. See *Restatement (Second) of Contracts § 206* (1981). Accordingly, although we cannot say that Section [*21] 5.4 provides a model of draftsmanship, considering the language, the relevant legal principles and the Liquidation Agreement's treatment of Section 5.4, we cannot adopt JPMC's reading at this stage and decline to dismiss plaintiff's contract claim on the ground that the Accountant's Certificate was not a condition precedent to liquidation. n6

n6 Defendant also argues that even where a condition is found to constitute a condition precedent, the law excuses the nonoccurrence of that condition where it was not a material part of the agreement. While defendant is correct in its statement of the law, see e.g. *Holdeen v. Rinaldo, 245 N.Y.S.2d 95, 97, 20 A.D.2d 597, 598, (3d Dep't 1963)*; *Jacob & Youngs, Inc. v. Kent, 230 N.Y. 239, 241-43, 129 N.E. 889 (1921)* (Cardozo, J.), the departure at issue in this case was not in-

significant and the argument is therefore misplaced.

JPMC also argues, however, that even if it was required by the Indenture to issue an Accountant's Certificate before [*22] the liquidation, the failure to do so did not injure plaintiff in any way and that any alleged damages may not be attributed to JPMC. Plaintiff, however, has alleged that prior to the liquidation, it was holding a valuable security that if retained, was capable of recapturing much of its face value and that JPMC's behavior wrongly deprived it of the opportunity to assess its rights with respect to that security. Specifically, plaintiff complains that the Class A noteholders were not entitled to make a unilateral determination to liquidate unless a valuation of the defaulted collateral actually revealed that the collateral was equal to less than 110% of the Aggregate Principal Amount of the Class A notes and the subordinate noteholders were provided with an Accountant's Certificate so stating. Because it was never provided with an Accountant's Certificate, plaintiff complains, it has no way of verifying that it was properly excluded from the vote to liquidate or that the prices obtained in the liquidation were appropriate. Plaintiff asserts that without further discovery, it can only allege that as a result of defendants' actions, it has been damaged in an unstated amount.

"Although [*23] any breach of contract entitles the injured party at least to nominal damages, he cannot recover more without establishing a basis for an inference of fact that he has actually been damaged" by defendants' conduct. *Coastal Power Intern., Ltd. v. Transcontinental Capital Corp., 10 F. Supp.2d 345, 364 (S.D.N.Y. 1998)* (citations omitted). Even where a plaintiff in a contracts case has clearly suffered harm, the plaintiff "cannot be awarded damages unless the trier of fact is persuaded that the harm which the plaintiff suffered was in fact caused by the defendant's breach." *Krofft Entertainment Inc. v. CBS Songs, 653 F. Supp. 1530, 1534 (S.D.N.Y. 1987)*. "A plaintiff seeking damages for breach of contract ... must demonstrate that the damages were caused by and are directly traceable to the ... breach." *Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720, 731 (2d Cir. 1992)*.

Plaintiff alleges that JPMC's disregard of the requisite procedure concerning the Accountant's Certificate was a proximate and "but for" cause of the injuries sustained by Metropolitan West as a result of the wrongful liquidation of its investment. Although plaintiff has [*24] provided this Court with scant support for its allegations of damages, we cannot say at this stage of the litigation that plaintiff would be unable to prove that JPMC proximately caused it harm by failing to send all noteholders an Accountant's Certificate prior to the liquidation. However, it is hardly clear whether plaintiff would ultimately

2004 U.S. Dist. LEXIS 11761, *

be able to sustain such a burden. First, plaintiff has not provided any evidence that the valuation of the defaulted collateral did not support the liquidation without plaintiff's participation. Second, we note that plaintiff learned of JPMC's failure to issue an Accountant's Certificate when it received the Liquidation Agreement in June 2003. The Liquidation Agreement stated that the liquidation would not be completed until December 30, 2003. Plaintiff thus had approximately six months before the liquidation was completed to pursue injunctive relief through the courts, but it failed to do so. Plaintiff's argument that it suffered damage as a result of the liquidation is undermined by the fact that plaintiff did not pursue a course of action to prevent the liquidation while it had the opportunity to do so. Should the facts as ultimately established [*25] support the unilateral liquidation by the Class A noteholders, we would be reluctant to award damages in these circumstances.

Nonetheless, it does not "appear[] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. De-Buono, 101 F.3d 888, 891 (2d Cir. 1996)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*. Accordingly, JPMC's motion to dismiss the breach of contract claim is denied.

**D. Breach of Fiduciary Duty- Asserted Against JPMC**

In addition to its breach of contract claim, plaintiff also asserts that by failing to send out an Accountant's Certificate prior to the liquidation, JPMC breached its fiduciary duty to plaintiff. JPMC argues that plaintiff's breach of fiduciary duty claim must fail because JPMC did not breach any duty owed to plaintiff and because the breach of fiduciary duty claim is duplicative of the breach of contract claim.

In order to prevail on the tort claim of breach of fiduciary duty, a plaintiff must prove: (1) a fiduciary duty existing between the parties; (2) the defendant's breach of that duty; and (3) damages suffered [*26] by the plaintiff which were proximately caused by the breach. See *Weiss v. Robinson,2003 U.S. Dist. LEXIS 4009, No. 03 Civ. 0209, 2003 WL 1396436 at *7 (S.D.N.Y. Mar. 19, 2003)*. It is well-settled, however, that "a simple breach of contract is not to be considered a tort unless a duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389, 516 N.E.2d 190, 521 N.Y.S.2d 653, 656-57 (1987)* (citations omitted). Where a tort claim is "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract," *id. at 657*, the claim is barred as redundant.

In this case, plaintiff's breach of fiduciary duty claim arises out of the same facts as its breach of contract claim and is therefore insufficient. Even accepting plaintiff's allegations as true, plaintiff has failed to allege that JPMC breached any duty to plaintiff other than that [*27] which was created by the Indenture. In fact, the only allegation asserted by plaintiff in connection with the breach of fiduciary duty claim which is not also asserted in support of the breach of contract claim is the allegation that even after the liquidation, plaintiff has still failed to provide plaintiff with an Accountant's Certificate. This allegation, however, merely asserts that JPMC's breach of the Indenture is still continuing. As plaintiff has failed to allege any act or omission that is not based on the requirements of the Indenture, the breach of fiduciary duty claim must be dismissed.

**E. Gross Negligence- Asserted Against JPMC and Shenkman**

Plaintiff claims that both JPMC and Shenkman were grossly negligent in their management of the trust collateral. Specifically, plaintiff claims that JPMC acted with gross negligence in its failure to make prudent efforts to preserve the trust collateral both leading up to and following the Event of Default. With respect to defendant Shenkman, plaintiff claims that Shenkman was grossly negligent in allowing the liquidation to be commenced prior to the issuance of an Accountant's Certificate and that through gross negligence, [*28] Shenkman allowed the trust collateral to severely decline in value in violation of its duty to the noteholders to manage the trust collateral with the utmost care.

"To establish a prima facie case of negligence under New York law, three elements must be demonstrated: (1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach." *McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997)*. Like ordinary negligence, gross negligence involves "the commission or omission of an act or duty owing by one to another." *Curley v. AMR Corp., 153 F.3d 5, 13 (2d Cir. 1998)*. However, gross negligence involves "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi U.S.A., Ltd. v. Jewelers Protection Services, Ltd., 81 N.Y.2d 821, 823, 611 N.E.2d 282, 595 N.Y.S.2d 381 (1993)*; *Cromer Fin. Ltd. v. Berger, 137 F. Supp.2d 452, 495 (S.D.N.Y. 2001)* (stating that "to constitute gross negligence, the act or omission must be of an aggravated character, as distinguished [*29] from the failure to exercise ordinary care.") (citation, internal quotation marks omitted).

JPMC argues that like the fiduciary duty claim, plaintiff's gross negligence claim must be dismissed as duplicative of the breach of contract claim. As explained above, "[a] tort action may accompany one for breach of contract only where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is breached." *Bouquet Brands Div. of J & D Food Sales, Inc. v. Citibank, N.A., 97 A.D.2d 936, 937, 470 N.Y.S.2d 733, 734 (3d Dep't 1983); Tevdorachvili v. Chase Manhattan Bank, 103 F. Supp.2d 632, 643 (E.D.N.Y. 2000)* (same). Where a tort claim "does no more than assert violations of a duty which is identical to and indivisible from the contract obligations which have allegedly been breached" the tort claim cannot be sustained. *Luxonomy Car, Inc. v. Citibank, N.A., 65 A.D.2d 549, 550, 408 N.Y.S.2d 951, 954 (2d Dep't 1978).*

Plaintiff's gross negligence claim against JPMC fails for the same reasons as does its breach of fiduciary duty claim. Namely, plaintiff has failed to allege any [*30] act or omission by JPMC that is not based on the requirements of the Indenture. Plaintiff's gross negligence claim is based on the exact same violations of the Indenture as the breach of contract claim: the failure to issue an Accountant's Certificate or otherwise safeguard plaintiff's investment. Because these duties are specifically stated in the Indenture and did not arise independent of that agreement, plaintiff's gross negligence claim cannot be sustained as asserted against JPMC.

With respect to defendant Shenkman, against whom plaintiff has no contract claim, plaintiff alleges that Shenkman was grossly negligent based on two theories: (1) its acquiescence in the allegedly wrongful liquidation; and (2) its alleged mismanagement of the trust collateral. Shenkman responds that as Investment Manager of the fund, it was in privity with the Issuers, not the noteholders, and thus owed no duty to any individual noteholder. Shenkman further argues that plaintiff has provided insufficient allegations of mismanagement to sustain a claim of gross negligence.

Contrary to Shenkman's protestations, even in the absence of a contract with plaintiff, it did owe a duty to the noteholders by [*31] virtue of its relationship with the Issuers. Shenkman concedes that as Investment Manager, it was acting as an agent of the Issuers. See Shenkman Mem. at 6-8. Where an investment advisor is acting as an agent of a fiduciary, it can likewise be held liable for negligent misconduct. See *Schneider v. Lazard Freres & Co., 552 N.Y.S.2d 571, 575, 159 A.D.2d 291, 297-98 (1st Dep't 1990)* (stating that an investment advisor hired by a fiduciary is agent of the fiduciary and is thus liable directly to shareholders for its negligent acts and incompetent advice). Because Shenkman was hired by the Issuers, who had a fiduciary relationship with

plaintiff, it can be said that Shenkman's privity with the Issuer extends to create a fiduciary relationship with plaintiff. See *Credit Alliance Corp. v. Arthur Andersen & Co, 65 N.Y.2d 536, 542 n.9, 483 N.E.2d 110, 493 N.Y.S.2d 435, 442 n. 9 (N.Y. 1985).* Accordingly, since the Issuer owed a duty to plaintiff and Shenkman was acting as an agent of the Issuer, Shenkman also owed a duty to plaintiff. n7

n7 The Court also notes that Shenkman's Investment Management Agreement with the Issuers expressly states that Shenkman can be liable to noteholders for "willful misfeasance, bad faith, gross negligence or reckless disregard for its duties and obligations hereunder." Flanagan Declaration, Ex. A, Investment Management Agreement § 13(a).

[*32]

In addition to establishing that defendant Shenkman owed a duty to plaintiff, plaintiff has also sufficiently alleged that Shenkman breached that duty. Plaintiff argues that Shenkman was grossly negligent when it acquiesced in the liquidation plan adopted by the Class A noteholders. Plaintiff relies on Shenkman's participation in the Liquidation Agreement, which included the waiver of the Accountant's Certificate, as evidence of Shenkman's wrongdoing. Although Shenkman responds that it was acting only at the direction of the Class A noteholders in consenting to the liquidation prior to the issuance of an Accountant's Certificate, Shenkman owed plaintiff a duty of care and participated in the liquidation with the knowledge that an Accountant's Certificate had not been issued. The Liquidation Agreement stated "notwithstanding Section 5.4(a) of the Indenture, no Accountant's Certificate shall be required in connection with the liquidation of the Collateral until the Final Distribution Date." In light of Shenkman's acquiescence to this liquidation and its independent duty to plaintiff, we cannot say at this stage of the litigation that Shenkman did not engage in "conduct that evinces [*33] a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi U.S.A., Ltd. v. Jewelers Protection Services, Ltd., 81 N.Y.2d 821, 823, 611 N.E.2d 282, 595 N.Y.S.2d 381 (1993).*

With respect to plaintiff's allegation that Shenkman was grossly negligent in the management of the fund itself and that other funds managed by Shenkman flourished while the Magnus collateral floundered, Shenkman argues that the Indenture required it to buy and sell the collateral under several constraints and that comparing the Magnus collateral to other accounts managed by Shenkman is thus not possible.

2004 U.S. Dist. LEXIS 11761, *

The Indenture makes clear that Shenkman was required to buy and sell the Magnus collateral under several express constraints, including maintaining specific ratings, maintaining certain "Percentage Limitations," satisfying collateral coverage tests and prohibiting reinvestment of cash on hand when principal payments were owed to Class A noteholders based on the fund's failure to meet certain coverage tests. See Compl. Ex. A § § 11.1, 12.2, 12.4. Plaintiff has failed to allege that acting within these requirements, Shenkman could have performed any better than it did. Plaintiff makes no claim [*34] that any of the other investments managed by Shenkman were subject to the same strictures as the Magnus collateral. Comparing the Magnus collateral to these other funds is thus of no utility. Plaintiff's claim that Shenkman's strategies for managing other high yield investments were sufficiently superior to those employed by Magnus to serve as evidence of gross negligence is thus without support and is accordingly dismissed. Plaintiff may proceed with its gross negligence claim against Shenkman only insofar as such gross negligence is based on participating in the liquidation prior to the issuance of the Accountant's Certificate. n8

n8 Despite our decision to sustain the gross negligence claim against defendant Shenkman on the present motion, we note that we have the same concerns regarding plaintiff's damages with respect to this claim as we expressed above in connection with the breach of contract claim.

**F. Costs and Attorneys' Fees**

The Indenture gives the Court discretion to award attorneys' fees [*35] against a non-prevailing party. See Compl. Ex. A § 5.16. Both JPMC and Shenkman invoke that provision on this motion. No award of costs and fees is appropriate, however, as neither defendant has prevailed entirely on this motion. Accordingly, the motions of JPMC and Shenkman for attorney's fees are denied.

**CONCLUSION**

For the reasons stated above, defendant JPMC's motion to dismiss is granted with respect to the breach of fiduciary duty and gross negligence claims and denied with respect to the breach of contract claim. Defendant Shenkman's motion to dismiss is granted with respect to the mismanagement claim and denied with respect to the Accountant's Certificate claim.

**SO ORDERED.**

DATED: June 24, 2004

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

Westlaw.

Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1996 WL 544230 (E.D.Pa.), Pens. Plan Guide (CCH) P 23927U
**(Cite as: 1996 WL 544230 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
William H. TOBIN, et al.  Plaintiffs.
v.
GENERAL ELECTRIC COMPANY, et al.
Defendants.
**No. CIV. A. 95-4003.**

Sept. 26, 1996.

*MEMORANDUM AND ORDER*

VanARTSDALEN, Special Judge.

**\*1** Plaintiffs, nine former non-union employees of Defendant General Electric Company ("GE"), allege that the defendants wrongfully denied their claims for "plant closing" benefits pursuant to the GE Pension Plan and the GE Layoff Benefit Plan ("the Plans"). These Plans, which are subject to the provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et. seq. ("ERISA"), offer enhanced retirement and severance benefits to employees laid off by reason of a "plant closing."  In Counts I and II of their Amended Complaint, plaintiffs challenge defendants' denial of plaintiffs' claims for plant closing benefits pursuant to ERISA § 502, 29 U.S.C. § 1132(a)(1)(B).    Count IV further alleges discrimination by GE and its CEO John Welch in violation of ERISA § 510, 29 U.S.C. § 1140. [FN1] Defendants have moved for summary judgment on each of these claims.

> FN1.  By Order dated October 6, 1996, Count III of the Amended Complaint (29 U.S.C. § 1132(c) civil penalty claims for failure of Administrator to supply requested information) was dismissed.

I. Factual Background

This dispute arises from the closing of a GE operation at its Malvern, Pennsylvania facility.  As a large, publicly held corporation, GE operates a variety of diverse businesses.  GE employed each of the plaintiffs in its Static Power Components Operation ("SPCO"), which manufactured industrial semi-conductors.  In 1985, GE transferred the SPCO

operation from Collingdale, Pennsylvania to Malvern, where the Production and Control ("P & C") business, which manufactured metering and control systems, was already in operation. SPCO and P & C operated as lines of separate GE businesses.

In 1994, GE sold all the assets of SPCO and closed the operation.  As a result of this sale, GE laid off the plaintiffs.  The Pension Plan and Layoff Benefit Plan each provide additional benefits to employees laid off pursuant to a "plant closing" that are unavailable to employees laid off for other reasons:  the Pension Plan affords expanded opportunities for early retirement and the Layoff Benefit Plan offers increased severance pay.  Asserting that the closing of SPCO constituted a plant closing, plaintiffs applied for enhanced benefits pursuant to the Plans. GE, contending in contrast that the shut-down of SPCO was a mere "product line exit," denied the claims for plant closing benefits. [FN2]  The parties agree that the plaintiffs' rights to enhanced benefits depend upon whether, within the meaning of the Plans, a "plant closing" occurred.

> FN2.  GE is the administrator of both the Plans.   Under the Pension Plan, GE has created a Pension Board to manage the operation and administration of the Plan. This Pension Board reviewed and denied plaintiffs' claims for plant closing pension benefits in October 1994, and again in February 1995.    GE management employees, rather than the Pension Board, denied the claims arising under the Layoff Benefit Plan.

Both Plans define a "plant closing" as:
the announcement and carrying out of a plan to terminate and discontinue all Company operations at any plant, service shop or other facility.
Such terms do not refer to the termination and discontinuance of only part of the Company's operations at any plant, service shop or other facility nor to the termination or discontinuance of all of its former operations coupled with the announced intention to commence there either larger or smaller other operations.
Defendants contend that GE maintained one plant in Malvern, at which it operated two businesses.  By closing SPCO, defendants argue, GE merely eliminated one product line, causing a "product line

Not Reported in F.Supp.                                                                          Page 2
Not Reported in F.Supp., 1996 WL 544230 (E.D.Pa.), Pens. Plan Guide (CCH) P 23927U
(Cite as: 1996 WL 544230 (E.D.Pa.))

exit," not a plant closing. Because GE continued the P & C operation, defendants contend that there was no termination of "all Company operations" within the meaning of the Plans.

*2 The Plans do not, however, define "plant, service shop or other facility" for the purposes of determining when a discontinuance of all Company operations at a single "plant, service shop or other facility" has occurred. Plaintiffs contend that SPCO was a separate plant from P & C, and that GE's closing of all SPCO operations caused a termination or discontinuance of all GE operations at that plant. There is no dispute as to the underlying facts; rather, the parties argue for different interpretations of those facts.

Although SPCO and P & C manufactured different products and reported to different GE businesses, [FN3] a single building housed both operations. The two operations occupied separate portions of the building: the P & C business in an area referred to as Malvern I, and SPCO in the area known as Malvern II. Furthermore, SPCO and P & C had separate main entrances, and SPCO visitors reported directly to the SPCO entrance. Separate lease terms applied to the different sections of the building. [FN4] After 1992, in addition, Malvern I and Malvern II had separate mailing addresses, [FN5] and SPCO employees had a separate alarm system and access cards to unlock external doors. [FN6] Subsequent to the sale of SPCO, the purchaser, Silicon Power Company, has continued the same manufacturing operations in the space SPCO formerly occupied. [FN7] These factors emphasize the separation between the SPCO and P & C operations, and bolster plaintiffs' contention that the shut down of SPCO qualifies as a plant closing.

FN3. SPCO was part of the GE Industrial and Power Systems business, while P & C was part of GE's Electrical Distribution and Control business.

FN4. The building was enlarged in or about 1985 to accommodate SPCO when it moved from Collingdale to Malvern. At that time, GE and its lessor amended the lease to provide for the additional space. Plaintiff maintains that two different leases applied to Malvern I and Malvern II. Although conceding that different lease terms did apply, defendants argue that a single lease covered the entire facility.

FN5. From 1985 to 1992, Malvern I and

Malvern II did share one mailing address.

FN6. Prior to the consolidation of SPCO operations at their separate mailing address, the record suggests that one alarm system covered the entire facility. While some disagreement may exist as to the alarm system subsequent to that time, for purposes of this motion, I will accept as true plaintiffs' allegations.

FN7. In fact, defendants assert in their brief that eight of the nine plaintiffs continued to work for Silicon Power after the sale of SPCO. Plaintiffs do not contest that assertion.

Defendants note, however, that the SPCO and P & C operations shared a common roofline and were separated only by a common wall. GE employees enjoyed unrestricted access to both sections of the building through unlocked doors and a common shipping and receiving dock. Although Silicon Power has continued to use the former SPCO space, those doors have been sealed. One OSHA safety committee assumed responsibility for the entire facility, and the same union represented both SPCO and P & C employees as part of the same collective bargaining unit. Through an integrated job posting system, available positions in both the SPCO and the P & C operations were posted in the different sections of the building, and unionized employees in both operations had bumping rights. [FN8]

FN8. Plaintiffs emphasize that job qualifications and classifications, which restrict job transferability, sharply limit these bumping rights. Plaintiffs do not dispute, however, that certain rights did exist.

Defendants further emphasize that SPCO and P & C shared services at the Malvern facility. In addition to common computer, telephone, and electrical systems, the operations also shared the services of one on-site nurse and one security guard service. Although plaintiffs do not dispute these facts, they do challenge their relevance. SPCO paid P & C for the services provided, and other, non-GE tenants in the building also utilized the electrical and telephone systems. Plaintiffs therefore argue that such shared services do not support defendants' determination that the two operations were part of a single plant.

II. Discussion

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1996 WL 544230 (E.D.Pa.), Pens. Plan Guide (CCH) P 23927U
**(Cite as: 1996 WL 544230 (E.D.Pa.))**

A. Summary Judgment Standard

**\*3** Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson,* 477 U.S. at 248. A court must consider the evidence, and all inferences drawn from it, in the light most favorable to the nonmoving party. *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987).

B. Claims for Plant Closing Benefits

Plaintiffs have, pursuant to § 1132(a)(1)(B), challenged defendants' determination of their benefit eligibility. Section § 1132(a)(1)(B) provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The foregoing discussion indicates that both parties have asserted viable arguments in support of their interpretations of the Plans. Since plaintiffs' entitlement to benefits depends upon whether there was a "plant closing" within the meaning of the Plans, the standard of review applied to the defendants' construction of the term is crucial. Although ERISA does not itself set forth the appropriate standard of review for such actions, the Supreme Court has, in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 99 (1989), addressed the issue.

In that case, The Firestone Tire and Rubber Company ("Firestone") maintained a termination pay plan which provided severance benefits to employees laid off as a result of a "reduction in force." *Id.* at 105-06. Employees terminated subsequent to the sale of Firestone's Plastics Division sought severance pay benefits under the plan. *Id.* Determining that the sale did not constitute a "reduction in work force," Firestone denied those benefits, and the employees filed a class action under § 1132(a)(1). *Id.*

Noting that "ERISA abounds with the language and terminology of trust law," the Court applied trust law principles to determine the appropriate standard of review. *Id.* at 110. Generally, a court will defer to a trustee's reasonable interpretation where the trust document specifically grants the trustee the power to construe disputed terms. *See id.* at 111. In the absence of such a grant, however, courts "construe terms in trust agreements without deferring to either party's interpretation." *Id.* at 112. The Court therefore held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.

**\*4** The implication of the Court's holding is that, where a plan does grant an administrator discretionary authority, a court should apply a deferential standard of review. "Trust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers." *Id.* at 111 (citing Restatement (Second) of Trusts § 187 (1959)). Accordingly, "[a] trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." *Id.* (citing G. Bogert & G. Bogert, Law of Trusts and Trustees § 559, at 169-171).

Third Circuit cases subsequent to *Firestone* support the application of a deferential standard of review where a plan grants an administrator discretionary authority. "[T]he arbitrary and capricious standard [applies where] the plan contains provisions which give the administrator discretion in making eligibility determinations." *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 119 (3d Cir.1990). [FN9] The terms of the Plans thus determine the standard of review. The initial question is whether the Plans at issue vested discretionary authority in the administrator.

FN9. For examples of other cases applying a deferential standard of review to the benefit eligibility decisions of plan administrators, see *Epright v. Environmental Resources Management, Inc.,* 81 F.3d 335, 342-43 (3d Cir.1996); *Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 114 (3d Cir.1994); *Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1141 (3d Cir.1993); *Abnathya v. Hoffman-LaRoche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993); *Moats v. United Mine Workers of America Health and Retirement Fund,* 981 F.2d 685, 687 (3d Cir.1992); *Kotrosits v. GATX Corp. Non-Contributory Pension Plan For Salaried Employees,* 970 F.2d 1165, 1172-1173 (3d Cir.1992); *Nazay v. Miller,* 949 F.2d 1323, 1335 (3d Cir.1991).

Not Reported in F.Supp.                                                Page 4
Not Reported in F.Supp., 1996 WL 544230 (E.D.Pa.), Pens. Plan Guide (CCH) P 23927U
**(Cite as: 1996 WL 544230 (E.D.Pa.))**

Because plaintiffs assert benefit claims pursuant to both the Pension Plan and the Layoff Benefit Plan, I will consider the relevant provisions of each Plan. The Pension Plan names GE as the administrator, and provides that "the control and management of the operation and administration of the Plan shall be vested in a Pension Board." The Plan further states that:

> Any determination, decision or action of any Named Fiduciary or other entity having powers, duties, obligations and responsibilities with respect to the Plan concerning or with respect to any question arising out of or in connection with the construction, interpretation, administration and application of the Plan and of its rules and regulations, shall lie within the absolute discretion of such Named Fiduciary or other entity....

The plan specifically includes the Pension Board in the definition of a "Named Fiduciary," and this language unambiguously grants the Pension Board the right to interpret the terms of the Plan. In October 1994 and February 1995, the Pension Board considered plaintiffs' claims for benefits, and concluded that the SPCO shut-down did not constitute a "plant closing" within the meaning of the Plan.

The Layoff Benefit Plan provides that:

> the management and control of the operation and administration of the Plan shall be vested in the Company. The Company will solely make all determinations with respect to eligibility and benefits under this Plan and such determinations will be final and binding. Accordingly, the administration of any claims arising under the Plan, including the discretionary authority to interpret terms, review, pay or deny any claims and the provisions of a full and fair review of claims shall be vested exclusively in the Company. For purposes of the Act, the Company shall be the Administrator of the Plan.

**\*5** Under this Plan, the term "Company" refers to "General Electric Company and its affiliates." This provision, like its counterpart in the Pension Plan, unambiguously vests in GE absolute discretionary authority to interpret the Plan. In the instant case, the Company denied plaintiffs' claims for plant closing benefits under the Layoff Benefit Plan. Human Resources Manager P.W. Jarrosiak notified Plaintiff Tobin that, because the SPCO closing did not meet the Plan definition of a plant closing, Tobin would be ineligible for plant closing benefits. [FN10]

FN10. On these facts, the recent Third

Circuit opinion in *Moench v. Robertson, 62 F.3d 553 (3d Cir.1995),* is not controlling. In *Moench,* former employees alleged that their Employee Stock Option Committee's continued and exclusive investment in deteriorating employer stock constituted a breach of fiduciary duty. The Committee claimed that the plan mandated that it invest solely in employer stock. Although the plan did grant the Committee discretionary authority, the court declined to apply *Firestone's* arbitrary and capricious standard because it found no evidence that the Committee "actually deliberated, discussed or interpreted the plan in any formal manner." *Id.* at 567. In the instant case, however, the Pension Board and GE formally denied plaintiffs' claims, stating in writing that the decision was grounded in their construction of the term "plant closing" in the Plans. *Moench's* additional suggestion that some cases outside the purview of § 1132(a)(1)(B) may merit de novo review is also inapplicable on the facts here. *Id.* at 565. These plaintiffs assert only a claim for benefits pursuant to § 1132.

Despite this grant of broad discretionary authority to interpret the Plans and determine benefit eligibility, plaintiffs argue that the defendants' conflict of interests renders the deferential standard inapplicable. Although GE's dual role as sponsor and administrator of the Plans does inevitably create some conflict, I do not find that the conflict in this case mandates a heightened standard of scrutiny. The Court in *Firestone* stated that where "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " 489 U.S. at 115 (citing Restatement (Second) of Trusts § 187, comment d (1959)). As I read this language, the Court does not require a different standard of review in conflict situations, but merely indicates that any potential conflict is a factor to consider in an evaluation under the deferential standard.

Although such a deferential standard has been criticized as too unprotective of employee interests, I find nothing in *Firestone* to suggest that, where a Plan grants an administrator discretionary authority, any other factor--such as whether the plan is funded or unfunded or whether a conflict exists--can mandate a heightened standard of scrutiny. The court in *Abnathya v. Hoffman-LaRoche, Inc.* seems to

recognize that *Firestone* is controlling on this issue when it states: "[p]erhaps the Supreme Court will have an opportunity to reconsider this issue. Or perhaps Congress will consider amending ERISA to require more stringent review where an employer acts as its own plan administrator." 2 F.3d 40, 46 fn. 5 (3d Cir.1993). Until that time, I understand *Firestone* to require a deferential standard of review.

Accordingly, I will apply a deferential standard of review to the defendants' decision to deny plaintiffs' claims for plant closing benefits. In *Firestone,* the Court seems to refer to a reasonableness standard: "[a] trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." 489 U.S. at 111. Subsequently, the Third Circuit has referred to an arbitrary and capricious standard of review, under which "a district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Abnathya, 2 F.3d at 45 (quoting Adamo v. Anchor Hocking Corp., 720 F.Supp. 491, 500 (W.D.Pa.1989)). Regardless of the specific term used to describe the standard of review, I find that the defendants' decision can be considered neither unreasonable nor arbitrary and capricious.

**\*6** In *Moench v. Robertson,* the court cited a series of factors to consider in evaluating the reasonableness of an administrator's decision:

(1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

62 F.3d 553, 566 (quoting Cooper Tire & Rubber Co. v. St. Paul Fire & Marine Ins. Co., 48 F.3d 365, 371 (8th Cir.1995) (citations omitted)). These considerations indicate that the defendants' denial of plant closing benefits withstands judicial scrutiny. GE provides additional benefits to employees laid off pursuant to a plant closing at least in part to cushion the severe impact of the company's complete departure from a community. Because GE continued the P & C operations in Malvern, the defendants' interpretation of the Plans is consistent with the general rationale underlying enhanced plant closing benefits.

Plaintiffs argue that by failing to distinguish between a plant, service shop, or other facility, the defendants' interpretation renders the Plan language meaningless and inconsistent. [FN11] At most, however, defendants' construction renders the language redundant. The drafters of legal documents commonly include redundant or unnecessary terms to guard against potential loopholes. Plaintiffs do concede that defendants' interpretation does not conflict with any provision of ERISA. [FN12]

> FN11. Some possible differences among the terms "plant, service shop and other facility" could exist consistent with defendants' interpretation of the Plans. For instance, a "plant" often connotes a manufacturing operation, a "service shop" may refer to an equipment repair business, and an "other facility" could describe a laboratory testing site.

> FN12. Plaintiffs have, however, claimed that the Pension Board violated their procedural rights to a full and fair review, as guaranteed by ERISA § 503. 29 U.S.C. § 1133. In support of their position, plaintiffs cite Grossmuller v. International Union, 715 F.2d 853 (3d Cir.1983). In that case, the defendants terminated the plaintiff's disability benefits on the basis of a private investigator's report that the plaintiff was otherwise gainfully employed. Id. at 855. The court found that the defendants deprived the plaintiff of a full and fair review by failing to inform him of the evidence upon which they relied, by refusing to interview the plaintiff himself, and by violating past practices by allowing a third party, but not the plaintiff, to appear. Id. at 858. *Grossmuller,* however, is inapplicable on the instant facts. In contrast to *Grossmuller,* the Pension Board's decision here did not depend upon any factual determinations specific to these plaintiffs and their claims. Furthermore, the Pension Board provided plaintiffs with a written explanation of its decision to deny plant closing benefits, citing both Plan language and other factors in support of its position. *See* Plaintiffs' Amended Complaint, Exhibit C (letter from J.J. O'Brien, Secretary of the GE Pension Board, to plaintiffs' counsel). Plaintiffs' assertions that Frank Doyle influenced other Board members and that the Board members discussed the SPCO closing with other GE

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 544230 (E.D.Pa.), Pens. Plan Guide (CCH) P 23927U
**(Cite as: 1996 WL 544230 (E.D.Pa.))**

employees do not evidence the sort of unfairness deemed by *Grossmuller* to violate § 503.

Plaintiffs further contend that the defendants' interpretation of a "plant closing" has been inconsistent. They note that GE awarded plant closing benefits to employees laid off pursuant to the closing of an appliance plant in Milwaukee, even though GE continued other operations at the same site. I am satisfied, however, that undisputed factual differences between the Malvern and Milwaukee operations could reasonably justify the differing treatment. For instance, the Milwaukee operations were housed in different buildings, separated by a barbed wire fence, and were connected only by a tunnel kept locked at all times. The SPCO and P & C operations, in contrast, shared a single building. A common wall separated the two businesses, but employees of both operations had free access to the entire building through doors kept unlocked at all times.

Furthermore, GE did not provide plant closing benefits to unionized SPCO employees. Although this decision, and the union's failure to challenge it, are largely irrelevant to whether a plant closing in fact occurred, it does indicate that the defendants applied a consistent interpretation of the term "plant closing" to all aspects of the SPCO closing.

Finally, defendants' interpretation does not contradict the clear language of the Plans. In fact, plaintiffs' counsel admitted at oral argument that the Plan definition of a plant closing is ambiguous. [FN13] The Plans refer to a discontinuance of "all Company operations at any plant, service shop or other facility," but never define the terms plant, service shop, or facility. To clarify ambiguous terms, plan administrators may refer to extrinsic evidence, and the defendants here relied on both the Plan language and other evidence in reaching their decision. *See Epright v. Environmental Resources Management, Inc. Health and Welfare Plan, 81 F.3d 335, 339 (3d Cir.1996).*

FN13. Plaintiffs' counsel provided no clear definition of the terms, and suggested neither how a court should define the terms, nor what standards should be applied to determine whether a "plant closing" occurred. Plaintiffs' counsel suggested at oral argument that, as to Counts I and II, summary judgment should be granted in favor of plaintiffs.

*7 The Plan definition of plant closing specifically states that the term "do[es] not refer to the termination and discontinuance of only part of the Company's operations at any plant, service shop or other facility...." Because GE continued the P & C operation at the Malvern site, such language supports defendants' determination that the SPCO closing was a mere product line exit. Despite the ambiguity in the language, the most natural reading of this provision suggests that GE did not intend plant closing benefits to apply when it continued substantial manufacturing activities at the same location and in the same building.

Furthermore, the record provides evidentiary support for the defendants' characterization of the Malvern operation as a single facility housing separate product lines. One local bargaining unit represented the unionized employees of both businesses, and the operations shared certain common services, as well as an integrated job posting system. Although plaintiffs point to other facts which could conceivably justify a different conclusion, defendants' determination that the SPCO shutdown did not constitute a plant closing cannot be said to be unreasonable or arbitrary and capricious. Even considering the defendants' conflict of interests, I cannot conclude that their decision was unreasonable. Because defendants' position finds support in both the Plan language and the undisputed facts, it is not " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Abnathya*, 2 F.3d at 45 (quoting *Adamo v. Anchor Hocking Corp., 720 F.Supp. 491, 500 (W.D.Pa.1989).* [FN14] Defendants, therefore, are entitled to summary judgment on plaintiffs' claims for benefits pursuant to § 1132(a)(1)(B).

FN14. Accepting plaintiffs' suggestion at oral argument that Counts I and II are appropriate for summary judgment, I would find on the present record that, even under a de novo standard of review, the SPCO closing did not constitute a "plant closing" within the meaning of the Plans. Rather, GE eliminated one product manufactured at the site, while continuing other manufacturing operations.

## C. ERISA § 510 Claims

Plaintiffs further allege that Defendant GE and its CEO John Welch violated § 510 of ERISA by characterizing the SPCO closing as a product line exit rather than a plant closing. Section 510 provides

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 544230 (E.D.Pa.), Pens. Plan Guide (CCH) P 23927U
**(Cite as: 1996 WL 544230 (E.D.Pa.))**

that:

> [i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140.   To establish a prima facie case, plaintiffs must prove:   "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled."   *Gavlick v. Continental Can Co.,* 812 F.2d 834, 852 (3d Cir.), *cert. denied,* 484 U.S. 979 (1987).

 Plaintiffs here concede that, if the SPCO closing does not constitute a plant closing within the meaning of the Plans, the § 510 claim must fail.   As the forgoing discussion illustrates, plaintiffs cannot show that in denying the claims for plant closing benefits, the defendants wrongfully deemed the shutdown a product line exit.   In the absence of such wrongful or prohibited conduct, defendants are entitled to summary judgment on plaintiffs' claims arising under ERISA § 510.

### III. Conclusion

 **\*8** For the foregoing reasons, defendants' motion for summary judgment will be granted and judgment will be entered in favor of defendants on all claims remaining in plaintiffs' Amended Complaint.

 An appropriate order follows.

### ORDER

 For the reasons discussed in the accompanying memorandum, it is hereby ORDERED that Defendants' motion for summary judgment (filed document number 26) is GRANTED.

 IT IS FURTHER ORDERED that judgment is entered in favor of Defendants General Electric Company, John F. Welch, Jr., and GE Pension Trust, and against Plaintiffs William H. Tobin, Frank J. Canonico, III, Edward P. Doyle, Lars O. Eriksson, Dante E. Piccone, Kenneth R. Ricketts, Louis Trefz, Lawrence J. Willinger, and Gerald A. Woolf, on all claims.

Not Reported in F.Supp., 1996 WL 544230 (E.D.Pa.), Pens. Plan Guide (CCH) P 23927U

 **Motions, Pleadings and Filings (Back to top)**

• 2:95cv04003 (Docket) (Jun. 28, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.